**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**Central Division**

| | | |
|---|---|---|
| **STONE WORKS, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:21-CV-00941-JM** |
| | ) | |
| **RANDY SIMS, MEGAN SIMS;** | ) | |
| **WILLIAM THOMAS;** | ) | |
| **STONE CONCEPTS LLC;** | ) | |
| **MARTY HESCH; and EDWARD FRALEY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**PLAINTIFF'S RESPONSE TO THE MOTION FOR SUMMARY JUDGMENT OF DEFENDANT EDWARD FRALEY AND INCORPORATED BRIEF IN SUPPORT**</u>

COMES NOW Plaintiff, Stone Works, LLC, by and through undersigned counsel, Lassiter & Cassinelli and James, House, Swann, and Downing, pursuant to the Federal Rules of Civil Procedure, and for its Response to Motion for Summary Judgment of Defendant Edward Fraley and Incorporated Brief in Support, Plaintiff states the following:

**I.     INTRODUCTION**

As the Court well knows, summary judgment is only appropriate when there are no genuine issues of material fact. Defendant Edward Fraley appears to believe that simply because he drafted his own Statement of Uncontroverted Facts, that this is proper, ample evidence to support his motion for summary judgment. As seen in the evidence provided, as well as the affidavit of Plaintiff owner attached herein, Plaintiff disputes many of the assertions in Defendant Fraley's self-serving Statement of Uncontroverted Facts as well as his Declaration. See *Exhibit 4 – Affidavit of Rusty Ray* and *Plaintiff Statement of Controverted Facts*. Even more compelling, Fraley's own deposition testimony contradicts his own "Statement of Uncontroverted Facts." See

1

*Plaintiff Statement of Controverted Facts and Material Facts at Issue.*

For example, the second sentence of Fraley's brief proclaims that Fraley "never misappropriated any information or property belonging to Plaintiff." As detailed more fully below, Fraley's own sworn testimony is that he knew he improperly obtained Plaintiff's property and information and, although he wished he had never received it, he did – in fact – republish and resubmit the improperly, illegally received property to at least one third party, Centurion Chief Executive Officer Tim Pardue. Therefore, as a preliminary matter, there are numerous controverted issues of fact that preclude summary judgment, especially at such an early stage in litigation. See *Plaintiff Statement of Controverted Facts and Material Facts at Issue.*

Moreover, as a general rule, summary judgment is proper only after the nonmovant has had adequate time for discovery; nonmovants may request a continuance until adequate discovery has been completed if they otherwise cannot present facts sufficient to justify their opposition. This option exists to prevent a party from being unfairly thrown out of court by a premature motion for summary judgment. *See* Fed. R. Civ. P. 56(d).   The parties have just begun exchanging discovery in the last couple months. Because of events out of control of all counsel involved, the parties agreed to continue the litigation until the week of May 15, 2023. The Amended Scheduling Order sets a discovery deadline of February 6, 2023. Defendant Fraley now seeks for this Court to award summary judgment before the facts and allegations can be fully investigated, developed, and verified by the parties.  Only one deposition has been conducted to date, that of Defendant Fraley, and due to Defendant Fraley's sparse responses and improper objections, Plaintiff foresees the necessity of seeking Court intervention to compel Fraley to fully respond to Plaintiff's Interrogatories and Requests for Production. These two reasons alone are sufficient reason for the Motion for Summary Judgment to be denied.

## II.     BACKGROUND

Plaintiff is a stone veneer masonry business in Maumelle, Arkansas. In around 2005 or 2006, Plaintiff became a dealer and installer of Centurion Stone (hereinafter "Centurion"). Throughout the years, it became apparent that if Fraley became aware of any dealer, including Plaintiff, selling any stone besides Centurion, Fraley would spearhead a scheme to terminate that dealer's status and attempt to destroy that business. Over the course of several years, Fraley routinely bragged to Plaintiff's representatives that he would "smoke out" Plaintiff or other businesses who did not conduct business as he wished. See *Exhibit 4* – Affidavit of Rusty Ray. Upon information and belief, Fraley has engaged in similar behavior towards other businesses. During the spring of 2021, Centurion began delaying Plaintiff's orders of stone for months, causing delays in Plaintiff finishing jobs. Because of these delays, Plaintiff was forced to seek out other stone as a stop-gap measure in order to continue doing business. See *Plaintiff's Verified Complaint*.

During this time, unbeknownst to Plaintiff's owners, Defendants Randy Sims, Megan Sims, and William Thomas – all Plaintiff's employees - began secretly talking to Defendant Fraley. More specifically, in June 2021, Defendants Randy Sims and Megan Sims – while still employees of Plaintiff – began talking to Defendant Fraley; as Defendant Fraley testified that Randy Sims wanted to buy Centurion stone directly from Fraley. See *Exhibit 4* – Affidavit of Rusty Ray. In response to Defendant Sims – again, still employee of Plaintiff –- stating he wanted to buy stone directly from Defendant Fraley, Fraley did not bother informing Plaintiff that Plaintiff's employees were trying to buy stone directly from Fraley. See *Exhibit 1* – Fraley Deposition Transcript, Page 52, Lines 16 – 19. Instead, Fraley testified that he introduced Randy Sims to Defendant Marty Hesch. Defendant Fraley then traveled from Missouri to Jonesboro, Arkansas, where he met Defendant Marty Hesch. See *Exhibit 1* – Fraley Deposition Transcript, Pages 44 - 46. The two men

then traveled to Defendant Randy Sims' house in Benton, Arkansas, to secretly meet with Defendants Randy Sims and William Thomas. None of the Defendants ever informed any Plaintiff owners about this secret meeting. See *Exhibit 1* - Fraley Deposition Transcript, Pages 44 – 46. After their secret meeting, Fraley testified that Defendant Marty Hesch "said he didn't want to take a chance on selling them, so that's the end of the story." See *Exhibit 1* – Fraley Deposition Transcript, Page 44, Line 25 – Page 45, Line 2. Fraley testified that the secret meeting only lasted 20 minutes as "it don't take long for Marty to realize what he wanted to do or not." See *Exhibit 1* – Fraley Deposition Transcript, Page 47, Lines 8 – 9.

That was not, however, the "end of the story." Following Defendant Marty Hesch allegedly informing Fraley that he "did not want to chance" selling to Defendant Randy Sims, both Fraley and Hesch continued communicating with Randy Sims consistently from July 2021 through August 2021. See *Exhibit 2* – July 2021 Telephone Records for Randy Sims and *Exhibit 3* – August 2021 Telephone Records for Randy Sims. Defendant Hesch, whom Fraley represented was not comfortable selling to Sims, then – instead of declining to do business with Sims - formally hired Defendants Randy Sims and Megan Sims in August 2021, and, according to Fraley's testimony, put William Thomas "on some kind of assignment payroll." See *Exhibit 1* – Fraley Deposition Transcript, Page 55, Lines 8 – 9. Fraley's statements are self-serving and at odds with the conduct of both Fraley and Hesch in the days, weeks and months that followed the clandestine meeting, not to mention such an "end of story" conclusion defies logic when considering the events that followed.

On June 29, 2021, Defendant William Thomas sent Plaintiff's property, via text message, to Defendant Fraley. According to Fraley, he told William Thomas that it was a "bunch of bullshit" and that he "could get in a lot of trouble" after Thomas electronically sent Fraley Plaintiff's

property. Fraley also testified that he "knew it was wrong" for William Thomas to electronically send him Plaintiff's stolen property. See *Exhibit 1* - Fraley Deposition Transcript, Page 258. Despite admitting he knew it was wrong, Fraley republished and electronically resubmitted Plaintiff's stolen property by texting Plaintiff's property to Tim Pardue, CEO of Centurion Stone. See *Exhibit 1* - Fraley Deposition Transcript, Page 258. Fraley never once reached out to any of Plaintiff's owners to inform them of what Defendant Thomas had done. In hindsight, while in the middle of litigation, Fraley testified that he "should have" reached out and informed Plaintiff, "but I didn't." See *Exhibit 1* - Fraley Deposition Transcript, Page 259.

Instead, on August 12, 2021, over one month after secretly meeting with Defendants Marty Hesch, Randy Sims, Williams Thomas, and Megan Sims, after improperly and illegally receiving Plaintiff's stolen property electronically and republishing same, Fraley informed Plaintiff it would no longer serve as a Centurion dealer. See *Exhibit 4* – Affidavit of Rusty Ray. According to Fraley, the reasoning behind Plaintiff's termination as a dealer was as follows: Fraley informed Plaintiff's owner, Rusty Ray, that he had received a confidential document belonging to Plaintiff (a credit application from Plaintiff to another manufacturer and part of the confidential information illegally removed from Plaintiff's files and computer systems) which indicated to him that Plaintiff was selling Centurion's competitor's products. See *Exhibit 4* – Affidavit of Rusty Ray. When he was asked how he received the document, Fraley refused to answer and stated that he "it just showed up on my phone." See *Exhibit 4* – Affidavit of Rusty Ray. Fraley indicated that due to his belief that Plaintiff would be selling a competitor's product, Plaintiff would no longer be permitted to purchase Centurion Stone products from the factory and would in the future have to buy at a higher price from Stone Concepts, LLC, owned by Marty Hesch, who buys Centurion Stone products for resale – and who had just recently employed Defendants Thomas and Megan and Randy Sims and

just days after they suddenly quit at Stone Works on or about August 5 and 6, 2021, respectively. See *Plaintiff's Verified Complaint*.

Moreover, a review of Defendant Randy Sims's cell phone records reveals that Defendants Fraley and Randy Sims had telephone calls and text messages on the following critical dates, shortly after the clandestine meeting and the exchange of Plaintiff's business information, and up to the day Randy Sims, Megan Sims, and William Thomas left Plaintiff's employ:

- August 5, 2021: 12:19 p.m. CST: Fraley and Randy Sims talk for 16 minutes.

- August 5, 2021: 12:14 p.m. CST: Fraley and Randy Sims talk for 5 minutes.

- August 4, 2021: 8:47 p.m. CST: Fraley and Randy Sims send text messages.

- August 4, 2021: 7:45 p.m. CST: Fraley and Randy Sims talk for 1 minute.

- August 3, 2021: 4:05 p.m. CST: Fraley and Randy Sims talk for 9 minutes.

- August 3, 2021: 3:29 p.m. CST: Fraley and Randy Sims talk for 1 minute.

- August 3, 2021: 10:36 a.m. CST: Fraley and Randy Sims talk for 11 minutes.

- July 30, 2021: 5:31 p.m. CST: Fraley and Randy Sims talk for 10 minutes.

- July 30, 2021: 5:18 p.m. CST: Fraley and Randy Sims talk for 1 minute.

- July 22, 2021: 9:04 a.m. CST: Fraley and Randy Sims talk for 6 minutes.

- July 8, 2021: 6:50 a.m. CST: Fraley and Randy Sims talk for 1 minute.

- July 7, 2021: 4:30 p.m. CST: Fraley and Randy Sims talk for 1 minute.

- July 2, 2021: 3:05 p.m. CST: Fraley and Randy talk for 15 minutes. (See *Exhibit 2* and *Exhibit 3* – Randy Sims July 2021 and August 2021 Telephone Records)

Notably, Fraley has attempted - through his disingenuous declaration - to completely avoid the fact that he had 12 (twelve) telephone conversations with Defendant Randy Sims, all in the

lead up to Fraley terminating Plaintiff as a Centurion dealer.  These secret telephone calls totaled 76 minutes in time. Even more conveniently and quite curiously, in his own testimony Fraley does not recall a single detail from any of these telephone calls with Defendant Randy Sims. All these secret telephone calls between Fraley and Sims were conducted following the clandestine meeting at Randy Sims' residence that included all Defendants. Defendant Randy Sims was also communicating regularly with a number associated with Defendant Marty Hesch during this time. That telephone number is 870-761-8282. See *Exhibit 2* and *Exhibit 3* –  Randy Sims July 2021 and August 2021 Telephone Records. As set forth above, Defendant Fraley wholly withheld from this Court that he had a secret meeting with other separate Defendants, and that he kept in regular contact with Defendant Randy Sims – still a Plaintiff employee at the time – all in the leadup to Plaintiff's termination as a Centurion dealer.

### III.    SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56, "a party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. Pro. 56(a)*.

"Summary judgment is only appropriate if the evidence viewed in this manner demonstrates that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Smith v. Insley's Inc.*, 499 F.3d 875, 879 (8th Cir. 2007). While Rule 56 is a useful tool whereby needless trials may be avoided, nevertheless there are stringent limitations on its use.  *Robert Johnson Grain Co. v. Chemical Interchange Company*, 541 F.2d 207 (8th Cir. 1976). In *Johnson Grain Co.*, the Eighth Circuit cited with approval the earlier Eighth

Circuit decision in *Windsor v. Bethesda General Hospital*, 523 F.2d 891 (8th Cir. 1975), wherein it noted (523 F.2d at 893, n. 5) that summary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances. In passing upon a motion for summary judgment, the court is required to view the facts in the light most favorable to the party opposing the motion and to give to that party the benefit of reasonable inferences to be drawn from underlying facts. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 153-59 (1970); *United States v. Diebold, Inc.*, 369 U.S. 654 (1962); *Percival v. General Motors Corp.*, supra.

## IV.    ARGUMENT

### A.    Granting summary judgment is premature at this time, given that discovery is ongoing.

As a general rule, summary judgment is proper only after the nonmovant has had adequate time for discovery, and pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, a continuance may be granted the nonmovant to permit adequate discovery to be completed. This protects nonmovants from premature motions for summary judgment.

Here, the parties have begun discovery but it is far from complete. See *Exhibit 5* – Rule 56(d) Affidavit of Timothy Giattina. Defendant Fraley has not yet provided his materials in response to Requests for Production,[1] and the Defendants Sims and Thomas have not provided responses to any discovery. Depositions of the defendants are being scheduled, as at least Defendant Hesch requested to cancel and reschedule his deposition that was previously set in

---

[1] Plaintiff has submitted written discovery to Fraley and given Fraley's responses to interrogatories and failure to product a single production document, Plaintiff foresees the necessity of Court intervention to compel this discovery.

April. Defendant Fraley would have it that this Court rely solely on his word, despite his own contradictions and the self-serving nature of his declaration. While ample, sufficient facts have been presented to defeat summary judgment, there will be substantially more sworn testimony and documentary proof developed in the coming months as discovery proceeds. See *Exhibit 5* – Rule 56(d) Affidavit of Timothy Giattina. As discovery progresses, Plaintiff anticipates it may request leave of the court to amend its complaint to state additional claims or join additional defendants to this case.  Per the scheduling order, the deadline to amend pleadings is not until January 5, 2023, the discovery deadline is not until February 6, 2023, and trial isn't scheduled to begin until the week of May 15, 2023.  Thus, this request for summary judgment is premature and the Court should defer or deny the motion and allow time for discovery to proceed.

**B.    Defendant Fraley exercised dominion and control over Plaintiff's property, in addition to republishing Plaintiff's property to third parties.**

Defendant Fraley is correct that Arkansas courts have found that "to establish liability for the tort of conversion, a plaintiff must prove that the defendant wrongfully committed a distinct act of dominion over the property of another, which is a denial of, inconsistent with, the owner's rights." Here, Defendant Fraley's *own words* establish that he knew he was wrongfully in possession of Plaintiff's property, that he never disposed of but instead republished and resubmitted Plaintiff's property to a third party, and that he wholly failed to inform Plaintiff that he had control of Plaintiff's property until he terminated them as a Centurion dealer. It is disingenuous for Defendant Fraley to represent to this Court – as he does in his Motion for Summary Judgment – that he did not commit any "distinct act of dominion" over Plaintiff's property, as he exercised control over the property and sent it to the third parties, while finally informing Plaintiff that he possessed their property when he used it as an excuse to terminate

Plaintiff as a Centurion dealer. Moreover, as explained in Subsection E below, Defendant Fraley

is liable to Plaintiff for the other Defendants' acts of conversion on the basis of civil conspiracy

and acting in concert.  For these reasons, Defendant Fraley's Motion for Summary Judgment as to

Count I should be denied.

### C.    Fraley had knowledge of Plaintiff's business and jobs and purposefully worked to intentionally interfere with Plaintiff's business expectancy.

Under Arkansas law, the elements of tortious inference are:

> (1) the existence of a valid contractual relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Baptist Health v. Murphy*, 373 S.W.3d 269, 281 (Ark. 2010), *citing K.C. Props. Of N.W. Ark., Inc.*

*v. Lowell Inv. Partners, LLC*, 280 S.W.3d 1, 11 (Ark. 2008).  Arkansas law "also requires that

the conduct of the defendants be at least 'improper . . .'." *Id*. In determining whether conduct is

improper, the factors to be considered include:

> (a) the nature of the actor's conduct,
> (b) the actor's motive,
> (c) the interests of the other with which the actor's conduct interferes,
> (d) the interests sought to be advanced by the actor,
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
> (f) the proximity or remoteness of the actor's conduct to the interference and the relations between the parties.

Rest. (2d) Torts, § 767; *Baptist Health*, 373 S.W.3d at 282. Further, "Arkansas law provides that

the defendant must have *either* desired to bring about the harm to the plaintiff or have known that

the result was substantially certain to be produced by his conduct." *J.D. Fields & Co.,* 976 F. Supp.

2d 1051, 1066 (E.D. Ark. 2013) (*citing Baptist Health*, 373 S.W.3d at 282).

Whether Fraley worked directly for Plaintiff is irrelevant to a claim of tortious interference with business expectancy. Moreover, as Fraley testified, he was not an employee of Centurion and rather an independent contractor. Therefore, he was aware of any business expectancy or agreement between Centurion and Plaintiff and he held no privileged basis to interfere. Plaintiff had a business expectancy in that Plaintiff had been the main dealer of Centurion stone in central Arkansas for over a decade. Fraley was well-informed as to Plaintiff's ongoing jobs as he worked sometimes as a liaison between Stone Works and Centurion. Just in the short time since Fraley and Centurion terminated Plaintiff as a Centurion dealer, Plaintiff has lost jobs and suffered losses. See *Exhibit 4* – Affidavit of Rusty Ray.

Even more compelling, Defendant Stone Concepts, who was installed by Fraley as the Centurion dealer for Central Arkansas, is working on residential masonry jobs in the Mountain Terrace subdivision in Maumelle, Arkansas. See *Exhibit 4* – Affidavit of Rusty Ray. Plaintiff had worked the Mountain Terrace subdivision since 2005, after Plaintiff became a Centurion dealer. Since being terminated by Fraley, Plaintiff has not done any jobs in the Mountain Terrace subdivision.

Furthermore, as explained in Subsection E below, Defendant Fraley's liability arises not only from his own conduct but also that of his co-conspirators for their acts of tortious interference in furtherance of the civil conspiracy and acting in concert. For these reasons, Defendant Fraley's Motion for Summary Judgment as to Count II should be denied.

D.     **Fraley knowingly obtained trade secrets of Plaintiff, retained and exercised control of Plaintiff's trade secrets, and republished trade secrets to third parties.**

As Plaintiff highlighted, the DTSA "creates a private right of action for an owner of a trade secret when that secret has been misappropriated . . ." *Pitts v. Fire Extinguisher Sales & Services*

*of Ark., LLC*, No. 4:21- cv-00075-LPR, 2021 WL 4860812, at *8 (E.D. Ark. 2021). The DTSA

defines "trade secret" as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> > (A)  the owner thereof has taken reasonable measures to keep such information secret; and
> >
> > (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

18 U.S.C. § 1839(3). The term "misappropriation" is defined under the DTSA as:

> (A)  acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B)  disclosure or use of a trade secret of another without express or implied consent by a person who—
>
> > (i) used improper means to acquire knowledge of the trade secret;
> > (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was--
> > > (I) derived from or through a person who had used improper means to acquire the trade secret;
> > > (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
> > > (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
> >
> > (iii) before a material change of the position of the person, knew or had reason to know that--
> > > (I) the trade secret was a trade secret; and
> > > (II) knowledge of the trade secret had been acquired by accident or mistake;

18 U.S.C. § 1839(5).

Under a plain reading of the statute, Plaintiff's financial information included in the credit application that was stolen by Defendant-Employees constitutes a trade secret. Plaintiff kept the credit application in a central office that was only accessible by Plaintiff's owners and employees. Defendants very conduct in stealing and sending the credit application, and the subsequent failure of Fraley to inform Stone Works that their employees were sending him confidential information and to instead use it to Plaintiff's disadvantage, shows that all Defendants knew that their conduct was - at the very least - improper.

Fraley was well-aware that his acquisition of Plaintiff's property was acquired via improper means. Moreover, not only did Fraley acquire Plaintiff's property via improper means, he then went so far as to disclose and publish this improperly obtained trade secrets to third parties. Fraley knew it was wrong and testified – under oath – that he knew it was improper to obtain Plaintiff's property, continue to possess it, and subsequently submit it and republish it to at least one third party, Centurion Chief Executive Officer Tim Pardue.

And again, as explained in Subsection E below, Defendant Fraley's liability arises not only from his own conduct but also that of his co-conspirators for their overt acts of misappropriation in furtherance of the civil conspiracy and acting in concert. For these reasons, Defendant Fraley's Motion for Summary Judgment as to misappropriation of trade secrets should be denied.

**E.     Fraley assisted Defendant-Employees in carrying out their scheme to obtain Plaintiff's property, to terminate Plaintiff as a Centurion dealer, to steal Plaintiff's customers, and to destroy Plaintiff's business, as evidenced by his uncontroverted conduct.**

As set forth above, Defendant Fraley – by his own testimony and uncontroverted telephone records – engaged in secret dealings and conduct with all other Defendants in the weeks prior to terminating Stone Works as a Centurion dealer. In June 2021, Fraley traveled from

Missouri to Jonesboro, Arkansas, where he and Defendant Marty Hesch then traveled to Benton, Arkansas, where the two men held a secret meeting with Defendant-Employees while said Defendants were still employees of Stone Works. Fraley also had 12 (twelve) telephone calls with Defendant Randy Sims totaling 76 (seventy-six) minutes, all in the leadup to the Defendant-Employees leaving Plaintiff's employ and Fraley and Centurion terminating Stone Works as a Centurion dealer.

Arkansas courts are clear: "A civil conspiracy is an intentional tort which requires a specific intent to accomplish the contemplated wrong." *Faulkner v. Arkansas Children's Hosp.*, 69 S.W.3d 393, 406 (Ark. 2002) (citations omitted). "To prove a civil conspiracy, a plaintiff must show that two or more persons have combined to accomplish a purpose that is unlawful or oppressive or to accomplish some purpose, not in itself unlawful, oppressive or immoral, but by unlawful, oppressive or immoral means, to the injury of another." *Id*. "A civil conspiracy is not actionable in and of itself, but a recovery may be had for damages caused by acts committed pursuant to the conspiracy." *Id*. "A plaintiff alleging a claim for civil conspiracy must state a prima facie case for the underlying tort in order to support a conspiracy claim." *Tuohey v. Chenal Healthcare, LLC*, 173 F. Supp. 3d 804, 812 (E.D. Ark. 2016). "A conspiracy may be shown by direct evidence of an actual agreement or understanding between conspirators, but it may also be shown by circumstantial evidence." J*.D. Fields & Co.*, 976 F. Supp. 2d at 1070(*quoting Mason v. Funderburk*, 446 S.W.2d 543, 548 (Ark. 1969)).

The Arkansas Court of Appeals stated, in a case involving civil conspiracy:

> It also may be inferred from actions of alleged conspirators, if it be shown that they pursued the same unlawful object, each doing a part, so that their acts, although apparently independent, are in fact connected and cooperative, indicating a closeness of personal association and a concurrence of sentiment. *Wilson v. Davis,* 138

> Ark. 111, 211 S.W. 152; *Stewart v. Hedrick,* 205 Ark. 1063, 172
> S.W.2d 416; *Chapline v. State, supra.* Any act done or declaration
> made by one of the conspirators in furtherance, aid or perpetration
> of the alleged conspiracy may be shown as evidence against his
> fellow conspirators. *Wilson v. Davis, supra; Chapline v. State,
> supra.*

*SeaChange Int'l, Inc. v. Putterman,* 79 Ark. App. 223, 229, 86 S.W.3d 25, 28 (Ark. 2002).

Defendants in the instant matter deny both the conspiracy allegations and any wrongdoing which

could rise to a conspiracy. Fraley's own testimony, however, has already demonstrated that they

meet the requirements for a conspiracy as laid out above in *SeaChange. Id.* The steps Defendants

took in creating and furthering this conspiracy, include but are not limited to the following actions:

- Defendant Fraley traveled from Missouri to Jonesboro, Arkansas to meet
  Defendant Marty Hesch;

- Defendants Fraley and Hesch then traveled to Bryant, Arkansas to meet with
  Defendant-Employees;

- More than twelve (12) phone calls between Defendant Fraley and Defendant Randy
  Sims;

- Defendant Fraley's statements that he would "smoke out" Plaintiff or other
  businesses who did not conduct business to his liking;

- Defendant Fraley's introduction of Defendant-Employees to Defendant Hesch;

- Defendant Thomas's transmission of trade secrets via text message to Defendant
  Fraley;

- Defendant Fraley's possession of this illegally obtained trade secret;

- Defendant Fraley's refusal to inform Plaintiff about this illegally obtained property;

- Defendant Fraley's republishing of this property to the CEO of Centurion Stone;

- Defendant-Employee's false statements to customers of Plaintiff regarding the state of their business.

As discussed in *SeaChange,* these individual actions are connected and cooperative, furthering a common goal between all Defendants. In examining whether a genuine issue of material fact exists in this case, the Court needs to look no further than Fraley's own "Statement of Uncontroverted Facts," which has been conveniently drafted so as to support his narrative. As has been previously brought to this Court's attention in the instant Response, Defendant Fraley's own deposition testimony and his pre-litigation conduct contradicts his self-serving declaration and "Statement of Uncontroverted Facts". As Fraley has controverted his own statements, summary judgement should be denied.

In *SeaChange,* the Court found that "Putterman's and Siegel's credibility was sufficiently questionable to raise a genuine issue of material fact. The obvious doubtfulness of the moving party's supporting evidence, including the credibility of an affiant can create a genuine issue of material fact for a jury. Further, Putterman's and Siegel's denials of having conspired together do not render the issue undisputed." *Id.* at 229.

Defendant Fraley has called his own credibility into question by submitting known falsities to this Court, raising a genuine issue of material fact. Examining the totality of the circumstances, the finder of fact could easily infer that Defendant Fraley's communications and interactions with the Defendant-Employees were not the result of mere happenstance, but rather part of a calculated and coordinated campaign by which Defendants were participating in a civil conspiracy to harm Plaintiff. Unfortunately for Defendants, simply denying the existence of a conspiracy does not render the issue resolved. As a genuine issue of material fact has been raised regarding the credibility of Defendants, summary judgment is precluded on the issue of civil conspiracy.

**F.     Defendant Fraley took control of the credit application and assisted and conspired with Defendant-Employees in their scheme to steal Plaintiff's property.**

Defendant Fraley fundamentally misunderstands the notion of a civil conspiracy of upon which acts parties can be held liable. To that point, Arkansas courts have found that "even though a person may not be liable as a direct actor in interfering with a contract, he may be liable as a participant in a conspiracy which results in one or more overt acts constituting actionable interference." *Lane v. Chowning*, 610 F.2d 1385 (8th Cir. 1979).

Simply because Fraley states – in his self-serving declaration - that he received an "unsolicited" text message from Defendant William Thomas, this does not make this an uncontroverted fact. It is already clear from Defendant Fraley's *own testimony* that his conduct – in an of itself – puts into controversy whether he received unsolicited text messages.

The following is truly uncontroverted evidence: Defendant Fraley, Defendant Hesch, and Defendant-Employees all held a clandestine meeting in late June 2021 at the home of Defendant Randy Sims. Following the meeting, Fraley and Hesch communicated regularly with Defendant Randy Sims. Following the meeting, Fraley received Plaintiff's property and confidential information from Defendant-Employee William Thomas. Fraley did not inform Plaintiff owners he had received said property and that he knew it was wrong to possess Plaintiff's property and confidential information. Fraley continued exercising control over said property, and Fraley forwarded Plaintiff's property and confidential information to a third party at Centurion. On August 5th, 2021, after all above uncontroverted events occurred, Defendant-Employees caused to be removed or copied from Plaintiff's computers proprietary information and business property, on the same day Defendant-Employees quit working for Plaintiff.  See *Exhibit 4* – Affidavit of

Rusty Ray. Fraley then finally informed Plaintiff they would be terminated as a Centurion dealer on August 12, 2021.

Fraley appears to assert that because he was not on Plaintiff's property or he did not personally download electronic information, that those respective claims against him cannot survive. This is incorrect. Whether on the basis of Fraley's own actions or those of his co-conspirators, there remain genuine issues of fact regarding the claims against Defendant Fraley for Unauthorized Computer Program Access and Theft, theft of property, and unauthorized access to property, and as such, summary judgment should be denied.

## G.      Fraley engaged in behavior designed to be remedied by the ADTPA, and Plaintiff suffered financial loss attributable to Fraley's acts.

 Defendant Fraley argues that the Arkansas Deceptive Trade Practices Act (ADTPA), protects only consumers and does not apply to the facts as alleged by the plaintiff. This point of view, however, was rejected in *Electrocraft Ark. v. Super Electric Motors*, in which Judge Susan Webber–Wright recognized that the ADTPA specifically states that it was designed to protect the legitimate business community as well as consumers. *Vanoven v. Chesapeake Energy Corp.*, 2011 WL 1042251 (citing *Electrocraft Ark. v. Super Electric Motors,* 2009 U.S. Dist. LEXIS 120183, 70, 2009 WL 5181854 U.C.C. Rep. Serv.2d (Callaghan) 716 (E.D. Ark. Dec 23, 2009) Additionally, the act provides a cause of action to a "person" suffering damage from an unconscionable, false, or deceptive act or practice. Ark.Code Ann. §§ 4–88–105(c), 4–88–113(f). Within the context of the ADTPA, person is defined in Ark.Code. Ann. § 4–88–102(5) as an "individual, organization, group, association, partnership, corporation, or any combination of them." Accordingly, by its plain terms, the ADTPA protects the business community at large,

providing its members with a broad cause of action to remedy harms suffered from deceptive or unconscionable conduct. *Id.*

Courts in the Western District of Arkansas have also noted that "even though it may initially seem or appear that the ADTPA does not apply to non-consumers, the plain and unambiguous language of the ADTPA is controlling, *K.C. Properties of N.W. Arkansas, Inc. v. Lowell Inv. Partners, LLC*, 373 Ark. 14, 19–20, 280 S.W.3d 1, 7 (2008), and in that regard, the ADTPA makes clear that (1) the Act is meant to protect both the consumer public and the legitimate business community, see Ark.Code Ann. § 4–88–105(c) (Act creates Consumer Protection Division to protect legitimate business community and the general public as consumers), and (2) Ark.Code Ann. § 4–88–113(f) allows a cause of action for any person who suffers damages as a result of an unconscionable, false or deceptive act or practice in business, commerce, or trade, with "person" being defined in Ark.Code Ann. § 4–88–102(5) as an "individual, organization, group, association, partnership, corporation, or any combination of them." *Electrocraft Arkansas, Inc. v. Super Electric Motors, Ltd.*, 2009 WL 5181854.

Defendant Fraley's assertion that the ADTPA does not pertain to Plaintiff is unavailing. Plaintiff is contemplated within the ADTPA as a party whom can seek redress. Defendant incorrectly states that Plaintiff is not a consumer for the purposes of the ADTPA. The statute specifically envisions parties situated like Plaintiff as parties protected under the ADTPA. Finally, Plaintiff has lost jobs and customers since the scheme was carried out by Defendants, and this translates into actual financial harm suffered by Plaintiff. As such, summary judgment on Count IX of Plaintiff's Complaint is improper and should be denied.

**H.      Defendant Fraley is not entitled to summary judgment on Plaintiff's claim for unjust enrichment because he and the other Defendants have received the value of Plaintiff's misappropriated trade secrets, customers, and supply line at no benefit to Plaintiff.**

In order for a Court to determine a party has been unjustly enriched, "a party must have received something of value to which he or she is not entitled and which he or she must restore." *Robbins v. Lemay,* 2021 Ark. App. 436, 4 (2021). By Defendant Fraley's own admission, he obtained property from Defendant Thomas in an improper manner and knew that this action was inappropriate. See *Exhibit 1* - Fraley Deposition Transcript, Page 258.

As established both in the instant response and Plaintiff's complaint, Plaintiff's confidential and proprietary information, including computer data, customer information, financial information, employee files, and more, are "trade secrets" because they constitute information which Plaintiff derives independent economic value from the information which is generally not known to or readily accessible by proper means or by other persons who could obtain economic value from its disclosure or use. Plaintiff took several steps to protect its trade secrets, including but not limited to, password protected systems and limiting access to certain employees. In *R.K. Enterprises,* the Supreme Court upheld a lower Court's ruling that a defendant benefitted from the misappropriation of trade secrets. *R.K. Enterprises, LLC v. Pro-Comp Mgmt., Inc.,* 372 Ark. 199, 272 S.W.3d 85 (2008*)*.

*R.K. Enterprises* involves a company (Pro-Comp Management, Inc., d/b/a The Right Solutions, hereinafter known as "TRS"), who provided nursing care services to medical care facilities. R.K. Enterprises, LLC, d/b/a Nationwide Nurses (hereinafter known as "Nationwide") was a business which also provided travel nurses to different medical facilities. Founders and employees of Nationwide had previously been employed by TRS, and after leaving TRS, formed

Nationwide. Upon an investigation, TRS learned that these former employees had removed confidential documents and utilized a software exclusive to TRS. In *R.K. Enterprises,* the Supreme Court established that "the correct measure of damages on the issue of unjust enrichment is the fair market value of the trade secrets. This value represents the benefit that Nationwide has received by avoiding the payment of this value in order to obtain this information." *Id.* at 203.

Prior to severing employment with Plaintiffs, Defendant-Employees worked together, as well as with Defendant Fraley in a conspiracy to remove and share trade secrets belonging to Plaintiff. Defendant-Employees participated in tortious actions which removed confidential business information from Plaintiff, including but not limited to client lists and design and bid information. See *Plaintiff's Verified Complaint*. Defendants were able to use these trade secrets without paying Plaintiffs for them. This utilization lead to the following benefits to Defendants:

- Defendant Fraley's compensation is dependent on the amount of stone veneer he is able to sell for Centurion, and he utilized Plaintiff's client list to expand his business;

- Defendant Fraley directly utilized the credit application obtained improperly from Defendant Thomas to ensure that Plaintiff had to purchase their products from Stone Concepts, LLC rather than directly, causing higher prices for Plaintiffs equaling lower profit, while simultaneously creating revenue for Stone Concepts, LLC;

- Defendant Fraley passed the above-mentioned application along to Centurion, who then required upfront payment by Plaintiff for all materials, a practice which they had not before participated in, which caused lost revenue and longer wait times for materials;

- Defendant-Employees utilized the afore-mentioned misappropriated trade secrets to secure employment with Stone Concepts, who was then able to utilize the bid information and client lists to generate additional revenue.

Defendant Fraley, through misappropriating trade secrets, not only received a direct monetary benefit through his actions, but schemed with other Defendants to confer mutual benefits, thereby unjustly enriching themselves at Plaintiff's expense. The same steps of the conspiracy as set forth above, were utilized to unjustly enrich all Defendants. While it is well-established that civil conspiracy is not a claim on its' own, it appears in the instant case as a thread that ties the actions of Defendants together in each respective count.

Defendant Fraley claims that he received no benefits from any of his tortious actions. However, Plaintiff has not been given an opportunity to vet this assertion through the discovery process.   Defendant Fraley's credibility has been shown to be questionable throughout the pendency of this case. There are numerous inconsistencies between his own testimony under oath, his pre-litigation conduct, and the pleadings he has filed with this Court. It is unfathomable that any of the Defendants would have taken any of these steps or practiced the conduct in question with no benefit to themselves. Defendant Fraley directly used misappropriated trade secrets and other Plaintiff information obtained via a conspiracy with other Defendants to unjustly enrich himself. As numerous genuine issues of material fact remain before the Court and for the additional foregoing reasons, summary judgment should be denied.

I.      **Summary judgment on Count XII is precluded because there is substantial evidence of actual or inferred malice to support an award of punitive damages.**

As explained above, there are genuine issues of material fact that must be resolved at trial by a jury to determine Defendant Fraley's liability for compensatory damages on the preceding

counts.  Consequently, Defendant Fraley is not entitled to summary judgment on Plaintiff's claim for punitive damages on the alleged basis that he is not liable to Plaintiff for compensatory damages.

Defendant Fraley is further precluded from summary judgment on Count XII because there is substantial evidence of actual or inferred malice to support an award of punitive damages. "[M]alice is not necessarily personal hate; it is, rather, an intent and disposition to do a wrongful act greatly injurious to another." *In re Prempro Prod. Liab. Litig.*, 586 F.3d 547, 571 (8th Cir. 2009) (quoting *Yeakley v. Doss*, 370 Ark. 122, 257 S.W.3d 895, 899 (2007)).  Malice can be inferred from either a conscious indifference to or from a reckless disregard of the consequences of one's actions.  *Stein v. Lukas*, 308 Ark. 74, 78, 823 S.W.2d 832, 834 (1992).  Even when "no individual's health or safety [is] compromised[,] . . . infliction of economic harm may warrant substantial exemplary damages under the right circumstances." *Holiday Inn Franchising, Inc. v. Hotel Assocs., Inc.*, 2011 Ark. App. 147, 22, 382 S.W.3d 6, 19 (citing *Allstate Ins. Co. v. Dodson*, 2011 Ark. 19, at 29-30, 376 S.W.3d 414, 432-433). "Even if the underlying intent of the defendant is to enrich himself, rather than to harm the plaintiff, punitive damages may be appropriate." Brill, Arkansas Law Of Damages § 9:2.

From the evidence presented, a jury could reasonably infer that Defendant Fraley and the remaining Defendants conspired to "smoke [Stone Works] out" so that they could enrich themselves; that in furtherance of that conspiracy, Defendant Fraley refused to supply Stone Works with the materials it needed to perform its work, forcing Stone Works to attempt to procure them from other suppliers, and thereby manufacturing grounds to terminate Stone Works as a Centurion dealer and enabling Defendant Fraley to assign the territory to Defendants Marty Hesch and Stone Concepts. A jury could also infer that Defendant Fraley's meetings and communications with other

Defendants leading up to Plaintiff's ouster as a Centurion dealer were in furtherance of a conspiracy. There is substantial evidence from which a reasonable jury could conclude that Defendant Fraley knew or ought to have known, that his tortious conduct and that of his co-conspirators would naturally and probably result in serious financial injury to Plaintiff, and that Defendant Fraley continued such conduct in reckless disregard of those consequences. For these reasons, Defendant Fraley's Motion for Summary Judgment as to Count XII should be denied.

## V.     CONCLUSION

There are genuine issues of material fact precluding summary judgment in Defendant Fraley's favor.  Perhaps more importantly, his Motion is a premature effort to stymie the discovery process and should be denied or deferred until the parties have fully completed the discovery process.

WHEREFORE, Plaintiff respectfully requests this Court deny Separate Defendant Edward Fraley's Motion for Summary Judgment; or in the alternative, that this Court defer ruling upon Defendant Fraley's Motion for Summary Judgment until after the discovery deadline of February 6, 2023; for their attorneys' fees and costs; and for any and all proper relief to which they are entitled.

Respectfully submitted,

STONE WORKS, LLC

BY:     */s/ Timothy J. Giattina*
Timothy J. Giattina
Lassiter & Cassinelli
300 S. Spring St., Suite 800
Little Rock, Arkansas 72201
Ph: 501.370.9300
Fax: 501.370.9306
tim@lcarklaw.com

*Attorney for Plaintiff*

and

/s/ Erin Cassinelli
Erin Cassinelli
ABN 2005118
erin@lcarklaw.com
LASSITER & CASSINELLI
300 S. Spring St., Suite 800
Little Rock, AR 72201
(501) 370-9306
*Attorney for Plaintiff*

and

/s/ Patrick R. James
Patrick R. James
James House Swann & Downing P.A.
Post Office Box 3585
Little Rock, AR 72203-3585
501-372-6555
pjames@jamesandhouse.com

## **CERTIFICATE OF SERVICE**

I, Timothy J. Giattina, do hereby certify that a copy of the foregoing has been served, on the following counsel of record via electronic filing on this 10th of June, 2022:

Dustin McDaniel
Scott Richardson McDaniel
Wolff & Benca, PLLC
1307 West Fourth St. Little Rock, AR 72201
scott@mwbfirm.com
*Attorneys for Stone Concepts, LLC And Marty Hesch*

Daniel R. Carter
James & Carter, PLC
500 Broadway, Suite 400 Little Rock, AR 72201
dcarter@jamescarterlaw.com
*Attorney for Defendant Edward Fraley*

Jason C. Smith
AR #2006103
2144 E. Republic Road, Suite. B300
Springfield, Missouri 65804
(417) 888-1000
(417) 881-8035 (facsimile)
jcsmith@spencerfane.com
*Attorney for Defendant Edward Fraley*

Harry E. "Bud" Cummins
AR #89010
The Law Offices of Bud Cummins
1818 N. Taylor St. #301 Little Rock, AR 72207
bud@budcumminslaw.com
*Attorney for Defendant Edward Fraley*

Via Email To Pro Se Parties Randy Sims, Megan Sims, and William Thomas

*/s/ Timothy J. Giattina*
Timothy J. Giattina