```
1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF ARKANSAS
2                        CENTRAL DIVISION
3
4     STONE WORKS, LLC,          )
                                 )
5                 Plaintiff,     )
                                 )
6     v.                         )
                                 ) No. 4:21cv941 JM
7     RANDY SIMS, MEGAN SIMS,    )
      WILLIAM THOMAS, STONE      )
8     CONCEPTS, LLC, MARTY       )
      HESCH AND EDWARD           )
9     FRALEY,                    )
                                 )
10                Defendants.    )
11
12
13
14          DEPOSITION OF EDWARD FRALEY, the
15    Defendant, taken on behalf of the Plaintiff
16    before Jane A. Blackerby, CSR #1369, CCR #877,
17    pursuant to Notice on the 12th day of April,
18    2022, at the offices of Spencer Fane, LLP, 2144
19    E. Republic Road, Suite B300, Springfield,
20    Missouri.
21
22
23
24
25
```

Page 1

**Exhibit 1**

## Page 2

```
1        A P P E A R A N C E S
2 FOR THE PLAINTIFF:
3    Mr. Patrick R. James
     JAMES, HOUSE, SWANN & DOWNING, P.A.
4    Post Office Box 3585
     Little Rock, Arkansas  72203
5    501.372.6555
     pjames@jamesandhouse.com
6
     Mr. Timothy Giattina
7    HODGE, CALHOUN GIATTINA, PLLC
     711 W. 3rd Street
8    Little Rock, Arkansas  72201
     501.404.4874
9
     Ms. Erin Cassinelli - by Zoom
10   LASSITER & CASSINELLI
     300 S. Spring Street
11   Suite 800
     Little Rock, Arkansas  72201
12   501.370.9300
13 FOR THE DEFENDANTS RANDY SIMS AND MEGAN SIMS:
14   Ms. Megan Sims, Pro Se - by Zoom
     136 Border Circle
15   Benton, Arkansas  72015
     Megansims71@gmail.com
16
   FOR THE DEFENDANT STONE CONCEPTS, LLC AND MARTY
17 HESCH:
18   Mr. Scott Richardson - by Zoom
     Mr. Dustin McDaniel - By Zoom
19   MCDANIEL, WOLFF & BENCA, PLLC
     1307 W. Fourth Street
20   Little Rock, Arkansas  72201
     scott@mwbfirm.com
21   dmcdaniel@mwbfirm.com
22
23
24
25
```

## Page 3

```
1        A P P E A R A N C E S (Cont.)
2 FOR THE DEFENDANT EDWARD FRALEY:
3    Mr. Jason C. Smith
     SPENCER FANE, LLP
4    2144 E. Republic Road
     Suite B300
5    Springfield, Missouri  65804
     417.888.1000
6    jcsmith@spencerfane.com
7    Mr. Harry E. "Bud" Cummins - by Zoom
     THE LAW OFFICES OF BUD CUMMINS
8    1818 N. Taylor Street
     #301
9    Little Rock, Arkansas  72207
     bud@budcumminslaw.com
10
   ALSO PRESENT:
11
     Mr. Rusty Ray
12   Mr. Marty Hesch - By Zoom
     Ms. Angela Rhodes - by Zoom
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1              I N D E X
2 WITNESS:              PAGE:
3   EDWARD FRALEY
4   Examination by Mr. James        5
5
6        E X H I B I T S
7 NO.:     DESCRIPTION:        MARKED:
8 Exhibit 10  Declaration of Edward Fraley   5
9 Exhibit 11  Agreed Temporary Restraining
            Order         100
10
   Exhibit 12  Arkansas Business Magazine
11     article          100
12 Exhibit 13  January 19th, 2010 e-mail    234
13 Exhibit 13A Highlighted map       236
14 Exhibit 14  Commercial Credit Application  255
15 Exhibit 15  Commercial Credit Application  256
16 Exhibit 16  Commercial Credit Application  258
17 Exhibit 17  Facebook post of William
            Thomas         261
18
   Exhibit 18  Text message          266
19
   Exhibit 19  Text message of Randy Sims    277
20
   Exhibit 20  Text message of Ed Fraley     279
21
   Exhibit 21  E-mail dated August 18, 2021  295
22
23
24 (Reporter's Note:  Exhibits were filed with the
   original transcript.)
25
```

## Page 5

```
1        (Deposition commenced at 8:30 a.m.)
2          EDWARD FRALEY,
3 being first duly sworn, testified under oath as
4 follows:
5          EXAMINATION
6 BY MR. JAMES:
7   Q.  Sir, would you state your name for the
8 record.
9   A.  Edward Fraley.
10  Q.  Mr. Fraley, my name is Pat James.  I
11 represent Stone Works.  We just met this morning
12 for the first time.  Is that correct?
13  A.  Correct.
14  Q.  And Tim Giattina is to my right.  You
15 have not met him before today?
16  A.  No, I have not.
17  Q.  And you know Rusty Ray.  Correct?
18  A.  Yes.  I know Rusty well.
19      (Fraley Exhibit 10 was marked for
20 identification by the reporter.)
21  Q.  (By Mr. James)  All right.  Let me hand
22 a document I'm going to label Deposition Exhibit
23 No. 10, which is labeled Declaration of Edward
24 Fraley, and ask you if you are familiar with this
25 document, sir?
```

**Page 6**

1        MR. RICHARDSON:  I'm sorry to
2  interrupt, but Pat is kind of muffled.
3        MS. CASSINELLI:  Yeah, I can't hear
4  either.
5        MR. JAMES:  I'll get a little
6  closer here.  Maybe that will help.
7     Q.  (By Mr. James)  Sir, are you familiar
8  with this Declaration?
9     A.  Yes.
10    Q.  Is it true and correct?
11    A.  The best of my knowledge, yes.
12    Q.  Well, let's go to the last page where it
13  says you declare under penalty of perjury that
14  the foregoing is true and correct, and it doesn't
15  say to the best of your knowledge, does it?
16    A.  No, it does not.
17    Q.  So I want to be clear, is this true and
18  correct?
19    A.  Yes.
20    Q.  Or is it just true and correct to the
21  best of --
22    A.  Let me go through it all real quickly
23  and I'll make sure.
24    Q.  I'll tell you what.  We're going to have
25  to have some rules here, and I will try not to

**Page 7**

1  talk on top of you if you'll try not to talk on
2  top of me.
3     A.  That would be wonderful.
4     Q.  Make sure I finish my question and then
5  answer.  All right?
6     A.  All right.
7     Q.  And you've asked for a moment to review
8  Exhibit 10?
9     A.  No.  9 is the only one I see.  They're
10  pretty near all a turnkey installation, but they
11  do sell some materials.
12    Q.  Paragraph 9?
13    A.  Yes.  They do sell some, but they're
14  mostly a turnkey installer.  The rest of this
15  seems pretty correct.
16    Q.  Right.  You've reviewed Exhibit 10,
17  which is your March 3rd, 2022 Declaration filed
18  in this case, and is it true and correct?
19    A.  Yes.
20    Q.  And can we rely upon it?
21    A.  Yes.
22    Q.  Do you have firsthand knowledge,
23  personal knowledge of the items contained in this
24  declaration?
25    A.  Firsthand knowledge?

**Page 8**

1     Q.  Yes, sir.
2     A.  On everything?  I have not got -- let's
3  see.
4        MR. MCDANIEL:  Dan, I'm sorry to
5  interrupt, but you're impossible to hear, and I
6  don't know if it's just me and everybody else can
7  hear.  I'll just read the transcript, but if
8  everybody else is having the same problem, your
9  -- you have no active microphone or whatever the
10  problem is.
11        MR. SMITH:  I'm having the same
12  problem.
13        MR. JAMES:  I'm by the computer.
14  Does that help?  I'm sitting a foot from the
15  computer.
16        MS. CASSINELLI:  No, both of you --
17  yours is worse, but you're both going in and out
18  but you're pretty bad.  We can hear like one word
19  per sentence.
20        MR. JAMES:  Let's go of the record
21  and see if we can fix this.
22        (Off the record.)
23    Q.  (By Mr. James)  I think we fixed our
24  problem with the microphone.  Sir, when we took
25  the break I asked you if this was -- this

**Page 9**

1  Declaration was based on your firsthand
2  knowledge.  Can you review the Declaration?
3     A.  It is.
4     Q.  And is it based on your personal
5  knowledge?
6     A.  Yes.
7     Q.  Who prepared this document?
8     A.  Me and my attorneys.
9     Q.  Did anybody else assist?
10    A.  No.
11    Q.  Were there any previous drafts?
12    A.  No.
13    Q.  Sit down and do it in one setting?
14    A.  I think it took maybe twice.
15    Q.  Okay.  Did you make any changes?
16    A.  Just today.
17    Q.  The Paragraph 9 that you clarified to me
18  a few moments ago?
19    A.  Yes.
20    Q.  Did you rely upon information from any
21  other person or source in making this
22  Declaration?
23    A.  No, sir.
24    Q.  Is it full and complete?
25    A.  Yes.

3 (Pages 6 - 9)

| | |
|---|---|
| 1   Q.   And can we rely upon it at trial? | 1   Q.   How many baths? |
| 2   A.   Correct. | 2   A.   Four. |
| 3   Q.   Sir, what is your date of birth? | 3   Q.   Who do you own that with? |
| 4   A.   4-18-50. | 4   A.   Me and my son. |
| 5   Q.   Where do you reside? | 5   Q.   Lee Fraley? |
| 6   A.   You mean where I live? | 6   A.   Yes. |
| 7   Q.   Yes, sir. | 7   Q.   Do you have any other sons? |
| 8   A.   Rogersville, Missouri. | 8   A.   No. |
| 9   Q.   Wrightsville, Missouri? | 9   Q.   What's Lee's age? |
| 10   A.   Rogersville. | 10   A.   Oh, lord. |
| 11   Q.   Rogersville.  And what's that street | 11   Q.   Sorry. |
| 12   address? | 12   A.   You're going to find out my mind is |
| 13   A.   194, East Farm Road 194. | 13   gone. |
| 14   Q.   How long have you lived there? | 14        THE WITNESS:  How old are you, |
| 15   A.   Oh, since about '95. | 15   Jason? |
| 16   Q.   Where did you live before that? | 16        MR. SMITH:  You got to answer, not |
| 17   A.   I lived on a little street called Logan | 17   me. |
| 18   Avenue in Rogersville. | 18   A.   I'm guessing probably 40.  He was born |
| 19   Q.   Same area? | 19   in about '79, '80. |
| 20   A.   Yes. | 20   Q.   (By Mr. James)  Do you have any |
| 21   Q.   How long did you live in that house? | 21   daughters? |
| 22   A.   Since '90. | 22   A.   One. |
| 23   Q.   Do you have any other residences? | 23   Q.   What's her name? |
| 24   A.   As far as me and my son has got a place | 24   A.   Michelle. |
| 25   on the lake, yes. | 25   Q.   What's her last name? |
| Page 10 | Page 12 |
| 1   Q.   What lake? | 1   A.   Tracy. |
| 2   A.   Table Rock. | 2   Q.   Where does she live? |
| 3   Q.   What's your son's name? | 3   A.   Here in Springfield. |
| 4   A.   Lee. | 4   Q.   What does she do? |
| 5   Q.   How big a place? | 5   A.   She works at an inn, a bed and breakfast |
| 6   A.   It's about a half acre.  About 12, 1500 | 6   inn. |
| 7   square foot house.  Rusty has been there. | 7   Q.   Okay.  She didn't work in the business? |
| 8   Q.   Any other residences that you own? | 8   A.   No. |
| 9   A.   We got a little lodge at Ava, Missouri. | 9   Q.   All right.  Any other children? |
| 10   Q.   Lodge at where? | 10   A.   No. |
| 11   A.   Ava, Missouri. | 11   Q.   To whom are you married? |
| 12   Q.   What kind of lodge? | 12   A.   Tricia Fraley. |
| 13   A.   It's just a little hunting lodge. | 13   Q.   How long have you-all been married? |
| 14   Q.   What do you hunt there? | 14   A.   Fifty years come Monday. |
| 15   A.   Turkeys, deer. | 15   Q.   Hope you bought a good gift. |
| 16   Q.   We don't have many turkeys down south | 16   A.   Not yet. |
| 17   this year.  You guys got a bunch up here? | 17   Q.   Other than your house at Table Rock, the |
| 18   A.   Got several. | 18   lodge and your residence you've described to us, |
| 19   Q.   Our turkey season is only ten days. | 19   do you have any other residences? |
| 20   A.   That's all we got here, too. | 20   A.   No, I do not. |
| 21   Q.   All right.  So what kind of lodge do you | 21   Q.   All right.  What is your cell number? |
| 22   have at Ava, Missouri? | 22   A.   (417) 861-0611. |
| 23   A.   It's just a little one story lodge. | 23   Q.   Who is your carrier? |
| 24   Q.   How many bedrooms? | 24   A.   Not AT&T, but what's the other. |
| 25   A.   Four. | 25   Q.   Verizon? |
| Page 11 | Page 13 |

4 (Pages 10 - 13)

**Exhibit 1**

```
 1    A.  Yes.  It's Verizon.
 2    Q.  And you have it personally or through
 3 work?
 4    A.  It's through work.
 5    Q.  Through what work is it through?
 6    A.  Fraley Masonry.
 7    Q.  Fraley Masonry.  What's that?
 8    A.  That's my son's business.  When I left
 9 there, they just kept my phone intact.
10    Q.  They keep anything else intact, health
11 insurance?
12    A.  No, no.
13    Q.  Vehicle, anything like that?
14    A.  No.
15    Q.  When did you leave there?
16    A.  It was probably about '08.
17    Q.  Why did you leave there?
18    A.  I started doing this and let him have
19 the business.
20    Q.  When you say you started doing this,
21 what do you mean?
22    A.  I was repping before that.  He was
23 running my business, and then it was getting more
24 that I could do both, so I just let him take over
25 my business.
```

Page 14

```
 1    Q.  Okay.  When you say you started repping,
 2 what do you mean?
 3    A.  Well, with Sentina stone.  Going out and
 4 finding the dealer.  I started doing that in '04
 5 and '05.
 6    Q.  How many have you found over the years?
 7    A.  Right now?  I found a bunch.  I have
 8 just six that I work on.  I turned the rest
 9 of them over about three years ago.  Got tired of
10 chasing them.
11    Q.  Who did you turn them over to?
12    A.  They're at house plant.  They went back
13 to Nashville to the plant.
14    Q.  Have you had any other cell phone number
15 than the 417, is it 861?
16    A.  Yes, sir.
17    Q.  861-0611 phone?
18    A.  I have never had another phone, no.
19    Q.  Some people carry second phones.  You
20 don't?
21    A.  No.  I do good to keep one.
22    Q.  All right.  What e-mail addresses do you
23 use?
24    A.  Edfraley@1950gmail.com.
25    Q.  @1950?
```

Page 15

```
 1    A.  Uh-huh.
 2    Q.  Do you have a work e-mail?
 3    A.  No, I don't.  That's it.  That's the
 4 only e-mail I got.
 5    Q.  Who pays for that?
 6    A.  It just gets on this same account
 7 with --
 8    Q.  The phone?
 9    A.  Yeah.
10    Q.  And how long have you had that?
11    A.  Probably about two or three years.
12    Q.  What e-mail did you have before that?
13    A.  I didn't have one.
14    Q.  You did not have one?
15    A.  No.
16    Q.  What is your preferred method of
17 communication with your dealers or other people
18 within the business?
19    A.  By phone.
20    Q.  I was going to ask this question, you
21 may have already answered it.  How computer
22 literate do you consider yourself?
23    A.  None.  Zero.
24    Q.  Okay.  But you do -- do you have a
25 laptop or a desktop?
```

Page 16

```
 1    A.  No, none.  None.
 2    Q.  You don't have a computer at all?
 3    A.  No.
 4    Q.  So the only computer you have is your
 5 phone?
 6    A.  Correct.
 7    Q.  Do you have a laptop?
 8    A.  No.
 9    Q.  Tablet?
10    A.  No.  Nothing.
11    Q.  Phone?
12    A.  No.
13    Q.  What kind of phone you got?
14    A.  Just a little square, smart phone.
15    Q.  IPhone?
16    A.  Yeah.
17    Q.  Do you know what number it is, 6, 11, X?
18    A.  Probably about a 10, 11.  I don't know.
19    Q.  Okay.
20    A.  I guess I'm really illiterate on that.
21 I cannot even send you an e-mail.  I have got
22 where I can get them, but I can't send them back.
23    Q.  Do you text?
24    A.  Some, yes.
25    Q.  And do you keep those texts on your
```

Page 17

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

1 phone?
2    A.  Some, yes.  Some I don't.  Because my
3 grandbabies, some of them -- my grandbabies play
4 with my phone a lot and they got games on it, so
5 some of them come in a little bolder, so I clear
6 it.
7    Q.  I can get that, but your work text
8 messages?
9    A.  I try to keep most of them, yes.  But
10 something I don't.  I'm bad to delete.
11    Q.  When you say you're bad to delete, what
12 do you mean?
13    A.  I mean, I don't keep my phone cleaned
14 up.  I don't get that much text messages.
15    Q.  What would you call a lot in a day?
16    A.  Just sometimes maybe one in a week.
17    Q.  Okay.  And how many e-mails do you get
18 on average?
19    A.  Maybe one or two.
20    Q.  Do you keep those e-mails?
21    A.  No, I don't.  Are you talking -- yes, I
22 do.  I got all my e-mails.
23    Q.  Okay.  You don't delete those?
24    A.  No.  I don't know how.
25    Q.  All right.  How long do you work on an

Page 18

1 average day?  How many hours?
2    A.  That depends on the day.  Sometimes I
3 might be in the truck for 24.  Sleep in a Walmart
4 parking lot for a couple hours and wake up, go
5 again.
6    Q.  When you're on the road?
7    A.  Yes.
8    Q.  How often do you go on the road?
9    A.  Not much anymore.  Used to go a lot.
10 Maybe about once a week now.  I was in Springdale
11 last week.
12    Q.  So tell me how you spend your average
13 day.
14    A.  Average day is work with my son some at
15 the office and not a lot anymore.  Play with my
16 fishing poles.
17    Q.  You say you work with your son at the
18 office?
19    A.  I just -- some, just helping him with
20 the yard in there.  Once in awhile, just get
21 bored.
22    Q.  Sure.  What office is that?
23    A.  Fraley Masonry.
24    Q.  Where is it located?
25    A.  Ozark, Missouri.

Page 19

1    Q.  What's the street address?
2    A.  Biagio.
3    Q.  Biagio?
4    A.  Uh-huh.  B-i-a-g-i-o or something.
5    Q.  Does it have a number?
6    A.  99, I believe.
7    Q.  99 Biagio?
8    A.  I think that's right, yes.
9    Q.  In Ozark?
10    A.  Yes.
11    Q.  How far is that from here?
12    A.  Probably from here, about ten miles.
13    Q.  Okay.  And so when you're at the office
14 with your son, do you have an office there?
15    A.  No, I do not.
16    Q.  So where do you sit?
17    A.  Huh?
18    Q.  Where do you sit?
19    A.  They got chairs in their offices.
20    Q.  All right.
21    A.  I just sit in there.  In other words,
22 he's one of my dealers, so I correspond with him,
23 just like I would if I was going to Rusty's or
24 anywhere else.
25    Q.  Okay.  Do you do any work on other

Page 20

1 dealers while you're at your son's office --
2    A.  No.
3    Q.  -- at Fraley Masonry?
4    A.  I do.
5    Q.  So you just do his?
6    A.  Yes.
7    Q.  So how many days a week would you say on
8 average you go to Fraley Masonry?
9    A.  Probably a week?  Maybe twice a month.
10    Q.  Twice a month?
11    A.  Yes.
12    Q.  Who are your other dealers in your six
13 dealers?
14    A.  Okay.  It would be Jeff Leek and Justin
15 Shockley.
16    Q.  Shockley, Missouri?
17    A.  No.  They're in Springdale, Arkansas.
18 Marty Hesch, Jonesboro.
19    Q.  Tell me their companies as you go
20 through these names.
21    A.  Builder's Stone.
22    Q.  Builder's Stone?
23    A.  Builder's Stone Company.
24    Q.  Is Marty Hesch?
25    A.  No, his is Stone Concepts.

Page 21

6 (Pages 18 - 21)

**Page 22**

1    Q.   All right.  And Jeff?
2    A.   Jeff Leek.
3    Q.   Is what?
4    A.   Builder's Stone.
5    Q.   Okay.  Who are your others?
6    A.   Brandon Becker is in Olathe, Kansas.
7  He's Builder's Stone.
8    Q.   Brenda Becker?
9    A.   Brandon Becker.  Yes.
10    Q.   So he's tied with Builder's Stone?
11    A.   No.
12    Q.   They just have the same name?
13    A.   Correct.
14    Q.   But they're separate?
15    A.   Correct.
16    Q.   What else?
17    A.   Okay.  Then I have got Bud Paris in
18  Broken Arrow, Oklahoma, Tulsa, that area.  He's
19  fireplace.  He's a fireplace shop.
20    Q.   Fireplace shop?
21    A.   Uh-huh.
22    Q.   And what's the name of his business?
23    A.   Bud Farris Fireplace Shop.  Tulsa
24  Fireplace.
25    Q.   Okay.  Any other?

**Page 23**

1    A.   I'm trying to think of his name.  I have
2  got one at Mountain Home.  If I don't have a
3  brain freeze.  Wes Unich.
4    Q.   Wes who?
5    A.   Unich.
6    Q.   Can you spell that?
7    A.   U-n-i-c-h, I believe.
8    Q.   Wes U-n-i-c-h?
9    A.   Unich, uh-huh.
10    Q.   Any others?
11    A.   I think that's it.
12    Q.   When did you turn the others one back?
13    A.   Oh, I had them three or four years.
14    Q.   How many did you turn back?
15    A.   Just two.
16    Q.   What two did you turn back?
17    A.   EF Materials in El Paso, Texas then I
18  turned one back many years ago in Ocala, Florida.
19  I can't even remember his name.
20    Q.   So three or four years ago you just
21  turned back EF Materials?
22    A.   That was a long run out to El Paso.
23    Q.   All right.  So why did you turn them
24  back?
25    A.   It was too far for me to go to go work

**Page 24**

1  them.  I got tired of being on the road.
2    Q.   Have you had any other dealers other
3  than the six you've identified in the last three
4  to four years?
5    A.   As far as any more dealers, I have had
6  some come and go.  I couldn't even tell you their
7  names.
8    Q.   All right.  Well, you didn't list Stone
9  Works in there.
10    A.   Stone Works is not my dealer anymore.
11    Q.   When did they stop being your dealer?
12    A.   I guess when they got that letter.  I
13  mean, they can still buy materials, if they want.
14  I wish they would.
15    Q.   Where would they buy materials from?
16    A.   From Marty Hesch, from my son, any of my
17  dealers.  If they do a multi-family job, Rusty
18  knows, any multi-family they can go right to the
19  office and get it.
20    Q.   They can buy from Centurion?
21    A.   Yes.  Multi-family.
22    Q.   You say Rusty knows it.  What do you
23  mean?
24    A.   Well, anybody can buy multi-family.
25  That's just an open account.

**Page 25**

1    Q.   How long has that been the case?
2    A.   Many, many years.
3    Q.   How many years?
4    A.   I don't know.  Many.
5    Q.   More than five?
6    A.   Oh, yeah.  More than I can remember.
7    Q.   What is multi-family housing?
8    A.   It's multi units, apartments complexes.
9    Q.   Why are they treated different than
10  other?
11    A.   Because that's just -- it takes big
12  special crews that travel to do multi-family, and
13  multi family's going to come in your backyard or
14  my backyard, whoever, and we just -- multi-family
15  can just move in.
16    Q.   How many trips to Arkansas have you made
17  in the last two years?
18    A.   To Arkansas?  I mean, you're talking
19  about during duck season?
20    Q.   Sure.
21    A.   I went to Stuttgart about four times.
22    Q.   When were you last in Arkansas?
23    A.   Oh, gosh, probably back in duck season,
24  November, that I can remember.
25    Q.   Duck season runs into January, doesn't

7 (Pages 22 - 25)

**Exhibit 1**

1 it?
2    A.  I don't hunt in real cold.  It got cold
3 in January.
4    Q.  So how many times?
5    A.  In other words, I was laid up for about
6 six weeks.  I had an operation on my -- had some
7 health issues.
8    Q.  All right.  Where do you go duck
9 hunting?  Stuttgart?
10    A.  Different places.  Mostly with Marion
11 McCollum.
12    Q.  Marion who?
13    A.  Marion McCollum there at Mack's Prairie
14 Wings.
15    Q.  What's the name of his place?
16    A.  Mack's Prairie Wings.
17    Q.  Well --
18    A.  Where we hunted at?
19    Q.  Yes.
20    A.  Wellstone Lake, Red Pool.
21    Q.  Does he have a name for his club?
22    A.  No.
23    Q.  What does he have there, house or a
24 trailer?
25    A.  Yeah, he got a lodge.  It's just

Page 26

1 private.
2    Q.  And he owns Mack's Prairie Wing?
3    A.  Yes.
4    Q.  How do you know him?
5    A.  Just mutual friends.  Many, many years
6 going hunting down at Stuttgart.
7    Q.  Does he ever buy any Centurion stone?
8    A.  He's got on it on his lodge, yes.  He
9 didn't buy it, but he's got it.
10    Q.  How did he get it?
11    A.  Tim Pardue give it to him.
12    Q.  When did Tim Pardue give it to him?
13    A.  Back when he built his lodge about 20
14 some years ago.
15    Q.  Who is Tim Pardue?
16    A.  He's the owner of Centurion Stone.
17    Q.  Are there any other owners?
18    A.  No.
19    Q.  How long has Mr. Pardue owned Centurion
20 Stone?
21    A.  Completely probably five years.
22    Q.  Why would Mr. Pardue -- well, let me
23 back up.  Who owned -- who was a partial owner
24 before?
25    A.  J.B. Ball.

Page 27

1    Q.  And did he buy Mr. Ball out?
2    A.  Correct.
3    Q.  Were they fifty-fifty?  Do you know?
4    A.  I don't have a clue.  I don't know
5 nothing about that inside business.
6    Q.  Do you know any other owners?
7    A.  No, I really don't.
8    Q.  Why would Tim Pardue give stone to
9 Mr. McCollum?
10    A.  You have to talk to Tim Pardue.  I don't
11 know.
12    Q.  What was your understanding?
13    A.  They good friends.
14    Q.  All right.  Does Mr. Pardue have a club
15 there?
16    A.  Yes.
17    Q.  Or lodge there?  Where is his lodge?
18    A.  It's just right up the road from
19 Marion's.
20    Q.  Okay.  How big a place does Mr. Pardue
21 have?
22    A.  As far as -- fair size.  I couldn't tell
23 you the size.
24    Q.  How many bedrooms?
25    A.  Four, I believe four.  How many

Page 28

1 bedrooms, Rusty?  You were up there with me one
2 time.
3    Q.  He's not allowed to testify.  I'll get
4 on him if he does.  He's not allowed to.
5    A.  He's been there with me.
6    Q.  How many baths?
7    A.  Two.
8    Q.  How many times you been there?
9    A.  I don't know.  Several.  I done a lot of
10 work on it.
11    Q.  Does it have Centurion stone?
12    A.  Yes.
13    Q.  Does he have a name for his club?
14    A.  I think he does, but I can't think of it
15 right at the moment.
16    Q.  Does Mr. McCollum have a name for his?
17    A.  No.  He does not.  Yeah, he does.  It's
18 Sunset Lodge.
19    Q.  Sunset Lodge.  Is that Mr. McCollum's?
20    A.  Yeah.
21    Q.  All right.  How often is Mr. Pardue down
22 here based on what you've seen, known or talked
23 to?
24    A.  Down where?
25    Q.  Stuttgart, hunting at his lodge.

Page 29

8 (Pages 26 - 29)

1    A.  How much is he down there?
2    Q.  Yes, sir.
3    A.  Probably 50 days out of the 60.  He
4 brings in customers.
5    Q.  And the customers go hunt there?
6    A.  Yes.
7    Q.  Does he have like contract workers that
8 will work there and like prepare meals or
9 bartenders?
10    A.  He's got a cook, yes.
11    Q.  He's got a cook?
12    A.  Uh-huh.
13    Q.  All right.  Anything else they bring in.
14 They have a bar?
15    A.  Yeah.
16    Q.  Have a big old U-shaped bar?
17    A.  Pretty good size.
18    Q.  Who waits the bar?
19    A.  Personally whoever is behind it.
20 There's no waiter.  He's got no bartender.
21    Q.  How often do you hunt with Mr. Pardue?
22    A.  Oh, three or four times a year.
23    Q.  You-all do anything else socially
24 together?
25    A.  Fish.

Page 30

1    Q.  Where do you-all fish?
2    A.  Table Rock Lake.  We fished two weeks
3 ago down in Toledo Bend, the tournament.
4    Q.  Toledo Bend, where is that?
5    A.  Louisiana.
6    Q.  I take it multi-day trip?
7    A.  What?
8    Q.  Multi-day trip?
9    A.  Ys.
10    Q.  Who all went to Louisiana on this
11 fishing trip?
12    A.  Just me and Tim.
13    Q.  How many days was it?
14    A.  Five.  Five days.  We had a little club.
15 We fished from the club.
16    Q.  What club?
17    A.  It ain't a club.  It's just a group of
18 our friends from Louisiana.  We have a fishing
19 tournament.
20    Q.  What else do you-all do?  Do you own any
21 lodge or club or anything like that or a member
22 of any hunting club?
23    A.  No, no.
24    Q.  Or fishing club?
25    A.  No.

Page 31

1    Q.  Or any --
2    A.  No.
3    Q.  All right.  What else do you do socially
4 with Mr. Pardue besides hunt and fish?
5    A.  That's about the size of it, really.
6    Q.  Have you-all gone on -- like your wives
7 gone on trips with you?
8    A.  Oh, yes.
9    Q.  Where all have you-all gone?
10    A.  We went to go to Vegas one year.  That's
11 the main thing.  We don't do a lot of trips.
12    Q.  How long ago was Vegas?
13    A.  Three years ago.  Right before the
14 Corona virus come.  That kind of shut everything
15 down.
16    Q.  And before that what other trips had you
17 taken?
18    A.  We took company trips.
19    Q.  What kind of company trips and where?
20    A.  Just islands.  I couldn't even tell you
21 where.
22    Q.  Aruba?
23    A.  Yeah, we went to Aruba.  St. Bart.
24    Q.  Any other islands?
25    A.  Well, we took cruise ship trips.  I

Page 32

1 couldn't tell you what all we stopped on.  It's
2 been several years ago.
3    Q.  And your wives go?
4    A.  Yes.
5    Q.  Mr. Pardue's wife go?
6    A.  Yes.
7    Q.  What is his wife's name?
8    A.  Anita.
9    Q.  Where do they live?
10    A.  Tennessee.
11    Q.  Nashville?
12    A.  Uh-huh.
13    Q.  You got to answer yes.  She can't pick
14 up uh-huh.
15    A.  Yes.  Yes.  I'm sorry.
16    Q.  And had you gone on any -- what's
17 Maxwell House?
18    A.  Maxwell House, that's a motel by the
19 plant, used to be the old plant.
20    Q.  Have there ever been conferences or
21 seminars there?
22    A.  Many years ago.
23    Q.  All right.
24    A.  I mean, many years ago.
25    Q.  Do you all have meetings with dealers

Page 33

9 (Pages 30 - 33)

**Exhibit 1**

**Page 34**

1 still?
2    A.  No, not long time.
3    Q.  Not since Covid?
4    A.  No, it was way past before that.
5    Q.  All right.  Why did that quit?
6    A.  I couldn't answer.  I don't know.
7    Q.  All right.  Anything else you do
8 socially with Mr. Pardue, anything at all?
9    A.  Not that I can think of.
10    Q.  No other memberships or ownerships of
11 lodges or hunting clubs or anything like that
12 other than what you have told us.  Correct?
13    A.  Correct.
14    Q.  Has Covid affected your business?
15    A.  Yes.
16    Q.  How has it affected your business?
17    A.  People don't want you in their offices.
18 It's just everybody was nervous.
19    Q.  You don't travel as much?
20    A.  No, I haven't been.  I'm starting to get
21 back a little bit more.  People are starting to
22 get more at ease.
23    Q.  Have you had your shots?
24    A.  Oh, yes.
25    Q.  Good for you.  How was the Centurion

**Page 35**

1 plant affected, if at all?
2    A.  Very much affected.
3    Q.  How was it affected?
4    A.  The labor was dead.  No labor.
5    Q.  Did they shut down?
6    A.  Yes.
7    Q.  How long did they shut down?
8    A.  You're going to have to talk to someone
9 besides me.  I don't know.
10    Q.  Do you know how much their production
11 went down?
12    A.  Oh, yeah.  About 75, 80 percent, way
13 down.
14    Q.  Did their demands go down, also?
15    A.  Demands went up.
16    Q.  Demands went up?
17    A.  I don't know why, but -- and then the
18 supply went down because of the labor, but now
19 all these questions here, I can't answer them
20 fully.  You have to have Tim Pardue answer them.
21    Q.  So I would have to ask Mr. Pardue?
22    A.  When it comes to the manufacture of
23 Centurion, yes.  I'm getting into something that
24 I don't know about.
25    Q.  Did you talk to Mr. Pardue about your

**Page 36**

1 deposition?
2    A.  No, I have not.
3    Q.  Have you ever talked to him about this
4 lawsuit?
5    A.  Yes.  He knows all about it.
6    Q.  Tell me what conversations you've had
7 with Mr. Pardue concerning this lawsuit.
8    A.  Really not a lot of conversation with
9 him at all.  Just telling him that it's -- what's
10 happening.  Like we have deposition.  In other
11 words, I don't know how to talk about it.  I
12 don't know what's happening.
13    Q.  Well, you attended the preliminary
14 injunction.
15    A.  Yes, I did.  I told him that.
16    Q.  You told him about that?
17    A.  Yes.
18    Q.  And he knows about the preliminary
19 injunction?
20    A.  Correct, he does.
21    Q.  And have you talked to him about it in
22 person or just over the phone?
23    A.  Probably in person mostly.  I don't talk
24 business on the phone much.
25    Q.  And was Mr. Pardue here or were you-all

**Page 37**

1 probably hunting?
2    A.  Probably hunting and fishing.
3    Q.  When is the last time you've been to the
4 factory in Nashville?
5    A.  Probably two years.
6    Q.  Because of Covid?
7    A.  Yeah.
8    Q.  If it wasn't for Covid, how often would
9 you typically go?
10    A.  I used to go at least every six months.
11    Q.  Why would you go every six months?
12    A.  To catch up on new ideas and new stone,
13 and used to take stone down there and have them
14 made to add to our collection of materials for
15 sales.
16    Q.  When did the plant starting getting back
17 on regular production?
18    A.  Oh, about five, six months.  Five or six
19 weeks ago.  Not months ago.  Weeks ago.  They
20 just now starting to catch back up.
21    Q.  Did Covid affect your compensation in
22 any way?
23    A.  Some it did, yes.
24    Q.  How did it affect it?
25    A.  Oh, it was slowed down because there

10 (Pages 34 - 37)

1 wasn't no material going out.
2   Q.   And how did that affect your
3 compensation?
4   A.   I get paid by square foot, and if
5 they're not making materials, I'm not getting
6 paid.
7   Q.   How do you get paid by the square foot?
8   A.   Each dealers orders.
9   Q.   How much do you get paid a square foot?
10   A.   I get 18 cents a square foot.
11   Q.   Each dealer across the board?
12   A.   The ones I have, yes.  That's just from
13 my dealers.  That's all.  I don't get paid for
14 dealers that's not mine.  I can give you the
15 names of them.
16   Q.   Any other way it affected your
17 employment?
18   A.   As far as I couldn't go out and do any
19 contacts to build up any business.
20   Q.   Right.  Who's paying your attorney's
21 fees?
22   A.   Me.
23   Q.   Why have you got three attorneys?
24   A.   I like them.
25   Q.   They're nice people, but that's a lot of

Page 38

1 attorneys to pay.  Why in your mind did you need
2 three attorneys?
3   A.   Why did I?
4   Q.   Yes, sir.
5   A.   Well, one of them is a personal friend
6 of mine.
7   Q.   Who is that?
8   A.   Jason.
9   Q.   Okay.
10   A.   And Bud Covin or Bud Cummins, he duck
11 hunts with us and he's helping me.
12   Q.   What about the James Law Firm?  I'm not
13 part of that James law firm, by the way.
14   A.   He's the part of Bud's deal.  We're all
15 just -- honestly, I don't know.
16   Q.   Do you have any agreement or
17 understanding that anybody would pay -- will pay
18 your attorneys' fees?
19   A.   No, sir.
20   Q.   Do you have any expectation that anybody
21 will pay your attorneys' fees?
22   A.   No, sir.
23   Q.   Do you know if there is a joint defense
24 agreement?
25   A.   Not that I know of.

Page 39

1   Q.   Have you been on the phone since this
2 lawsuit's been filed with Randy Sims or Megan
3 Sims?
4   A.   No, I have not talked to Megan Sims.
5 Randy has called many times.
6   Q.   Why has Randy Sims called you?
7   A.   I don't even know.
8   Q.   Well, did you talk to him?
9   A.   Yes.  But I can't remember what we
10 talked about.
11   Q.   Did you talk about the lawsuit?
12   A.   No.  Never.
13   Q.   How long have you known Randy Sims?
14   A.   Since 1995.  He started working for me.
15   Q.   He started working for you.  What do you
16 mean?
17   A.   I was working for masonry, and he come
18 in as a little kid and he started helping me
19 work.  I used to have to him help, and I trained
20 Randy Sims.
21   Q.   You consider him a friend?
22   A.   Well, just social friend, yeah.  I don't
23 hang with Randy, no.
24   Q.   You hunt with him?
25   A.   No.  I don't hang at all with him.

Page 40

1   Q.   You never hunt with him?
2   A.   No.  If he called me and said he had a
3 flat tire, yes, I would try to help him, but as
4 far as me hanging with Randy, no, I don't.
5   Q.   Why not?
6   A.   I just don't.
7   Q.   Why not?
8   A.   Like I said, we're social friends.
9 We're not friends.  There's a difference.
10   Q.   What's the difference with a social
11 friend?
12   A.   In other words, you got people you deal
13 with that you don't hunt and hang with.  Just
14 like I don't -- in other words, he's just not one
15 I want to be around.
16   Q.   Why do you not want to be around him?
17   A.   That's not my kind of people.
18   Q.   Why is he not your kind of people?
19   A.   We're getting personal now and I don't
20 know how to explain this.
21   Q.   I think you do, so please do this.  I
22 know you don't want to.
23   A.   No, it ain't that.  He's just different
24 than me.  He don't -- me and him don't have the
25 same hobbies.  He hunts artifacts and I like

Page 41

11 (Pages 38 - 41)

**Exhibit 1**

1 hunting fish.
2   Q.   Is that the only reason you don't want
3 to do things with him socially?
4   A.   I guess that's good enough, yes.
5   Q.   Well, if there's any other reasons.
6   A.   I can't think of any more.
7   Q.   What about drugs?
8   A.   I don't know anything about drugs. Now,
9 he used to be on drugs.
10   Q.   Does that affect whether you want to
11 hang with him or not?
12   A.   No, it does not. As long it don't
13 affect me with them.
14   Q.   What drugs did you understand he was on?
15   A.   I have no idea.
16   Q.   Did you have any understanding?
17   A.   No, I didn't know anything. I don't
18 know what he had or nothing. I know he had a
19 little issue, and that's been many, many years
20 ago.
21   Q.   How long ago?
22   A.   Probably about the time 15, 16 years.
23   Q.   Fifteen, 16 years ago?
24   A.   He had a little trouble with them,
25 and --
                                        Page 42

1   Q.   When you say a little trouble?
2   A.   I don't have a clue.
3   Q.   Did he quit working for you?
4   A.   No.
5   Q.   You kept him on?
6   A.   He was not doing drugs on the job.
7   Q.   Was he -- did he go to rehab or miss
8 work?
9   A.   I don't have a clue there. I don't
10 know.
11   Q.   Not that you're aware of?
12   A.   Not that I'm aware of, no. I don't
13 know.
14   Q.   Have you talked about the lawsuit with
15 him?
16   A.   Not really, no. I haven't.
17   Q.   Well, when you say not really, that
18 makes me think you have.
19   A.   I mean, he just more or less wanted to
20 know what it was all about, and I said Randy, I
21 don't know. Have I sat and talked, no, I have
22 not.
23   Q.   Have you talked to Megan Sims?
24   A.   No.
25   Q.   Not at all?
                                        Page 43

1   A.   Well, I say I talked to her once. I
2 asked her how her daughter was doing, Paige. I
3 haven't seen her. When Megan used to come in I
4 said how's your daughter, granddaughter doing.
5 She said fine. That's the end of the
6 conversation.
7   Q.   When did you talk to Megan Sims?
8   A.   Back in June.
9   Q.   What caused you-all to talk in June?
10   A.   Randy was wanting to buy stone, and I
11 told him I couldn't sell stone personally to him.
12 He would have to go through a dealer, so I
13 introduced him to Marty Sim and Marty talked to
14 him about buying stone, and William was there for
15 the meeting. He was going to have William start
16 selling for him, and I told them both at the
17 time, I said, I don't know what Marty is going to
18 do. I don't know how he's going to sell to you,
19 if he's going to. I said, Randy here's the deal.
20 Whatever you do, you know all of Stone Works
21 installers. You don't use them. And I looked at
22 William just straight as I could. I said, look,
23 William, you know all their builders, and I said,
24 don't contact. If you do this, get new builders.
25 And when we went back to Jonesboro Marty said he
                                        Page 44

1 didn't want to take a chance on selling them, so
2 that's the end of the story.
3   Q.   Okay. You said Marty Sims. I think
4 you --
5   A.   Marty Hesch. William Thomas.
6   Q.   All right. And you introduced Randy
7 Sims and William Thomas to Marty Hesch. You got
8 to let me finish, because it will he mess up her
9 record and it's hard to do.
10   A.   I'm very sorry.
11   Q.   You introduced Randy Sims and William
12 Thomas to Marty Hesch in June of 2021.
13   A.   Correct.
14   Q.   Summer of '21. And they -- at that time
15 they were both employees of Stone Works.
16 Correct?
17   A.   Correct.
18   Q.   And they wanted to buy stone from you?
19   A.   Yes.
20   Q.   And what did you understand they wanted
21 to buy stone from you for?
22   A.   Randy wanted to go in business for
23 himself.
24   Q.   And what about William Thomas?
25   A.   He was going to work for Randy, what I
                                        Page 45

12 (Pages 42 - 45)

**Exhibit 1**

1 understand.  I didn't get too much involved in
2 it.
3     Q.  Were they going to continue to work at
4 Stone Works?
5     A.  What I told them then at the time, as
6 long as they was working for Stone Works, I told
7 Randy I have the same feeling towards as I did
8 when he worked for me.  If you're working for a
9 man, you give them a hundred percent of the day.
10 So don't go doing half of the day on him or half
11 on somebody else.
12    Q.  Did you take him up to meet Marty Hesch?
13    A.  No.  I was in Jonesboro when I was
14 talking with Marty and told him that Randy was
15 thinking about wanting to buy stone and asked him
16 would he would be interested, and he said he
17 would like to talk to them, and me and Marty
18 drove over to Randy's house.
19    Q.  Where was Randy's house?
20    A.  In Benton, Arkansas.
21    Q.  So you and Marty Hesch in June of 2021
22 drove from Jonesboro to Benton, Arkansas to meet
23 with Marty Sim?
24    A.  No, Randy Sims.
25    Q.  Randy Sims, excuse me.

1     A.  Yes.
2     Q.  And where did you all meet?
3     A.  At Randy's house.
4     Q.  And how long did you all meet?
5     A.  Oh, about 20 minutes.
6     Q.  You-all drove all that way and only met
7 for 20 minutes?
8     A.  Yes.  It don't take long for Marty to
9 realize what he wanted to do or not.
10    Q.  And who all was present?
11    A.  William Sims was there -- or William
12 Thomas and Randy Sims, me and Marty, and Megan
13 was there for about -- she come through the
14 backyard.  We never -- we stayed in the backyard.
15 Megan went through.  That's when I talked to her
16 about her grandbabies and her daughter, and then
17 her daughter came in the driveway as we was
18 leaving.  I talked to Paige for a minute, and me
19 and Marty we left to go back to Jonesboro.
20    Q.  They never invited you in the house?
21    A.  I didn't want to go in the house.
22    Q.  Why did you not want to go in the house?
23    A.  I don't like going in people's houses.
24    Q.  You just stood in the backyard?
25    A.  Yes.

1     Q.  And you-all talked.  Obviously they knew
2 you were coming?
3     A.  Yes.
4     Q.  And you would not sell them stone, but
5 you were going to try to hook them up with Marty
6 Hesch at Stone Concepts.  Correct?
7     A.  They got to go through a dealer to buy
8 Centurion products.
9     Q.  Why do they have to go through a dealer?
10    A.  That's my philosophy.  See, yes.  I
11 could sell you stone today if I want to, but I'm
12 not going to.  Because if you got a dealer, why
13 would you want to take his money and opportunity
14 away from him.  And I try to be as loyal as I
15 could to these dealers.
16    Q.  But you had the ability if I called you
17 and said I wanted --
18    A.  If I wanted to I could probably sell you
19 stone.  I'm not going to.
20    Q.  Were there ever any times you did not --
21 you sold stone to someone other than a dealer?
22    A.  No.
23    Q.  Never in your career?
24    A.  Not that I can recall.  No.
25    Q.  Ever any time you gave stone to someone

1 other than a dealer?
2     A.  Not that I can recall.  I haven't, no.
3     Q.  Are you aware of Tim Pardue doing that
4 or anybody else?
5     A.  Yeah, he's bad at doing that.
6     Q.  What do you mean by he's bad?
7     A.  He does.  He helps people.
8     Q.  What do you mean he helps people?
9     A.  He done that whole McCollum lodge.  He
10 give them all the stone for that.
11    Q.  Any other besides Mr. McCollum's lodge
12 at --
13    A.  Not that I'm aware of.  I don't know
14 what he done on the front of that store there at
15 Mack's.  I don't know if he give it to him or
16 sold it to him.
17    Q.  All right.  So let's talk about this
18 meeting in Randy's Sims' backyard.  Had you been
19 to his house before?
20    A.  Never.
21    Q.  How did you find it?
22    A.  He give me an address and Marty put it
23 in on his GPS.
24    Q.  Now, did you and Marty go, stop anywhere
25 on your way from Jonesboro to Benton?

13 (Pages 46 - 49)

**Page 50**

1    A.  To eat, yeah.
2    Q.  Did he stop, doing any work related
3 stops?
4    A.  Not work, no.
5    Q.  Driving back from Benton?
6    A.  Driving back we just come on back.  We
7 be working in Marty's office.  He was just
8 getting moved in his new office.
9    Q.  His new office, where is his new office?
10    A.  Jonesboro.
11    Q.  And he was -- so June of 2021 he was
12 moving into a new office?
13    A.  He was getting partially moved in.
14    Q.  What's the difference between his new
15 office and old office?
16    A.  This one here got enough room now he can
17 do something.  He did have a small office where
18 he was leasing, and he owns this one now.
19    Q.  You say he's got enough room where he
20 can do something.  What do you mean?
21    A.  Inventory.
22    Q.  Oh, where he can inventory stone?
23    A.  Yeah, and Marty sells brick.
24    Q.  How much does he inventory?
25    A.  I couldn't tell you.  Probably eight,

**Page 51**

1 nine loads.
2    Q.  And how many yards a load?
3    A.  How many what, sir?
4    Q.  How many -- how many square feet a load?
5    A.  Oh, probably between 20,000 square feet
6 roughly, if I'm guessing.
7    Q.  Does he have any type of warehouse
8 there?
9    A.  Yes.
10    Q.  How big is his warehouse?
11    A.  I don't know.
12    Q.  And --
13    A.  I never measured it.
14    Q.  Is this what he moved into, that he can
15 only hold eight or nine loads?
16    A.  No, it's about what he carries.  He's
17 got other items in there.  Cement.  He's has a
18 complete masonry business.
19    Q.  What else does he have in there besides
20 cement?
21    A.  Wire lathe.  I couldn't really tell you
22 what all.  Rebar.  Whatever it takes to be in the
23 masonry business.
24    Q.  All right.  Let's go back to the June 21
25 meeting where you and Mr. Hesch drove down from

**Page 52**

1 Jonesboro to meet Randy Sims in his backyard and
2 William Thomas.  Tell me what was said during the
3 course of that meeting.
4    A.  Well, we just -- I asked Randy what his
5 intentions was, and he said he wanted to buy
6 stone from Marty.  And I said, well, Randy,
7 here's the deal.  You got to talk to Marty, and
8 Marty told me he wasn't sure if he wanted to sell
9 him stone.  He had to think about it.  And on the
10 way back Marty just told me, he said he didn't
11 think he wanted to sell stone to him, and left it
12 at that.
13    Q.  Did he tell you why?
14    A.  No, he did not.  He just said he didn't
15 feel good about it, and that's all that was said.
16    Q.  Did you tell anybody at Stone Works
17 about this?
18    A.  I have not.  I haven't talked to anyone
19 at Stone Works, no.
20    Q.  But you could have easily picked up the
21 phone and called?
22    A.  I probably could, yeah.
23    Q.  Why did you not do that?
24    A.  I didn't figure it was anything I need
25 to be talking to him about.

**Page 53**

1    Q.  Well, did you communicate with Randy
2 Sims or William Thomas or Megan Sims after this
3 concerning buying stone?
4    A.  No.  I have not had any contact with
5 Megan Sims whatsoever, except that one time.
6    Q.  Well, how was it communicated, if you
7 know, that Marty Hesch didn't want to sell him
8 stone?
9    A.  Well, Marty was driving back and he told
10 me he didn't want to.
11    Q.  How was it communicated to Mr. Sims from
12 or Mr. Thomas?
13    A.  I have no idea.
14    Q.  Did he say he would give them a call?
15    A.  I don't remember that.  I don't know.
16    Q.  I would think, if you drove down from
17 Jonesboro to Benton, that either they'd follow up
18 with you or you'd follow up with them?
19    A.  I figured he would follow up with Marty,
20 because I just know what Marty told me, and then
21 I just got away from it, so I don't know.
22    Q.  Why did you get away from it?
23    A.  I was busy doing other things.  I didn't
24 get involved in the sales.  I was just at
25 Jonesboro for that one day.

**Page 54**

1    Q.  You didn't want to set him up as a
2 dealer?
3    A.  He doesn't qualify as a dealer.
4    Q.  What takes to qualify as a dealer?
5    A.  You got to have an office, a warehouse,
6 and Rusty will tell you this.  Like I told him,
7 he's in the same place today as he was when he
8 went down there 15 years ago.
9    Q.  And where is that?
10   A.  Broke.  I told him this.  In other
11 words, he's just not qualified to be a dealer.
12 He's a good worker.
13   Q.  He's a good worker?
14   A.  Very good worker.
15   Q.  Did you ever say words to the effect
16 that you needed to keep him broke because he
17 would keep on working harder?
18   A.  Do what now, sir?
19   Q.  Keep him broke because he would work
20 harder?
21   A.  He would, but I never did tell him that,
22 no.
23   Q.  Well, at some point you're aware that
24 Randy Sims, Megan Sims and William Thomas went to
25 work at Stone Concepts.  Is that correct?

**Page 55**

1    A.  I heard they did.  I did not know when
2 or what.  I don't know anything much.  When they
3 hired him, I don't know.
4    Q.  When did you hear it?
5    A.  It was about the time when Marty
6 built -- done something in Alexander.  He sent a
7 picture out, and then he said he hired Randy.
8 And he told me he didn't hire William, he just
9 put William on some kind of assignment payroll.
10   Q.  Assignment payroll?
11   A.  I don't know what the deal was there.  I
12 mean, you're getting into Marty's business now.
13   Q.  Well, was Stone Concepts, Alexander
14 store was one of your dealers.  Right?
15   A.  He is now, yes.
16   Q.  And I mean, that's part of Stone
17 Concepts?
18   A.  Stone Concepts.
19   Q.  So you made money off those sales?
20   A.  I will, yes.
21   Q.  Are they not selling?
22   A.  Some, but I don't know how much.
23   Q.  Okay.
24       MR. SMITH:  We don't need to go
25 off.  Someone just joined.  I wanted to make sure

**Page 56**

1 you knew who had joined the Zoom.  It shows as
2 Amanda Kennedy.  I don't know who that is.
3       MR. RICHARDSON:  That might be
4 Erin.
5       MR. SMITH:  If they're from your
6 office, that's fine with me.  I didn't know who
7 that was.
8       MS. CASSINELLI:  It's me.  I had to
9 switch devices.  My iPad went kaput.
10       MR. JAMES:  Let's go off the record
11 if we're going to do that.
12       (Recess.)
13   Q.  (By Mr. James)  Mr. Fraley, I want to
14 get an understanding of this June 2021 meeting.
15 You said you were in Jonesboro.  Did you go there
16 to meet Marty Hesch?
17   A.  Correct.
18   Q.  And was it specifically to take him down
19 and introduce him to Randy Sims?
20   A.  No, sir.
21   Q.  So you were there and it came up?
22   A.  Yeah.
23   Q.  Did Randy Sims call you?
24   A.  I called Randy and asked him.  Randy
25 called me previous, asked if I was going to bring

**Page 57**

1 him to see Mary or let Marty introduce him, and
2 then I called him and told him if he wanted to,
3 we could be there.  I mean, it was 3:30 that next
4 morning be at home.  It was a long night for me.
5    Q.  What did you tell Marty Sims, or excuse
6 me, Marty Hesch about what Randy Sims said?
7    A.  All I told Marty Hesch was that Randy
8 Sims was a good installer, and he's wanting to go
9 in business on his own.  And that was all I said.
10   Q.  Now, business on his own?
11   A.  Yeah, doing install work.
12   Q.  So -- okay.  Doing install work?
13   A.  Correct.
14   Q.  And buying stone factory direct?
15   A.  No.
16   Q.  Buy it from Stone Concepts?
17   A.  Stone Concepts, yes.
18   Q.  Okay.  And you-all drove down there.
19 Did Marty tell you why he didn't he feel good
20 about it?
21   A.  He did not.
22   Q.  Did you surmise why he did?
23   A.  No, I didn't ask him no questions.
24 That's Marty's business.
25   Q.  And then you talked about them opening

15 (Pages 54 - 57)

**Exhibit 1**

1 the Alexander store. When and how did you become
2 aware of Stone Concepts, Marty Hesch opening the
3 Alexander store?
4     A.  He sent out a text saying they was open.
5 I didn't have a clue he had been doing this yet.
6 I knew he was thinking about it, but I didn't
7 know when or where.
8     Q.  When you say you knew he was doing it,
9 you knew he was going to open a store in central
10 Arkansas?
11     A.  Yes.  I didn't know where or what time
12 or nothing.  In other words, he elaborated on
13 doing it.  He would.  I didn't know when.
14     Q.  How long had he been talking about it?
15     A.  After I found out about Troy and them's
16 situation.
17     Q.  Okay.  So it's your testimony --
18     A.  I give him first opportunity.
19     Q.  You gave him first opportunity for what?
20     A.  To fill in for central Arkansas for
21 Centurion Stone.
22     Q.  Let me be clear here.  You said after
23 you found out about Stone Works, you mean the
24 ProVia credit app?
25     A.  No, no, I knew about that before.  The

Page 58

1 credit app really didn't make up my mind.  Randy
2 Sims called and told me that he was switching
3 over.
4     Q.  When did he tell you that?
5     A.  Sometime in June.  I don't have dates.
6     Q.  Okay.  Tell me about this June 2021
7 conversation with Randy Sims.  And my first
8 question is, was it before or after you and Marty
9 Hesch drove down there?
10     A.  It was before.
11     Q.  It was before?
12     A.  Randy Sims, yes.  You mean with ProVia?
13     Q.  Yes.
14     A.  It would be before, yeah, they
15 considered doing anything before.  I mean, if I
16 didn't-- in other words, right there, I'm losing
17 a friend, two friends.  Three, really.
18     Q.  The Stone Works, Troy Rhodes, Rusty Ray.
19 Why would you be losing a friend?
20     A.  I hope I don't.
21     Q.  Why would you be losing a friend?
22     A.  Because they feel like I undercut them,
23 and I'm not.
24     Q.  How are you not undercutting them?
25     A.  What do you mean, how am I not?  I'm not

Page 59

1 undercutting them.  They're going a different
2 direction.
3     Q.  So let's talk about this conversation
4 with Randy Sims in June of 2021.  As I understand
5 it, it was before you and Marty Hesch came down
6 from Jonesboro to Benton?
7     A.  Correct.
8     Q.  And Marty Hesch calls you -- or excuse
9 me.  Strike that.
10         Randy Sims calls you?
11     A.  Yes.  And said he didn't want to lay
12 ProVia Stone, and that Stone Works was switching
13 over.  So I just let it go for a week or two and
14 I talked to Marty and went from there.
15     Q.  And did that result in you -- the trip
16 from Jonesboro to Benton?
17     A.  Correct.
18     Q.  All right.  Now, when William Thomas
19 said that, did you ask anybody at Stone Works if
20 that was true?
21     A.  I did not.
22     Q.  Did you do any type of investigation to
23 determine whether it was true?
24     A.  No, I did not.  Well, I didn't have to.
25 When that -- when it was sent on e-mail that they

Page 60

1 was authorized dealer, that's -- really turned my
2 head.
3     Q.  When did you see it on e-mail that they
4 were an authorized dealer?
5     A.  June 28th or 29th, somewhere in the last
6 of June.  I'm not exactly sure what day it was.
7     Q.  And what did you look at to see that?
8     A.  It was on -- William Thomas sent it to
9 me.
10     Q.  So what did William Thomas send you on
11 June 29th, 2021?
12     A.  I was thinking where they were
13 authorized dealer, and then the credit app come
14 in after that.
15     Q.  Are you talking about ProVia's website?
16     A.  Correct.
17     Q.  And so that was sent to you by William
18 Thomas?
19     A.  Yes.  Why, I could not tell you.
20     Q.  How did he send it to you?  Via e-mail?
21     A.  No, text.
22     Q.  You still have that text?
23     A.  I do.
24     Q.  All right.
25     A.  I would be very happy to get it up.

Page 61

16 (Pages 58 - 61)

**Exhibit 1**

Page 62

1   Q.   Okay.  We would like that, so please
2 don't delete it.  Okay?
3   A.   Okay.
4   Q.   So what did you do when William Thomas
5 -- did it just come out of the blue when Randy
6 Sims sent you that or did you know it was coming?
7   A.   Randy Sims didn't send me nothing.
8   Q.   So who sent you the ProVia?
9   A.   William Thomas.
10   Q.   Okay.  William Thomas sent it.  How did
11 you know William Thomas?
12   A.   He was a salesman for Stone Works.  I
13 mean, I dealt with all of them.  I mean, they
14 have called me periodically through the years.
15   Q.   Did you know Williams Thomas other than
16 through Stone Works?
17   A.   No, I did not.
18   Q.   And before William Thomas sent you this
19 e-mail on June 28th or 29, 2021, did you talk to
20 either him or Randy Sims?
21       MR. SMITH:  Lacks foundation.  I
22 think he said it was a text message, not an
23 e-mail.
24   Q.   (By Mr. James)  Okay.  Let me correct
25 that.

Page 63

1       MR. SMITH:  Let him re-ask it.
2   Q.   (By Mr. James)  Before receiving this
3 text on June 28th or 29th, 2021 did you talk to
4 anybody about this?
5   A.   I don't remember, no.
6   Q.   All right.  When Randy Sims called you
7 before the text was sent, sometime in June of
8 2021, did you talk to anybody about it?
9   A.   No.
10   Q.   You didn't talk to anybody at Centurion?
11   A.   I can't remember if I did.  I might have
12 told Tim Pardue, told him about switching over.
13 I believe I might have, yes.
14   Q.   Is that something you would have
15 expected you would have done?
16   A.   Correct.  I did call Tim.
17   Q.   Okay.
18   A.   Other than that, nobody else, no.
19   Q.   What do you recall about your
20 conversation with Tim Pardue in June of 2021,
21 after this first phone call from Randy Sims?
22   A.   I just called him and I said I think
23 Stone Works is going different direction with
24 ProVia, and if there is, everybody has gotta do
25 what they gotta do.

Page 64

1   Q.   How did you take that?
2   A.   I take it with Tim Pardue.
3   Q.   I mean, what did you understand that to
4 mean?
5   A.   It means, in other words, if they want
6 to go with ProVia there's nothing we can do to
7 change it.
8   Q.   What was wrong with them selling ProVia
9 and Centurion?
10   A.   They still can, but they cannot do it --
11 they have to buy it through another dealer.  I
12 mean, if I was ProVia, I wouldn't want to have
13 two stones.  I wouldn't want Centurion in my
14 office.
15   Q.   Well, was Stone Works Centurion or Stone
16 Works Stone Works?
17   A.   Well, they was -- Stone Works was a
18 Centurion dealer.
19   Q.   So it's your testimony --
20   A.   For example, I mean, ProVia does mostly
21 advertising in the phone books.  You know, I
22 mean, everything -- in other words, they do a lot
23 of advertising.  They're not advertising for
24 Centurion.  Centurion does advertising, not on
25 behalf of ProVia.  So if someone calls Centurion

Page 65

1 headquarters and says I need to know your dealer
2 in Little Rock, they're not going to say that
3 that's selling three or four stones, because they
4 could be a lost cause.  It'd go to ProVia.
5   Q.   So is it your testimony that a dealer of
6 Centurion cannot sell other stone?
7   A.   They can sell natural stone.  No.  If
8 they're a dealer, they cannot, no.  Not precast
9 stone.
10   Q.   Let's agree on terminology here, because
11 I understand you, but I want to make sure the
12 record is clear.  Natural stone is what it sounds
13 like, it's real stone?
14   A.   Correct.
15   Q.   And precast or veneer stone is what
16 Centurion sells.  Correct?
17   A.   Manmade.  Manmade products.
18   Q.   Manmade or can I call it veneer?
19   A.   You can call it veneer, yes.
20   Q.   And you'll understand what I'm saying?
21   A.   Yes.
22   Q.   And so it's your testimony that your --
23 Centurion's dealers could only sell Centurion
24 veneer?
25   A.   Yes.

17 (Pages 62 - 65)

**Page 66**

1    Q.   No exceptions?
2    A.   Not with me.  In my areas, no.
3    Q.   So whose decision is that, Centurion or
4 yours?
5    A.   Me and Centurion both.  We got an
6 agreement.
7    Q.   What's the agreement you have with
8 Centurion?
9    A.   The agreement is I must carry one stone
10 or I'm not going to go work area selling three
11 stones.  I'm not going to waste my time.
12    Q.   Okay.  So if you work with a dealer, you
13 want to make sure they're selling just Centurion?
14    A.   That's what I'm working for.
15    Q.   Because that's how you get compensated
16 is Centurion?
17    A.   Correct.  Correct.
18    Q.   And your agreement with Centurion Stone
19 is there won't be any dealers that sell anything
20 other than Centurion stone?
21    A.   Correct.  If they want to sell ProVia, I
22 back them a hundred percent.  I wish them well.
23    Q.   So ultimately you made the decision to
24 terminate Stone Works?
25    A.   Not a hundred percent, no.  I can never

**Page 67**

1 make a hundred percent decision.  It come from
2 Tim Pardue.
3    Q.   So tell me how that decision came about
4 and when it came about.
5    A.   Well, I just called him, told him, and
6 he said take care of it.  He said, we'll find
7 somebody else, and I talked to him, I said, Marty
8 is thinking about it.  He said Marty would be a
9 good man, so.
10    Q.   When you say Marty was thinking about
11 it?
12    A.   He never did commit about going in to
13 central Arkansas.
14    Q.   So when did you talk to Marty about
15 going into central Arkansas?
16    A.   I told him when we was driving to see
17 Randy, because he never would -- I mean, he
18 started a brand-new business, and he wasn't sure
19 what he could do.
20    Q.   Now, was the Jonesboro trip before --
21 Jonesboro to Benton trip before or after you
22 received the text from William Thomas?
23    A.   It was before.
24    Q.   Okay.  So after the trip you received
25 the text from William Thomas?

**Page 68**

1    A.   After, yes.  That come in right the last
2 of June.
3    Q.   So at that point you didn't know what
4 was going on with Stone Works.  Correct?
5    A.   Correct.  I knew something was going on.
6 I didn't know what.  In other words, I wasn't
7 making no decisions until I fully knew.
8    Q.   What information did you have, other
9 than the one phone call from Mr. Sims?
10    A.   That's it right there then.  That's all.
11    Q.   And do you know whether Mr. Sims had
12 been talking bad to Stone Works about Centurion
13 product?
14    A.   I have no idea.  I have no idea what he
15 was talking.
16    Q.   Right.  But did you just straight up man
17 to man, these are your friends, and I guess I'm
18 being sexist when I say man to man so let me
19 rephrase that.  Did you straight up call your
20 friends at Stone Works and say, hey, I hear that
21 you may be selling ProVia Stone?
22    A.   No, I did not.
23    Q.   Why not?
24    A.   They didn't call me.
25    Q.   Well, you hadn't confirmed it?

**Page 69**

1    A.   Huh?
2    Q.   You hadn't confirmed it.
3    A.   If they were considering selling, they
4 could have called me and let me know, too, so
5 that's a two-way street there.
6    Q.   Why would they call you and let you
7 know?
8    A.   Huh?  The same reason I need to call
9 them let them know.
10    Q.   Why is that?
11    A.   That's just good business.
12    Q.   Did you have an agreement with them that
13 they would not sell anything other than Centurion
14 stone?
15    A.   Everybody knows that.
16    Q.   Tell me what that agreement is that
17 everybody knows?
18    A.   I tell them up front.
19    Q.   And that's your rule?
20    A.   (Witness shakes head.)
21    Q.   You're shaking your head yes?
22    A.   Yes.  Yes.  That's my rule.  I'm sorry,
23 I need to be on the record.
24    Q.   And that's your agreement with them?
25    A.   Yes.  Everybody knows it.

18 (Pages 66 - 69)

**Exhibit 1**

**Page 70**

1    Q.   Because it affects your compensation?
2    A.   Yes.  And it's just -- that's not good
3 for two manufacturers to be in the same building.
4 I mean, it's just not right.
5    Q.   Do other Centurion reps, such as
6 yourself --
7    A.   I have no idea.
8    Q.   I was going to say jump off a bridge.
9 You don't know what I'm going to say.
10    A.   I know what you're going to say.  I'm
11 sorry.
12    Q.   Let me finish the question.  Do other
13 Centurion reps allow their dealers to sell other
14 products?
15    A.   I could not answer that question.
16    Q.   You haven't talked to other reps out
17 there?
18    A.   No.
19    Q.   Who are other Centurion reps that are
20 similarly situated as yourself?
21    A.   Right now they got one in Atlanta,
22 Georgia, Scott Jones, and I'm almost a hundred
23 percent sure he's going to be in my same boat,
24 and they got another one in Florida, Craig Black,
25 and I would say he's going to be in the same

**Page 71**

1 situation with me.  And that's the only two I
2 know.
3    Q.   Have you talked to both of them about
4 this?
5    A.   No.
6    Q.   Then how do you know they're going to be
7 in the same situation as you?
8    A.   I know how they feel towards Centurion.
9    Q.   How do you know how they feel?
10    A.   I have been with them before on trips.
11    Q.   And what do they say about how they feel
12 toward Centurion?
13    A.   It's our blood.
14    Q.   It's your blood.  What do you mean?
15    A.   We're kind of married to Centurion.  I
16 mean, that's how I make my living.
17    Q.   Does Tim Pardue listen to you?
18    A.   I don't know what you mean by listen to
19 me.
20    Q.   Well, have you ever recommended anybody
21 be a dealer that he said no?
22    A.   Yes.
23    Q.   Who?
24    A.   I'm trying to think who it was.  One
25 time a boy from Cape Girardeau.  I can't remember

**Page 72**

1 his name.  I brought him down to the plant and he
2 didn't think he would qualify, and I just told
3 him they didn't make the cut.  I can't remember
4 even who the boy was, but he was in a --
5    Q.   How long ago was this?
6    A.   Oh, God, this was probably 15 years ago.
7    Q.   Other than this one incident 15 years
8 ago, have you ever recommended a dealer to Tim
9 Pardue --
10    A.   No.
11    Q.   -- and he said no?
12        MR. SMITH:  Make sure you let him
13 finish.  I know it's tough when you know where
14 he's going, but try to let him finish the
15 question.
16    A.   Go ahead.
17    Q.   (By Mr. James)  Other than this one
18 instance with the fellow from Cape Girardeau,
19 have you ever recommended a dealer to Tim Pardue
20 and he said no?
21    A.   No.  Not that I'm aware of, no.
22    Q.   Have you ever recommended termination of
23 a dealer to Tim Pardue and he said no?
24    A.   No.
25    Q.   How many times have you terminated

**Page 73**

1 dealers, such as Stone Works?
2    A.   I have never done another one like this
3 situation.
4    Q.   Like this situation, what do you mean?
5    A.   In other words, I had one dealer in
6 Mountain Home that stabbed me.  Alcohol got him,
7 and I had to talk to him.
8    Q.   Did you terminate him?
9    A.   Yeah.  You know what he said?
10    Q.   What did he say?
11    A.   He said been a good ride.  He said I
12 knew it was coming.
13    Q.   Because it was affecting his business?
14    A.   Yeah.  He knew it was.  His wife is the
15 one that called me.
16    Q.   What was the name of that business?
17    A.   Rockin' 8 Stone.
18    Q.   Rockin' 8?
19    A.   Yeah.  Tim Hedrick.  I was the best man
20 at his wedding.
21    Q.   Best man.  Tim was the best man?
22    A.   I was the best man at his wedding.
23    Q.   What was his name?
24    A.   Tim Hedrick.  And I just told him, I
25 said, Tim, I said -- he said Ed, I know.

19 (Pages 70 - 73)

**Exhibit 1**

Page 74

1    Q.   Okay.  But between the trip from
2  Jonesboro to Benton to see Randy Sims and William
3  Thomas sending the text on June 28th and 29th, did
4  you talk to Randy Sims or William Thomas or Megan
5  Sims?
6    A.   I have never talked to Megan except that
7  one evening and ask her about her daughter.
8    Q.   So I need to take her off my question
9  list.  Right?
10   A.   Would be probably good.
11   Q.   All right.  I'm going to rely on that
12 and I'll move on past her.  So my question is
13 after this Jonesboro trip to Benton and until
14 William Thomas sent his text on June 28th or
15 29th, did you talk to Randy Sims or William
16 Thomas?
17   A.   They called me a lot, but I couldn't
18 even tell you what they called me about.
19   Q.   They're probably calling you about Stone
20 Works, dealers business?
21   A.   I can't even remember.
22   Q.   You don't have a recollection?
23   A.   No, I don't.
24   Q.   But they called you a bunch?
25   A.   Yeah.  Way too much.  As a matter of

Page 75

1  fact, I finally told William just quit calling
2  me.
3    Q.   And then he sent you the text?
4    A.   That was after that he called once and
5  no more after that.
6    Q.   I said -- right.
7    A.   I'm sorry.
8    Q.   No, you're good.  I'm sorry.
9    A.   I mean, really when I got that text you
10 don't even want to know what I told William.  It
11 wasn't nice.
12   Q.   I do want to know.
13   A.   I told him it was a bunch of bullshit.
14 He could get in a lot of trouble.
15   Q.   You told that to who?
16   A.   William Thomas.
17   Q.   The text.  Wait a minute, the text on
18 the ProVia website or the credit application?
19   A.   No, the website text was -- that's open
20 to the public.
21   Q.   Okay.
22   A.   The credit app is not.
23   Q.   All right.  So let's stay on the website
24 text.  What did you do when you got --
25   A.   I was a little disappointed.

Page 76

1    Q.   Did you call Stone Works?
2    A.   No.  You don't call someone after
3  they've jumped the fence.
4    Q.   Why not?
5    A.   They've already jumped the fence.  I'm
6  not going to pull them back over.  They made
7  their decision, so I'm going to make mine.
8    Q.   And your decision was to terminate?
9    A.   Correct.
10   Q.   And did you talk to Tim Pardue?
11   A.   Yes.
12   Q.   And you told him what your decision was,
13 and did he agree or approve it?
14   A.   I told him what I thought he needed to
15 do.  He's the one that has to make the final
16 decision.
17   Q.   And you said everybody's got to do what
18 they gotta do?
19   A.   Yep.
20   Q.   And what did you take that to mean?
21   A.   Huh?  I took it to mean that Rusty and
22 them made the decisions to do what they had to
23 do.
24   Q.   And you were going to do what you had to
25 do?

Page 77

1    A.   Correct.
2    Q.   And that was terminate him?
3    A.   Correct.
4    Q.   Do you have any complaints or criticisms
5  of the folks at Stone Works besides this instance
6  of what you contend was selling ProVia stone?
7    A.   Any what?
8    Q.   Complaints or criticisms of them.
9    A.   Of Stone Works?
10   Q.   Yes, sir.
11   A.   No, I have no complaints.
12   Q.   They were a good dealer?
13   A.   Good.  I mean, they know what their
14 potential was.  They made a good call, and I
15 hate the devil out of losing them.  Angela was --
16 she's just my friend.
17   Q.   And the sole reason they were terminated
18 as a distributorship was because of the belief or
19 understanding that they were going with ProVia?
20   A.   Correct.
21   Q.   During this period of time was Stone
22 Works -- or excuse me, strike that.  Let me start
23 over.
24        During this period of time was Centurion
25 having trouble keeping Stone Works' orders

**Page 78**

1  current?
2     A.   At that time Centurion was having
3  trouble keeping everybody's orders together.  I
4  was getting lots of calls.  I never did receive
5  one from Stone Works.  I didn't know they had
6  trouble.
7     Q.   You didn't know they had back orders?
8     A.   No, I did not.
9     Q.   Could you tell where the production was
10 in the plant and when people could expect to get
11 product?
12    A.   I could not, no.
13    Q.   No information available on that?
14    A.   No.
15    Q.   Would you ask and say, hey --
16    A.   If someone would call me -- in other
17 words, I had Jeff Lee in Springdale called me.
18 He had that -- a builder was fixing to close a
19 house, and I called that.  I got him six skids
20 run especially so he could finish up that one
21 job, and then he had to wait for the rest, but
22 that was an exception.
23    Q.   Could you call the plant and say, hey,
24 Stone Works has an order that was supposed to be
25 filled June 3rd.  When can we expect it?

**Page 79**

1     A.   If I knew that they was needing it, yes,
2  I could, but I did not know.
3     Q.   Who would you call?
4     A.   Who would I call?  Probably -- let me
5  think of her name.
6     Q.   Jody George?
7     A.   No, I wouldn't call Jody.  I'm trying to
8  think of her name.  She's over the customer
9  service.  She's the one that does the -- Lisa.
10    Q.   Lisa.  Do you remember her last name?
11    A.   No, I do not.
12    Q.   All right.
13    A.   In other words, she's the one over the
14 production.
15    Q.   And she could tell you when the
16 production would be done?
17    A.   Correct.
18    Q.   And this isn't a problem where we've got
19 a slow boat from China bringing product in.
20 We're talking American made here.
21    A.   American made if you got the Americans
22 working in there.  The slow boat was they was
23 having labor issues.
24    Q.   It wasn't a boat offshore?
25    A.   No, no cargo to be unloaded.  But I

**Page 80**

1  mean, it was just like everything.  Centurion had
2  issues.  Every stone company had issues.
3     Q.   Now, you talked about Builder's Stone
4  awhile ago.  Are they a part of Fraley Masonry?
5     A.   No.
6     Q.   Have they ever been?
7     A.   Yes.
8     Q.   When were they?
9     A.   Oh, God.  Be '08, '09.
10    Q.   And why did they no longer become a part
11 of Fraley Masonry?
12    A.   Jeff Lee and Justin Shockley are in
13 Springdale, and Jeff sold out to Justin.  In
14 other words, they made -- they all wound up -- I
15 don't really know how this all happened.  I was
16 not involved, so I mean, I'm guessing, so I don't
17 know.
18    Q.   Well, let me get your best understanding
19 what happened.
20    A.   They just made a trade.  In other words,
21 Justin was part of Fraley.  And Jeff Lee -- in
22 other words, they -- my son traded part of his
23 stuff from Fayetteville.  It's just trades.  I
24 don't know.  I don't know.
25    Q.   I understand what you're saying.

**Page 81**

1     A.   I mean, I stay out of their business.
2     Q.   In your dealings with Stone Works other
3  than -- and these series of questions, or other
4  than your information about them growing with
5  ProVia.  Okay?
6     A.   Correct.
7     Q.   Did the folks at Stone Works act in good
8  faith?
9     A.   I felt they did.
10    Q.   Did they act in a commercially
11 reasonable manner?
12         MR. SMITH:  Objection, calls for a
13 legal conclusion.  You can answer if you know the
14 answer.
15    A.   Yes.
16         MR. JAMES:  Just for the record --
17         MR. RICHARDSON:  Join in that
18 objection.
19         MR. JAMES:  Just for the record,
20 though, that was two coaches in there.  Number
21 one is if you can answer.  Whatever these people
22 say if you can answer, then to answer typically
23 is I can't answer.  Number two, legal conclusion,
24 so I'm going to ask they not be suggestive.
25         MR. SMITH:  I'm trying to tell you

21 (Pages 78 - 81)

**Exhibit 1**

1 what the flaw is with your question, so you
2 correct it, sir.
3          MR. JAMES:  All right.  I'm going
4 to ask that they not be suggestive.
5     Q.  (By Mr. James)  Did Stone Works do
6 anything to harm Centurion's name?
7     A.  Not that I'm aware of.
8     Q.  Did they act honestly in conducting
9 their business?
10    A.  As far as I'm concerned they did.
11    Q.  How long have you known Marty Hesch?
12    A.  Seven or eight years.
13    Q.  How did you first meet Marty Hesch?
14    A.  In Jonesboro.  Duck hunting.
15    Q.  Duck hunting?
16    A.  Yes.
17    Q.  And did he have a stone -- what business
18 did he have then?
19    A.  He was building a duck lodge in
20 Stuttgart.
21    Q.  What product was he using?
22    A.  Centurion.
23    Q.  And did you help him in opening up a
24 Centurion dealership?
25    A.  I give him opportunity.

Page 82

1    Q.  And when you say give an opportunity,
2 what do you mean by that?
3    A.  In other words, if he wanted to, I asked
4 him if -- I did not have one in Jonesboro, so I
5 give him opportunity and he took it.
6    Q.  And when you say you gave him the
7 opportunity, what all did that entail?
8    A.  It entailed him to be a Centurion stone
9 dealer.
10    Q.  And what all did that entail?  What were
11 the requirements?
12    A.  Same as, just like Rusty Rhodes, you buy
13 Centurion stone.
14    Q.  Anything else?
15    A.  No.
16    Q.  But you had to have an office, you would
17 to have a warehouse?
18    A.  You got to have all that.
19    Q.  You have to have an infrastructure in
20 place?
21    A.  He had all that.
22    Q.  You have to do a credit app?
23    A.  Yeah, and you got to buy, buy a
24 truckload of stone for stock.  He went through
25 the same routine as everyone else does.

Page 83

1    Q.  You have to buy a truckload of stone
2 from stock?
3    A.  Yes.  He has to carry inventory.
4    Q.  Okay.  And have at least a truckload of
5 inventory?
6    A.  Start out with, yes.
7    Q.  And how many square feet is a truckload?
8    A.  Roughly 45.  I mean, I'm thinking maybe
9 we slid a little bit slow on Rusty and them, cut
10 them back where they didn't have to get a full
11 truck.
12    Q.  And what would be the cost be on that?
13    A.  It depends.  Depends on the kind of
14 stone you get.  Roughly 15, 20,000.
15    Q.  And how much would you make off a pallet
16 or a skid?
17    A.  I make 18 cents a square foot.  Skids
18 are different.  You can figure about 80, 90 feet
19 to a skid.
20    Q.  Okay.  So let me get my -- pallet is 45.
21 A skid is 90.
22    A.  Uh-huh.
23    Q.  Is that correct?
24    A.  What, sir?
25    Q.  A pallet is 45 square feet?

Page 84

1    A.  A pallet is roughly a hundred square --
2 90 to a hundred.  On a skid, yeah.
3    Q.  Is there a difference between a pallet
4 and a skid?
5    A.  No.
6    Q.  Okay.  Ninety to a hundred square feet
7 and how much money would you?
8    A.  Probably $18 a skid, roughly.  But that
9 was not my requirement.  That was Centurion's.
10    Q.  Centurion's requirement.  That they
11 prepurchase a skid?
12    A.  No, a truckload.
13    Q.  Okay.  What's the difference between a
14 truckload and a skid?
15    A.  About 40 pallets, 45.
16    Q.  There we go.  So your $18 a skid would
17 be times 45 on that?
18    A.  Correct.
19    Q.  All right.  Was there a requirement of
20 how often they had to buy a truckload?
21    A.  No.
22    Q.  Just buy one to start out with?
23    A.  Start out with.  That's one thing that
24 Rusty could tell you, that I did not put any
25 judgment on no one.

Page 85

22 (Pages 82 - 85)

1    Q.  Let me ask you if I were a Centurion
2  dealer in your area and I bought Centurion stone
3  for a project, but I needed to finish the
4  project, maybe some corners or ends and I
5  couldn't get the material from Centurion, would
6  it be okay to go buy those pieces from ProVia or
7  another?
8    A.  It wouldn't match up.
9    Q.  So that would not happen?
10    A.  You would have bad looking job.
11    Q.  Okay.  So couldn't do that?
12    A.  No.
13    Q.  And you wouldn't allow it?
14    A.  It would not look good.  I wouldn't like
15  if, but the customer, that would be the one that
16  wouldn't allow it.  Be like putting a Chevy hood
17  on a Ford truck.  They don't just match up.  The
18  colors aren't the same.
19    Q.  And that's one of the things you helped
20  the dealers with is colors?
21    A.  Correct.
22    Q.  Why are colors so important?
23    A.  For looks.  I mean, this is a manmade
24  product.  You go look at a driveway, you're going
25  to see different shades in that driveway.  It may
Page 86

1  be poured the same day, but the humidity changes
2  cement.  So it's just -- it's a technical thing
3  keeping the color properly tuned in your stone.
4    Q.  Does it fade?
5    A.  Some.  Sunshine will fade anything.
6    Q.  What other requirements were there to be
7  a dealer?
8    A.  That's about -- you named them all.
9    Q.  Now, they had to fill out a credit app?
10    A.  Yes.
11    Q.  And would they have to agree to pay for
12  the stone that they purchased?
13    A.  Yeah.  You got a 30 day pay period.  You
14  got 25 days.  If you paid, you get a 10 percent
15  discount, 25/10.
16    Q.  Tell me what 25/10 means?
17    A.  That means if you pay within 25 days,
18  you get 10 percent off your invoice.
19    Q.  Well, what if you paid in 30 days?
20    A.  It depends on.  Me and Angela have
21  worked that out where she's got her 10 percent.
22    Q.  Okay.  But not past 30 days?
23    A.  I mean, we went past a few times.
24    Q.  Can you do that with other dealers?
25    A.  No.
Page 87

1    Q.  Stone Works is the only one you did it
2  for?
3    A.  Yes.
4    Q.  How many times did you do that for
5  Angela?
6    A.  Maybe just one.
7       MR. SMITH:  Hold on just a second.
8       MR. JAMES:  Let's go off the record
9  for a second.  We're having trouble with Zoom.
10       (Off the record.)
11    Q.  (By Mr. James)  Did you have anything to
12  do with Randy Sims going to work at Stone Works?
13    A.  Yes.
14    Q.  Tell me what you had to do with that.
15    A.  Well, when we first started, when Stone
16  Works started up, they were pretty illiterate.
17  They knew nothing about stone.  I think I'm
18  telling it right.  And I had Randy Sims that he
19  was going to go down and help for a couple weeks,
20  and I guess he loved the area and he talked to
21  Rusty and stayed there.  He was an employee of
22  mine at the time.
23    Q.  That's my next question.  He was working
24  for you, and he went down.  And did you express
25  any concerns to the folks at Stone Works
Page 88

1  regarding Mr. Sims?
2    A.  No, I did not.
3    Q.  Did you tell them he had had a drug
4  history?
5    A.  I did not.  I didn't really know he had
6  that much of a drug history until Angela.  Angela
7  is the one that really brought it to me.
8    Q.  Do you have any complaints or criticisms
9  of Randy Sims?
10    A.  No.  I have no complaints, no.
11    Q.  Megan Sims?
12    A.  No.  I have never really been around
13  Megan Sims.
14    Q.  William Thomas?
15    A.  I never really been around William
16  enough to know him.  If he walked in the room I
17  probably wouldn't recognize him.
18    Q.  Do you have any complaints or criticisms
19  of Marty Hesch?
20    A.  No.
21    Q.  Who all have you talked to about this
22  case besides Tim Pardue and your counsel?
23    A.  That's about the size of it.
24    Q.  Talked to your wife?
25    A.  Very little.  I try to keep her.
Page 89

23 (Pages 86 - 89)

**Page 90**

1   Q.   You talk to hunting buddies?
2   A.   No. I keep it real personal.  This is
3 between me and whoever.  It's not a friend thing.
4 It's nothing to be proud of.
5   Q.   In the -- when did you actually notify
6 Stone Works you were terminating them as a
7 dealer?
8   A.   Mid-August.
9   Q.   In the weeks leading up to that did you
10 quit taking their calls?
11   A.   I never got any calls, except one time.
12 Angela tried to call me one evening, and I was at
13 my hunting lodge and I had very bad service.
14   Q.   How long a period of time was it when
15 the decision was made to terminate Stone Works
16 and they were notified that they were being
17 terminated?
18   A.   I let it run probably a week and a half
19 or two weeks because I was dreading making that
20 call.
21   Q.   Did you also want to make sure you
22 had --
23   A.   I want to make sure it's perfectly
24 legit.
25   Q.   Let me finish my question.

**Page 91**

1   A.   I'm sorry.
2   Q.   Did you also want to make sure that you
3 had another dealer to go into that area?
4   A.   No.  I was not concerned about that at
5 the time.  I mean, to start with we was having
6 enough trouble getting materials, so.
7   Q.   Was the Alexander -- were you aware of
8 the Stone Concepts Alexander store before the
9 decision was made to terminate Stone Works?
10   A.   No.
11   Q.   It would have been after that is your
12 testimony.  Is that correct?
13   A.   Yes, it is.  I didn't know anything
14 about it until he sent a text out one day with a
15 picture on it.
16   Q.   How many times have you been to the
17 Alexander store?
18   A.   Zero.
19   Q.   Never been to it?
20   A.   No.
21   Q.   You ever seen pictures of it?
22   A.   One.
23   Q.   Where did you see the picture?
24   A.   He sent -- that's when I first knew he
25 had one.  He sent the picture out.

**Page 92**

1   Q.   He didn't need your permission to open
2 the Alexander store?
3   A.   He had permission.
4   Q.   What permission did he have?
5   A.   To go in central Arkansas.  It didn't
6 have to be Alexander.  Could be Conway, could
7 have been Hot Springs.  It was his decision where
8 to go.
9   Q.   And what was Stone Works' territory?
10   A.   Well, I never really did iron it out.
11 Mostly from Conway to Hot Springs, Cabot, in that
12 area.
13   Q.   Central Arkansas?
14   A.   Central Arkansas.
15   Q.   Were there ever any issues with him
16 selling outside their territory?
17   A.   I mean, I have had a call one time, but
18 it's a legit call.  They were not doing anything
19 wrong.  G.F. Lee called me from Springdale and
20 said Stone Works was doing a project in their
21 area, and it was a builder from Little Rock that
22 they followed their builder.
23   Q.   Who was the builder?
24   A.   I don't have a clue.  I don't really
25 know their names.

**Page 93**

1   Q.   And that was okay?
2   A.   Yeah.  You can go follow your builder,
3 yes.
4   Q.   And did Stone Works also have Saline
5 County and the area around there?
6   A.   Saline, I'm not familiar.
7   Q.   Benton?
8   A.   That would be the Hot Springs area, yes,
9 uh-huh.
10   Q.   All right.  And were there ever any
11 problems with anybody else selling in their
12 territory?
13   A.   I'm not sure.
14   Q.   Do you recall any problems or issues
15 with that?
16   A.   Oh, you mean with Stone Works selling
17 their -- somebody's territory?
18   Q.   Yes, sir.
19   A.   No, not that I'm aware of.  No.
20   Q.   Prior to Stone Works -- notifying Stone
21 Works they were being terminated as a dealer, was
22 production at the factory at Centurion made
23 aware?
24   A.   Rephrase that, please.
25   Q.   Sure.  I would be happy to.  Prior to

24 (Pages 90 - 93)

**Exhibit 1**

## Page 94

1 Stone Works being informed they were being
2 terminated as a dealer of Centurion, did their
3 orders stopped being filled?
4    A.  I don't have a clue there.  They
5 shouldn't have been.  Not prior.
6    Q.  They should have continued?
7    A.  Yes.
8    Q.  As contracted?
9    A.  Correct.  I wouldn't know why.  I
10 wouldn't see an issue in there.
11    Q.  I might have asked you and if I did I
12 apologize.  I did, so I'll move on with that one.
13       Did you seek advice of counsel before
14 you terminated Stone Works?
15    A.  Counsel, Tim Pardue is my counsel, yes.
16 That is the only counsel.
17    Q.  You didn't talk to an attorney?
18    A.  Well, yes.  Their attorney.
19    Q.  Who is their attorney?
20    A.  John Enkema.
21    Q.  Spell that last name?
22    A.  I can't.
23    Q.  E-n or i-n?
24    A.  E-n.  I'm not sure how to spell it.
25    Q.  Have you talked to Mr. Enkema about this

## Page 95

1 lawsuit?
2    A.  Very little, but some.
3    Q.  Does he represent you?
4    A.  No.  I mean, he represents to a point.
5 Jason talked to him some, but I don't.
6    Q.  Jason?
7    A.  Right here.
8    Q.  Jason Smith.  Okay.  And what
9 conversation did you have with Mr. Enkema
10 concerning this lawsuit?
11    A.  When I got it I took the copies down
12 there, and he's the one that explained it to me.
13 I didn't have a clue.
14    Q.  What did he tell you?
15    A.  Well, at the time he told me I couldn't
16 work for five days.
17    Q.  Why could you not work for five days?
18    A.  Because I think that was an injunction
19 or something is what he told me.  I don't know.
20    Q.  Okay.  What is Tim Pardue's cell number?
21    A.  I don't have a clue.
22    Q.  Is it on your phone?
23    A.  I have not got my phone.
24    Q.  Where is your phone?
25    A.  It's at home.

## Page 96

1    Q.  Were you told not to bring your phone?
2    A.  No.  I didn't want to bring it.  I
3 didn't want an disturbance.
4    Q.  It's got an on/off switch.  Right?
5    A.  Do what, sir?
6    Q.  It's got an on/off switch.  Right?
7    A.  I don't know if it does or not.  That's
8 how much I am on the phone.
9    Q.  How often do you head out from home and
10 don't bring your cell with you?
11    A.  Several, if I can.  If I'm going in a
12 meeting or something, I won't take a phone.
13    Q.  And you don't know Tim Pardue's cell
14 phone number?
15    A.  Not off the top of my head, no, I don't.
16    Q.  All right.  What do you know about Randy
17 Sims, Megan Sims and William Thomas leaving Stone
18 Concepts?
19    A.  I don't know anything about it.
20    Q.  That's outside your area of knowledge?
21    A.  Yes.
22    Q.  You gone on any trips with Randy Sims or
23 Megan Sims?
24    A.  No.
25    Q.  Do anything social with them?

## Page 97

1    A.  No.
2    Q.  Hunting, fishing?
3    A.  No.
4    Q.  Now, Centurion would have distributor
5 trips.  Is that correct?
6    A.  They used to, yes.  They did.
7    Q.  And what was the purpose of those trips?
8    A.  Incentive trip.
9    Q.  I'm sorry?
10    A.  Incentive trips.
11    Q.  Was it also to keep them up to date with
12 Centurion, what was going on?
13    A.  Yeah.
14    Q.  What the requirements were?
15    A.  Yes.
16    Q.  Would they ever at these meetings
17 discuss territories and honoring another dealers'
18 territories?
19    A.  No, sir.
20    Q.  Not that you recall?
21    A.  No.  It was mostly just color changes
22 and different things.
23    Q.  Who is Blake Almond?
24    Q.  Who?
25    Q.  Blake Almond, A-l-m-o-n-d.

25 (Pages 94 - 97)

**Exhibit 1**

1   A.  Blake Almond.  That may be -- Marty
2  Hesch has got a man that works for him named
3  Blake, but I don't know his last name.
4   Q.  Where does Blake work?
5   A.  If it's the one I'm thinking of, he
6  works for Stone Works.  Or not Stone Works, but
7  Stone Concepts.
8   Q.  Physically where does he work?
9   A.  He's in sales.
10   Q.  Does he work in Jonesboro or Alexander?
11   A.  I don't know who's in Alexander.  I have
12  never been there, so it has to be Jonesboro.
13   Q.  What did you do to prepare for your
14  deposition today?
15   A.  Got up this morning and I was hoping
16  everything would go smooth.
17   Q.  Did you speak with your counsel
18  beforehand?
19   A.  Some, yes.
20   Q.  I'm not allowed to get into what you-all
21  talked about, but I am allowed to know how long
22  you-all met, so how long did you meet?
23   A.  Fifteen, 20 minutes.
24   Q.  Did you look at any records or
25  documents?

Page 98

1   A.  I think you gave me one.
2   Q.  Gave you your declaration.
3   A.  Yes.
4   Q.  Any other documents?
5   A.  No.  I'm trying to think.  I had the one
6  that had the different things.  I'm trying to
7  think what it was.  I'm trying -- yeah.
8   Q.  Okay.  You got some in your pocket.
9  Probably give your attorney a heart attack.
10       MR. SMITH:  Amen to that.
11   A.  This right here.
12   Q.  (By Mr. James)  May I see that?
13   A.  No.
14       THE WITNESS:  Can he see it, Jason?
15       MR. SMITH:  Let's go of the record.
16       (Off the record.)
17       MR. SMITH:  Mr. Fraley had in his
18  coat pocket Plaintiff's Response to Defendant' --
19  Defendant Fraley's Motion For Protective Order
20  and Incorporated Brief.  I have let Mr. James
21  know off the record that is the document that he
22  had in his coat.  This document does, I'm
23  representing, does not serve the court.  It does
24  have my notes to Mr. Fraley on it so it is
25  privileged, and we're not going to produce it or

Page 99

1  do anything further with it.
2       (Fraley Exhibit 11 was marked for
3  identification by the reporter.)
4   Q.  (By Mr. James)  Sir, I'm going to hand
5  you a document labeled Deposition Exhibit No. 11,
6  which is captioned Agreed Temporary Restraining
7  Order.  Have you seen this document before?  Have
8  you seen this document before?
9   A.  I don't think I have.  If I have, I
10  can't recall.
11   Q.  We sat here for approximately four
12  minutes while you read it twice.  Do you see your
13  attorneys' names on there?
14   A.  I saw Bud on the back.  Dan Carter.
15   Q.  So you know this was approved by your
16  attorney.  Did you authorize it?
17   A.  Not that I can recall, no.
18   Q.  You ever had any discussions regarding
19  compliance with or violation of this order?
20   A.  No.
21   Q.  And this is the first time today -- or
22  strike that.
23       Today is the first time you recall
24  seeing this document.  Is that correct?
25   A.  Yes.  I believe it is.

Page 100

1       (Fraley Exhibit 12 was marked for
2  identification by the reporter.)
3   Q.  (By Mr. James)  I'm going to hand you a
4  document labeled Deposition Exhibit 12, which is
5  a spring of 2009 subcontractor feature in
6  Arkansas Business Magazine.  And I am going to
7  ask you to focus your attention on the second
8  page, Paragraph 5, where it talks in the middle
9  about you.  You see the second page, the back of
10  the first page talks about you.
11       MR. RICHARDSON:  Pat, sorry, can we
12  jump off for just a second?
13       MR. JAMES:  Who is this?
14       MR. RICHARDSON:  It's Scott
15  Richardson.  Sorry.  I don't know that I have
16  that document, so I just want to talk about
17  sharing it with me.
18       MR. JAMES:  Well, I want to stay on
19  the record and ask the witness questions.
20       MR. RICHARDSON:  I want to see a
21  copy of the document before you start.
22       MR. JAMES:  I'm going to ask.  You
23  can instruct him not to answer or do whatever,
24  but I'm going forward.
25       MR. RICHARDSON:  It shouldn't take

Page 101

26 (Pages 98 - 101)

1 any time --
2        MR. JAMES: I'm not going to debate
3 it.
4        MR. RICHARDSON: -- to scan it and
5 e-mail it to me, but I would like to see the
6 document before we examine on it.
7    Q. (By Mr. James) Sir, did you serve as a
8 mentor to Stone Works?
9    A. Are you talking to me?
10    Q. Yes, sir.
11    A. I done my best to.
12    Q. All right. And it says, "Ed Fraley of
13 Centurion Stone and owner of Fraley Masonry in
14 Springfield had a huge impact on your career and
15 mentored us through the beginning phases of
16 development." Would you agree with that
17 statement?
18    A. Makes me feel proud, yes.
19    Q. And it says Ed is --
20        MR. RICHARDSON: Can we go off for
21 five minutes so Jason can scan that document and
22 send it to us?
23        MR. JAMES: My time is running.
24 I'm not going to debate on the phone.
25        MR. SMITH: We're in my office.

Page 102

1 not how this deposition is set up.
2        MR. RICHARDSON: Well, we agreed to
3 do Zoom.
4        MR. JAMES: Let's go off the record
5 because I don't want to burn any more of my time.
6 And I'll let you -- we'll go off at 10:20.
7        (Recess.)
8        MR. JAMES: We're back on the
9 record. We have offered to the Defendants to
10 either, A, or both, as we introduce the
11 documents, provide it to be scanned and sent to
12 the Defendants, or alternatively, to take
13 photographs of the documents and text them to the
14 Defendants. We're willing to do that. We're
15 sitting here in Springfield wanting to go forward
16 with the deposition. I think that's a more than
17 reasonable alternative. So let's go with the
18 witness.
19        MR. SMITH: I just want to make
20 sure that my position is clear on the record. We
21 are in my office. This is Jason Smith
22 representing Ed Fraley. If all of the documents
23 wanted to be provided to me, I could have someone
24 in one swoop put those together, scan them,
25 e-mail them out. What I am not able to do is to

Page 104

1 I'm willing to scan and e-mail it to him, but
2 it's not my deposition, so.
3        MR. RICHARDSON: It won't take any
4 time.
5        MR. JAMES: It will, because
6 there's more documents behind it and there's more
7 documents behind it, and I'm not going to do it
8 each time. You've chosen not to be here. I've
9 got six copies of records.
10        MR. RICHARDSON: Well, Pat, I don't
11 think that's how it works.
12        MR. JAMES: I'm not going to do it
13 on my time.
14    Q. (By Mr. James) Sir, it goes on and says
15 "Ed is well-known and respected among the
16 regional masonry community over 50 years." Would
17 you agree with that statement?
18    A. Who, me?
19    Q. Yes, sir.
20        MR. RICHARDSON: If we're going to
21 keep doing this, I'm going to have to call the
22 court. I'd rather not do that. It won't take
23 any time to scan and e-mail.
24        MR. JAMES: It will because I have
25 several documents I'm going through, and that's

Page 103

1 have a person on standby throughout the day to do
2 that whenever a document -- anytime a document is
3 introduced. I just don't have the ability to do
4 that.
5        MR. RICHARDSON: Can we split them
6 into -- because I kind of understand Pat's
7 concern -- sorry -- Mr. James' concern of not
8 wanting to give us his order of examination
9 through the documents. Could we split them into
10 a morning and afternoon group, give us some of
11 the documents that you anticipate using this
12 morning, a paralegal can scan and send them, and
13 then after lunch another set, scan and send
14 those. So two bunches of documents instead of
15 somebody being on standby. That was a question
16 to you, Jason. I'm sorry.
17        MR. CUMMINS: This is Bud Cummins.
18 Mr. James, could the paralegal go scan them and
19 put them on a thumb drive and you could put them
20 in your laptop, and as you use them send them in
21 e-mails, peel them off your thumb drive? It
22 seems like that would be taking about as much
23 time as taking a picture and sending them.
24        MR. JAMES: Time is a factor here.
25        MR. GIATTINA: Bud, that actually

Page 105

27 (Pages 102 - 105)

**Exhibit 1**

**Page 106**

1 is not a bad idea, but I mean, it really, it just
2 might take -- I just don't want to burn up our
3 time is all, because again, I'm having to drive
4 us back after this tonight, too, and I don't want
5 to be here at until 10 o'clock at night and drive
6 back home.
7     MR. CUMMINS:  I understand the
8 problem.
9     MR. JAMES:  If you will agree,
10 Jason, not to make an extra copy and transfer to
11 us on thumb drive, I'll take the time to pull and
12 then we'll do it after lunch, too.  Now, guys,
13 stuff like Centurion website, I'm assuming
14 you-all have looked at it.  You can pull it up
15 and look at it.  Pleadings, like most that I may
16 use.  You've got them.  So you're saying you need
17 all that stuff, just because?
18     MR. RICHARDSON:  No, that's fine.
19 Like you talked about the protective order and
20 his Declaration.  I had those, so I didn't say
21 anything.  It came up with the Arkansas Business
22 article, because I don't have that and didn't
23 have an indication that that was going to be
24 used.  So if in your stack or pleadings things
25 that have already been shared with us, that's

**Page 107**

1 fine.  If it's a website, you know, I guess Tim
2 text us the URL or something.  Just so long as we
3 can get to it.  That's fine, too.
4     MR. JAMES:  Well, if Jason will
5 agree that they will scan them in but not copy
6 them in, and we will get the only one that Tim
7 can then put up with a thumb drive, I'll do that.
8 I'll take your word.
9     MR. SMITH:  I don't care.  I don't
10 need to see anything until you're ready to
11 introduce it, so I don't care anything about
12 that.
13     MR. JAMES:  Okay.
14     MR. GIATTINA:  All right.  So can
15 we go off the record so we can pull these real
16 quick, guys?
17     MR. RICHARDSON:  Yeah, that's fine.
18     MR. GIATTINA:  All right.
19     (Off the record.)
20   Q.  (By Mr. James)  We're back on the
21 record.  Sir, have you talked to anybody other
22 than counsel during break?
23   A.  No.
24   Q.  All right.  Looking at Exhibit 12, the
25 first paragraph talked about Stone Works being a

**Page 108**

1 distributor for natural stone products and
2 masonry solutions.  Do you see that first page,
3 first paragraph?
4   A.  I'm reading it now.
5   Q.  Just the first paragraph.  That's all.
6   A.  Yes.
7   Q.  All right.  It talked about selling
8 Centurion Stone and then Dufferin,
9 D-u-f-f-e-r-i-n, stone.  Is that a competitive
10 product of Centurion?
11   A.  That's a full bed stone.
12   Q.  I'm sorry?
13   A.  That's a thick stone.
14   Q.  What does that -- are they a competitor?
15   A.  Not on that, no.  We cannot -- we got a
16 full.
17   Q.  Full break?
18   A.  Yes.
19   Q.  What about Bellgard, B-e-l-l-g-a-r-d?
20   A.  That is for landscaping.
21   Q.  So you don't consider any of these
22 competitors?
23   A.  No.
24   Q.  And you don't have any objection to
25 Stone Works selling this type product.  Correct?

**Page 109**

1   A.  No.
2   Q.  What about it talks about Alpha
3 Concrete, brick of wall and brick of floor?
4   A.  That's a brick product.
5   Q.  And are there any restrictions or
6 conditions on Stone Works selling any brick
7 products?
8   A.  No, sir.
9   Q.  You have no control over that?
10   A.  No.
11   Q.  No objections, no problems with that.
12 Correct?
13   A.  No, Centurion has no brick.
14   Q.  So that's not an issue.  Correct?
15   A.  Correct.
16   Q.  I think when we broke we were talking
17 about what documents you reviewed for your
18 deposition.  We saw one.  Did you talk to anybody
19 about your deposition other than counsel?
20   A.  No, sir.
21   Q.  You realize you are under oath today.
22 Is that correct?
23   A.  Yes, sir.
24   Q.  You have an obligation to tell the
25 truth.  Correct?

28 (Pages 106 - 109)

1    A.  Yes, sir.
2    Q.  The same as if you were before a judge
3  or a jury?
4    A.  Correct.
5    Q.  And can the jury and the court rely upon
6  your testimony today the same as they can rely on
7  your trial testimony?
8    A.  Yes.
9    Q.  Have you given a deposition before?
10   A.  No.
11   Q.  This is your first deposition?
12   A.  Correct.
13   Q.  Your attorney I'm sure has explained the
14  process to you.  It's not a baton death march.
15  If you need a break, you tell me, we'll break.
16  Okay?
17   A.  Okay.
18   Q.  My only question is I have a question
19  pending other than relating to privilege, that
20  you answer that question and then we'll break.
21  All right?
22   A.  All right.
23   Q.  I got your date of birth.  What is your
24  highest level of education?
25   A.  Twelfth grade.

Page 110

1    A.  My what now?
2    Q.  Your employment or your work from high
3  school until you joined Centurion.
4    A.  Well, I was a carpenter for awhile and
5  natural stone mason for about ten years, and I
6  got stupid and bought a sawmill.  I have done a
7  little of whatever to make a living.
8    Q.  What was your last position, work or job
9  before joining Centurion?
10   A.  I was working as a carpenter when I
11  moved here in '90.
12   Q.  Now, when did you start Fraley Masonry?
13   A.  '93.
14   Q.  And did you do that full-time?
15   A.  Yes.
16   Q.  Were you the only owner of it?
17   A.  Correct.
18   Q.  Is there any other owner of Fraley
19  Masonry?
20   A.  You mean today?
21   Q.  Yes, sir.  Well, you sold that to your
22  son.
23   A.  My son and he's got a partner, I guess.
24   Q.  Who is your son's partner?
25   A.  John Rudder.

Page 112

1    Q.  Where did you -- when and where did you
2  graduate?
3    A.  Leslie High School, Leslie, Arkansas.
4    Q.  What year?
5    A.  '68.
6    Q.  You go to Nam?
7    A.  Pardon?
8    Q.  Did you go to Nam, Vietnam?
9    A.  No.
10   Q.  Were you -- you were up for the lottery
11  then, weren't you?
12   A.  Yeah.  Got the draw and then they let me
13  out.  I didn't have to go.  I didn't have to
14  serve.
15   Q.  Why did they let you out?
16   A.  I guess they had their quota.  I was
17  lucky.
18   Q.  You had a high number?
19   A.  One of the lucky ones.
20   Q.  Have you attended any courses or
21  seminars in excess of three days?
22   A.  Seminars, no.  Not that I'm aware.
23   Q.  All right.  Now, tell me, high points,
24  if you would, your employment from high school
25  until you joined Centurion.  What did you do?

Page 111

1    Q.  John Rudder?  How do you spell that?
2    A.  J-o-h-n R-u-d-d-e-r, I think.
3    Q.  And where do they work?
4    A.  They work at the office.
5    Q.  I guess I asked for that.  What office
6  do they work at?
7    A.  Fraley Masonry.
8    Q.  Is that the one you said that's in
9  Ozark, what's the name of street?
10   A.  Biagio.
11   Q.  Biagio.  And how long has Mr. Rudder
12  been an employee or co-owner, let's put it that
13  way?
14   A.  I would say probably since about '08.
15   Q.  And did he ever -- did he work in
16  business beforehand?
17   A.  No.
18   Q.  Where did he work beforehand?
19   A.  Walmart.  He's the manager for Walmart
20  stores.
21   Q.  All right.  Did you-all hire him away
22  from Walmart?
23   A.  No, sir.
24   Q.  So how did he end up joining you?  Did
25  they terminate him?

Page 113

Bushman Reporting          800-556-8974
A Veritext Company          www.veritext.com

**Exhibit 1**

Page 114

```
 1     A.  No, sir.  Him and another man got
 2  together and they wanted a part of that, and he
 3  was tired of working at Walmart, so they joined
 4  up and went into the stone business for
 5  themselves.
 6     Q.  Who was the other man?
 7     A.  Stacy.  I'm trying to think of the last
 8  name.  I can't think of it.
 9     Q.  Was he from --
10     A.  He was from Springfield, yes.
11     Q.  And did he work at Walmart, also?
12     A.  No.  He was in the fence business at the
13  time.
14     Q.  Did Rudder live in Bentonville or
15  Bentonville area?
16     A.  No.  He lived right here in town.
17     Q.  When he was working for Walmart?
18     A.  Yeah.  He was working at a Walmart store
19  here.
20     Q.  And they work at, is it Fraley Masonry
21  or Ed Fraley Masonry?
22     A.  No.  It's no Ed no more.  It's Fraley
23  Masonry.
24     Q.  Was there an Ed Fraley Masonry?
25     A.  Yeah.  That's the one I had.
```

Page 116

```
 1     A.  John Rudder.
 2     Q.  -- and Rudder owns it 50/50?
 3     A.  As far as I know they do.
 4     Q.  Now, you said you worked at an office.
 5  Was that -- or you went to the office?
 6     A.  Yeah.  I spent time with John.
 7     Q.  All right.  And you don't have a desk.
 8  You just sit in a chair?
 9     A.  Sit in a chair.
10     Q.  And how often do you go there?
11     A.  Oh, a couple times a week, a couple
12  times a month.  Just depends on how I'm feeling
13  of a morning and if they need anything, I will go
14  up there every day, but it's not necessary.
15     Q.  Do you have any ownership interest in
16  Fraley Masonry?
17     A.  No, sir.
18     Q.  Do you have any financial interest,
19  other than your cell?
20     A.  That's all.
21     Q.  And your e-mail?
22     A.  Yeah.  Just on my phone.  That's all.
23     Q.  But you don't get paid anything from
24  them directly or indirectly?
25     A.  No.
```

Page 115

```
 1     Q.  So let me get this straight.  When you
 2  sold Fraley -- your business to your son, I take
 3  it you did sell it to him?
 4     A.  To a point.  I guess you could say that,
 5  yes.
 6     Q.  Okay.  You went from Ed Fraley Masonry,
 7  or it ended and it became Fraley Masonry?
 8     A.  That's correct.
 9     Q.  All right.  Any other entities out there
10  you've had ownership in since, say, the 1990s?
11     A.  No.
12     Q.  Nothing else?
13     A.  No.
14     Q.  No LLC, PLLC, Inc., partnership?
15     A.  I mean, you got to explain that.  Like a
16  rental property or something or just business?  I
17  had no businesses.
18     Q.  Businesses.
19     A.  No.
20     Q.  Right.  And is Stacy still involved in
21  Fraley Masonry?
22     A.  No.
23     Q.  He's out?
24     A.  He's out.
25     Q.  And your son --
```

Page 117

```
 1     Q.  Any other businesses besides Ed Fraley
 2  Masonry and Fraley Masonry which you have had an
 3  ownership interest in?
 4     A.  No.
 5     Q.  That's all the businesses you've owned.
 6  Correct?
 7     A.  Are you talking about in the past or
 8  now?
 9     Q.  Both.
10     A.  I have had that sawmill and I was in
11  the --
12     Q.  Okay.  Let me limit the time period.
13  From 1990 forward.
14     A.  Oh, 1990 forward, this is all I have,
15  yeah.
16     Q.  Okay.  Those two businesses?
17     A.  Yes.
18     Q.  And what was your original position you
19  were hired at Centurion?
20     A.  I wasn't really hired at Centurion as
21  far as being hired.
22     Q.  Were you ever an employee of Centurion?
23     A.  No.
24     Q.  When did you meet Tim Pardue?
25     A.  1993.
```

30 (Pages 114 - 117)

1   Q.   And what happened in 1993?  Is that when
2 you sold out to your son and you went to work at
3 Centurion?
4   A.   No, sir.
5   Q.   Okay.
6   A.   I started my own -- that's when I
7 started Ed Fraley Masonry.
8   Q.   Okay.
9   A.   And Centurion had sold a job, and I
10 took -- I liked the stone products, so I wrote
11 the number down, called them, went and met him
12 and been good ever since.
13   Q.   And were you an independent contractor?
14   A.   Correct.
15   Q.   And you've never been an employee of
16 Centurion?
17   A.   No, sir.
18   Q.   Do you get 1099 income?
19   A.   Yes.
20   Q.   Do you get K1 income from anybody?
21   A.   No.  You have to explain that to me.
22   Q.   Partnership income.
23   A.   No.
24   Q.   But you've always been 1099?
25   A.   Yes.

Page 118

1   Q.   Have you always had the same independent
2 contractor role at Centurion?
3   A.   Yes.  Just manufacturer rep.  That's
4 all.
5   Q.   What's your job as a manufacturer's rep?
6   A.   Just if I increase sales as far as
7 selling dealers, trying to select dealers, to
8 call the dealers and mostly keeping the
9 maintenance up on their products if they have
10 trouble.
11   Q.   Keep them happy?
12   A.   Yes.  Keep them happy.  That's my goal.
13 Really that's my goal, keep them happy.
14   Q.   All right.  And that was in 1993?
15   A.   No, that was in -- I started repping in
16 around '04, '05.
17   Q.   2004, 2005.  From 2004 to 2005 you've
18 had the same position?
19   A.   Correct.
20   Q.   You ever been sued?
21   A.   No.
22   Q.   Never been sued?
23   A.   No.
24   Q.   You ever testified in a lawsuit?
25   A.   No.

Page 119

1   Q.   You ever been arrested?
2   A.   No.
3   Q.   You serve on any boards or committees?
4   A.   No.
5   Q.   Any corporate boards, like, for example,
6 Centurion board or committee?
7   A.   No.
8   Q.   With Fraley Masonry?  I'm asking as
9 broadly as I can.
10   A.   No boards.
11   Q.   Or committees?
12   A.   No committees.
13   Q.   All right.  Do you serve -- are you a
14 member of any professional organizations?
15   A.   No.
16   Q.   Are you a member of any home builders
17 association?
18   A.   No.
19   Q.   Do you own any other entities directly
20 or indirectly, other than Ed Fraley Masonry which
21 you sold to your son?
22   A.   No.
23   Q.   There's nothing else out there.
24 Correct?
25   A.   You mean, as far as businesses goes?

Page 120

1   Q.   Yes, sir.
2   A.   No.
3   Q.   What is Centurion Stone?
4   A.   It's a precast stone, concrete stone.
5   Q.   Describe the business of Centurion
6 stone, as you understand it.
7   A.   Just big manufacturing plant that
8 produces concrete stone.
9   Q.   All right.  Did it used to be -- was it
10 ever affiliated with another entity?
11   A.   Not that I'm aware of.
12   Q.   Was it ever a part of Coronado Stone?
13   A.   At one time, yes.
14   Q.   And when did that end?
15   A.   About 1993.
16   Q.   And what caused it to end in 1993?
17   A.   I couldn't answer that.
18   Q.   Who owns Centurion Stone?
19   A.   When?  In '93?
20   Q.   No, right now.
21   A.   Tim Pardue.
22   Q.   Have there been any other owners during
23 the period of time you've been affiliated with
24 Centurion Stone?
25   A.   Yes.  J.B. Ball.

Page 121

31 (Pages 118 - 121)

Exhibit 1

1    Q.   And you testified to him earlier?
2    A.   Correct.
3    Q.   How many locations does Centurion Stone
4 have?
5    A.   As far as I know, one.
6    Q.   When you say as far as you know, what do
7 you mean?
8    A.   That's all.  I mean, I don't know of any
9 more.
10    Q.   And the only location you're aware of is
11 the factory in Nashville.  Is that correct?
12    A.   Yes.
13    Q.   Who is Roger Cunningham?
14    A.   He's a worker at Centurion.  He worked
15 for Centurion.  Used to be J.B.'s -- well, he
16 still is, his nephew, J.B. Ball.
17    Q.   Oh, J.B. Ball's nephew?
18    A.   Yes.
19    Q.   Okay.  Do you know his position?
20    A.   No, really, I don't.  J.B. bounces
21 around.
22    Q.   Is he friends with Tim Pardue?
23    A.   I'm sure he is.
24    Q.   Why do you say you're sure he is?
25    A.   He's worked there from about day one

Page 122

1    Q.   How does the Centurion product compare
2 to its competitors?  And by that I mean, is it
3 entry level, high end, mid range?  Are there
4 different grades?
5    A.   There are.  Yes.  I would say we're on
6 the high end, as far as water absorption.
7    Q.   As far as what?
8    A.   Water absorption and PSI strength.
9    Q.   What do you mean by water absorption?
10    A.   It's a borstaff stone.  It will not take
11 water on as quickly as some of the stones,
12 because we have no pumice in our stone.
13    Q.   And PSI strength?
14    A.   Yes.  It's one of the top.  Boulder
15 Creek is right there at the top with us in that
16 range.
17    Q.   Is Dutch Quality a --
18    A.   Yes.  That's a competitor.
19    Q.   A competitor.  Boral?
20    A.   Yeah, they are.  There's several.  I
21 just can't think of all of them.
22    Q.   Does Centurion Stone sell natural stone?
23    A.   No, sir.
24    Q.   Do you consider -- and you don't
25 consider natural stone to be a competitor of

Page 124

1 with him.
2    Q.   All right.  Who's Jody George?
3    A.   He is their account manager.
4    Q.   Have you ever heard of an entity called
5 Centurion Stone Works?
6    A.   What now, sir?
7    Q.   Entity called Centurion Stone Works.
8    A.   Not that I'm aware of.
9    Q.   Who are the competitors of Centurion
10 Stone?
11    A.   Oh, there's several.  I mean, ProVia is
12 one.  Coronado.  Culture Stone.
13    Q.   Culture Stone?
14    A.   Uh-huh.  I mean, there's probably a list
15 of seven or eight more, but I can't just jump
16 them off my head.
17    Q.   What products does Centurion sell?
18    A.   Just manufactured precast stone.
19    Q.   Does it sell any other products?
20    A.   No.
21    Q.   Concrete, wire?
22    A.   No.
23    Q.   Just the stone itself?
24    A.   Correct.  That's all they produce is
25 stone.

Page 123

1 Centurion.  Correct.
2    A.   No, because they both used it different
3 ways.
4    Q.   How do they compare in cost?  If I was
5 going to side my house, would it be more
6 expensive to use natural stone?
7    A.   Yes.  Correct.
8    Q.   About twice as much?
9    A.   Probably not -- well, it probably will
10 be, yes, with the cost of fuel and all.
11    Q.   What type of warranty does Centurion
12 Stone have?
13    A.   Hell, I don't know what they have got
14 now, honestly.  They did have 50 year.
15    Q.   Is that the best in the industry?
16    A.   Yes.  It's right there with them, yes.
17    Q.   Did that include replacement and
18 reinstallation?
19    A.   No.  Not installation.  I don't know
20 what all they include, really.
21    Q.   All right.
22    A.   You're asking questions I can't answer.
23    Q.   All right.  So explain to me how your
24 product, your stone veneer gets from Centurion as
25 a manufacturer to an end user where it's

Page 125

32 (Pages 122 - 125)

**Exhibit 1**

1 installed?
2   A.   On the truck from the plant.  Then it
3 goes to the dealership and then the dealer, it's
4 up to the dealer to get it to the job site.
5   Q.   Do you ever -- does Centurion ever
6 deliver to the job sites?
7   A.   No, sir.
8   Q.   That doesn't occur?
9   A.   Centurion has no trucks.  They do not
10 outsource trucks.
11   Q.   So, for example, when Tim Pardue wanted
12 to give stone to his buddy in Stuttgart, how
13 would that work?
14   A.   You would have to call a trucking line
15 and they would send it to them.
16   Q.   Would Centurion help make those
17 arrangements?
18   A.   I have no idea.
19   Q.   What is a custom blend?
20   A.   That's just a special color.
21   Q.   Why would one use a custom blend?
22   A.   Preference of looks.
23   Q.   Is a special blend difficult to
24 replicate?
25   A.   Some, yes, it is.

Page 126

1   A.   It's got the name and the stone, the
2 kind of stone it is.
3   Q.   Will it have the name of the recipient?
4   A.   You mean the person it's going to?
5   Q.   Yes.
6   A.   Yes, it will.
7   Q.   And would that typically be a dealer?
8   A.   It would be always a dealer, yes, that
9 I'm aware of.
10   Q.   It would never be a customer like being
11 delivered direct from Centurion to a job site?
12   A.   No.
13   Q.   Never, ever happened?
14   A.   Not that I'm aware of.
15   Q.   And you would know if that happened in
16 your market.  Correct?
17   A.   In my market, it's not going to happen
18 in my market.
19   Q.   Why is that?
20   A.   Because it's going direct to my dealers.
21 I have no one else purchasing stone.  Dealers
22 only.  If someone comes in and buys a stone, it
23 goes to the dealer, the dealer goes to the
24 manufacturer and then.  So they would have the
25 dealer's name.  If Rusty sold the stone it would

Page 128

1   Q.   What states is Centurion products sold
2 in?
3   A.   I couldn't answer all that.  I don't
4 know.  I know they were at one time still in
5 Japan and China.  I mean, not China but Canada,
6 and I know in Trinidad, so I don't know what all.
7   Q.   You understood it sells internationally?
8   A.   It does some.  It did.  I really don't
9 know now.
10   Q.   Approximately how many states does it
11 sell in?
12   A.   I don't know.
13   Q.   Of the stone veneer, how does Centurion
14 rank in the marketplace?  Is it the biggest, with
15 most sales, medium?
16   A.   It's probably in the midrange, yes.
17   Q.   Who's the biggest?
18   A.   Culture Stone used to be.  I don't know
19 who is it is now.
20   Q.   What kind of stone?
21   A.   Culture Stone out of California.
22   Q.   When your product is shipped are there
23 labels on it?
24   A.   Correct.
25   Q.   What do the labels say?

Page 127

1 have Stone Works on the skid.
2   Q.   If Stone Works or Stone Concepts ordered
3 stone from the factory, could they have it
4 delivered to the job site if they chose?
5   A.   If the trucking company would let them
6 do that.  It would be entirely up to the trucker.
7 You're using independent truckers.
8   Q.   Where do you-all store the Centurion
9 stone?
10   A.   You mean --
11   Q.   Strike that.  Where does Centurion store
12 its stone?
13   A.   In their facility.
14   Q.   Do they have any other place they store
15 it?
16   A.   No.  They've got the three warehouses
17 scattered in the country.
18   Q.   Who does?
19   A.   Centurion.  You know, they deliver to
20 different warehouses.
21   Q.   Where are the warehouses?
22   A.   One in is Atlanta, one's in Charlotte,
23 North Carolina and one's right here in Ozark,
24 Missouri.
25   Q.   Where is the one in Ozark, Missouri?

Page 129

33 (Pages 126 - 129)

**Page 130**

1  A.  At Fraley Masonry.
2  Q.  Okay.  So who owns these warehouses?
3  A.  The individuals with the companies.
4  Q.  Wait a minute.
5  A.  Fraley Masonry owns them.  Atlanta,
6 Georgia owns them.  Charlotte, North Carolina
7 owns theirs.
8  Q.  So Fraley Masonry has a warehouse in
9 Ozark?
10  A.  Correct.
11  Q.  And it owns the warehouse?
12  A.  Yes.
13  Q.  So how is that a warehouse for
14 Centurion?  Explain that to me.
15  A.  Centurion puts the stone in, and then
16 like if Rusty really wanted, if he got in real
17 bad he could pull stone from the warehouse.  It's
18 Fraley Masonry stone.  It's warehouse stone.
19 There's an up charge for the handling, but.
20  Q.  So who owns the stone in the warehouse?
21  A.  Centurion.
22  Q.  Who pays for the shipping of the stone
23 from Centurion to the warehouse?
24  A.  I do not know.  I'm not involved in the
25 warehouse.

**Page 131**

1  Q.  Would that be factored in the price as
2 it sits there?
3  A.  I'm sure it would, yes.
4  Q.  So if Stone Works called Centurion or
5 called you and said, hey, I need a truckload of
6 stone and you didn't have it at the factory, what
7 would you do?
8  A.  If they needed it in a hurry I would
9 call the warehouse to see if they had that stone.
10 If they had it, I would say they've got it.  Then
11 I would let them make their own arrangements.
12  Q.  Who would be the dealer that sold that
13 stone?
14  A.  It depends on where you call.  If you
15 call Atlanta, it would be the people in Atlanta.
16  Q.  So if Stone Works bought from your
17 warehouse, Fraley's warehouse --
18  A.  It's called northern warehouse.
19  Q.  Northern warehouse?
20  A.  And then we got a southern warehouse.
21  Q.  Where is the southern warehouse?
22  A.  Atlanta.
23  Q.  And what's the North Carolina one?
24  A.  I don't know what they call that.
25  Q.  So let me get this straight.  The dealer

**Page 132**

1 at these locations owns the physical building of
2 the warehouse?
3  A.  Correct.
4  Q.  The product contained within the
5 warehouses is Centurion product?
6  A.  That's my understanding.
7  Q.  Now, is there an agreement between the
8 dealer in Centurion with regard to the operation
9 of the warehouse?
10  A.  I couldn't answer that.  I'm not
11 involved in the warehouse.
12  Q.  Well, if stone is shipped from Centurion
13 to the warehouse, do you get a piece of that?
14  A.  If it sells.
15  Q.  Well, I'm just talking about it getting
16 to the warehouse.
17  A.  No.
18  Q.  And then if it's sold from the warehouse
19 to another dealer, do you get a piece of that?
20  A.  I get my 18 cents.
21  Q.  Who all does the warehouse sell to?
22  A.  I don't know.
23  Q.  Are they required to sell just to
24 dealers?
25  A.  That's who they sell to, yes.

**Page 133**

1  Q.  Can they sell to a contractor?
2  A.  Through the warehouse.  I don't know.  I
3 honestly don't.  If it would have to go -- if
4 they sold it to a contractor it would have to go
5 to the dealer first.  If Fraley Masonry sold it
6 to a contractor, they would have to buy it from
7 northern warehouse and then it would go from
8 there to the contractor.  No, it wouldn't go
9 directly out of northern warehouse.
10  Q.  So before --
11  A.  It would have to change hands.
12  Q.  So before any stone got moved out of the
13 warehouse, a dealer would have to purchase it?
14  A.  Correct.
15  Q.  Even the dealer that owns the warehouse?
16  A.  That's correct.
17  Q.  Would that be the same amount, price as
18 other dealers?
19  A.  Warehouse stone would be up.  It's an up
20 charge.
21  Q.  Why would there been an up charge on the
22 warehouse stone?
23  A.  Because the freight is already made from
24 Nashville to the warehouse.
25  Q.  Okay.  And that's paid by Centurion and

34 (Pages 130 - 133)

**Exhibit 1**

Page 134

1 they up charge that?
2    A.  I really don't know who pays the
3 freight, but the freight is there.  Somebody had
4 to pay it.
5    Q.  Can somebody else buy from the
6 warehouse?
7    A.  No, just dealers.
8    Q.  Just dealers?
9    A.  I mean, they could come in Fraley
10 Masonry or Atlanta and say if they need ten skids
11 of something that Fraley doesn't have it or
12 Atlanta doesn't have it, Fraley can purchase it
13 from the warehouse and then sell it to the
14 individual.  It doesn't go through a dealer.
15    Q.  Are the warehouses separate entities?
16    A.  Yes.
17    Q.  So who owns -- I thought it was at
18 Fraley Masonry.
19    A.  It is.
20    Q.  So help me.
21    A.  Separate buildings.
22    Q.  But my question was, are they separate
23 entities?
24    A.  What do you mean now?
25    Q.  Like an LLC or an --

Page 135

1    A.  I cannot explain.  I don't know.
2    Q.  Can the warehouses stock competitor's
3 product?
4    A.  No, sir.
5    Q.  They can only stock Centurion product?
6    A.  In my area, yes.  I don't know about
7 anybody else.
8    Q.  But do you have any say in that?
9    A.  Do what?
10    Q.  Do you have any say in what does or does
11 not go in the warehouse?
12    A.  I wouldn't in this one because the only
13 one that we got is my son's and he knows what
14 would happen.
15    Q.  Well, okay.
16    A.  Atlanta, Georgia, I don't know.
17    Q.  All right.  And what would happen?
18    A.  Just sitting right here, my son knows
19 not to sell any products.
20    Q.  So how long ago were the warehouses
21 formed?
22    A.  They probably been there 18 years.  I
23 don't really know the dates on them.
24    Q.  Now, when you said -- now, Stone
25 Concepts has a warehouse.  Is that right?

Page 136

1    A.  They got their own warehouse.  It's not
2 a Centurion warehouse.
3    Q.  Does Fraley Masonry have their own
4 warehouse?
5    A.  Correct.
6    Q.  Separate and apart from the northern
7 warehouse?
8    A.  Yes.
9    Q.  And so who owns the northern warehouse?
10    A.  I guess that the building is owned by
11 John and Lee, my son and John Rudder.
12    Q.  Do you know?
13    A.  Do what, sir?
14    Q.  Do you know?
15    A.  Do I know who owns it?
16    Q.  Yes, sir.
17    A.  Yeah.  I think it's Lee and John Rudder.
18 Fraley Masonry owns the warehouse.
19    Q.  All right.
20    A.  Then the stone is owned by Centurion.
21    Q.  So what area is the stone for the
22 northern warehouse for?
23    A.  Anybody that needs stone.  It's the
24 emergency type stone.  It's more emergencies.
25    Q.  Okay.  It was not open for sales west of

Page 137

1 the Mississippi?
2    A.  Is it open -- if a dealer calls, a
3 dealer, anybody can buy through the warehouse.
4 Any dealer.  I mean, we pull stone from Atlanta,
5 you know.
6    Q.  Is lead time on ordering and getting
7 product important in your business?
8    A.  The quicker you get it, the better it
9 is, yes.
10    Q.  Is it crucial?
11    A.  Sometimes.  It depends on your build.
12 Some builders come in and give me a year's
13 notice and some gives you two weeks, and some
14 will come in and give you one day, so, yes.
15 Inventory is crucial on -- keeping stock is
16 crucial in a business.
17    Q.  All right.  Is it detrimental on the
18 business to not timely get their orders filled?
19    A.  It's not good.
20    Q.  Why is that?
21    A.  Because you got customers waiting on
22 you, and they get madder and madder.
23    Q.  Are any of your customers -- or excuse
24 me, dealers on COD?
25    A.  Not that I'm aware of, no.

35 (Pages 134 - 137)

**Exhibit 1**

| | |
|---|---|
| 1  Q.  Have you ever had that situation?<br>2  A.  Yes.  When they get behind on payments,<br>3 they can't make the bills.<br>4  Q.  You-all put them on COD?<br>5  A.  I don't.  That's Jody's department.<br>6  Q.  Okay.<br>7  A.  I wouldn't even know about it.  That was<br>8 strictly up to the plant.  I don't get involved<br>9 in all that.<br>10  Q.  Is there a lease of the warehouse<br>11 between Centurion and Fraley Masonry?<br>12  A.  Yeah, I don't know.<br>13  Q.  Who operates the warehouse?  By that I<br>14 mean, Fraley Masonry employees or warehouse<br>15 employees.<br>16  A.  They have got warehouse employees.<br>17  Q.  And do they work for Centurion?<br>18  A.  No, they do not.  They work for Fraley.<br>19  Q.  So Fraley's employees operate the<br>20 warehouse?<br>21  A.  Correct.<br>22  Q.  Who's over the warehouse?<br>23  A.  I don't know.  Everybody that's at<br>24 Fraley Masonry, I think.  John Rudder, I would<br>25 assume so.<br><br>Page 138 | 1  Q.  And so how would that work?  Describe<br>2 that to me.<br>3  A.  That dealer would sell to that dealer.<br>4 If a dealer wants to have a personal dealer, he<br>5 would have to pull from his warehouse.  It<br>6 wouldn't be a storefront of Centurion.<br>7  Q.  So if I were ABC dealer I would order<br>8 the stone from Centurion, and then I would sell<br>9 my stone to another dealer who I have set up?<br>10  A.  Yes.  That's what it would be.<br>11  Q.  And does Centurion have anything to do<br>12 with that relationship that I had with that<br>13 dealer?<br>14  A.  No.  That would be up to you.  That<br>15 would be your dealing.<br>16  Q.  And would it go over and take over that<br>17 relationship with that dealer?<br>18  A.  What now, sir?<br>19  Q.  Would Centurion ever go in and take over<br>20 that relationship with my dealer?<br>21  A.  They shouldn't unless you have conflict<br>22 with Centurion.<br>23  Q.  What do you mean conflict?<br>24  A.  I mean, if something goes south where<br>25 you don't buy from Centurion anymore and your<br><br>Page 140 |
| 1  Q.  Is that why he came, to run the northern<br>2 warehouse?<br>3  A.  No, sir, he come because he wanted to<br>4 get away from Walmart.<br>5  Q.  Have you ever heard an entity called<br>6 Northern Warehouse, LLC?<br>7  A.  Northern Warehouse.  That could be the<br>8 one right here we're talking about.<br>9  Q.  Did you know who owns that LLC?<br>10  A.  No, I do not.<br>11  Q.  Has Centurion grown over the years?<br>12  A.  Yes, sir.<br>13  Q.  How has it grown?<br>14  A.  Customers and volume of stone.<br>15  Q.  When you say customers, what do you<br>16 mean?<br>17  A.  Customer base, more dealers.<br>18  Q.  Okay.  So you consider a dealer a<br>19 customer, or you're referring to --<br>20  A.  Customer of Centurion.<br>21  Q.  Would there -- do dealers develop more<br>22 dealers?<br>23  A.  If they want, they can, yes.<br>24  Q.  And are they allowed to do that?<br>25  A.  In their area, yes.<br><br>Page 139 | 1 dealer still wants to, they might -- the dealer<br>2 that you set up may want to go to Centurion.<br>3  Q.  But as long as the dealer is selling<br>4 Centurion stone?<br>5  A.  You never ever have conflict.<br>6  Q.  Okay.  If a dealer sells to a<br>7 contractor, is that something Centurion respects<br>8 and allows to occur?<br>9  A.  Yes.  Yes.  Contractors is your main<br>10 customers.<br>11  Q.  If the dealer wants to ship directly to<br>12 the contractor, is that okay?<br>13  A.  Yes.<br>14  Q.  And would Centurion ever come in and<br>15 take over a relationship with a contractor?<br>16  A.  Not that I'm aware of, no.<br>17  Q.  And not in your area?<br>18  A.  No.<br>19  Q.  And that shouldn't occur.  Correct?<br>20  A.  No, it wouldn't, no.  Not that I'm aware<br>21 of, no.<br>22  Q.  Who are the three largest competitors of<br>23 Centurion?<br>24  A.  I couldn't answer that.<br>25  Q.  Outside your area of knowledge?<br><br>Page 141 |

36 (Pages 138 - 141)

**Exhibit 1**

1   A.  Yeah, it really is.
2   Q.  So if you have a ProVia or Eldorado in
3 your market area, how do you compete with them?
4   A.  We got them.  I mean, every town has got
5 the competition.
6   Q.  So how do you compete with them?
7   A.  You got to work hard.  I mean, just --
8   Q.  Specifically what do you do?  How do you
9 compete?
10   A.  You just go out and you got your own set
11 of builders.  I mean, they ain't nobody going to
12 be able -- Fraley Masonry got their builders, and
13 someone come in, they're not going to be able to
14 take your builders.  If you got respect for your
15 builders, they got respect for you, so you got to
16 go out and work hard and improve yourself.
17   Q.  Based on relationships?
18   A.  Relationships.
19   Q.  Does pricing affect it?
20   A.  Yes.
21   Q.  How does pricing affect it?
22   A.  If it's a spec home, it really does.  On
23 homes that's just -- you know, I'm trying to
24 rephrase it.
25   Q.  Cost-plus?

Page 142

1   A.  Yeah, it doesn't affect, but if they're
2 building spec, they're building it cheap, it
3 makes a lot of difference, and Russ can tell you
4 that, that Wes Morrison would come in on spec
5 homes and beat everybody's price.
6   Q.  Do each the dealers get the same
7 pricing?
8   A.  In my area they do.  I could not answer
9 any other areas.
10   Q.  Do you ever sell Centurion products?
11   A.  No.  I sell to dealers.  I mean, I don't
12 actually sell.  I go with the dealers if they
13 need me to and explain the product to the
14 customer.
15   Q.  The dealers buy from Centurion --
16   A.  Correct.
17   Q.  -- direct, and that's who they owe the
18 money to?
19   A.  Yes.
20   Q.  And that's who sells them the product?
21   A.  Correct.
22   Q.  So would it be an untruth to say that
23 you sell Centurion product?
24   A.  I don't -- when I sell Centurion
25 products I don't really sell a product.  What I

Page 143

1 do is go to the dealer and get them to sell the
2 product.
3   Q.  Sure, I understand that.
4   A.  Yes.
5   Q.  So I mean, it would be an untruth to say
6 that you sell Centurion products?
7        MR. SMITH:  Asked and answered.
8 He's already answered the question.
9        MR. JAMES:  That's coaching.  I'm
10 going to ask you not to do that.
11        MR. SMITH:  No, it's not.
12        MR. JAMES:  It definitely is, so
13 I'm going to ask you not to.
14   Q.  (By Mr. James)  It would be an untruth
15 to say you sold Centurion product?
16        MR. SMITH:  Asked and answered.  He
17 answered the question.  Go ahead.
18   A.  Rephrase that again.
19   Q.  (By Mr. James)  Sure.  I'll be happy to.
20 Would it be an untruth to say that you sold
21 Centurion product?
22        MR. SMITH:  The question was asked
23 and answered.  Go ahead.
24   A.  If I -- do I sell Centurion?
25   Q.  (By Mr. James)  Yes, sir.

Page 144

1   A.  To the dealers.  Not to individuals.
2   Q.  So do you sell to the dealers?
3        MR. SMITH:  Asked and answered.
4   A.  I don't really sell to the dealers.  I
5 get them set up to buy from Centurion.
6   Q.  (By Mr. James)  Right.  And we went
7 through that.
8   A.  Yes.
9   Q.  So you do not sell Centurion products
10 personally?
11        MR. SMITH:  Asked and answered.
12   A.  Personally no.
13   Q.  (By Mr. James)  Now, do you operate
14 through an entity or are you just you?
15   A.  Me.
16   Q.  Do you sell masonry products in several
17 states?
18   A.  Just -- not now.  Arkansas, Missouri,
19 one little area in Kansas, one little area in
20 Oklahoma.
21   Q.  Is that your territory?
22   A.  Yes, sir.  I cut myself way back.
23   Q.  When did it change?
24   A.  I have changed five or six years ago,
25 probably, roughly.

Page 145

37 (Pages 142 - 145)

Bushman Reporting                800-556-8974
A Veritext Company            www.veritext.com

**Exhibit 1**

1    Q.   All right.  But even in those states you
2 do not sell masonry products.  Correct?
3    A.   No, no.  The dealers do.
4    Q.   When you refer to customers, are you
5 referring to dealers or the end user?
6    A.   Dealers.  I don't really get really
7 involved with the customers.
8    Q.   You ever deal with customers?
9    A.   Very little.
10   Q.   What circumstances would you deal with
11 customers?
12   A.   Mostly trouble with the color.  If they
13 have trouble with the stone or something, I will
14 be involved in the customer.
15   Q.   If they say the stone wasn't what I saw?
16   A.   Yes.  Then I would try to please the
17 customer.
18   Q.   Does the color change over years?
19   A.   It may a little but it doesn't change
20 much.
21   Q.   Other than colors, why would you deal
22 with a customer?
23   A.   I don't deal with customers unless they
24 have a situation.
25   Q.   I think you told us R.J. Horner

Page 146

1 better opportunity.
2    Q.   And Mr. Horner agreed?
3    A.   Yes.  And I talked to Troy about it, and
4 Angela called me and she said what's this deal
5 about buying stone, getting rich quick deal.  And
6 it took a few minutes to convince her.
7    Q.   Did R.J. Horner receive commissions on
8 Centurion products sold through Stone Works?
9    A.   For about three loads.
10   Q.   Why three loads?
11   A.   Because I cut Angela's price back to 50
12 and 10.
13   Q.   So in --
14   A.   We always -- 45 if you got two dealers
15 involved, two reps.  But then I just talked to
16 R.J. about that, told him it wasn't really fair.
17 I mean, me and Billy Pegg had four or five
18 dealers in Mississippi that we split commissions
19 on.  They were set up 45 and 10.
20   Q.   You and who?
21   A.   Billy Pegg.
22   Q.   Who's Billy Pegg?
23   A.   Used to be a dealer in Memphis.
24   Q.   All right.  So before -- while R.J.
25 Horner was getting commission, what were Stone

Page 148

1 introduced you to Stone Works?
2    A.   He introduced me to Troy and Angela.
3    Q.   Okay.  Was R.J. -- is there an R.J.
4 Horner and a C.J. Horner?
5    A.   Yes.  C.J. was his daddy.
6    Q.   Okay.  And R.J. is the son?
7    A.   Correct.
8    Q.   Now, was R.J. Horner wanting Troy and
9 Rusty and Angela to work in his business?
10   A.   At one time.  That was his goal.  He was
11 trying to sell a product at Hot Springs.
12   Q.   What was the name of his Hot Springs
13 operation?
14   A.   C.J. Horner Lumber.
15   Q.   All right.
16   A.   He was a lumberyard.
17   Q.   And when you learned that he wanted
18 Rusty and Ray and/or Rusty and Troy and Angela to
19 work for him, did you approach them to be --
20 separately to be --
21   A.   No, not separately.  Rusty was not
22 involved at that time, and I talked to R.J., and
23 I asked him how good a relationship he had with
24 Troy.  And he said he thought the world of him,
25 and I said, I explained to him, let's give him a

Page 147

1 Works' terms?
2    A.   45 and 10.  The same terms, yeah.
3    Q.   And after R.J. Horner was not getting a
4 commission, what were Stone Works' terms?
5    A.   Explain terms.  You mean payment?
6    Q.   Yes.
7    A.   Same payment.
8    Q.   45/10?
9    A.   No, 50/10 once R.J. got there.  50/10,
10 it got back to the regular, everybody's payments,
11 yes.
12   Q.   Is there any way you can get up to 55
13 percent?
14   A.   No.  I don't care who you are, 50 and 10
15 is your bottom price.
16   Q.   And the 50 is 50 percent, if you pay
17 with -- off retail --
18   A.   Yes.
19   Q.   -- within 30 days?
20   A.   Thirty days.
21   Q.   And what's the 10?
22   A.   If you pay it within 25 days.
23   Q.   You get another 10?
24   A.   10 percent.
25   Q.   So is that 60?

Page 149

38 (Pages 146 - 149)

**Exhibit 1**

1    A.  What now, sir?
2    Q.  Is that 60 percent?
3    A.  I'm not a mathematician.  You just take
4  50 and then take 10 percent off the next one and
5  that is your price.
6    Q.  Okay.  Did you ever tell anybody at
7  Stone Works that you could not continue to employ
8  Randy Sims?
9    A.  No.  Did I tell them that Stone Works,
10  they couldn't work Randy.
11    Q.  No, no, no, that you could no longer
12  employ Randy Sims.
13    A.  Explain that one more time.  I don't
14  quite understand what you mean.
15    Q.  Well, if someone were to say that you
16  said Randy Sims had a meth problem and you could
17  no longer employ him, do you agree with that
18  statement?
19    A.  I would have to have more proof from
20  somebody saying on meth.  I still do not
21  understand.
22    Q.  Do you have any recollection of saying
23  anything like that?
24    A.  No, no.
25    Q.  All right.  Has Ed Fraley Masonry or

Page 150

1    A.  No, sir.
2    Q.  Is there a difference between a dealer
3  and a distributor?
4       MR. SMITH:  Objection, calls for
5  legal conclusion.  You can answer.
6    A.  A distributor is one that you got the
7  warehouse, being up like Marty Hesch would be.
8  He's got 18 or 10 to 12 loads, he could be a
9  distributor.  Set up three or four different
10  areas.  If he was carrying a truckload of stone
11  you wouldn't qualify to be a distributor, because
12  you barely would have enough for your own
13  personal use.
14    Q.  So what would you be?
15    A.  You'd be a dealer.
16    Q.  So what is the difference between a
17  dealer and a distributor, in your industry?
18    A.  I just explained that.  It's quantity of
19  your material in your warehouse to be able to
20  fulfill your -- demands on your own dealers
21  that's needing stone.
22    Q.  Earlier you went through a list of
23  distributors in your territory.  What dealers are
24  in your territory?
25    A.  That's the only ones.  That's all the

Page 152

1  Fraley Masonry every sold or ever directly or
2  indirectly sold veneer stone other than
3  Centurion?
4    A.  Not that I'm aware of, no.
5    Q.  And you would know?
6    A.  Yeah.  Turned down some big jobs because
7  it wasn't our stone.
8    Q.  Say that again?
9    A.  I turned some big jobs down because it
10  wasn't our stone.
11    Q.  Have you ever developed dealers for
12  Centurion outside your territory?
13    A.  Well, that one time, my territory, I had
14  no territory.  I was free range.  I cut my
15  territory down.
16    Q.  When did you get a territory?
17    A.  Do what, sir?
18    Q.  When did you first get a territory?
19    A.  '04 I started selling for -- '04, '05 I
20  started repping.
21    Q.  What were you before then?
22    A.  I worked for Ed Fraley Masonry.
23    Q.  So my question is, while you were with
24  Centurion did you ever develop any dealers
25  outside your territory?

Page 151

1  dealers I have, the six.
2    Q.  Okay.  So I'm confused.  Was Stone Works
3  a dealer or a distributor?
4    A.  I call them all the same.
5    Q.  Okay.  That's my question.  Do you lump
6  those up the same?
7    A.  Yes.  I lump them the same.
8    Q.  And do they get the same pricing?
9    A.  Get the same pricing, yes, sir.
10    Q.  Is there an advantage to being a dealer
11  or a distributor?
12    A.  Not really, no.  No advantage.
13    Q.  What are the advantages of being a
14  distributor for Centurion?
15    A.  None.
16    Q.  Well, you get Centurion product?
17    A.  You get Centurion product, but if you're
18  a distributor, you're just pushing more products
19  in your area to different people that are
20  handling your material.  As far as being any more
21  different with Centurion, it would be the same.
22  Centurion is going to treat you the same.
23    Q.  You say more product in your --
24    A.  You would have -- if you had
25  distributor, you're selling to two or three

Page 153

39 (Pages 150 - 153)

**Exhibit 1**

1 different dealers in your area.
2    Q.   Okay.  So would a distributor be someone
3 that also sells to a dealer?
4    A.   Yes.  If you wanted to, they could.
5    Q.   But a dealer would not sell to a
6 distributor?
7    A.   If the distributor needs the stone,
8 everybody can interchange.  Any dealer can
9 interchange.  Rusty has went to Springdale to get
10 stone.  I went different places got stone.  Every
11 dealer, we work together if you need stone.
12    Q.   I'm trying to get an understanding, if
13 there is one.  I just want to know how it is in
14 your industry and in your business.  If there is
15 a difference between a distributor and a dealer
16 and I understand you say volume sold?
17    A.   Yes.  A distributor more so and if
18 you're a distributor, you have got two or three
19 people you're feeding your source to.
20    Q.   All right.  So are there any dealers in
21 central Arkansas?
22    A.   Any dealers?
23    Q.   Yes, sir.
24    A.   Just Marty Hesch is all.
25    Q.   Are there any distributors in central

1 Arkansas?
2    A.   Not in central Arkansas, no.  Marty's
3 area is in eastern, southeastern Arkansas.
4    Q.   So when he's selling in central Arkansas
5 he's selling as a dealer?
6    A.   Correct.  He's selling as a dealer
7 through his area, through Jonesboro.
8    Q.   So the Alexander store is a dealer
9 store?
10    A.   It is right now, yes.
11    Q.   How could it change from a dealer store
12 to a distributor store?
13    A.   Just more product in his store.
14    Q.   Inventory?
15    A.   Inventory.
16    Q.   And what is the requirement for
17 inventory?
18    A.   No real requirement.  Just so you can
19 keep your customer happy.
20    Q.   You can service your customer base?
21    A.   Yes.
22    Q.   Have you ever gone behind a distributor
23 and taken their dealer and made them a
24 distributor?
25    A.   No, sir.

1    Q.   That would be wrong?
2    A.   Yeah.
3    Q.   You told us several ways you've assisted
4 dealers.  Are there any other ways you assist
5 dealers other than what you've told us?
6    A.   Not really.  Not that I can think of.
7    Q.   We've talked about you selling masonry
8 products in several states, and you say that
9 doesn't happen.  Do you sell it directly or
10 indirectly in states, masonry products from
11 Centurion?
12    A.   Rephrase that so I can understand.
13    Q.   As I understand it, you don't sell any
14 products?
15    A.   Correct, no.
16    Q.   You are the contact and relationship on
17 behalf of Centurion with the distributors?
18    A.   Through Centurion.
19    Q.   Through Centurion?
20    A.   Correct.
21    Q.   But the orders are always placed with
22 Centurion and never placed with you?
23    A.   I never see an order.
24    Q.   And you never see an order?
25    A.   Not until it's -- not until it ships.

1    Q.   Because you see it then because that's
2 when you get your commission on it?
3    A.   Correct.  That's where I was at.  I
4 didn't have no idea.  I don't know when anybody
5 has got any stone orders off of what.
6    Q.   Have you ever competed with any of your
7 dealers or distributors --
8    A.   No.
9    Q.   -- for customers in any way?
10    A.   Not that I'm aware of, no, sir.
11    Q.   Well, you would know, wouldn't you?
12    A.   I would know.
13    Q.   Have you ever had any conflicts with
14 distributors or dealers?
15    A.   No.  Not that I'm aware of.
16    Q.   Is it in your personal financial
17 interest to make sure that dealers are selling as
18 much as possible?
19    A.   I want all of them to do as best -- I
20 want every dealer to be, how do you say it, to
21 the best of their potential I want them to do.  I
22 want them to be prosperous.
23    Q.   When a dealer is getting replaced, you
24 want to have another dealer already set up to
25 come in their place?

Bushman Reporting                    800-556-8974
A Veritext Company                   www.veritext.com

**Exhibit 1**

1    A.   Not necessarily.
2    Q.   But that's what you did here with Stone
3 Works and Stone Concepts.  Correct?
4          MR. SMITH: Lacks foundation.  Go
5 ahead.
6    A.   It was in a way, yes.  Marty Hesch, I
7 didn't know what he was going to set up.  I had
8 no idea.  He had an opportunity.
9    Q.   (By Mr. James)  You gave him permission
10 to set up, and you wanted him to come in and fill
11 that gap?
12    A.   I wanted, yes.  I wanted to see
13 Centurion in the area, yes.
14    Q.   Okay.  How long does it normally take to
15 fill an order, say, for a house?
16    A.   It depends on size.  I mean, it depends
17 on the orders.  I mean, I don't know how far.  It
18 depends on how far back they are.  Right now it
19 would probably be three week, three week wait.
20 That's normally the -- what they try to keep to.
21 I have seen it way up there.
22    Q.   Were any dealers incentives given to
23 dealers or distributors to open up as a dealer
24 and distributor on behalf of Centurion?
25    A.   No, not that I'm aware of.

*Page 158*

1 apartments.
2    Q.   Quads?
3    A.   Yes.  Yes.
4    Q.   Okay.  But otherwise, territories are
5 respected by Centurion, unless it's multi-family
6 housing or a situation where you're following
7 your contractor or builder?
8    A.   Yes.  And really, our territory are
9 mostly just respected by each dealer.  You can't
10 restrict trade.
11    Q.   Are dealers required to pay any type of
12 fee or dealers or distributors required to pay
13 any type of fee to Centurion?
14    A.   No, sir.
15    Q.   Were there any requirements that dealers
16 or distributors display or sell products from a
17 fixed location?
18    A.   From what, sir?
19    Q.   From a fixed location.  Fixed,
20 f-i-x-e-d.
21    A.   You're talking about like from the
22 dealership?
23    Q.   Yes, sir.
24    A.   Yeah, you're supposed to have -- you got
25 to have your office and your displays.

*Page 160*

1    Q.   Would Centurion have meetings with just
2 dealers or distributors?
3    A.   It's been a long time.  They used to
4 have meetings.  A few years ago they would have
5 everybody come in for lunch.
6    Q.   In any of these meetings were there
7 complaints that the -- that Centurion was
8 competing with the dealers in their territory or
9 not honoring their territory?
10    A.   No.  I don't know no complaints.  Most
11 of them was to find out what the dealers needed
12 to help better their business.
13    Q.   But if I were a dealer and I had my
14 territory and I had a large contractor that I had
15 a relationship and did business with and he did
16 business outside my territory --
17    A.   And he was your contractor?
18    Q.   Yes, sir.
19    A.   You go with him.
20    Q.   You go with him.  And then the other
21 exception is multi-family housing?
22    A.   Multi-family.
23    Q.   And is multi-family two or more or
24 what's multi-family?
25    A.   Multi-family are like condominiums,

*Page 159*

1    Q.   So you have to have an office and a
2 display area?
3    A.   Yeah, and a warehouse.
4    Q.   And a warehouse?
5    A.   Yes.
6    Q.   If you were a distributor, but a dealer
7 didn't have to?
8    A.   No, dealer, you got to have all that.
9 You're supposed to have.
10    Q.   Okay.  Any requirements on the size of
11 the warehouse?
12    A.   There's no requirements of anything.
13 Not really, no.
14    Q.   So was your relationship with your
15 distributors and dealers a continuing
16 relationship?
17    A.   Are they continuing?
18    Q.   Yes, sir.
19    A.   Yes.
20    Q.   During the period of their relationship
21 with Centurion?
22    A.   Yeah.  I still contact my dealers and
23 talk with them.
24    Q.   Did Centurion grant authority to Stone
25 Works to sell its products?

*Page 161*

41 (Pages 158 - 161)

**Exhibit 1**

```
 1    A.  Yes.
 2    Q.  Were there ever, to your knowledge, any
 3  written agreements?
 4    A.  No written agreements.
 5    Q.  Between dealers and distributors and
 6  Centurion?
 7    A.  No, sir.
 8    Q.  Did the dealer or distributor have the
 9  opportunity to ask for the requirements in
10  writing?
11    A.  They might have asked for them, but they
12  wouldn't have got them.
13    Q.  Are you aware of anybody asking for it
14  in writing?
15    A.  No, I never have.
16    Q.  Was there any type of application
17  required?
18    A.  Explain that, please.
19    Q.  Well, to become a dealer or distributor
20  did they have to complete any type of
21  application?
22    A.  You would have to get a credit app and
23  you got to be qualified to have your warehouse
24  and your showroom.
25    Q.  When you say qualified as your warehouse
                                             Page 162
```

```
 1  Springdale and it was Jeff Lee's territory, but
 2  it was Rusty's builder, so I had to explain that
 3  to Jeff and everything was good.
 4    Q.  Is central Arkansas a good territory?
 5    A.  Every territory is good if you want to
 6  work.
 7    Q.  Is central Arkansas a good territory?
 8    A.  Yes.  Yes.
 9    Q.  Is it a coveted territory?  Do other
10  people want it?
11    A.  I have never really tried to give it.
12  If you have a stone business, if you live in this
13  area, it would be a good market.  I have had
14  several people inquire about it.  ABC Block, for
15  one.
16    Q.  ABC Block.  They're brick, aren't they?
17    A.  Well, brick and block, but they sell
18  stone.  But I told them they would have to go
19  through Rusty to get it, or Stone Works.  They're
20  right out of Searcy wanting me to sell to them.
21  I said no.
22    Q.  Did they want to be a dealer in central
23  Arkansas?
24    A.  Yeah.
25    Q.  And you wouldn't let them.  You stayed
                                             Page 164
```

```
 1  or showroom?
 2    A.  Showroom, yes.
 3    Q.  You go out and look at it and say this
 4  meets our requirements?
 5    A.  Yes.
 6    Q.  Generally what were the requirements for
 7  a showroom?
 8    A.  With me, it's very minimal.  Because I
 9  want someone to get started to work and then
10  build.
11    Q.  What would you require at the beginning?
12    A.  Very little.  I mean, just if you could
13  put a lean-to up, I would say it's good.
14    Q.  All right.
15    A.  I mean, it depends on the individual.  I
16  mean, Rusty could tell you.  When it come to him,
17  I done my best to help get them started.
18    Q.  Did you ever have issues where dealers
19  or distributors complained about other dealers or
20  distributors' territories?
21    A.  Some.  But very little.
22    Q.  How would that arise?  What would that
23  be about?
24    A.  I mean, I have got one on Rusty one time
25  because Jeff Lee, Rusty went and done a job in
                                             Page 163
```

```
 1  with Stone Works?
 2    A.  Stone Works was my dealer.
 3    Q.  And you're loyal, and loyalty should be
 4  two ways?
 5    A.  Yes.  A hundred percent.
 6    Q.  You expect them to be loyal and only
 7  sell Centurion, and you're loyal and you protect
 8  your territory?
 9    A.  Very much.
10    Q.  And protect their dealers and their
11  customers?
12    A.  Yes.
13    Q.  And not let them go around them?
14    A.  No.  I fight for my customers.
15    Q.  Now, if I were Stone Works and let's say
16  I had a contractor that owes me $7,000, would you
17  let that customer go buy the stone from another
18  Centurion dealer while they still owed me money?
19    A.  No, sir.  What I would do is go with
20  them to the customer and do my best to collect
21  that money.
22    Q.  And then if you didn't, would you let
23  them buy from another --
24    A.  No.
25    Q.  -- distributor?
                                             Page 165
```

42 (Pages 162 - 165)

**Exhibit 1**

1    A.   Me and Rusty had that situation in the
2  past.
3    Q.   And that's part of the loyalty, isn't
4  it?
5    A.   Yes.
6    Q.   And isn't the approval process for a
7  dealer they had to have a showroom, a warehouse,
8  credit application, and then you had to talk to
9  Tim Pardue to get approval?
10   A.   Yes.  Every -- everybody goes to
11 Nashville for the day.  Once you go through the
12 plant -- everybody gets a tour and meets the
13 people.  You need to know who you do business
14 with, so they go through the plant, meet the
15 girls, meet everybody in the plant.
16   Q.   Now, other than that, how often would a
17 dealer or distributor go to the plant?
18   A.   That would be a -- dealer's
19 discretion.
20   Q.   How often typically?
21   A.   Well, most of the time a lot of them
22 never go.  They just want their stone.  They
23 could care less about the plant.  They want
24 product.
25   Q.   I understand.  Were any purchase price

Page 166

1  restrictions placed on distributors or dealers,
2  such as Stone Works?
3    A.   Purchase price.
4    Q.   Or I said that wrong.  Sales price.
5  Could they sell at any price they wanted to?
6    A.   At their discretion.  We had a suggested
7  price sheet, but it was not mandatory to what
8  they sell.
9    Q.   Were dealers or distributors authorized
10 to use Centurion's name?
11   A.   In some cases, yes.  That would have to
12 go through Tim Pardue.  Not me.
13   Q.   That was going to be my next process.
14 If I wanted to be Stone Works Centurion of
15 Arkansas, how would I do that?
16   A.   You would have to go through Tim Pardue
17 and they would have to work that out.  In other
18 words, I do not know.
19   Q.   Now, do any of your dealers use the
20 Centurion name?
21   A.   Not that I'm aware of.  They do not, no.
22   Q.   So you have never had to go through that
23 process?
24   A.   No, sir.
25   Q.   Does Centurion do advertising?

Page 167

1    A.   Yes.
2    Q.   How does it do advertising?
3    A.   Well, used to done trade shows, builders
4  shows every year, and then they do magazine
5  advertising.  I really don't know what all
6  advertising they do now.
7    Q.   Are dealers or distributors required to
8  pay any type of advertising fee?
9    A.   No.
10   Q.   Is there a minimum territory size you
11 provide?
12   A.   I try to let everybody have plenty of
13 room to grow.
14   Q.   That was going to be my next question.
15 Once you had a territory could you grow that
16 territory?
17   A.   Quickly.
18   Q.   How would you go about growing that?
19 And when I say grow a territory, I mean adding
20 counties, for example.
21   A.   I try to give you plenty of room.  For
22 example, I asked him one time about Exocranial.
23 I had an opportunity to sell in Exocranial for a
24 dealer.  He said, well, I might want to go there,
25 so I left it open for Rusty.

Page 168

1    Q.   Did he go there?
2    A.   I don't know if he has or not.  I don't
3  know if he made sales or not, but I left it open.
4    Q.   Where he could sell that there?
5    A.   Yes.  I left his territory.  Did I make
6  the sell, no.  I honored Rusty's request.
7    Q.   All right.  But they had to get your
8  permission to go into additional territory,
9  unless it was multi-family housing or following
10 their contractor?
11   A.   Everybody in Centurion, each of them
12 knows everybody's kind of territory they work.
13   Q.   How would they know that?
14   A.   Just by the rank.  I mean, Rusty knows
15 that we have Jeff Lee in Fayetteville or
16 Springdale.
17   Q.   Were these exclusive territories except
18 for contractors you followed in multi-family
19 housing?
20   A.   Yes.  Really it's hard to say
21 exclusively.  It was honorable territories.
22 Everybody honored each other.
23   Q.   And they were supposed to be exclusive
24 in those areas?
25   A.   Yes.

Page 169

**Exhibit 1**

1   Q.   And if they weren't, what would happen?
2   A.   Nothing.  I mean, you would just get a
3   little pissy with the other people.
4   Q.   For example, if Stone Concepts sold in
5   Little Rock and it wasn't multi-family housing
6   and it wasn't a contractor they followed, it was
7   -- would that be a problem?
8   A.   It would.
9   Q.   What would you do about that?
10   A.   I would have a very long talk with them
11   and ask them to honor any other dealers, if
12   someone else was selling in that area.
13   Q.   What if they didn't do that?
14   A.   Then we had to get a little rougher.  I
15   mean, that's a consequence I have never been up
16   against.
17   Q.   Is your intent to avoid competition
18   between dealers and distributors?  You don't want
19   them to compete in the same territory?
20   A.   No, I want them.  So, no, if you get two
21   of the same stone companies competing in the same
22   area, first thing you know they are having a
23   pricing war and neither one is going to make a
24   dime.
25   Q.   Right.  Were there circumstances where

Page 170

1   you changed or narrowed a territory?
2   A.   No.  Not that I know of.  I want every
3   dealer to grow.
4   Q.   Was there any prohibition from a dealer
5   selling or attempting to sell outside their
6   territory that was not another Centurion
7   territory dealer?
8   A.   If it was open territory, that's not a
9   problem.
10   Q.   Open territory.  Okay.  Was there any
11   type of term or renewal date on a dealership,
12   Centurion dealership or distributorship?
13   A.   A term?
14   Q.   Yeah, like three years and you had to go
15   through a renewal process?
16   A.   No.
17   Q.   Once you had it, you had it until
18   somebody terminated it?
19   A.   (Witness shakes head.)
20   Q.   You're shaking your head yes.
21   A.   I'm sorry, I have got to speak out.
22   Yes.  No, there's no termination.  Centurion had
23   no rules.
24   Q.   Were there any restrictions on a
25   dealers' or distributors' ability to transfer

Page 171

1   their interest to another person or entity?
2   A.   That would have to go through Centurion.
3   Q.   IT had to be approved?
4   A.   Yes.
5   Q.   So if Stone Works wanted to be bought by
6   somebody, it had to be approved by Tim Pardue?
7   A.   Correct.
8   Q.   What if they just had a 10 percent or 20
9   percent purchaser?
10   A.   I would say you would be fine as long as
11   the main owner was involved.
12   Q.   Majority owner?
13   A.   Yes.
14   Q.   Were there any restrictions or
15   prohibitions on a distributor doing business with
16   another distributor?
17   A.   Are they the same distributor,
18   Centurion?
19   Q.   Yes.  They are both Centurion
20   distributors.
21   A.   No problem.
22   Q.   Okay.  Was there any requirement that a
23   dealer or distributor be provided written notice
24   of intention to terminate?
25   A.   No.

Page 172

1   Q.   Was there an opportunity to object to
2   termination?
3   A.   Not that I'm aware of.
4   Q.   Did the authority to sell Centurion
5   products have any value, in your mind?
6   A.   Have any value.  Yes, it does.
7   Q.   And why do you say that?
8   A.   Because you've got something to offer a
9   customer.
10   Q.   In an exclusive territory?
11   A.   Yes.
12   Q.   With the name of Centurion behind it?
13   A.   Correct.  And with Centurion, you don't
14   have to promise -- you don't have the guarantee
15   to buy so much square feet a year.  In other
16   words, you work at your own pace.
17   Q.   I'm going to throw out another term I've
18   heard, and I want you to tell me what it means in
19   the industry.  And what does a representative
20   mean to you?
21   A.   A representative would be somebody like
22   myself that would come out if you have a problem
23   and help you solve your problem.
24   Q.   Okay.  So you're the dealer, distributor
25   representative?

Page 173

44 (Pages 170 - 173)

**Exhibit 1**

**Page 174**

1    A.  Correct.
2    Q.  Correct?
3    A.  Correct.
4        MR. SMITH:  Let's go off for a
5  second.
6        MR. JAMES:  Sure.
7            (Recess.)
8    Q.  (By Mr. James)  Sir, it is 1 o'clock.
9  We're resuming your deposition.  Are there any
10  answers you have given that you need to change or
11  clarify?
12   A.  Not that I'm aware.
13   Q.  All right.  Is there anything to keep
14  you from giving a full, complete and accurate
15  deposition today?
16   A.  Not that I know of.
17   Q.  Not on any medications that affect your
18  ability to remember or anything of that nature?
19   A.  No.  I mean, the only thing I got going
20  for me is my age.  It's kind of slowed down.  I
21  think we all got that.
22   Q.  I think so.  Do you understand we're
23  going to rely on your testimony?
24   A.  Correct.
25   Q.  And we can do that.  Correct?

**Page 175**

1    A.  As far as I know, yes.
2    Q.  Now, once a distributor was acquired by
3  Centurion in your territory, once you got it
4  built up as a distributor, what was your role
5  with that distributor?  What was your continuing
6  role?
7    A.  Okay.  Just like -- just for the first
8  year you about got to live with the new, to help
9  them get started, to get them off their feet,
10  because most of them are green.  It's not easy
11  getting started.  I was at Stone Works many days
12  on the first year, and then they get the feel of
13  it and then whenever they see me coming we'll go
14  out to lunch because they don't need you that
15  much anymore, unless they got a situation like a
16  problem.  But as far as the purchasing, I mean,
17  just learning all the little ins and outs.  Randy
18  Sims was a big benefit for them to help, you
19  know, get them started.
20   Q.  Randy Sims was?
21   A.  For Stone Works, yes.  He was a big
22  benefit to have on the front end for Rusty and
23  them.
24   Q.  Did you ever terminate him?
25   A.  No.

**Page 176**

1    Q.  Do you know, did you ever recommend that
2  Stone Works terminate him?
3    A.  Not that I am aware of.
4    Q.  All right.  Now, if Centurion had bad
5  news for a dealer or distributor, such as there's
6  multi-family housing in your area and you're not
7  going to be exclusive there, it's wide open
8  territory, would that be something you would
9  communicate to the distributor on behalf of
10  Centurion?
11   A.  I need to follow.  Try to rephrase more.
12  I didn't quite understand.
13   Q.  Well, let me do it just generally.  If
14  there was bad news for a distributor, would you
15  be the one to communicate that on behalf of
16  Centurion?
17   A.  Like what would -- explain the bad news.
18  I don't follow.
19   Q.  You've been working on this multi
20  housing family project in your area, but another
21  dealer is going to come take that over and do it,
22  and we're going to sell them product and let them
23  do it in your territory.
24   A.  If it was multi-family, I have had that
25  happen.

**Page 177**

1    Q.  All right.  And would you communicate
2  that on behalf of Centurion?
3    A.  You just talk to the dealers.  You work
4  it out together.  I mean, there's nothing
5  Centurion can do because everybody is legal.
6    Q.  Were dealers or distributors listed on
7  Centurion's website?
8    A.  Some there are, yes.  Some -- I don't
9  know how that works.  I don't know.
10   Q.  Was there a dealer locator on the
11  website?
12   A.  I don't know.
13   Q.  Okay.  Beyond your area of knowledge?
14   A.  Yes.
15   Q.  Could Centurion dealers or distributors
16  sell to competitors?  For example, could it sell
17  Centurion stone to a ProVia distributor?
18   A.  Yes.
19   Q.  No restrictions, no prohibitions?
20   A.  No.
21   Q.  How do the exclusivity requirements of
22  Centurion provide a benefit to Centurion?
23       MR. SMITH:  Objection, vague.  Go
24  ahead.
25   A.  Probably a disadvantage for Centurion.

45 (Pages 174 - 177)

**Exhibit 1**

1    Q.  (By Mr. James)  And why do you say that?
2    A.  Well, for example, just like I told you
3  I was holding Texarkana for Rusty.  Centurion has
4  lost all them sales all these years it was
5  sitting there vacant.
6    Q.  Do the exclusivity provisions affect
7  competition in the market?
8          MR. SMITH:  Objection, vague.  Go
9  ahead.
10    A.  I need to follow that a little closer.
11    Q.  (By Mr. James)  Your marketing of veneer
12  stone, do the exclusivity provisions affect
13  competition in the marketplace?
14          MR. SMITH:  Objection.
15    A.  I don't understand why.
16    Q.  (By Mr. James)  Does it benefit
17  competition among competitors?
18    A.  I really don't know how to answer that.
19    Q.  All right.  Can you list any benefit to
20  competition that the exclusivity provisions of
21  Centurion would bring about?
22          MR. SMITH:  Objection, vague.  Go
23  ahead.
24    A.  I'm still not -- I'm getting slow.
25    Q.  (By Mr. James)  All right.  Well, let's

Page 178

1  ask it this way.  Do other competitors have
2  exclusivity provisions like Centurion?
3    A.  I don't know.
4    Q.  Do you ever deal with competitors,
5  distributors or dealers?
6    A.  Do I deal with them personally?
7    Q.  Yes, sir.  In connection with your
8  performance of your duties or responsibilities,
9  do you?
10    A.  No, I do not.  Now, when you get paid by
11    Q.  All right.  Now, when you get paid by
12  Centurion, tell me how you get paid and what the
13  process is.  How it's determined what you're paid
14  and then how you end up getting a check.
15    A.  Well, in other words, I don't get paid
16  until Centurion gets paid.  When they get their
17  check in, then they got there accounts there.
18  They figure your footage, they cut you a check
19  the 1st and the 15th.
20    Q.  So it's based on collections?
21    A.  Collections and square footage.  I mean,
22  there's times if it rains for two months, nobody
23  that has bought any stone, there's no checks.  So
24  it's a hit and miss situation.
25    Q.  But you make money?

Page 179

1    A.  Sometimes.
2    Q.  Make good money?
3    A.  To be fair, it cost a lot of money
4  running down the road.
5    Q.  Do you get a check from the northern
6  warehouse?
7    A.  Directly from them, no, not directly
8  from them.
9    Q.  If you sell product in the northern
10  warehouse, it's still calculated the same way by
11  the Centurion factory.  Correct?
12    A.  That's correct.  I just get one check.
13    Q.  Were there any rules or requirements
14  that Centurion distributors had to follow?
15    A.  Any rules or requirements?
16    Q.  Yes, sir.
17    A.  Well, if -- you have to have your
18  warehouse.  You have to have inventory.  Yeah,
19  that's about it.
20    Q.  Office?
21    A.  And office and ability to work.
22    Q.  And agree to sell?
23    A.  Centurion only.
24    Q.  Centurion only.
25    A.  That's just an oral agreement.

Page 180

1    Q.  And pay the invoices monthly?
2    A.  Yes.
3    Q.  You say there's no written agreement.
4  Would it be fair to describe the relationship as
5  an oral agreement for an indefinite period in
6  which Centurion granted to Stone Works the right
7  to its product?
8    A.  No.  No.  Granted period, no.  Just the
9  rights to sell.
10    Q.  Sell its product?
11    A.  Yes.
12    Q.  Exclusively in a territory?
13    A.  In the area, unless things change, but.
14    Q.  Is the area the territory?
15    A.  It's never really fulfilled.  As far as
16  me and Rusty and Angela and Troy, we kind of work
17  out an area that he wanted to work in and I would
18  extend it.  In other words, you try to give them
19  plenty of area.
20    Q.  Do you know why Centurion did not enter
21  into a written contract?
22    A.  I do not know.
23    Q.  Now, if a dealer didn't pay for
24  Centurion product, what would it do?
25    A.  If it didn't pay for it?

Page 181

46 (Pages 178 - 181)

**Exhibit 1**

1   Q.   Yeah.
2   A.   They would cut him off until he paid, no
3   more materials.
4   Q.   What if he didn't pay and he owed a
5   hundred thousand dollars?
6   A.   I figure that John Enkema was talking
7   about would probably be talking to him.
8   Q.   And have you ever known Centurion to
9   sue?
10   A.   Not that I can recall, no.
11   Q.   But you would expect that to happen?
12   A.   Well, I never had.  I have never been in
13   that situation.  I don't know what would happen.
14   Q.   Did Centurion have any type of dealer
15   manuals?
16   A.   They used to have a manual.  They kind
17   of just give you orientation of how to do your
18   showroom and stuff, yes.
19   Q.   They don't have one anymore?
20   A.   I have not been down there.  I don't
21   know if they do or not.  It's been a long time.
22   I have not really.  Been at the office for a
23   couple years.
24   Q.   Now, what does ship date mean in your
25   business?

Page 182

1   A.   Ship date means that's the date it's
2   shipped out.
3   Q.   From the factory?
4   A.   In the factory.
5   Q.   And if I had an order out there, I was
6   Stone Works and I had an order with Centurion,
7   could I go in and get the ship date?
8   A.   They used to send you a confirmation.
9   Now, since everything got screwed up with all
10   this virus and stuff, I don't know if they could
11   even give you a confirmation right at the moment
12   because they so logged behind.
13   Q.   Would distributors get a row at the
14   factory?
15   A.   Yes.
16   Q.   Tell us what that means.
17   A.   It means that you turn an order in.
18   Then when you get your 50 skids or 48 skids, they
19   call you, say you need to get a truck.  You got a
20   load ready to get ship.
21   Q.   You had a row that you had to fill?
22   A.   You didn't have to fill it.  You could
23   call and put that -- they would ship you a load.
24   They'd ship you one if you get it, if you
25   preferred, but it's going to cost you a lot of

Page 183

1   money.  The more skids you put on the truck, the
2   cheaper.
3   Q.   When the rows got full you would have to
4   send a truck.  Correct?
5   A.   Yes.
6   Q.   And then a freight broker would be
7   contracted for by the dealer or distributor to
8   deliver.  Correct?
9   A.   You could give -- Centurion has someone
10   that would call.  They got people that would
11   broker your freight for you.
12   Q.   And set it up you?
13   A.   Yes.  But it was outside source of
14   Centurion.
15   Q.   And in order to get a row, your product
16   would have to be put in production.  Correct?
17   A.   Correct.  You already had known, even if
18   you didn't have a load on order, you still have
19   your row sitting there empty waiting for you to
20   put an order in.  All the row is is in a
21   warehouse like a parking spot.
22   Q.   It's literally a row where this is Stone
23   Works' product and it keeps on getting added to
24   it?
25   A.   Right.

Page 184

1   Q.   Until they got enough for a truckload?
2   A.   When it comes time for shipping, the
3   shipper knows where their row is.  Like a little
4   parking garage.
5   Q.   Do you have your Declaration?  I bet
6   your attorney does.
7   A.   What now?
8   Q.   This is your Declaration, which we
9   looked at earlier, which is Exhibit 10.
10   A.   Uh-huh.
11   Q.   If you look at Paragraph 8 at the bottom
12   of the first page.  It says, "Some dealers
13   purchase Centurion products for their own
14   installation projects."
15   A.   Yes.
16   Q.   What does that mean?
17   A.   That means like if you just -- some of
18   them just install only.  They don't sell out.
19   They don't have no outside sales to other people.
20   They just use it for installation.
21   Q.   I'm not sure what you mean, so give me
22   an example of a distributor that does that and
23   then does it for their own installation only.
24       MR. SMITH:  Dealer or distributor?
25   A.   This is dealer.

Page 185

47 (Pages 182 - 185)

**Exhibit 1**

1    Q.   (By Mr. James)  Okay.  Dealer.
2    A.   And in other words, I mean, Rusty and
3 them are probably a 90 percent installation
4 project.  They probably sell 8 or 10 percent
5 outside.  Most of sales are probably installed.
6    Q.   Do you know that or are you guessing?
7    A.   I'm guessing.
8    Q.   Okay.  So in your mind, is there a
9 difference between dealers and distributors with
10 regard to installation projects?
11    A.   The only thing, you're doing your own
12 distributing or installation, you're making more
13 money.
14    Q.   You're making more money because you
15 control it vertically?
16    A.   Yes.
17    Q.   To the end user?
18    A.   Yeah.
19    Q.   And then you say while some dealers also
20 sell to third-party installers, would that be
21 like a contractor?
22    A.   Uh-huh.  Or yeah, another mason.
23    Q.   Or contractor?
24    A.   Yes.  Mason contractor.
25    Q.   Well, yeah, a mason would be a

Page 186

1 contractor?
2    A.   Uh-huh.
3    Q.   Okay.  Are there restrictions on selling
4 to third-party installers?
5    A.   No.
6    Q.   Was it understood from the beginning
7 with Stone Works that central Arkansas would be
8 its territory?
9    A.   That never really was an understanding.
10 We just started working.  We work on them at the
11 time.  When Stone Works got involved, I had --
12 Burton Building Products was right down the road
13 from them and R.J. Horner was down in Hot
14 Springs, and then we just started working their
15 territory from there.
16    Q.   So my question is, was it understood
17 from the beginning that Stone Works would have
18 exclusive territory in central Arkansas?
19    A.   No.
20    Q.   What was the understanding?
21    A.   They was going to be a stone dealer in
22 an area, but they would have competition around
23 them.
24    Q.   What competition would they have around
25 them?

Page 187

1    A.   Well, they had Burton Building Products
2 was right down the street that was dabbling in
3 our stone.  They wasn't doing much, and then they
4 do a lot in Hot Springs now, which R.J. Horner
5 was down there, but R.J. wasn't doing much and
6 they went in and done a good job.  R.J. is gone
7 and Burton Building probably is gone.  Well,
8 Burton Building Products sells a new product.
9 It's called Plymouth now, if I'm not mistaken.
10    Q.   Turn to Paragraph 9 of your Declaration.
11 You state "Plaintiff only used Centurion products
12 for its own masonry work, and therefore, did not
13 actually sell Centurion products to third-party
14 installers."  That's not correct, is it?
15    A.   No, no, it's not correct.  That's what
16 we talked this morning, we need to change that.
17    Q.   And you said they do sell some material?
18    A.   Yes.
19    Q.   But mostly install?
20    A.   Correct.
21    Q.   And that's what you told us this
22 morning?
23    A.   I tell you that today.
24    Q.   And you say, "In other words,
25 Plaintiff's business involved purchasing

Page 188

1 Centurion product and then installing those
2 products directly for the end users," and those
3 would be like customers or businesses?
4    A.   Correct.
5    Q.   And would you protect those customers of
6 Stone Works?
7    A.   Well, they would be already protected
8 because they're in the area, you know.
9    Q.   All right.  But if another dealer wanted
10 to sell to a customer?
11    A.   Once we got -- the other dealers aren't
12 going to be in the area because we got them out.
13    Q.   But if another dealer wanted to sell to
14 one of our customers in our territory, would you
15 stop that?
16    A.   I would try.  I would go talk to him.
17    Q.   Well, if they went ahead and did it, you
18 had a pretty big stick, didn't you?
19    A.   I carried one.  I didn't carry no stick.
20 I just -- most people respect what you do.
21    Q.   But those customers should be protected.
22 You agree with that?
23    A.   Yeah.
24    Q.   And it wouldn't be fair for another
25 dealer to solicit those customers?

Page 189

48 (Pages 186 - 189)

**Exhibit 1**

**Page 190**

1    A.   Not another Centurion dealer, no.  I
2  mean, you're going to have --
3    Q.   We're just talking about Centurion
4  dealers.
5    A.   Okay.  Yeah, no, they wouldn't.
6    Q.   And were distributors such as Stone
7  Works encouraged to set up dealers, such as
8  contractors?
9    A.   No, they had an opportunity to, if they
10  wanted to.
11    Q.   Were they encouraged to?
12    A.   No.  They was limited with what they
13  could do.
14    Q.   But if they were selling to like a
15  contractor, then that's just more product getting
16  sold and benefits everybody.  Correct?
17    A.   Correct.
18    Q.   And was that encouraged?
19    A.   Yes.  Selling to contractors it was,
20  because that's just another -- just a customer.
21  To have a dealer you have to have another
22  location similar to what you are selling the
23  dealer to, another warehouse, and in other words,
24  you're not looking for someone to put stone in
25  the back of the truck and go sell it.

**Page 192**

1  mean it's mandatory?
2    A.   Yes.
3    Q.   Does Centurion sell factory direct to
4  end users such as customers?  And I mean direct
5  from the factory.
6    A.   Not in my area.  I don't know what they
7  do outside mine.
8    Q.   Do you have crews that can install
9  Centurion product?
10    A.   Do I have crews?
11    Q.   Yes, sir.
12    A.   No, sir, I do not.
13    Q.   Does Mr. Pardue have crews that can
14  install?
15    A.   No, sir.  Now, he's got, in his other
16  facility, yes, they do.
17    Q.   What's Mr. Pardue's other facility?
18    A.   Well, they have got the same thing as we
19  have.  They have a dealership.  They sell
20  Nashville area.  They just like we do, they have
21  a distributor, or like go ahead and make sales
22  and they have got their masons.
23    Q.   What is the name of that distributor?
24    A.   I'm not sure.
25    Q.   So let me get it straight.  Mr. Pardue

**Page 191**

1    Q.   No. 10, "Centurion prefers its dealers
2  to exclusively sell its stone products."
3    A.   Yes.
4    Q.   And we know not only do they prefer, but
5  they're going to terminate you if you're selling
6  other competitors' products.  Correct?
7    A.   Yes.  When you say terminate, that means
8  that you're not -- you could still buy from
9  another dealer, but not from the factory.
10    Q.   You could not buy factory direct?
11    A.   Right.
12    Q.   And they would just be terminated as a
13  Centurion distributor?
14    A.   Because they're like a jobber.
15    Q.   And they wouldn't be on the dealer
16  locator, for example, on Centurion's website?
17    A.   No.
18    Q.   And you say you communicated this
19  directly to Plaintiff on multiple occasions?
20    A.   Yes.
21    Q.   Who did you communicate it to, or would
22  it be too many to count?
23    A.   Rusty knew and Angela knew it, Troy knew
24  it.  Randy Sims definitely knew it.
25    Q.   But when you say preferred, you really

**Page 193**

1  has a distributor that is a distributor for
2  Centurion?
3    A.   In the Nashville, Tennessee area.
4    Q.   In the Nashville, Tennessee area?
5    A.   Yes.
6    Q.   And who does it sell to?
7    A.   Builders.
8    Q.   And he's got a crew that runs?
9    A.   Yeah.
10    Q.   Now, do those crews ever go to other
11  locations other than the Nashville area?
12    A.   Not that I'm aware of.
13    Q.   Such as Stuttgart?
14    A.   No.  He might have sent a crew to
15  Stuttgart.  I don't know that.  I'm not aware of
16  it.  I don't know.
17    Q.   And you don't know the name of the
18  business?
19    A.   No, I do not.
20    Q.   I take it you don't get a piece of that
21  distributorship?
22    A.   Oh, no, sir.
23    Q.   How long has that been running?
24    A.   As long as I can remember, sir.
25    Q.   You heard of Oaks Brothers?

49 (Pages 190 - 193)

**Exhibit 1**

```
 1    A.  Yes, I have.
 2    Q.  What are Oaks Brothers?
 3    A.  They are mostly multi-family type
 4 distributor.
 5    Q.  Were they a dealer for Centurion?
 6    A.  No, sir.
 7    Q.  Were they a dealer for Stone Works?
 8    A.  At one time they was buying from Stone
 9 Works.  I really do not know what happened there.
10    Q.  Are they a contractor or --
11    A.  They're multi-family contractor, yes.
12    Q.  And Centurion was contracting with them
13 as a third-party installer.  Correct?
14    A.  No, they was buying direct.
15    Q.  Strike that.  I asked that poorly.
16 Stone Works was contracting with Oaks Brothers as
17 a third-party installer.  Correct?
18    A.  Yes.  They were, yes, at one time.
19    Q.  And they developed them.  Is that
20 correct?
21    A.  Me and Angela went and talked to them at
22 one time.
23    Q.  You and Angela.  In fact, Angela took
24 you and introduced you to Oaks Brothers, didn't
25 she?
                                          Page 194
```

```
 1    A.  Yes, she did.
 2    Q.  And they were a contractor where we were
 3 trying to develop business with and selling to.
 4 Correct?
 5    A.  Correct.
 6    Q.  And Centurion then changed them from a
 7 dealer for Stone Works to a distributor for
 8 Centurion.  Correct?
 9    A.  No.  What happened was -- I really don't
10 know Angela.  Angela and Oaks Brothers, they had
11 some kind of difficulty.
12    Q.  What difficulty did they have?
13    A.  I do not know.
14    Q.  Did they have difficulty because they
15 wanted to buy factory direct after you met them?
16    A.  No.  Angela was getting paid or
17 something.  I really don't know what the
18 difficulty was.  As far as I know, the only thing
19 they were bidding was multi-family.  I really
20 don't know what they were bidding.
21    Q.  Can you tell us what happened with Oaks
22 Brothers?
23    A.  Oaks Brothers is not buying anymore.
24 They went to a different source.
25    Q.  But did they become a distributor for --
                                          Page 195
```

```
 1    A.  No, they did not.  They never did.
 2    Q.  Did you ever make any money off sales
 3 from Centurion to Oaks Brothers?
 4    A.  Very little because they didn't do that
 5 much.
 6    Q.  But you did?
 7    A.  Some, yes.
 8    Q.  Did Angela introduce you to Greg Oaks of
 9 Oaks Brothers?
10    A.  No.  Not Greg Oaks.
11    Q.  Who did she introduce you to?
12    A.  Somebody that was up there at the front
13 that was working the counter up there.
14    Q.  And then after your introduction did
15 Stone Works stop doing -- or strike that.
16       After your introduction did Oaks
17 Brothers stop doing work with Stone Works, doing
18 business with Stone Works?
19    A.  No.
20    Q.  Did they at some point?
21    A.  Yes.  They -- like I said, I don't
22 really know what did happen.  Angela and Oaks
23 Brothers had a difficulty.
24    Q.  Do you know what that difficulty was?
25    A.  No, I do not.
                                          Page 196
```

```
 1    Q.  Is there any more you know about Stone
 2 Works than what you've just told us?
 3    A.  About what, sir?
 4    Q.  Excuse me, Oaks Brothers.  Let me just
 5 strike --
 6    A.  No, I do not.
 7    Q.  You don't know any more?
 8    A.  No.  That's about the size of it.  I
 9 spent very little, very little time with Oaks
10 Brothers.
11    Q.  Did Centurion ever deal directly with
12 Oaks Brothers without Stone Works?
13    A.  They sold us some stone, yes.
14    Q.  And did that include the Sulfur
15 construction property?
16    A.  I could not answer that question.  I
17 don't know where it went.
18    Q.  Did -- when Centurion sold to Oaks
19 Brothers, did they have the same terms as Stone
20 Works as a distributor?
21    A.  No.
22    Q.  What was the difference?
23    A.  They had a different discount rate.
24    Q.  What was the difference?
25    A.  They had a 45 and 10 instead of a 50.
                                          Page 197
```

50 (Pages 194 - 197)

**Exhibit 1**

1    Q.   Did Stone Works get any of that money?
2    A.   I'm not aware of it.  I don't know.
3    Q.   You ever heard of or known a person by
4 the name of Andrew Griffin?
5    A.   Yes.
6    Q.   Who is he?
7    A.   He's a mason at Stuttgart, Arkansas.
8    Q.   And did he purchase Centurion product?
9    A.   Not from me.
10    Q.   To your knowledge, did he purchase
11 Centurion product?
12    A.   He purchased from Rusty because I
13 introduced him to Stone Works.
14    Q.   So he was a customer of Stone Works?
15    A.   As far as, he was at one time.
16    Q.   And was he a friend of yours and Tim
17 Pardue?
18    A.   No.  I wouldn't know Andrew Griffin if
19 he walked in here.  I met him once or twice.
20    Q.   Did you know any of his customers?
21    A.   No, I did not.
22    Q.   Did Centurion or Stone Concepts sell to
23 any of Mr. Griffin's customers?
24    A.   Not that I'm aware of.
25    Q.   Did Centurion ever ship factory direct

Page 198

1 to Mr. Griffin?
2    A.   Not that I'm aware of.
3    Q.   Is there anything else you know about
4 the Oaks Brothers other than what you've already
5 told us?
6    A.   No.  Really, that's it.
7    Q.   Are you familiar with Burton Building
8 Products?
9    A.   Yes.
10    Q.   Who are they?
11    A.   That's the Plymouth I was telling you.
12 Burton Building Products is out of business.
13    Q.   Did they sell some Centurion product in
14 Stone Works' territory?
15    A.   Burton Building Products was buying
16 stone before Stone Works.
17    Q.   So is that a yes?
18    A.   No.  Yeah, they sold, but what I'm
19 saying is Burton Building Products was there
20 first.
21    Q.   And when Stone Works complained about
22 them selling in their territory, did you tell
23 them, well, they weren't solely selling stone.
24 They were selling other products?
25    A.   No, I didn't.

Page 199

1    Q.   Do you remember any discussion with
2 Stone Works regarding Burton Building Products?
3    A.   No, I do not really.  Very vague.
4    Q.   Anything else, other than what we've
5 talked about?
6    A.   Not that I can recall, no.
7    Q.   Do you know a Terry Lester?
8    A.   Yes.  As a matter of fact, I talked to
9 Terry down -- I had Terry call Rusty.
10    Q.   Why did you have Terry called Rusty for?
11    A.   Because he needed some stone installed.
12    Q.   And who is Terry Lester?
13    A.   He's a contractor and he was friends, or
14 just a semi contractor.  He worked at -- I don't
15 know where he worked.  He had a job, but he was
16 selling a little stone on the side.  Him and
17 Rusty worked together some.
18    Q.   Did Stone Works train Mr. Lester?
19    A.   I couldn't answer that.  I was just
20 never really around Terry Lester but one time.
21    Q.   Did Centurion sell stone to Mr. Lester?
22    A.   No, he did not.  They did not.
23    Q.   Are you familiar with the company called
24 Lakeside Siding?
25    A.   Yes.  Dana Swanson.

Page 200

1    Q.   What is Lakeside Siding?
2    A.   They're a siding company.  They sell
3 some stone.
4    Q.   Were they friends with Danny Swanson?  A
5 friend of Terry Lester?
6    A.   I think they could be a little bit of
7 friends.  I'm not a hundred percent sure.
8    Q.   Did Lakeside Siding purchase from Stone
9 Works?
10    A.   No, they purchased for themselves.  They
11 bought directly with Centurion.
12    Q.   At any point in time did Lakeside Siding
13 purchase directly from Stone Works as a
14 distributor?
15    A.   They might have bought some stone from
16 Stone Works.  I don't know.  I don't know.  I
17 don't have a clue who all Stone Works sold to.
18    Q.   Would it be accurate to say that
19 Lakeside Siding was a customer of Stone Works and
20 then became a distributor for Centurion?
21    A.   No, sir.  Not really, because that was a
22 little bit out of their territory.
23    Q.   What do you mean by out of their
24 territory?
25    A.   They was supposed to be from Conway

Page 201

51 (Pages 198 - 201)

**Exhibit 1**

1 south.  That's kind of our area.
2   Q.   And where was Lakeside Siding?
3   A.   April Springs.
4   Q.   And you contend that's not in Stone
5 Works' territory?
6   A.   No, I mean, it's kind -- it was more of
7 an open territory.
8   Q.   Let's just say that regardless of
9 whether the territory was open or not, did Stone
10 Works sell to Lakeside Siding before Centurion?
11   A.   I can't answer that.  I'm not sure.
12   Q.   You don't know?
13   A.   No.
14   Q.   Are you familiar with a job at Hank's
15 Fine Furniture?
16   A.   Hank's Fine Furniture.  Yes, I think I
17 am.  I think we done one in Springdale.
18   Q.   Was there a Hank's Fine Furniture in
19 Little Rock?
20   A.   I'm not sure.  I'm not aware of it.
21   Q.   Were you aware of Fraley Masonry being
22 allowed to sell directly to Hank's Fine Furniture
23 in Little Rock?
24   A.   I'm not aware of that.
25   Q.   That would be in Stone Works' territory,

*Page 202*

1 wouldn't it?
2   A.   Yeah.  Hank's -- you know what, Hank's
3 Fine Furniture was J.J. Klaman, which was the
4 installer for us.  He was a customer, Hank Brown.
5 I do remember that name.
6   Q.   Did he do the job at Hank's Fine
7 Furniture in Little Rock or was it somebody else?
8   A.   As far as I know, it was him.
9   Q.   And you think that gave a basis for
10 Fraley Masonry to do work in central Arkansas on
11 Hank's Fine Furniture?
12   A.   Yes.  No different than Rusty and them
13 coming to Springdale doing a job.
14   Q.   What is Octavian -- or strike that.
15      Can you tell me anything else about
16 Hank's Fine Furniture, other than what you've
17 told us?
18   A.   No, I can't.  I know Jay Klaman traveled
19 throughout the country doing it.
20   Q.   What is Octavian Architectural Design?
21   A.   He was a little bitty, small mom and pop
22 dealer, which he lasted about three months.
23   Q.   Did you tell the folks at Stone Works
24 about him before they opened?
25   A.   Yes.

*Page 203*

1   Q.   Where was he located?
2   A.   Over on Broadway.
3   Q.   In North Little Rock?
4   A.   Correct.
5   Q.   You've talked about Billy Pegg.  How do
6 you know Mr. Pegg?
7   A.   Billy Pegg stopped in Springfield one
8 time and asked me about Centurion Stone, and I
9 told him what the plan was and he went down and
10 talked with them and started selling.
11   Q.   What territory did Billy Pegg sell in?
12   A.   I'm not -- Memphis, as far as I know.  I
13 wasn't connected to Billy Pegg.
14   Q.   Did he sell in the Jonesboro area?
15   A.   Yes.  Well, no.  Yeah, he had a dealer
16 there.  He did.
17   Q.   Did Tim Pardue inform Mr. Pegg he would
18 no longer be a Centurion distributor and he would
19 have to buy from Stone Concepts?
20   A.   That's what I understood, yes.
21   Q.   Why did that happen?
22   A.   Because I think, what I understand, I'm
23 not a hundred percent sure on Billy Pegg, but he
24 was carrying more than one stone.
25   Q.   Do you know that?

*Page 204*

1   A.   Not a hundred percent.
2   Q.   But that's your understanding the reason
3 it changed.  Is that correct?
4   A.   Yes.
5   Q.   And is there anything else you know
6 about Billy Pegg other than what you've already
7 told us?
8   A.   Not really, I don't.  And I worked with
9 Billy some.
10   Q.   Did you ever go to Billy Pegg's showroom
11 in Memphis?
12   A.   Yes.
13   Q.   Why did you go to Billy Pegg's showroom
14 in Memphis?
15   A.   I was on my way to Mississippi and I
16 went by to see him.
17   Q.   Why would you go see Billy Pegg?
18   A.   Because he was part of us.
19   Q.   Was he one of your distributors or
20 dealers?
21   A.   Not at the time, no.
22   Q.   Did you ever make any money off any
23 business of Billy Pegg?
24   A.   Some.
25   Q.   What entity?

*Page 205*

52 (Pages 202 - 205)

**Exhibit 1**

| Page 206 | Page 208 |
|---|---|
| 1  A.  I helped him for about six months, and | 1 Coronado Stone? |
| 2 then he started helping me.  He made money off of | 2   A.  I'm not aware of that.  They could have |
| 3 me. | 3 if they choose because they were not a dealer. |
| 4  Q.  Explain that to me. | 4 They were a jobber. |
| 5  A.  I started getting dealers in Mississippi | 5  Q.  But you were selling to them factory |
| 6 and Louisiana, and me and him was splitting the | 6 direct as a jobber? |
| 7 commissions. | 7  A.  Yes.  At a different discount. |
| 8  Q.  You-all were splitting the commissions? | 8  Q.  What is a jobber? |
| 9  A.  Correct. | 9  A.  That's someone that just buys different |
| 10  Q.  Were you-all selling direct to dealers? | 10 stones and they're just inside, just jobs.  They |
| 11  A.  Yes.  We set up new dealers. | 11 do not carry no inventory.  They do anything a |
| 12  Q.  Setting up new dealers? | 12 dealership do. |
| 13  A.  Correct. | 13  Q.  So do they get -- what do they do when |
| 14  Q.  Why would you-all split the commissions? | 14 they get the stone? |
| 15  A.  I just thought it was fair. | 15  A.  I don't have a clue. |
| 16  Q.  Was this approved by Tim Pardue? | 16  Q.  I mean, do they install direct or do |
| 17  A.  Correct. | 17 they sell to another contractor? |
| 18  Q.  So you're telling me Billy Pegg was a | 18  A.  No, they don't sell.  It's a direct |
| 19 representative of Centurion Stone? | 19 sale.  This is bound for their own jobs. |
| 20  A.  At one time, yes. | 20  Q.  Did you inform Centurion that Billy Pegg |
| 21  Q.  And he would have received 1099 income | 21 was selling different stone? |
| 22 like you? | 22      MR. JAMES:  Objection, lacks |
| 23  A.  Yes. | 23 foundation. |
| 24  Q.  Anything else you can tell me about | 24  A.  I cannot remember if I have or not. |
| 25 Billy Pegg other than what you've already told | 25  Q.  (By Mr. James)  Now, I understood you to |

| Page 207 | Page 209 |
|---|---|
| 1 me? | 1 say that Tim Pardue fired him because they were |
| 2  A.  That's about it.  He was a good airplane | 2 selling other stone? |
| 3 pilot, I understand. | 3  A.  That's what I was told, yes. |
| 4  Q.  What is Salter Construction? | 4  Q.  Were you the one that informed them of |
| 5  A.  I have no idea. | 5 Oaks Brothers using different stone? |
| 6  Q.  You have never heard of Salter | 6  A.  Oaks Brothers, no. |
| 7 Construction in Hot Springs? | 7  Q.  I'm sorry.  Of Billy Pegg using |
| 8  A.  I have heard of them, but I don't know | 8 different stone? |
| 9 them. | 9  A.  I told Tim Pardue that he had different |
| 10  Q.  Have they ever been a distributor or | 10 stones in his warehouse. |
| 11 dealer in your territory? | 11  Q.  You told Tim Pardue that? |
| 12  A.  Not that I'm aware. | 12  A.  Yes. |
| 13  Q.  Did you ever make any money off Salter | 13  Q.  And after that was Billy Pegg |
| 14 Construction? | 14 terminated? |
| 15  A.  Not that I'm aware of there, no.  I | 15  A.  Not right away.  I'm not sure how long |
| 16 still don't know who Salter Construction is. | 16 that was before that. |
| 17  Q.  You don't know? | 17  Q.  Are we talking days, months, weeks, |
| 18  A.  No. | 18 years? |
| 19  Q.  Is Martin -- what is Martin Borscht | 19  A.  Probably a year or longer.  I don't |
| 20 Company? | 20 know.  You're asking something I don't remember. |
| 21  A.  I'm not sure there. | 21  Q.  Did it go over a year where Centurion |
| 22      MR. GIATTINA:  I think Borscht is | 22 allowed Billy Pegg to sell other competitors' |
| 23 how you pronounce it. | 23 product? |
| 24  Q.  (By Mr. James)  Did Oaks Brothers ever | 24  A.  I'm not sure.  I just don't know. |
| 25 sell Coronado Stone or another competitor of | 25  Q.  Would you go by and look? |

**Exhibit 1**

**Page 210**

1   A.   Would I what?
2   Q.   Is that why you went by Billy Pegg's
3 warehouse in Memphis?
4   A.   No, I went by, I was on the way to one
5 of my dealers in Hattiesburg, Mississippi.
6   Q.   Are you familiar with Hank's Fine
7 Furniture in Conway?
8   A.   I know there's one there, yes.
9   Q.   Did Fraley Masonry sell the product?
10   A.   They sold it to Jay Klaman.  Jay Klaman
11 was the one that does all of Hank's Furniture.
12 He's a mason contractor.
13   Q.   Do you know who did the masonry work at
14 the Hank's Fine Furniture in Conway?
15   A.   No, I do not.
16   Q.   Was it Murdaugh, M-u-r-d-a-u-g-h,
17 Masonry?
18   A.   I do not know.
19   Q.   When Billy Pegg was terminated, was he
20 told that he could buy or would have to buy
21 Centurion Stone from Marty Hesch at Stone
22 Concepts?
23   A.   That was my understanding, yes.
24   Q.   And the same thing was told to Stone
25 Works.  Is that correct?

**Page 211**

1   A.   Yes.  He's the closest dealer in that
2 area.
3   Q.   Is Ed Fraley Masonry still active?
4   A.   No.
5   Q.   It's your testimony it's been shut down?
6   A.   Excuse me?
7   Q.   Is it your testimony it's been shut
8 down?
9   A.   It has been, yes.
10   Q.   What is the territory for Fraley
11 Masonry?
12   A.   Springfield, Missouri and surrounding
13 area.
14   Q.   Say that again?
15   A.   Springfield, Missouri, up to around Lake
16 of the Ozarks.  Just kind of a little open
17 territory there.  There's a dealer in Columbia,
18 Missouri.  They kind of bump heads right around
19 the Lake of the Ozarks.
20   Q.   Does it have any territory in Arkansas?
21   A.   Yes.  They work Harrison, Arkansas.
22   Q.   Anywhere else?
23   A.   I'm not aware of where all they go.
24   Q.   Is Harrison an open territory or part of
25 their territory?

**Page 212**

1   A.   It's open.
2   Q.   Does Ed Fraley or does Fraley Masonry
3 compete in northwest Arkansas?
4   A.   Not compete, no.
5   Q.   Does it do business there?
6   A.   I have got some builders that go over
7 there, yes.
8   Q.   Contractors that they follow, is your
9 testimony?
10   A.   Correct.
11   Q.   Other than contractors which they
12 follow, are there any territory or do they have
13 any other territory in Arkansas?
14   A.   Not that I'm aware of.
15   Q.   Did you ever receive a bonus from
16 Centurion?
17   A.   No.
18   Q.   Would you ever try to quote, smoke out,
19 close quote?
20   A.   I don't know where that came from.
21   Q.   Let me finish.  Then you can say yes or
22 no.  Okay?
23   A.   Go ahead.
24   Q.   Because you heard that phrase before?
25   A.   Yes.

**Page 213**

1   Q.   Where did you hear that phrase before?
2   A.   I heard it from Rusty and Billy Pegg.
3   Q.   Did you ever try to smoke out
4 distributors who you thought were selling other
5 products?
6   A.   No, sir.
7   Q.   Did you ever try to discover or search
8 out or whatever words you want to do, investigate
9 dealers selling product other than Centurion?
10   A.   Not intentionally, no.
11   Q.   If you found out about it, it just
12 happened by happenstance it's your testimony.  Is
13 that correct?
14   A.   That's correct.
15   Q.   How would I go about finding the
16 territory of the distributors in your area
17 serving as a representative with Centurion?
18   A.   Excuse me?  My territory?
19   Q.   No, the territory of the distributors
20 within your territory.
21   A.   I'm not following what you mean.
22   Q.   Okay.  Well, is there like a map that's
23 stated?
24   A.   No, no, no.  No map.
25   Q.   So how would I determine the territories

1 of each of the distributors in your territory?
2    A.  The distributors really work honorably
3 with one another, and they have got so much
4 territory, it's hard to cross over.
5    Q.  So there's no map, no --
6    A.  No, no map.  No map.  It's all just
7 honorably done.
8    Q.  Now, was Centurion approached two and a
9 half years ago to open a Centurion northern
10 warehouse so it could sell stone west of the
11 Mississippi?
12    A.  Excuse me.
13        MR. JAMES:  Read that one back.
14 That was a pretty good question.
15        (The requested portion of the
16 record was read by the reporter.)
17    A.  Was Centurion approached?
18    Q.  (By Mr. James)  Yes, sir.
19    A.  Not that -- I don't know that.  I really
20 don't know how that come about.
21    Q.  You don't know anything about Lee Fraley
22 or Rudder or anybody else?
23    A.  I know, but I don't know how all that
24 all came back.  That was Tim and my son's deals.
25    Q.  Did you know they were doing it?

Page 214

1    A.  I had confirmation, yes.
2    Q.  It was a good idea?
3    A.  At the time it sounded good, but really,
4 not -- it's been an expensive idea.
5    Q.  Do you know if Centurion approached Lee
6 Fraley and John Rudder to do it?
7    A.  Yes.  I didn't do it.  I was not
8 involved.
9    Q.  Okay.  Do you know who approached who?
10    A.  I don't know.  I really don't know much
11 about it.
12    Q.  Who is Austin Hill?
13    A.  He works for Centurion.  That's all I
14 really know about Austin Hill.
15    Q.  Corporate sales rep?
16    A.  I don't know.
17    Q.  Are you familiar with noncompete
18 agreements?
19    A.  Yes.
20    Q.  Are they common in your industry?
21    A.  In some places they are, especially if
22 you train someone.
23    Q.  Did you have an economic interest?
24    A.  Yeah.  But as far as me, I have never
25 had them.

Page 215

1    Q.  And of course, if the competitors -- or
2 strike that.
3        Employees have the ability to know
4 confidential information, including witness lists
5 contact, telephone numbers, bidding preferences,
6 purchase preferences, that kind of thing?
7        MR. SMITH:  Calls for speculation.
8    Q.  (By Mr. James)  Would that be a fair
9 statement?
10    A.  I don't understand the statement.
11    Q.  What type of information would you
12 expect an employee to have regarding a
13 distributor they work for that they could use to
14 compete with them?
15        MR. SMITH:  Objection, vague.  Go
16 ahead.
17    A.  I'm trying to figure how to phrase that.
18 I mean, really, what information?  It would be up
19 to the employee they were working for what they
20 could have.
21    Q.  (By Mr. James)  Are you familiar with
22 confidentiality agreements?
23    A.  No, really, I'm not.
24    Q.  Which of your distributors that you're
25 aware of have noncompete agreements?

Page 216

1    A.  I think as far as I know, none.
2    Q.  Does Stone Concepts?
3    A.  I don't have a clue.  I do not know.
4    Q.  You just don't know one way or another?
5    A.  No, I do not.  I do not ask them all
6 those personal questions.  I don't know.
7    Q.  What is Tim Pardue's relationship with
8 Stone Concepts and its principals?
9    A.  His relationship is he sells stone to
10 him.
11    Q.  Well, they have a personal relationship.
12 They're friends, aren't they?
13    A.  Well, I don't know how you would
14 classify friends.
15    Q.  They hunt together?
16    A.  Some duck hunt, yes.
17    Q.  They take vacations together?
18    A.  Not that I'm aware of, no.
19    Q.  They golf?
20    A.  Not that I'm aware of.
21    Q.  Do you know any of them doing -- Marty
22 Hesch and Tim Pardue doing anything socially
23 together?
24    A.  Not that I'm aware of, no, sir.
25    Q.  How often have you been aware of them

Page 217

Exhibit 1

**Page 218**

1 hunting together?
2   A.  That is -- they will duck hunt a time or
3 two, but not very often, really.
4   Q.  You a golfer?
5   A.  No, sir.
6   Q.  It would be fair to say that subject to
7 Tim Pardue's approval, you made the determination
8 as to who would be a distributor and who would
9 continue as a distributor of Centurion Stone.
10 Correct?
11   A.  I would have the -- yes, I'd have some
12 ruling on it.
13   Q.  Subject to Tim Pardue's approval?
14   A.  It would be Tim Pardue's approval, yes.
15   Q.  And would you have a relationship with
16 each of your distributors, to get to know them,
17 to advise them, consult with them?
18   A.  I would do my best, yes, to make -- I
19 want to make them prosperous.
20   Q.  Did you try to befriend them?  Did you
21 consider them friends?
22   A.  Yes.  Friends, associate friends.  I try
23 not to really get real close with any of them.
24   Q.  Did you consider Rusty Ray a friend?
25   A.  Yes.

**Page 219**

1   Q.  Troy Rhodes a friend?
2   A.  Yes.
3   Q.  Angela Rhodes a friend?
4   A.  Yes.  Very much.
5   Q.  Now, how do the Centurion sales in
6 central Arkansas compare to Stone Works' previous
7 sales in central Arkansas?
8       MR. SMITH:  Objection, vague.
9   A.  I don't know.  I don't have an answer to
10 that.  I don't know what to say those are.
11   Q.  (By Mr. James)  Well, I get the
12 impression that you know when you're supposed to
13 make a commission.
14   A.  You're correct, but I don't know -- I
15 could not answer for the Marty.  Are you talking
16 about Marty Hesch's sales?
17   Q.  Yes.
18   A.  I don't know where he's allocating them,
19 because they are -- all his trucks are coming to
20 Jonesboro, so I do not know what's going where.
21   Q.  You don't know what's in central
22 Arkansas?
23   A.  No, I don't.
24   Q.  So you don't know if they're selling
25 more or less?

**Page 220**

1   A.  I'm saying right now probably less.
2   Q.  But you don't know?
3   A.  No, I don't.
4   Q.  You could be making more money, you
5 could be making less money?
6   A.  Yeah.  You're correct there.  Right now
7 with the way things are, loads have been slow.
8   Q.  Have you made money from Stone Concepts?
9   A.  Yes.
10   Q.  Have you received any compensation
11 directly or indirectly from Stone Concepts?
12   A.  No.
13   Q.  They haven't paid you anything?
14   A.  No.  Why would they?
15   Q.  That's what I'm asking.
16   A.  No, they have not.
17   Q.  Bear with me.  I'm asking some things
18 that I have already asked.  Is it common for you
19 to communicate directly with employees of the
20 distributors and dealers or -- distributors or
21 dealers for Centurion Stone?
22   A.  I'm trying to figure out what you mean.
23 You mean, like?
24   Q.  Like their employees, for example, like
25 Randy Sims.

**Page 221**

1   A.  Yes.  I told you I'm friends with
2 everybody.
3   Q.  And so is it common for you to
4 communicate directly with employees of dealers or
5 distributors?
6   A.  Yes.
7   Q.  Have you ever heard Tim Pardue say words
8 to the effect I'll spend any amount of money to
9 take out a dealer who sells any other stone than
10 mine?
11   A.  Not that I'm aware of, no, I have not.
12   Q.  But have you known that to be his
13 practice?
14   A.  No.
15   Q.  The fact is, if he becomes aware of a
16 Centurion distributor or dealer selling stone
17 other than Centurion, he'll terminate them.
18 Correct?
19       MR. SMITH:  Lacks foundation.  Go
20 ahead.
21   A.  As far as I'm concerned, yes.
22   Q.  (By Mr. James)  And that's been your
23 knowledge of the practice, custom and practice.
24 Is that right?
25   A.  Yes.

**Exhibit 1**

1    Q.   Now, your exclusivity preference is to
2 avoid dealers using other competing products.  Is
3 that correct?
4    A.   Yes.  I don't --
5    Q.   What is Builder Stone Supply in
6 Springdale?
7    A.   It's an existing distributor like Rusty
8 Ray and them had.
9    Q.   And who's the principal there?
10    A.   Justin Shockley.
11    Q.   All right.  Did I ask you about Lakeside
12 Siding?
13    A.   Yes, you did.
14    Q.   I thought I did.
15    A.   They went to ProVia.  They're no longer
16 with us.  Dana Swanson --
17    Q.   Did they get terminated?
18    A.   No, Dana Swanson called me and said, Ed,
19 I want to start selling ProVia stone because I
20 buy ProVia siding, and he said, it's a conflict
21 of interest to buy their siding and not their
22 stone.  You know what, I agree a hundred percent
23 with you.
24    Q.   If Stone Works sold to Lakeside Siding,
25 would you have any problem with that?
                                        Page 222

1    A.   I'm trying to figure out what you mean
2 by that.
3    Q.   (By Mr. James)  Well, I mean, did you
4 ever have any meetings, and you told us one --
5    A.   That's the only one, yes.  No.
6    Q.   And I'm not limiting it to meetings.
7 I'll include texts, e-mails.
8    A.   I have just saw Randy Sims that one time
9 this whole thing.
10    Q.   Now, when did you start or did you at
11 some point start talking with Randy Sims about
12 him going to work at Stone Concepts?
13    A.   I never did mention that to Randy Sims.
14    Q.   Did he mention it to you?
15    A.   Yes.
16    Q.   What did he say to you?
17    A.   He just said would Marty be interested
18 in hiring him.  I said you have to talk to Marty,
19 I don't do that.
20    Q.   You were aware of that.  Is that
21 correct?
22    A.   Correct, but I have no idea when or
23 what.
24    Q.   Did you tell Marty that he would be
25 contacting him?
                                        Page 224

1    A.   Not right now.  None at all, if they
2 want to.
3    Q.   You say none right now.  Is that because
4 they're no longer a dealer or distributor?
5    A.   Yeah.  I don't see that I have any
6 problem.
7    Q.   How long did Randy Sims work with you?
8    A.   Probably roughly ten years.
9    Q.   Did Megan Sims ever work with you?
10    A.   No.
11    Q.   Did you ever feel Stone Works needed to
12 get rid of Megan and Randy Sims?
13    A.   Did I ever what now, sir?
14    Q.   That they needed to get rid of Megan
15 or --
16    A.   No.
17    Q.   Did you ever tell them that they would
18 turn -- did you tell Stone Works that the Sims
19 would turn on them?
20    A.   No, I did not because I didn't even have
21 that feeling towards the Sims.
22    Q.   Did you participate in any
23 communications with the Sims for Marty Hesch and
24 Marty Hesch?
25         MR. JAMES:  Objection, vague.
                                        Page 223

1    A.   I can't remember if I did or not.
2    Q.   Is it possible you did and you don't
3 recall?
4    A.   It could be.
5    Q.   How long before they actually left did
6 Marty Sims notify you that he wanted you to go
7 work with -- Randy Sims notify you that he wanted
8 to go work with Marty Hesch?
9    A.   I'm not sure.  I don't know.  I'm not
10 sure if he even notified me.  Most of the time
11 Randy was going to go to work for himself.
12    Q.   Did Marty Hesch ask you what you thought
13 about Randy Sims?
14    A.   No, sir.
15    Q.   Do you know whether Randy Sims and Megan
16 Sims were hired by Hesch and paid more money than
17 while at Stone Works?
18    A.   I have no idea about none of that, no.
19    Q.   No one's talked to you about that?
20    A.   No.
21    Q.   You ever heard of Centurion Exteriors?
22    A.   Yes.  That's in Nashville, Tennessee.
23    Q.   And is that a distributor?
24    A.   That's Tim Pardue's distributor.  That's
25 their name.  Since you brought it up, it rung a
                                        Page 225

Bushman Reporting                    800-556-8974
A Veritext Company                   www.veritext.com

**Exhibit 1**

1 bell.
2    Q.   And his territory is what with Centurion
3 Exteriors?
4    A.   I do not know.
5    Q.   And what is -- have you ever heard of
6 Centurion Stone of Clarksville?
7    A.   No, I have not.  That's all out of my
8 area.
9    Q.   Have you ever heard of Centurion Stone
10 of Chattanooga?
11    A.   Yes.  That's Harold Johnson.  I know
12 Harold Johnson.
13    Q.   How do you know Mr. Johnson?
14    A.   He used to work for Centurion Stone as a
15 salesman.
16    Q.   Is he a Centurion distributor?
17    A.   As far as I know, he is.  I don't know.
18 That's not an area I work.
19    Q.   Did he sell other product other than
20 Centurion product?
21    A.   I don't know.
22    Q.   Have you ever heard that?
23    A.   No, I have not.  I don't know anything
24 about what Darrell is doing.
25    Q.   Did Centurion allow another dealer or

Page 226

1 distributor to open up in his same territory?
2    A.   I can't answer that.  I don't know.
3    Q.   Do you know whether that competitor
4 stayed in business or went out of business?
5    A.   I don't know.
6    Q.   Did you ever deal with Centurion of
7 Chattanooga and receive any compensation from
8 that?
9    A.   No.
10    Q.   Do you know where Oaks Brothers is
11 located?
12    A.   Not now.  I do not know.  I have not
13 seen or talked to Oaks Brothers in several years.
14    Q.   Have you ever heard of Centurion of
15 Memphis?
16    A.   Yes.  That would be Billy Pegg.
17    Q.   What was the territory of Centurion of
18 Memphis?
19    A.   I do not really know.
20    Q.   And did you get a piece of it?
21    A.   For a short time.
22    Q.   And why did it start and why did it end?
23    A.   It was just for me to help Billy Pegg
24 kind of get on his own feet, and then Tennessee
25 was a Nashville -- that's their headquarters,

Page 227

1 Tennessee is.
2    Q.   Did it then become Memphis Stone &
3 Stucco?
4    A.   As far as I'm concerned I think it did,
5 yes, but I don't really know.
6    Q.   Did you get a piece of that?
7    A.   No, sir.
8    Q.   Did Tim Pardue pull Memphis Stone &
9 Stucco off the website for selling other product?
10    A.   You have to talk to Tim Pardue.  I don't
11 know.
12    Q.   Did you hear anything about that?
13    A.   No.
14    Q.   When Centurion of Memphis was cut off,
15 did you go to Christie Cut Stone in Memphis and
16 tell them they were no longer a rep for
17 Centurion?
18    A.   No, I did not.
19    Q.   Have you ever heard of Christie Cut
20 Stone in Memphis?
21    A.   I have heard of them, but I don't know
22 where they're located.
23    Q.   And you never got a piece of that?
24    A.   No, I did not.
25    Q.   What is Centurion Stone of Appalachia?

Page 228

1    A.   I don't have a clue what that is.
2    Q.   What is Aztec Masonry?
3    A.   I do not know.
4    Q.   Who is Dan Britton?
5    A.   I do not know that.
6    Q.   Did Stone Concepts or Fraley Masonry
7 ever attempt to start selling brick in central
8 Arkansas?
9    A.   I'm -- when it comes to brick, I cannot
10 answer that.  I don't get concerned on brick.
11    Q.   Do you have any knowledge of --
12    A.   No, not that I have knowledge, no.
13    Q.   You ever deal with a Dan Britton,
14 B-r-i-t-t-o-n?
15    A.   No.  I just said I didn't know him.
16    Q.   I'm sorry.  Have you ever heard of
17 Mountain Valley Estates?
18    A.   No, I have not.
19    Q.   Doesn't ring any bells with you?
20    A.   No.
21    Q.   How many times have you been to Stone
22 Concepts or their offices?
23    A.   I have never been to one in Alexandria.
24 I have been to the one in Jonesboro two or three
25 times.

Page 229

58 (Pages 226 - 229)

**Exhibit 1**

| | |
|---|---|
| 1 Q. And do you talk to their employees?<br>2 A. The ones in the office, yes. Not the<br>3 outside employees.<br>4 Q. Did you talk to Randy Sims after he<br>5 became an employee of --<br>6 A. No, I have never been there since all<br>7 that took place.<br>8 Q. Let me finish.<br>9 A. I'm sorry.<br>10 Q. Did you ever talk to Randy Sims after he<br>11 became an employee of Stone Concepts?<br>12 A. I'm thinking he called me once or twice.<br>13 Q. And what did he call you for?<br>14 A. You know, I can't remember. When you<br>15 talk to Randy Sims, you never know. I can't<br>16 recall.<br>17 Q. Was Darrell Johnson required to purchase<br>18 from Stone Concepts if he wanted Centurion Stone?<br>19 A. Not that I'm aware of. Darrell Johnson<br>20 is in Chattanooga, Tennessee.<br>21 Q. What about Billy Pegg?<br>22 A. I think they did have Billy Pegg, if he<br>23 wanted Centurion, because he was carrying another<br>24 product.<br>25 Q. He had to go through Stone Concepts?<br>*Page 230* | 1 MR. JAMES: That's coaching.<br>2 Please don't.<br>3 MR. SMITH: No, it's not.<br>4 MR. JAMES: It's very suggestive.<br>5 Q. (By Mr. James) Go ahead.<br>6 A. Yeah, that would be their closest area<br>7 to get the stone.<br>8 Q. And do you know Nick and Hanna Graves?<br>9 A. No, I do not.<br>10 Q. Never heard those names?<br>11 A. Not that I can place from on mine, no.<br>12 Q. You believe Megan and Randy Sims to be<br>13 truthful and honest?<br>14 A. I don't -- I believe Randy is not going<br>15 to lie to me. I have not never been around Megan<br>16 enough to know. I betcha all the whole years I<br>17 have known Randy I have probably maybe spent an<br>18 hour with Megan. That's because she's come in<br>19 and picked their checks up on Friday.<br>20 Q. Do you believe William Thomas to be<br>21 truthful and honest?<br>22 A. I don't know how to think about that. I<br>23 don't know what to say.<br>24 Q. You don't know what to think. What do<br>25 you mean by that?<br>*Page 232* |
| 1 A. Yes. Or another dealer, yes. It<br>2 wouldn't have to necessarily be Stone Concepts.<br>3 Q. What was your first knowledge that Stone<br>4 Concepts was opening a store in central Arkansas?<br>5 A. I'm trying to think when that was. I<br>6 mean, it was already done before I knew it.<br>7 Q. Who all was involved in the store?<br>8 A. I do not know.<br>9 Q. Was Randy Sims?<br>10 A. I have not been there, so I don't know.<br>11 Q. Do you know whose idea it was to open<br>12 the store?<br>13 A. Marty's.<br>14 Q. Did they have to have a showroom?<br>15 A. Yes.<br>16 Q. And be -- and have a warehouse for<br>17 inventory?<br>18 A. Yes. I'm sure they got all that. I<br>19 have not been there.<br>20 Q. After you terminated Stone Works or in<br>21 connection with the termination of Stone Works,<br>22 were they told they could only get Centurion<br>23 Stone from Stone Concepts?<br>24 MR. SMITH: Lacks foundation,<br>25 misstates prior testimony. Go ahead.<br>*Page 231* | 1 A. I don't know William Thomas.<br>2 Q. In the summer of 2021 were you aware of<br>3 anybody saying negative things about Stone Works?<br>4 A. Not that I'm aware of, no.<br>5 Q. Did you hear talk about them going out<br>6 of business?<br>7 A. No, not out of business, no. I would<br>8 not.<br>9 Q. Who would you mainly deal with at Stone<br>10 Works?<br>11 A. Angela. I mean, you always deal with<br>12 Rusty and Troy, but when it comes to the main<br>13 majority of the work is Angela.<br>14 Q. Did you ever tell Stone Works that they<br>15 needed to tell you about their customers so you<br>16 could help them with their customers and to<br>17 develop the customers?<br>18 A. No, I did not. The only time I did if<br>19 Angela had asked me to go help her with<br>20 something, I would.<br>21 Q. Was there ever any product or vendor<br>22 confusion between Stone Works and Stone Concepts?<br>23 A. I'm not aware of any.<br>24 MR. SMITH: Let's take five<br>25 minutes.<br>*Page 233* |

**Exhibit 1**

1           (Recess.)
2           (Fraley Exhibit 13 was marked for
3   identification by the reporter.)
4       Q.  (By Mr. James)  Sir, I'm going to hand
5   you a document labeled Deposition Exhibit No. 13,
6   which is a January 19th, 2010 e-mail from Rusty
7   Ray to L. Cunningham.
8           MR. GIATTINA:  Scott?  Scott, can
9   you hear me?
10          MR. RICHARDSON:  Yeah.
11          MR. GIATTINA:  I'm e-mailing this
12  to you right this second.  All right?
13          MR. RICHARDSON:  All right.
14      Q.  (By Mr. James)  All right.  Sir, you
15  have in front of you a January 19, 2010 e-mail
16  from Rusty Ray to people at Centurion.  And the
17  second paragraph says that "I attach a map of the
18  counties which Stone Work represents.  This is
19  the core area we do business regularly, and have
20  an active outside sales effort.  We will go
21  outside of this area for, for example, to the
22  south where there is no Centurion representation
23  and we continue to grow."  And you would agree
24  that they could go outside their territory if
25  there was no active representation.  Correct?
                                            Page 234

1       A.  Correct.
2       Q.  And because I'm the one that copied
3   these and not someone smarter, the copy is not
4   highlighted.  The original is.  So I'm going to
5   make sure your counsel is looking, and this is
6   the same map that we're going to make an exhibit,
7   showing highlighted counties.  I want you to take
8   a look at that and ask you if these highlighted
9   areas constitute the territory of Stone Works?
10      A.  Well, he's getting a little bit behind,
11  a little bit further north than he should be.
12  Fulton County is, but when you get on up in Van
13  Buren and Clinton he's getting up in Clinton and
14  a hot button.
15      Q.  I'm going to hand you a red pen, and I'm
16  going to ask you to underline the ones or mark
17  the ones you believe are not included in the
18  territory.  Underline the county.
19      A.  Okay.  As far as the counties go, I'm
20  not familiar with all the counties.  I mean,
21  Searcy County and VB, he's getting a little bit
22  past right in here.  I would say probably,
23  probably these counties here took out.  He's
24  dropped way down in Arkansas County.  I could say
25  these territories right in here might be open
                                            Page 235

1   territory, a couple of them.
2       Q.  Why don't you write open there.
3       A.  That don't mean he can't sell that.
4   That means anybody can.  I think that's pretty
5   close.
6       Q.  Okay.  So what I'm going to do, I'm
7   going to label this Exhibit 13A, and the court
8   reporter will have the original with your
9   markings on it.
10      A.  Okay.
11          (Fraley Exhibit 13A was marked for
12  identification by the reporter.)
13      Q.  (By Mr. James)  And I am to go through
14  this now.  Van Buren County.
15      A.  That's Clinton.
16      Q.  That's Clinton.  Who's got that
17  territory?
18      A.  That's open.  That's all open territory.
19      Q.  Cleveland County?
20      A.  That was Dana Swanson, that was Heber
21  Springs.
22      Q.  Dana Swanson?
23      A.  Yeah, that would be Tri-Lake Siding.
24      Q.  Who gets White County?
25      A.  I'm not sure where White County.  That's
                                            Page 236

1   getting awful close over into the eastern part.
2       Q.  Searcy.
3           MR. RICHARDSON:  Are we talking
4   currently?  I'm sorry, are we talking currently
5   or the past time?
6       A.  It had to be past rime.
7           MR. JAMES:  I don't even know how
8   to answer your question and I don't want to.
9   Because you object to form and let's move on.
10      Q.  (By Mr. James)  Who has White County, if
11  anybody?
12      A.  That's getting off pretty close to
13  Jonesboro in that area.
14      Q.  That's Searcy.  Does that help you?
15  Searcy is in White County, I believe.
16      A.  That would be more his area, Searcy
17  would be.
18      Q.  Are you telling me that was a part of
19  his territory or you're not sure?
20      A.  I'm not sure.  That was really at one
21  time Dana Swanson territory, more than likely,
22  but he's not there anymore.
23      Q.  You said the counties that are open are
24  Arkansas and Clark.  Correct?
25      A.  Yeah, that should be close, yeah.
                                            Page 237

Bushman Reporting                          800-556-8974
A Veritext Company                         www.veritext.com

**Exhibit 1**

1    Q.  All right.  And Prairie would be in
2  Stone Works' territory.  Correct?
3    A.  That's getting close.  That's right
4  around Cabot, Lone Oak.
5    Q.  So would the remaining counties on
6  Exhibit 13A be the Stone Works territory is your
7  testimony?
8    A.  Should be fairly close, yes.
9    Q.  Okay.  We'll move on, but I want to
10  physically give this one to the court reporter.
11   A.  Hard to just actually make a complete
12  without.
13   Q.  All right.  Did you ever tell Rusty Ray
14  words to the effect that you would show him how
15  to sell the product, but if he ever bought anyone
16  else's product you would shut him down?
17   A.  Not that I recall, no.
18   Q.  Do you recall words to that effect?
19   A.  No, I do not.
20   Q.  Do you recall telling him about shutting
21  down other dealers?
22   A.  No, I do not.  I have not shut any other
23  dealers down than that one I was talking about.
24   Q.  What customers of Stone Works have you
25  had communications with?

Page 238

1    A.  What's that, you say?
2    Q.  You know, customers include contractors
3  or jobbers?
4    A.  Yes.
5    Q.  And so that wouldn't be masonry work
6  performed by Stone Works, would it?
7    A.  It should be, yes.  It says Plaintiff's
8  performed masonry work.
9    Q.  So you're telling me if Stone Works
10  hires a contractor and the -- or strike that.
11        If you're telling me Stone Works sells
12  to a contractor who is a dealer and that dealer
13  then installs the masonry, that that's Plaintiff
14  installing it?
15   A.  I miss --
16   Q.  Okay.
17   A.  I'm trying to.
18   Q.  I think you're going to tell me the
19  first paragraph or first sentence of Paragraph 25
20  is inaccurate.
21   A.  It's very hard to understand.
22  Plaintiff's customers.  That would be their
23  customers.  Plaintiff's customers that they have
24  done masonry work for.
25   Q.  So you're telling me if Stone Works

Page 240

1    A.  I have no recollection.  It's been so
2  long.
3    Q.  You don't dispute you have.  You just
4  don't recall which ones?
5    A.  I don't recall, no, I don't.  No, when
6  they first started I had -- I helped with a
7  couple home shows.  I had no idea who all.  I
8  just don't recall.
9    Q.  If you'll look at Paragraph 25 of your
10  Declaration, sir.  Let me know when you're there,
11  and it says, "Plaintiff's customers are limited
12  to those for which Plaintiff performs masonry
13  work."  That's not true, is it?
14   A.  I'm going to read this some more.  I
15  have not made contact with them.  I have not done
16  that.  I really don't know.
17   Q.  My question is, the statement that
18  Plaintiff's customers, Stone Works customers are
19  limited to those for which Stone Work performs
20  masonry work is not an accurate statement, is it,
21  sir?
22   A.  It's close, yes.  They should be.
23  That's their customers.
24   Q.  Okay.  So there's no contractors -- I
25  thought we have gone through this.

Page 239

1  sells Centurion product to a dealer-contractor
2  and that dealer contractor installs that product,
3  that that is Stone Works performing the masonry
4  work?  I don't think you mean that.
5    A.  What I'm trying -- it says Plaintiff has
6  done the work.  It says Plaintiff's customers are
7  limited, which Plaintiff performs the work.
8    Q.  Sir, these are your words.  They're not
9  mine.
10   A.  Yes.
11   Q.  So I'll ask you just one more time.  Are
12  you standing by the first sentence in Paragraph
13  25?
14   A.  Plaintiff's customers are limited to
15  those for which Plaintiff performs masonry work.
16  I didn't have any knowledge of these customers,
17  yes.
18   Q.  Now, just the first sentence, are you
19  standing by that?
20   A.  I don't understand what I was trying to
21  say there.
22   Q.  Again, these are your words aren't they,
23  sir?
24   A.  Yes, they are, and that's what I'm
25  trying to remember how I worded that.

Page 241

61 (Pages 238 - 241)

**Exhibit 1**

1        MR. SMITH:  Do you want him to read
2 the question back, Ed?  Do you want her to read
3 the question to you?
4        THE WITNESS:  Yes.  Please, yes.
5    Q.  (By Mr. James)  I'll just rephrase the
6 question.
7    A.  It's really got me in a shock.
8    Q.  My question is, Paragraph 25 of your
9 Declaration says in the first sentence, and
10 that's all I want to focus on, Plaintiff's, which
11 is Stone Works, customers are limited to those
12 for which Plaintiff, that's Stone Works, performs
13 masonry work.
14    A.  No, they're not -- no, they could be
15 other customers that they haven't done work for.
16    Q.  My point is --
17    A.  It's not limited.
18    Q.  Well, not only that, but Plaintiff's
19 customers, Stone Works customers would include a
20 dealer, such as a contractor.  Correct?
21    A.  Correct.
22    Q.  And if it sells product to that dealer/
23 contractor and he goes out and installs the
24 Centurion product, that's not Stone Works
25 installing it.  That's the customer installing

Page 242

1 shutting down Billy Pegg?
2    A.  I did not shut Billy Pegg down.  Angela
3 asked me how Billy was doing, and I told her that
4 Billy got shut off, but I did not do it.
5    Q.  But it was based on information you
6 provided.  Correct?
7    A.  I cannot say that.  I don't know.
8    Q.  You believe that to be true, don't you?
9    A.  No.  Not a hundred percent, no.
10    Q.  All right.
11    A.  I do not know who all Tim Pardue dealt
12 with on that.  Billy Pegg and Roger Cunningham
13 were very close, so it could have been in that
14 direction.  I don't know.
15    Q.  Now, once the decision was made to cut
16 off Stone Works as a dealer for Centurion, did
17 the terms and conditions of their purchases
18 change?
19    A.  They changed.  They was going to another
20 stone.
21    Q.  Well, not only that, but they were
22 required to pay up front before they got
23 delivery.  Correct?
24    A.  That was what I understood.  That was
25 Tim Pardue.  You have to talk to Tim Pardue about

Page 244

1 it.  Correct?
2    A.  That would be a masonry contractor, yes.
3    Q.  And so Plaintiff's customers are not
4 limited to those for which it performs masonry
5 work, and it has other customers beyond that.
6 Correct?
7    A.  Yes.  I agree with that.
8    Q.  Okay.  So that's -- first sentence,
9 Paragraph 25 is incorrect?
10    A.  Correct.  Yeah.
11    Q.  All right.  And then you said, "I do not
12 have any knowledge of those customers, nor have I
13 made contact with any such customers."  Let me
14 see if I can characterize your testimony
15 accurately.  I understand you have met customers.
16    A.  I have, yes, but it's been a long time.
17    Q.  So you have made contact with customers
18 before?
19    A.  Yes.  I would say at least ten, eight to
20 ten years.  This would be way back, but I have,
21 yes.
22    Q.  All right.  Have you bragged to Angela
23 Rhodes about shutting down Billy Pegg?
24    A.  No, I have not.
25    Q.  Have you talked to Angela Rhodes about

Page 243

1 that.
2    Q.  I need to talk to Mr. Pardue on that?
3    A.  Correct.
4    Q.  I think you're right, sir, and then
5 would you agree with me that Centurion's
6 exclusivity policy or procedure was to prevent
7 customers from using other competing products?
8    A.  Would you rephrase that one more time?
9        MR. JAMES:  I'm going to ask the
10 court reporter to read that one back.
11        (The requested portion of the
12 record was read by the reporter.)
13    A.  Are you talking about the dealers or the
14 customers?
15    Q.  (By Mr. James)  Customers.  You would
16 rather them sell or use Centurion product than
17 ProVia, wouldn't you?
18    A.  Well, yes.
19    Q.  And that was designed, one of the
20 reasons behind it to make that happen, that your
21 dealers would only sell Centurion and not ProVia
22 or other competitors.  Correct?
23    A.  Right.
24        MR. SMITH:  Objection, hold on.
25 Objection, vague.  Go ahead.

Page 245

62 (Pages 242 - 245)

**Exhibit 1**

1   A.  I feel like that would be a true
2 statement.
3   Q.  (By Mr. James)  All right.  And you
4 wanted to have Centurion to have more of the
5 market in a particular area because you would
6 make more money, Centurion would make more money?
7   A.  That is -- I want all the market, but as
8 far as that goes, we're going to have
9 competition.  Everybody has got competition.
10   Q.  Sure.
11   A.  But I wanted my share.
12   Q.  And you wanted as much as you could get?
13   A.  My share, yes.  I mean, I wanted --
14   Q.  Did you give a lesser price to exclusive
15 dealers than you did to direct customers?
16   A.  No.
17   Q.  Now, if a dealer sold other products and
18 then they were cut off and had to buy Centurion
19 stone from another dealer, it would be at a
20 higher price than they could purchase it before.
21 Correct?
22   A.  That is correct.  That would be at the
23 mercy of the dealer they bought from.
24   Q.  Now, did -- tell me why Randy Sims
25 called you or what he told you in conversations

Page 246

1 before the decision was made to cut off Stone
2 Works?
3   A.  I can't recall the conversations.
4   Q.  Okay.  What about after when the
5 decision was made?
6   A.  I can't recall.  Randy Sims was like
7 talking to a basketball.  I can't recall what all
8 that was said.
9   Q.  When was the decision made to terminate
10 Stone Works?
11   A.  I would have to look.  I'm not sure
12 about that date.
13   Q.  Were there -- what events occurred?  Was
14 it the William -- before or after the William
15 Thomas?
16   A.  It was before the William Thomas thing
17 me and Tim had talked.  It was sometime towards
18 the last week of June, but before all come out,
19 yes.
20   Q.  Was it before or after you were sent the
21 ProVia website?
22   A.  It was before.
23   Q.  Was it before or after Randy Sims called
24 you?
25   A.  I don't remember the phone calls.  It

Page 247

1 would be probably when Randy Sims called me and
2 let me know, but as far as what Randy talked
3 about, I can't remember all that.
4   Q.  It would be fair today to say that today
5 Stone Works would be a dealer of Centurion if
6 Centurion did not believe Stone Works was selling
7 competitive product.  Correct?
8   A.  That would probably be a true statement.
9   Q.  When you were served with a lawsuit who
10 was the first person you called?
11   A.  John Enkema.
12   Q.  And he is Centurion's counsel.  Correct?
13   A.  That is correct.
14   Q.  Tell me about that conversation.
15   A.  Well, I didn't call him.  I drove down
16 there.  Handed it to him.
17   Q.  You drove down to Nashville?
18   A.  Yes.
19   Q.  Did he know you were coming?
20   A.  No.
21   Q.  So where were you served?
22   A.  Springfield, Missouri.
23   Q.  How long a drive is it from Springfield
24 to Nashville?
25   A.  About seven hours.

Page 248

1   Q.  You didn't call him on the way?
2   A.  No.
3   Q.  Did you talk to anybody on the way?
4   A.  No, I did not.
5   Q.  So you just drove there to his office.
6 What time did you get there?
7   A.  About 5:30, 6 o'clock that morning.
8   Q.  So you drove through the night?
9   A.  Oh, yes.
10   Q.  Why did you do that?
11   A.  That's what I do.
12   Q.  When you say that's what you do, what do
13 you mean?
14   A.  I mean, I have worked of a day and drive
15 at night.  That's how I take care of my people.
16   Q.  You're a road warrior?
17   A.  Rusty can tell you right now, I have
18 been at his office waiting on him for breakfast
19 from Springfield.
20   Q.  So you drove seven hours from
21 Springfield to Nashville to talk to Centurion's
22 counsel?
23   A.  Yes.
24   Q.  You didn't call anybody and say you were
25 coming?

Page 249

63 (Pages 246 - 249)

**Exhibit 1**

| | |
|---|---|
| 1  A.  No.<br>2  Q.  You walked up to his office, I guess he<br>3 was there?<br>4  A.  Nope.  I wasn't there.  I got there<br>5 early.  I had to wait.  He got there about 9<br>6 o'clock.<br>7  Q.  You had to wait, and then tell me about<br>8 your conversation when you met with him?<br>9  A.  He just -- then I said I need to call<br>10 Bud Cummings, so that's what I done.<br>11  Q.  Did you hop in your car and turn around<br>12 and go back?<br>13  A.  Go back home.<br>14  Q.  How long did you meet with him?<br>15  A.  Probably 30 minutes.<br>16  Q.  Did you call Tim Pardue at anytime<br>17 during this period?<br>18  A.  Yes, I did.  I wanted Tim to know what<br>19 was going on.<br>20  Q.  When did you call Tim Pardue?<br>21  A.  When John got there.  It was --<br>22  Q.  You called him from John's office --<br>23  A.  Yes.<br>24  Q.  -- and talked?  What did you say, what<br>25 did Mr. Pardue say?<br><div align="right">Page 250</div> | 1 your main contact at Stone Works, why did you<br>2 call Troy Rhodes instead of Angela when you were<br>3 terminating Stone Works as a dealer?<br>4  A.  Because Troy was the main person I set<br>5 up.  Angela was just kind of the go through to<br>6 explain to everybody what they're going to do<br>7 today.<br>8  Q.  Would Marty Hesch be selling Centurion<br>9 Stone in central Arkansas, including Alexander,<br>10 if Centurion did not hear about Stone Works'<br>11 ProVia application?<br>12      MR. SMITH:  Calls for speculation.<br>13 Go ahead.<br>14  A.  We probably wouldn't have -- wouldn't be<br>15 having these conversations.<br>16  Q.  (By Mr. James)  Why do you say that?<br>17  A.  Because if they was still selling<br>18 Centurion Stone we wouldn't need to be here<br>19 today.  Marty Hesch would still be at Jonesboro,<br>20 and Marty just got his new business started and<br>21 really put a burden on him to move to central<br>22 Arkansas.<br>23  Q.  How did it put a burden on him to move<br>24 to central Arkansas?<br>25  A.  Because it put a double workload on him.<br><div align="right">Page 252</div> |
| 1  A.  Really all I can recall him saying is<br>2 I'm going to call Bud.  Bud Cummings.  That's<br>3 all.  And then John said I was supposed to go<br>4 home and lay low for five days.  I couldn't work.<br>5 I couldn't be nowhere, so that's what I done.<br>6  Q.  I'm not allowed to get the substance,<br>7 but when did you first talk to an attorney who<br>8 was representing you?<br>9  A.  On my way home.  Bud Cummings called me.<br>10  Q.  Okay.  So John had called Bud and then<br>11 Bud called you?<br>12  A.  Correct.<br>13  Q.  And you were friends with Bud?<br>14  A.  Not real good friends, but we duck<br>15 hunted together.<br>16  Q.  Kill God's creatures together?<br>17  A.  God's creatures together.<br>18  Q.  Shoot them in the face?<br>19  A.  Try to.<br>20  Q.  You ever heard of PlanHub?<br>21  A.  PlanHub?  No, sir.  Sounds like a sneak<br>22 attack.<br>23      MR. JAMES:  You all need to mute<br>24 your phones.<br>25  Q.  (By Mr. James)  If Angela Rhodes was<br><div align="right">Page 251</div> | 1  Q.  A double workload is more money, isn't<br>2 it?<br>3  A.  Sometimes, but is the money worth all<br>4 that double workload.  That's the reason I gave<br>5 all my territory up.<br>6  Q.  Now, were you aware that Randy Sims and<br>7 Megan Sims went to the Centurion factory in<br>8 Nashville?<br>9  A.  No, I was not.<br>10  Q.  You didn't set it up?<br>11  A.  No, I did not.<br>12  Q.  Have you ever heard that they went<br>13 around the summer of 2021?<br>14  A.  I think I heard it when we had that last<br>15 little meeting.  I seen stuff on where he done<br>16 some screen shots of something, but I did not<br>17 know anything about it.<br>18  Q.  What last little meeting are you<br>19 referring to?<br>20  A.  When we had the Zoom meeting in August.<br>21  Q.  The hearing?<br>22  A.  The hearing, yes.<br>23  Q.  Okay.<br>24  A.  That's when I found out about it.<br>25  Q.  Now, when you-all had the meeting with<br><div align="right">Page 253</div> |

Bushman Reporting       800-556-8974<br>A Veritext Company       www.veritext.com

<div align="right">**Exhibit 1**</div>

1 Randy Sims and Marty Hesch in Randy Sims'
2 backyard that you drove from Jonesboro to Benton,
3 after that meeting Marty Hesch said he didn't
4 want to do business with Randy Sims?
5    A.   He didn't put it quite like that.  He
6 said he didn't think he would sell to them.
7    Q.   And do you know what changed?
8    A.   I do not know.  I mean, I guess that
9 idea about him not selling to him, he had a
10 little more control.  I don't know.  That's a
11 question Marty would have to answer.
12    Q.   Earlier you testified that Angela Rhodes
13 and Oak Brothers had a quote, difficulty, close
14 quote?
15    A.   That's what I understood.  I think
16 that's what Angela was trying to explain to me,
17 and I honestly don't know what that was.
18    Q.   You had no clue?
19    A.   No, not really.
20    Q.   And you've told us everything you know
21 about the Oaks Brothers situation.  Correct?
22    A.   As far as I know, yes.
23    Q.   Did Centurion have noncompetes with its
24 employees?
25    A.   That not -- you have to talk to

Page 254

1 application?
2    A.   I'm thinking it might be two, maybe
3 three pages of it.  I'm not -- I would have to
4 relook.  I just looked at it and that's the size
5 of it.
6    Q.   Do you know how Mr. Thomas got your text
7 address?
8    A.   They all have my phone number because I
9 was working, and when they have a problem, they
10 would call me and ask me about colors.  It was
11 not unusual for Randy or William to call me about
12 something.
13    Q.   It's not unusual for employees of your
14 distributors to call you?
15    A.   Right.
16        (Farley Exhibit 15 was marked for
17 identification by the reporter.)
18    Q.   (By Mr. James)  And let mow show you a
19 document labeled Deposition Exhibit No. 15 and
20 ask you if this is also a text you received, part
21 of the text you received, which is labeled
22 Exhibit 1B, but we're labeling it Exhibit 15.
23 That probably makes as much sense as mud, but
24 we're going to go with it.  Did you also receive
25 Exhibit 15?

Page 256

1 Centurion.  I did not know.
2    Q.   So I need to ask Mr. Pardue again?
3    A.   That's what I'm suggesting, because I
4 have no knowledge.
5        (Farley Exhibit 14 was marked for
6 identification by the reporter.)
7    Q.   (By Mr. James)  Sir, I'm going to hand
8 you a document labeled Deposition Exhibit 14,
9 which is Exhibit 1A, I understand, to the TRO
10 hearing.
11        MR. GIATTINA:  That's to --
12        MR. SMITH:  The Declaration.
13    Q.   (By Mr. James)  Your Declaration.  Okay.
14 Thank you.  Can you tell me what is?
15    A.   It's that paragraph.
16    Q.   Was this what William Thomas sent you?
17    A.   That's what I have on my phone, yes.
18    Q.   And you still have it on your phone?
19    A.   Correct.  I didn't even take it off.
20    Q.   And, sir, if we look at your
21 Declaration, Paragraph 11, this text would have
22 been on June 29, 2001.  Is that correct?
23    A.   I think that is correct, yes.  That
24 sounds correct.
25    Q.   How many times did you get sent the

Page 255

1    A.   I would have to look and see.  I'm not
2 sure.
3    Q.   Okay.
4    A.   I just saw what that was, and as far as
5 me concentrating on it, I never.
6    Q.   Well, that's got a facsimile
7 confirmation on it, doesn't it?
8    A.   You're dealing with a man that can't
9 work the phone.  Got something.
10    Q.   You can't read it?
11    A.   I can read it.
12    Q.   Could you read it on your phone?
13    A.   If you can open it up real big you can.
14    Q.   Did you do that?
15    A.   Just enough to see what it was, yes.
16    Q.   And what did you see that it was?
17    A.   Credit app.
18    Q.   Would you like credit apps of your
19 potential dealerships to be put on the internet?
20    A.   No, I would not.
21    Q.   And you knew it was wrong to send this,
22 didn't you?
23    A.   I didn't know it was coming.  If you
24 notice it's about 6 o'clock one morning.
25    Q.   But you knew it was wrong for William

Page 257

65 (Pages 254 - 257)

**Exhibit 1**

1 Thomas to send this to you?
2   A.   Yes.  I knew it was wrong.
3   Q.   Okay.
4        (Farley Exhibit 16 was marked for
5 identification by the reporter.)
6   Q.   (By Mr. James)  I'm going to hand you a
7 document labeled Deposition Exhibit 16, which is
8 Exhibit 1C to the facsimile.  And would you have
9 received this?
10   A.   I mean, they all look the same, so I
11 would have to have to see it.
12   Q.   Reading your affidavit it says "The
13 photographs I received are Exhibits 1A through
14 1C."
15   A.   That must be them, then.
16   Q.   Okay.  So at that point you knew this
17 was confidential information of Stone Works,
18 didn't you?
19   A.   Yes.
20   Q.   You knew that Mr. Thomas should not have
21 been publishing it to you.  Correct?
22   A.   I do.
23   Q.   And despite that, did you forward it to
24 anybody?
25   A.   Tim Pardue.
Page 258

1   Q.   Tim Pardue.  So you got something you
2 knew you weren't supposed to have, and then you
3 forwarded it to Tim Pardue, didn't you?
4   A.   He's got the same credit app was sent to
5 him on ProVia.  No difference in information.
6   Q.   So it's your testimony that Centurion
7 has the same credit app as ProVia as listed on
8 14, 15 and 16.  Correct?
9   A.   Well, I would say it's not the same.
10 They don't have the Centurion app with the same
11 information.
12   Q.   Let me get back to my question.  You
13 knew you shouldn't have it?
14   A.   Correct.
15   Q.   And you didn't contact Stone Works, your
16 friends there and say, hey, one of your employees
17 is doing wrong.  He's sending me stuff he
18 shouldn't send.  I'm letting you know about it?
19   A.   I should have, but I didn't.
20   Q.   You didn't.  But you then forward it
21 electronically to Tim Pardue.  Correct?
22   A.   Correct.
23   Q.   And what is the next thing that
24 happened?
25   A.   That was the end of it right then.
Page 259

1   Q.   That shut it down for Stone Works,
2 didn't it?
3   A.   No, no, that didn't happen.
4   Q.   That decision had already been made?
5   A.   Correct.
6   Q.   Your testimony?
7   A.   Yes.
8   Q.   So when you say that was the end of it,
9 what do you mean?
10   A.   I mean that was the end of me looking at
11 that.  I have just left it in my phone.
12   Q.   But you knew that this was property of
13 Stone Works, didn't you?
14   A.   It should have been, yes.
15   Q.   And you knew that you maintained it
16 electronically on your phone.  Correct?
17   A.   Correct.
18   Q.   And so you knew you had electronic data
19 or information belonging to Stone Works on your
20 phone.  Correct?
21        MR. SMITH:  Calls for legal
22 conclusion.  You can answer.
23   A.   Yes.  I knew that.
24   Q.   (By Mr. James)  Now, what happened next
25 in the chain of events that you recall?
Page 260

1   A.   About?
2   Q.   Well, involving Stone Works, their
3 distributorship, anything related to this case.
4 I'm intentionally being broad.
5   A.   I can't recall at the moment what come
6 next.
7   Q.   All right.
8   A.   At this time it was getting close to 4th
9 of July, and I think everybody was trying to
10 enjoy a week, enjoying.
11   Q.   Who did you spend the 4th of July with?
12   A.   My grandbabies.
13   Q.   Where?
14   A.   Table Rock Lake.
15        (Fraley Exhibit 17 was marked for
16 identification by the reporter.)
17   Q.   (By Mr. James)  Mr. Pardue wasn't there,
18 by any chance, was he?
19   A.   No.
20   Q.   I hand you a document labeled Deposition
21 Exhibit 17, which is -- appears to be a Facebook
22 dated August 11, 2021.  Have you seen this
23 before?
24   A.   No.  No, I have not.
25        MR. GIATTINA:  Scott, it's in the
Page 261

66 (Pages 258 - 261)

Bushman Reporting                    800-556-8974
A Veritext Company                   www.veritext.com

**Exhibit 1**

1 TRO on the William Thomas Facebook.
2        MR. JAMES:  Well, you stole my
3 thunder.
4    Q.  (By Mr. James)  Do you recognize the
5 person on this first page?
6    A.  It looks like Marty, but I'm not a
7 hundred percent sure.
8    Q.  All right.  It says William Thomas at
9 the top.  Do you see that?  Twice.
10    A.  Yeah.  But I can't make it out.  I don't
11 know.
12    Q.  All right.  And it says, in the second
13 page, he's at Stone Concepts and he has under his
14 name, "Excuses don't get results."  Have you ever
15 heard that saying before?
16    A.  No, I have not.
17    Q.  And it says, on the third page, "He even
18 did the fireplace in Bass Pro Shop," and that's
19 actually Megan Sims.
20    A.  I don't know anything about that.
21    Q.  Okay.  And if you look at the last page,
22 there's a posting by Megan Sims two-thirds of the
23 way down that says, "We went to the Centurion
24 factory to pick up some sample boards."  And it's
25 your testimony you don't know anything about

Page 262

1 Concepts to establish a presence in central
2 Arkansas?
3    A.  No, I had no idea Stone Concepts was
4 moving this quickly.  I had no idea.
5    Q.  When did you give them the go ahead to
6 move?
7    A.  They had the go ahead after we talked to
8 Randy Sims that night at the thing.  He told me
9 that he was going to go ahead and carry on in
10 Little Rock, and Marty said, "Don't worry about
11 Little Rock.  I'll try to get something going."
12    Q.  Randy Sims?
13    A.  No, no.  That's when we had the meeting
14 with Randy.
15    Q.  In the backyard?
16    A.  Yeah.  Me and Marty was driving back to
17 Jonesboro.
18    Q.  Okay.  You-all were diving back to
19 Jonesboro?
20    A.  That's when he said, "I'm not sure if
21 I'll use Randy or not," but he said, "I will take
22 care of Little Rock.  Don't worry about it."
23    Q.  And that was the meeting where you drove
24 from Jonesboro to Benton, the backyard, then
25 you-all drove straight back?

Page 264

1 that?
2    A.  I'm not aware of that at all.  Not at
3 all.
4    Q.  All right.  Looking at your Declaration,
5 it says that on -- in Paragraph 19, "At
6 Centurion's direction I notified Plaintiff on or
7 about August 12th, 2021 that it would no longer
8 be a dealer for Centurion."
9    A.  That's correct.
10    Q.  Who did you talk to?
11    A.  I talked to Troy first, then Rusty
12 called me.
13    Q.  Okay.  You knew about this since June
14 29th?
15    A.  Correct.
16    Q.  You didn't give them the notification
17 until August 12th.  Correct?
18    A.  Correct.
19    Q.  Why did you wait until August 12th?
20    A.  I waited on Tim Pardue to give me the
21 okay.  He was gone on trips.
22    Q.  I thought you told me the decision had
23 been made?
24    A.  It had been, but not authorized.
25    Q.  Now, were you really waiting for Stone

Page 263

1    A.  Correct.
2    Q.  Who did you talk to at Stone Works on
3 August 12th?
4    A.  Troy Rhodes.
5    Q.  What did you say?
6    A.  I said Troy, I hate to tell you this,
7 but I said, you know what's about to happen.  I
8 said, if you would, you need to stop buying your
9 stone from them, Marty Hesch, because I don't --
10 you know, we don't allow you to carry two stones.
11 And he said okay.
12    Q.  That was it?
13    A.  That was it.  And then I said, we're
14 going to honor, try and honor all your stone,
15 Marty -- or Troy, I'm going to get that done.
16    Q.  You're going to try to honor?
17    A.  That's what I told him, I was going to
18 call the factory and tell them that's what I had
19 to do.
20    Q.  It was on hold before that?
21    A.  Not that I'm aware of, no.  I wanted to
22 make sure he would get his material.
23    Q.  Do you recall anything else said in this
24 August 12th, 2021 conversation?
25    A.  With Troy?

Page 265

67 (Pages 262 - 265)

**Exhibit 1**

**Page 266**

1 Q. Yes.
2 A. About the size of it. I told him that
3 he would need to contact Marty and I would text
4 him his number, and he said okay.
5 Q. Did Troy Rhodes inquire as to whether
6 Centurion would fulfill its existing orders?
7 A. Yes, he did. He texted me back and
8 asked me. I said yes, sir, I think they will.
9 It's not going to be an issue. I got that on my
10 phone, too.
11 Q. I'm going to ask that you preserve that.
12 Okay?
13 A. I will, yes.
14 Q. Where is your phone right now?
15 A. It's at home.
16 Q. Nobody rescued it and brought it over to
17 you?
18 A. No, nobody rescued. I don't want it.
19 Cell phones get me in trouble.
20        (Fraley Exhibit 18 was marked for
21 identification by the reporter.)
22 Q. (By Mr. James) Did you talk to anybody
23 at lunch other than your counsel?
24 A. Nope.
25 Q. Sir, I'm going to hand you a document

**Page 267**

1 labeled Deposition Exhibit 18, which I believe
2 was Exhibit 1E to your Declaration. Is this the
3 text message you were talking about a few moments
4 ago?
5 A. Yes.
6 Q. Now, let me ask you, before you called
7 Troy Rhodes on August 12th did you call Marty
8 Hesch and tell him what you were about to do?
9 A. No, Marty had no idea.
10 Q. Did anybody know besides you and Tim
11 Pardue?
12 A. That's all. That is all.
13 Q. And you didn't talk to anybody else
14 about it?
15 A. No. No.
16 Q. Did Rusty Ray call you back after that
17 phone call?
18 A. Yes.
19 Q. Was it the same day?
20 A. Within 15 minutes.
21 Q. Tell me about that call.
22 A. It was ugly.
23 Q. Why was it ugly?
24 A. Rusty was cussing me pretty good and
25 cussing Randy, and that's when I told him -- he

**Page 268**

1 was telling me that they hadn't even talked to
2 ProVia. And I said, "Rusty, you got a person in
3 the office that tell you different. They send me
4 a darn credit app," and then he said, "Well, that
5 sounds like a lawsuit." And that was the end of
6 the conversation. He hung up.
7 Q. Well, would you look at suing one of
8 your employees if they were sending out
9 confidential information?
10 A. I would consider it very thoroughly.
11 Q. That would look like a lawsuit, wouldn't
12 it?
13 A. It would.
14 Q. Now, what else did you say in that
15 conversation?
16 A. To who?
17 Q. Rusty Ray.
18 A. That was it.
19 Q. How long did it last?
20 A. Not very long. The phone was click, he
21 said I'm gone.
22 Q. Anything else you recall about the
23 conversation other than what you've told us?
24 A. No. Not that I can recall.
25 Q. You have in front of you Exhibit 18. Is

**Page 269**

1 this a text exchange from you to Troy Rhodes or
2 between you and Troy Rhodes?
3 A. This is Troy's text and I texted this
4 number to Troy.
5 Q. That's Marty Hesch's number?
6 A. Yes.
7 Q. You misspelled it. Right?
8 A. Yes, ma'am, or sir, probably.
9 Q. Now, above it it says RT. Do you know
10 what RT means?
11 A. Troy Rhodes.
12 Q. Okay. And so you're in the blue and
13 he's in the tan. Correct?
14 A. That's what it appears to be, yes.
15 Q. And you text him the number of Marty.
16 Why did you text him the number of Marty Hesch?
17 A. Because Marty was selling stone at a
18 very good deal.
19 Q. So we got -- Stone Works got zero notice
20 that it was getting cut off. Correct?
21 A. Correct.
22 Q. And when you called them, you told them
23 you could get it direct from Marty Hesch. Had
24 you told Marty Hesch to be looking for the call?
25 A. I did. After I talked to Troy.

68 (Pages 266 - 269)

1    Q.   So you picked up the phone and called
2 Marty Hesch?
3    A.   No, I didn't pick up the phone.  I
4 talked to him later.  It wasn't right at that
5 moment.
6    Q.   Was it before or after your conversation
7 with Rusty?
8    A.   It was after.  Probably two, three days
9 after.
10   Q.   And on August 12th you texted Marty
11 Hesch's number to Ed Fraley, or excuse me, to
12 Troy Rhodes.  Correct?
13   A.   Correct.
14   Q.   And you said he had a good deal, or what
15 were you --
16   A.   Marty was -- Marty said -- Marty was
17 going to work with Troy, make him the best
18 package he could to help both of them.  Marty
19 wanted to work with Troy.
20   Q.   Did they know each other?
21   A.   No.  Marty, if they would have teamed
22 up, it would have been unreal what I think they
23 could have done.
24   Q.   They didn't team up, so let's not talk
25 about that scenario.

Page 270

1 the termination.  Talked about pricing and talked
2 about how you would call Troy.  Correct?
3    A.   Marty, I didn't discuss that I was going
4 to call Troy.
5    Q.   You just sent him the number afterwards?
6    A.   Who?
7    Q.   Wait a minute.
8    A.   I sent Troy the number, yes.
9    Q.   And you expected him to call Marty Hesch
10 and hear what a good deal he had?
11   A.   If he was interested, yes.
12   Q.   Did you end your conversation with Troy
13 Rhodes telling him to call Marty Hesch and that
14 he had a good deal for him?
15   A.   No.  I told him that Marty would give
16 him a special price.
17   Q.   All right.  And you don't have any idea
18 how much that was off of retail?
19   A.   I do not.
20   Q.   Well, I'm trying to understand why Marty
21 Hesch, who doesn't know Troy Rhodes, would be
22 giving Troy a good price.
23   A.   Marty is that kind of a person.  He just
24 wants to be nice.
25   Q.   Just out of the goodness of his heart?

Page 272

1    A.   But they didn't.
2    Q.   So what kind of deal or package did you
3 understand Marty was going to put together?
4    A.   I didn't get into it.  He was going to
5 give him a good price, square foot price.
6    Q.   When you sent this text on August 12th
7 at 2:49 p.m., it was for him to call Marty Hesch
8 and get that good price?
9    A.   It was to him if he needed more stone,
10 yes, he could get it.
11   Q.   So you had talked to Marty Hesch before
12 this conversation about the pricing, hadn't you?
13   A.   Oh, yes.  I discussed with him.
14   Q.   And you talked to him about terminating
15 Stone Works?
16   A.   Well, at the time I wasn't real sure
17 where that was going.  I wasn't sure Troy was
18 going to be -- if he needed stone he would be in
19 good hands.
20   Q.   Well, you talked to him enough to know
21 that Marty Hesch was going to provide you good
22 pricing.  Correct?
23   A.   He was going to provide Troy good
24 pricing, yes.
25   Q.   So you had talked about it, talked about

Page 271

1    A.   That was my feeling.
2    Q.   So he's just a great guy?
3    A.   I think so.  I mean, he was going to
4 make a little off of it.  He wasn't going to give
5 him the stone.
6    Q.   And then Troy says, "Hey, Ed, when we
7 talked the other day you said the factory was
8 going to go ahead and produce the orders that I
9 have in.  As of now, it's just trying to verify
10 that is still" -- flip the page if you would --
11 "the case, because I'm having a hard time
12 reaching anyone at the factory.  So if you could
13 just let me know yes or no if they're going to
14 make any orders, I would appreciate it."  You
15 recall getting that text?
16   A.   Yes.
17   Q.   What did you do when you got that text?
18   A.   I think I texted right back and said
19 they're going to make it worse, or they're going
20 to be -- and then, at first, Rusty had called me.
21 After that, Rusty said that after the lawsuit I
22 told him, Tim, I said, well, Tim, I said, I was
23 threatened with a lawsuit or sound like a lawsuit
24 to Rusty, and then him and -- they was in the
25 back.  They done something.  I was not involved

Page 273

69 (Pages 270 - 273)

**Exhibit 1**

1  in that conversation.
2    Q.  Well, let's be clear.  He didn't
3  threaten to sue you or Centurion or Stone
4  Concepts?
5    A.  We didn't know.
6    Q.  And he said the producing or sending the
7  credit application sounded like a lawsuit.
8    A.  No.  Yeah, that's what --
9    Q.  And you agreed with me that one of your
10 employees did that, that would sound like a
11 lawsuit to you, too?
12   A.  Yes.  I agree.
13   Q.  But Centurion retaliated against Stone
14 Works and -- let me finish and then you can give
15 me whatever answer you want.  Centurion
16 retaliated against Stone Works and made it COD
17 after Mr. Ray made that statement.  Correct?
18   A.  Well, that's something that you probably
19 take up with Tim again.
20   Q.  Well, I got you now.
21   A.  You got me, but Tim is the one that
22 makes all these decisions.
23   Q.  But you were the in between man
24 conveying the messages.
25   A.  I did, but I didn't make the decisions

*Page 274*

1  on this.  Tim did.
2    Q.  Were there any Stone Works customers who
3  already knew Stone Works was getting cut off as a
4  dealer --
5    A.  Not that I am aware of.
6    Q.  -- before you called Troy and told him
7  that?
8    A.  Not as I'm aware of, no.
9    Q.  Besides -- excuse me.  Besides
10 Mr. Pardue, did you talk to anybody at Centurion
11 about terminating Stone Works before it occurred?
12   A.  John Enkema, their counsel.
13   Q.  So --
14   A.  He knew, yes.  Me and Tim discussed it
15 with him.
16   Q.  Tell me about that.  Is that a different
17 conversation with John?
18   A.  No.  It was the same time.
19   Q.  Well, you didn't get sued until later.
20   A.  I know that.
21   Q.  But you're saying there's only one
22 conversation?
23   A.  This was when we took the -- when I went
24 out, John had no idea it was coming until after I
25 took that.

*Page 275*

1    Q.  Lawsuit to him?
2    A.  Yes.  That's correct.  I believe that is
3  correct.  I'm not a hundred percent sure there
4  now.
5    Q.  All right.  So what did you do when you
6  got this text on August 16th?
7    A.  I think I texted him and told him what
8  was going on with ProVia Stone.  I have to look
9  on my phone.
10   Q.  The conversation you had -- contend you
11 had with John Enkema, it was on the phone or in
12 person?
13   A.  In person.
14   Q.  Regarding the termination of Stone
15 Works?
16   A.  Yes.
17   Q.  Was that before or after Stone Works was
18 terminated?
19   A.  I can't remember.  I'm not sure.
20   Q.  Was it around that time period?
21   A.  Around that time period.
22   Q.  Tell me everything you recall about that
23 telephone conversation.
24   A.  With John Enkema?
25   Q.  Yes.

*Page 276*

1    A.  I can't remember a whole lot about it.
2    Q.  Tell me what you do recall.
3    A.  All I can remember is -- this was after
4  I had been -- the lawsuit, so.
5    Q.  Okay.  Well --
6    A.  Because really what it comes down
7  meeting with Tim Pardue was the go to man on
8  that.  That was closed doors on all that.  I was
9  in the hallway.
10   Q.  If you had it to do it over again, would
11 you have just deleted that credit application and
12 not done anything with it?
13   A.  No, sir.  I didn't want -- it needs to
14 come off my phone legally.
15   Q.  No, no, no.  If when you got it, the
16 moment you got it, you knew you shouldn't have
17 it.
18   A.  Yeah, I knew.  I should have -- okay.
19 If you wiped it off, and then five years down the
20 road, oh, look here.
21   Q.  So you're glad you kept it?
22   A.  You're not joking I'm glad I kept it.
23   Q.  Why are you glad you kept it?
24   A.  Because I wanted to get officially off
25 my phone in a legal manner.

*Page 277*

70 (Pages 274 - 277)

**Exhibit 1**

1        (Fraley Exhibit 19 was marked for
2 identification by the reporter.)
3    Q.  (By Mr. James)  Sir, I'm going to hand
4 you a document labeled Deposition Exhibit 19,
5 which I understand to be a Facebook post of Randy
6 Sims, and ask you if you have seen this before.
7 It's dated August 14.  Have you seen this
8 document before, sir?
9    A.  No, sir, I have not.
10    Q.  Do you know anything about Randy Sims,
11 William Thomas or anybody else contacting Stone
12 Works' customers after the decision was made to
13 terminate Stone Works as a Centurion distributor?
14    A.  Not that I'm aware of any.
15    Q.  He says here "I am with another company
16 called Stone Concepts.  We are working towards
17 opening up shop hopefully in Benton Bryant area.
18 I'm running out of Jonesboro for the time being.
19 Have Centurion Stone.  Had a huge facility in
20 Jonesboro.  Will be running off a gooseneck."  He
21 goes on and says more.  Did you know anything
22 about this?
23    A.  No, I did not, sir.
24    Q.  And I have been corrected, it apparently
25 is a text, not a Facebook, so I misstated it.

Page 278

1    Q.  I'm confused.  We're looking at Exhibit
2 20.  This is a text exchange between yourself and
3 Troy Rhodes.  Correct?
4    A.  Yes.
5    Q.  And so it says yes, your stone is being
6 made.  Who typed that?
7    A.  I did.  But I knew that prior to this,
8 because they told me they was going to run the
9 stone.  That's why I could respond so quickly.
10    Q.  When you say going to run the stone,
11 what do you mean?
12    A.  Make it.
13    Q.  How long does it take from start to
14 finish?
15    A.  Just on one skid, you got four days tied
16 up in one skid.  They run multiple skids, but
17 it's a four day process for each skid.
18    Q.  If it was August 12th, should have the
19 product by August 16th.  Correct?
20    A.  Well, it depends on how many molds they
21 had available.
22    Q.  And what they had in stock, too.
23 Correct?
24    A.  Correct.
25    Q.  Because they hold inventory in

Page 280

1 Does that change your testimony in any way?
2    A.  No, it does not.  I have never saw this.
3        (Fraley Exhibit 20 was marked for
4 identification by the reporter.)
5    Q.  (By Mr. James)  All right.  I'm going to
6 show you a document labeled Deposition
7 Exhibit 20, and ask you if this is a text from
8 yourself to Troy Rhodes dated August 16, 2021.
9 Is this the text you were talking about earlier?
10    A.  Yes, it is.  And they told me the stone
11 was being run.
12    Q.  Who told you that?
13    A.  Jody George.
14    Q.  Jody George?
15    A.  Uh-huh.  He said that he was going to
16 run the stone, and then --
17    Q.  Go ahead.  And then?  Don't leave me
18 hanging.
19    A.  No.  Well, he was supposed to send the
20 money in.  That's what I understood and they
21 never sent no money.
22    Q.  When you called Jody George on August
23 16th?
24    A.  I didn't call Jody George.  This came to
25 Tim Pardue.

Page 279

1 Nashville, don't they?
2    A.  No.
3    Q.  They don't keep any inventory at
4 Centurion in Nashville?
5    A.  No.  All to order.
6    Q.  They keep it all in their warehouses?
7    A.  Yep.
8    Q.  What about when they run rows, I guess
9 that's not considered inventory?
10    A.  Inventory, that's already sold product.
11    Q.  All right.  So what happened next after
12 August 16th?  Did you talk to anybody?
13    A.  Not really.  For a long time.
14    Q.  You know anything about Randy Sims,
15 Megan Sims and/or William Thomas removing records
16 or documents from Stone Works before they left?
17    A.  I have no knowledge of none of that.
18    Q.  Have you ever heard an accusation that
19 it occurred?
20    A.  I have heard from some of this.  I have
21 not heard from none of them.
22    Q.  And you would agree with me that that's
23 wrong?
24    A.  What's wrong?
25    Q.  Them taking records from Stone Works.

Page 281

71 (Pages 278 - 281)

**Exhibit 1**

1    A.   If they actually took them, yes.  I
2 would agree.
3    Q.   Sure.  Did it -- how did you feel about
4 William Thomas sending you that?
5    A.   I didn't feel very good.
6    Q.   Did you ever talk to him about it?
7    A.   A little bit.  Don't ever send me
8 nothing like this on my phone or quit getting in
9 my business, is what I told him.
10    Q.   Did you call him?
11    A.   Yes.
12    Q.   How long after receiving it did you call
13 him?
14    A.   I talked to him, he called me it was not
15 long after that.  What do you think about that?
16 That's when I talked to him.
17    Q.   Were you angry?
18    A.   A little bit.
19    Q.   Had you already sent it to Tim Pardue?
20    A.   No.
21    Q.   Were you trying to figure out what to do
22 with it?
23    A.   It's 6 o'clock in the morning.  I was
24 trying to wake up.
25    Q.   You weren't driving?

Page 282

1    A.   No, I wasn't driving.  I was getting
2 ready for the 4th of July.
3    Q.   All right.  And so tell me everything
4 you recall about the conversation with William
5 Thomas.
6    A.   It's just I told him he shouldn't be
7 doing this.  This could get him in lots of
8 trouble, and don't be sending me nothing else on
9 my phone.
10    Q.   And what did he say?
11    A.   I'm sorry, sir.  I'm sorry, sir.  That
12 was the end of the conversation.
13    Q.   Have you ever talked to him since then?
14    A.   Not that I can recall.
15    Q.   Now, did you subsequently became aware
16 that Mr. Thomas became affiliated with Stone
17 Concepts?
18    A.   I knew he was doing something with them.
19 I did not know what.
20    Q.   Did that bother you?
21    A.   Huh?
22    Q.   Did that bother you?
23    A.   None of my business.
24    Q.   Well, this is a man you know that steals
25 his employer's records.  Correct?

Page 283

1    A.   Correct.  I didn't know he stole.  I
2 knew he had that, yes.  So you're right.
3    Q.   You knew he was going to work for one of
4 your distributors, Marty Hesch?
5    A.   What Marty explained to me, he was
6 working on the side.  I really don't know.
7    Q.   Did you warn him about this guy?
8    A.   I did.  I don't know the whole detail
9 about it.
10    Q.   What did you tell Marty Hesch about this
11 guy to warn him about it?
12    A.   I told him to be aware.
13    Q.   Did you tell him what he sent you?
14    A.   No.  Not at the time, no.
15    Q.   Did you tell him later?
16    A.   That all come out in court.
17    Q.   All came out in court.  Tell me about
18 your conversation with Marty Hesch when you told
19 him to be aware of William Thomas?
20    A.   That's about it.  I can't remember all,
21 everything I talked to him on the phone.  I can't
22 remember.  So if I was, I would be speculating.
23    Q.   Did you send any texts to anybody?
24    A.   Not that I'm -- about this, no.
25    Q.   Well, how did it get from you to Tim

Page 284

1 Pardue?
2    A.   I sent Tim a text, yes.
3    Q.   Did you send it to anybody else?
4    A.   No.
5    Q.   Do you know who Mr. Pardue sent it to?
6    A.   No.  I'm sure no on.  I figured he
7 looked at it and wiped it.  Tim wipes quickly.
8 Because he turn around and call me within five
9 minutes.  Where did you get that?  One of them
10 clowns down there at Stone Works send it to me.
11    Q.   One of those clowns at work?
12    A.   At Stone Works sent it to me.  That's
13 what I was referring to was William Thomas, a
14 clown at the time.
15    MR. SMITH:  I have got us set about
16 an another hour.
17    MR. JAMES:  That's fine.  No
18 problem.
19    (Recess.)
20    Q.   (By Mr. James)  Mr. Fraley, if Marty
21 Hesch wanted to work with Troy and Stone Works
22 out of the, quote, kindness of his heart, why in
23 the phone records we have did he only communicate
24 repeatedly with Randy Sims and not Troy Rhodes,
25 Rusty Ray or Angela Rhodes?

Page 285

72 (Pages 282 - 285)

**Exhibit 1**

Page 286

1          MR. JAMES:  Lacks foundation, calls
2 for speculation.  You can answer.
3     A.  Yeah, I can't answer that.  I don't
4 know.
5     Q.  (By Mr. James) So when you get that
6 objection that suggests to you not to answer and
7 it does.  It's called a suggestive objection.
8 They're not supposed to give them.
9     A.  Oh, not supposed to?
10          MR. SMITH:  It's fine.  He's just
11 arguing now.
12     Q.  (By Mr. James) All right.  I want to be
13 clear about this meeting with John Enkema.  Tell
14 me how to spell his name.
15     A.  I can't.
16     Q.  I-n-k-l-e?
17     A.  E I think.
18     Q.  E-n?
19     A.  I cannot spell it.  I don't know.
20     Q.  Good, because I'm having trouble with
21 it, too.  All right.  So I want to be clear.  As
22 I understand it, there were two phone calls -- or
23 strike that.
24          There were two communications with John
25 Enkema and yourself and Tim Pardue.  Correct?

Page 287

1     A.  Correct.
2     Q.  The first one was in August of 2021, or
3 you tell me when the first one --
4     A.  That sounds right.  It was when I called
5 Troy.  Yes.
6     Q.  And got what?
7     A.  When -- no, the first one would be
8 after, because Rusty told me they was going to
9 have a lawsuit.
10          MR. GIATTINA:  Guys, just so we're
11 clear for the record, I have got the spelling of
12 it and it's E-n-k-e-m-a.  All right.  Enkema.
13     Q.  (By Mr. James) All right.  So I'm
14 sorry, I lost you.  Tell me when this was now?
15     A.  I'm thinking it was when I went down
16 with this, all this here and we called.
17     Q.  Okay.  I understand when you drove seven
18 hours from Springfield to Nashville when you
19 received the lawsuit.  You got in your car and
20 drove down, and you told us about that
21 conversation?
22     A.  Yes.  But we had already had the other
23 one apparently.
24     Q.  That's what I'm trying to back up to,
25 and tell me event wise, you don't have to tell me

Page 288

1 the date, but was it before the backyard meeting
2 with Randy Sims or after?
3     A.  It was probably after.  It was -- it
4 would be around August 12.
5     Q.  It would be around August 12th.  So you
6 would have received the --
7     A.  Oh, no, that's when I went down.  That
8 was when they put Troy and them on COD on their
9 stuff.  That's what Tim and John Enkema went in
10 there, closed doors and worked that out.
11     Q.  After your conversation with Rusty
12 Rhodes?
13     A.  Yes.  I was not there.
14     Q.  Rusty Ray?
15     A.  Rusty Ray.  I was not involved in that
16 conversation at all.
17     Q.  Okay.  Now, but I want to give you a
18 chance to clear it up because I'm confused.  I
19 thought I'd heard you say --
20     A.  I'm confused, too.
21     Q.  You were there, I wasn't.  I thought I
22 heard you say that there was a telephone
23 conversation between yourself, John Enkema and
24 Tim Pardue in the summer of 2021 regarding Stone
25 Works.

Page 289

1     A.  That's when we got sued.  We was trying
2 to get our counsel to give Bud Cummins a call.
3     Q.  That was the meeting where you drove
4 down.  You told us about that.
5     A.  Yes.  I'm trying to -- I'm trying to
6 recall.  I don't think I've had two meetings.
7 I'm trying to recall that second one.
8     Q.  Now, frankly, sir, you seem a little
9 tired to me.
10     A.  I'm getting tired, yeah, but I cannot
11 recall the other meeting.
12     Q.  Let's put it this way.  I want to have
13 you at your best, and I see you having trouble
14 remembering things.  Do you need to stop for the
15 day?
16     A.  No, I'm good.  I just need a drink of
17 water.
18     Q.  Okay.  I mean, we can take a break, let
19 you walk outside, take a nap, do whatever.
20          MR. JAMES:  Counsel, do you feel
21 like he's ready to go forward?
22          MR. SMITH:  Yeah.  He's fine.
23     A.  Let's try again.
24     Q.  (By Mr. James) So let's try to nail
25 down this meeting.

1          MR. SMITH:  To be clear, I don't
2 think I ever said earlier there was two
3 meetings, but go ahead.
4     A.  I was trying to remember the first one,
5 and you know, the exact time.
6     Q.  (By Mr. James)  Was there a phone call,
7 the first one?
8     A.  Nope.  The phone call when I got down
9 there with the lawsuit is when we called Tim.
10 That's when we got Bud Cummins involved.
11    Q.  And you've told us about that.  You've
12 told us everything you recall about that.
13    A.  And I'm thinking that's -- and then
14 that's when they decided on the COD, so that's
15 really the only -- I had my meetings with John,
16 because I went back home and that was it.
17    Q.  Okay.  So you did have a discussion
18 regarding the COD?
19    A.  No, I did not.  Tim and John was in the
20 back room.  I had discussion on what I could do
21 with that lawsuit, like I couldn't do nothing.
22    Q.  I'm not talking about the lawsuit.  I'm
23 talking about the COD for Stone Works in the
24 summer of 2018 or 2021?
25    A.  That was John and Tim.
                                        Page 290

1 Centurion prior to the termination of Stone Works
2 as a dealer, and he said yes, he did.  John
3 Enkema prior to the termination.
4          MR. SMITH:  Now he's told you about
5 ten times the only conversation he can recall is
6 after he got served with the lawsuit, and I think
7 it's been pretty clear throughout his testimony.
8          MR. JAMES:  I don't think it has.
9          MR. SMITH:  Hold on, and it's been
10 clear through his testimony today that he does
11 not remember dates.
12         THE WITNESS:  I don't remember
13 dates.
14         MR. JAMES:  Quit coaching, okay?
15         MR. SMITH:  I mean, this --
16         MR. JAMES:  Let's go.  Let's go
17 with the deposition.
18         MR. SMITH:  Yeah, please, and one
19 lawyer per party here.
20         MR. JAMES:  He's not a potted
21 plant.  He's fine.
22    Q.  (By Mr. James)  So I thought I heard you
23 tell me that you had a conversation with
24 Mr. Enkema when the decision was made to put
25 Stone Works on COD.  Did I hear you correctly or
                                        Page 292

1     Q.  How do you know that John and Tim went
2 in the back room?
3     A.  Do what now?  I know John went in the
4 back room.  Tim was on the phone.
5     Q.  Where were you?
6     A.  I was in the hallway at the office.
7     Q.  At Centurion's office?
8     A.  Yes.
9     Q.  What were you doing at Centurion's
10 offices?
11    A.  I took that lawsuit down to get John to
12 look at it.
13    Q.  I feel like we're on who's on first.
14         MR. SMITH:  I think his testimony
15 has been that that's the only discussion he can
16 remember with John Enkema.
17         THE WITNESS:  That is correct.
18         MR. GIATTINA:  That's not true.
19         MR. JAMES:  I think that's a
20 mischaracterization of his testimony.
21         MR. SMITH:  I don't, but ask him
22 again.
23         MR. JAMES:  I'm not sure --
24         MR. GIATTINA:  The question that he
25 answered was did you speak with anyone else at
                                        Page 291

1 did I hear you wrong?
2     A.  Correctly.
3     Q.  Okay.
4     A.  Oh, what it was, I didn't hear the
5 conversation.  I was at Nashville for some other
6 reason.  I don't even know what for.
7     Q.  Okay.
8     A.  And then I was talking to John about it
9 and he called Tim, and those are the ones that
10 worked that out.  I have no knowledge of how they
11 done that.
12    Q.  How close is John Enkema's office to
13 Stone Works -- or excuse me, Centurion's?
14    A.  John Enkema, he is in Centurion.
15    Q.  Is he inhouse counsel?
16    A.  Yes.
17    Q.  Okay.  So you were at Centurion --  you
18 were at Centurion, and you were meeting with John
19 Enkema, and the issue came up about putting Stone
20 Works on COD, and then Mr. Enkema and Tim Pardue
21 went in the back room and talked?
22    A.  No, Tim Pardue was not there.  It was on
23 the phone, a phone call.
24    Q.  Okay.  I thought I heard you say they
25 went in the back room.
                                        Page 293

74 (Pages 290 - 293)

**Exhibit 1**

| | Page 294 |
|---|---|
| 1   A.   John did. | 1   Ed Fraley made it sound like Stone Works was |
| 2   Q.   To make the phone call? | 2   going to seek legal action against Centurion, all |
| 3   A.   Yes.  And talk to Tim. | 3   of the orders must be paid up front before the |
| 4   Q.   And you were sitting outside? | 4   order will be shipped.  In addition, any |
| 5   A.   I was out in the hall at the reception | 5   outstanding invoices must be paid."  Did you know |
| 6  desk. | 6   that was going to be sent? |
| 7   Q.   And when he was done, did he come back | 7   A.   No, I did not.  Not at the time. |
| 8  and say, hey, I just talked to Tim Pardue? | 8   Q.   Would this have been the result of your |
| 9   A.   Yes.  And he didn't talk to me.  He said | 9   conversation with Mr. Enkema and -- |
| 10  he had Tim on the phone.  Then he went to talk to | 10   A.   The conversation with John Enkema and |
| 11  Jody, and then that's really all I recall. | 11  Tim Pardue. |
| 12   Q.   Now, who's Jody? | 12   Q.   All right.  So you think that |
| 13   A.   He's an accountant. | 13  conversation occurred before this was sent and |
| 14   Q.   He's the guy that does the numbers, Jody | 14  resulted in this e-mail being sent? |
| 15  George.  Correct? | 15   A.   That's what I'm speculating.  I don't |
| 16   A.   Yes.  That's correct. | 16  know. |
| 17   Q.   All right.  And then you-all wrote the | 17   Q.   Okay.  It makes sense with how you |
| 18  letter saying you-all -- Stone Works is on COD. | 18  understand the facts. |
| 19  Correct? | 19   A.   Yeah. |
| 20       MR. SMITH:  Assumes facts not in | 20   Q.   So when Mr. Enkema came out of the back |
| 21  evidence. | 21  room with talking with Tim Pardue before this |
| 22       MR. JAMES:  That is coaching and | 22  August 18th e-mail, what did Mr. Enkema say to |
| 23  that needs to stop. | 23  you? |
| 24       MR. SMITH:  No, it's not. | 24   A.   When he was talking to him he didn't say |
| 25       MR. JAMES:  We're going to | 25  nothing. |

| Page 295 | Page 297 |
|---|---|
| 1  terminate the deposition. | 1   Q.   He said get out of my office? |
| 2       MR. SMITH:  You do that at your own | 2   A.   I think I knew not to go in his office. |
| 3  peril. | 3  I didn't go in. |
| 4       MR. JAMES:  I know, but quit | 4   Q.   So why were you there at this date? |
| 5  coaching. | 5   A.   I cannot remember.  Honestly, I go down |
| 6       MR. SMITH:  You do it at your own | 6  there some, but I don't know if I was needing to |
| 7  peril. | 7  pick something up.  I don't remember. |
| 8       MR. JAMES:  Quit coaching. | 8   Q.   Didn't have anything to do with the Sims |
| 9       (Fraley Exhibit 21 was marked for | 9  touring the plant, did it? |
| 10  identification by the reporter.) | 10   A.   Oh, shit, no.  I didn't know nothing |
| 11   Q.   (By Mr. James)  All right.  Sir, I'm | 11  about that. |
| 12  going to hand you a document labeled Deposition | 12   Q.   Okay.  And then if you turn this over, |
| 13  Exhibit 21, which is Exhibit 1F to your | 13  Exhibit 21 over, it's got orders that appear to |
| 14  Declaration, I understand.  Have you seen this | 14  be outstanding.  Does that look correct to you? |
| 15  before, sir? | 15   A.   I could not answer.  I don't have a |
| 16   A.   No, I have not. | 16  clue. |
| 17   Q.   And I don't know what's blacked out on | 17   Q.   Because you've never seen this document |
| 18  it.  This is how I got it.  This is an August 18, | 18  before.  Correct? |
| 19  2021 e-mail from Jody George to Troy at Stone | 19   A.   I have not.  Nothing about it.  No |
| 20  Works, and this is the first time you have seen | 20  knowledge. |
| 21  this document.  Is that correct? | 21   Q.   So I can sit here until kingdom come |
| 22   A.   That is correct. | 22  and you're not going to be able to tell me |
| 23   Q.   And it says, "Troy, Tim has agreed to | 23  anything more than what you have already told me? |
| 24  run all of the listed orders below for Stone | 24   A.   Not a word, nothing. |
| 25  Works, LLC.  Because Rusty in a conversation with | 25   Q.   Then I better move on. |

1          MR. JAMES:  Let's take five
2 minutes.
3          (Recess.)
4    Q.  (By Mr. James)  What did you talk about
5 at break?
6          MR. SMITH:  We're not getting into
7 that.  Don't answer that question.
8    A.  I don't remember.
9          MR. JAMES:  Okay.  State the basis
10 of the privilege or state the basis of the
11 objection.
12          MR. SMITH:  It's attorney-client
13 privilege.
14    Q.  (By Mr. James)  All right.  And your
15 attorney has instructed you not to answer.  Are
16 you going to not answer?
17    A.  Not answering if he instructs me.
18          MR. JAMES:  All right.  It's our
19 position that when you called the break in the
20 midst of the deposition that that waives the
21 attorney-client privilege and we're allowed to
22 know what coaching goes on.
23          MR. SMITH:  Give me some authority.
24          MR. JAMES:  I don't have Westlaw
25 right in front of me here, but that's our

Page 298

1 position.
2          MR. SMITH:  Okay.
3    Q.  (By Mr. Jones)  All right.  Would it be
4 fair to say that Stone Works was terminated by
5 Centurion as a dealer because of Centurion's
6 belief that Stone Works was selling a
7 competitor's product?
8    A.  That would be a fair statement.
9    Q.  Now, when Stone Works was placed on COD
10 for their remaining orders, did you alert Marty
11 Hesch that Centurion -- Stone Works may need
12 additional product?
13    A.  No, sir.
14    Q.  Did you talk to anyone other than
15 Mr. Enkema or Mr. Pardue?
16    A.  No.  Not about this, no.
17    Q.  If Stone Concepts was not ready and
18 willing to step into the central Arkansas market,
19 would Centurion have terminated Stone Works?
20    A.  Yes.  Marty Hesch did not affiliate that
21 termination at all.
22    Q.  I'm sorry?
23    A.  Marty Hesch did not have anything to do
24 with that at all.  If you recall, they was having
25 trouble anybody getting stone anyway, so we had

Page 299

1 plenty of time.
2    Q.  So if we get the Centurion records,
3 we'll see that everybody was having trouble
4 getting stone, not just Stone Works.  Correct?
5    A.  That's correct.
6    Q.  Have you seen those records?
7    A.  No, I have not.
8    Q.  All right.
9    A.  I have got phone calls, though, from
10 people needing stone.
11    Q.  What was the next thing you recall with
12 regard to Stone Works and its products?
13    A.  Excuse me?
14    Q.  What was the next thing you recall with
15 regard to Stone Works and its products?
16    A.  I don't recall anything else about it.
17    Q.  Do you know whether the product
18 eventually got shipped?
19    A.  I do not know.
20    Q.  You have no knowledge.  Did you receive
21 commissions on it?
22    A.  I don't -- not that I know of, no.
23    Q.  Did you have any idea for what jobs this
24 product was needed on?
25    A.  No, I did not know.

Page 300

1    Q.  Bear with me.  I'm taking some notes.
2 Were you talking with Terry Lester during this
3 period of time?
4    A.  No, sir.
5    Q.  What is your next communication with
6 Marty Hesch?
7    A.  I can't recall.
8    Q.  Between this period of time which was
9 August 18, 2021 and the filing of the lawsuit, do
10 you recall anything happening with regard to this
11 case or having any communications with any of
12 your co-defendants?
13    A.  No.  Not that I recall, no.
14          MR. JAMES:  All right.  My turn to
15 take a quick break.
16          (Recess.)
17    Q.  (By Mr. James)  Sir, do you recall any
18 more conversations with Randy Sims or William
19 Thomas or anybody at Stone Concepts during the
20 summer of 2021, other than what you have already
21 testified to?
22    A.  Not that I can recall, no, sir.
23    Q.  And you wouldn't have any notes or
24 records to go look at.  Correct?
25    A.  That is correct.

Page 301

76 (Pages 298 - 301)

**Exhibit 1**

1    Q.   And your phone would reflect phone
2   calls.  Correct?
3    A.   It would, yes.
4    Q.   And so to know what conversations, who
5   all you talked to, we would need to get your
6   phone records.  Correct?
7    A.   Probably so, yes.
8    Q.   The backyard meeting with Randy Sims and
9   Marty Hesch, do you remember what day of week it
10  was?
11   A.   No, I can't remember.
12   Q.   Now, you knew that Stone Works would be
13  hurt financially if it was terminated as a
14  Centurion dealer.  Correct?
15   A.   No, I didn't realize that.  They should
16  have been on top of their game with the new
17  product.
18   Q.   Did you ask, say, do you need phase in,
19  phase out time?
20   A.   No.  They didn't ask me.
21   Q.   Do you believe -- you believe there's an
22  advantage of selling Centurion product, don't
23  you?
24   A.   What, sir?
25   Q.   An advantage?

Page 302

1   person that would potentially have questions that
2   I see on the screen is Ms. Sims.  Ms. Sims, if
3   you are speaking, we are not hearing you.  And
4   she may not be participating at this point.  She
5   has a box up, but it is blacked out and it's
6   muted.  All right.  I don't have any questions.
7   We will read and sign.  I'll take an E-Tran.
8           MR. JAMES:  Mr. Fraley, thank you
9   very much.
10          MR. RICHARDSON:  An electronic
11  version.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 304

1    A.   There's no more advantage cancelling
2   Centurion than ProVia.
3    Q.   So they're fungible?
4    A.   You're dealing one or dealing the other.
5           MR. JAMES:  Sir, that's all I have.
6   I'm not going to make a speech, but I'm going to
7   reserve the rest of my time until we get
8   Centurion's records.  I know your counsel is not
9   going to agree to that, so there's no reason for
10  a speech.
11          MR. SMITH:  I'm nevertheless going
12  to make it clear on the record.
13          MR. JAMES:  My time is off, and I'm
14  taking the rest of it at 3:45.
15          MR. SMITH:  And just for the
16  record, I object to any additional questioning by
17  Mr. James or the Plaintiffs of Mr. Fraley.  They
18  noticed his deposition when they chose to notice
19  it and we're here today, and Mr. Fraley is
20  prepared to give a full and complete deposition.
21  But I understand Mr. James is nevertheless
22  passing the witness, so I guess, Scott?
23          MR. RICHARDSON:  No questions from
24  us.
25          MR. SMITH:  I think the only other

Page 303

1           C E R T I F I C A T E
2
3        I, Jane A. Blackerby, a Certified Court
4   Reporter of the State of Missouri, do hereby
5   certify:
6        That prior to being examined the witness
7   was by me duly sworn;
8        That said deposition was taken down by
9   me in shorthand at the time and place
10  hereinbefore stated and was thereafter reduced to
11  writing under my direction;
12       That I am not a relative or employee or
13  attorney or counsel of any of the parties, or a
14  relative or employee of such attorney or counsel,
15  or financially interested in the action.
16       WITNESS my hand and seal this 25th day
17  of April, 2022.
18
19       _____
20       *Jane A. Blackerby*
21       Jane A. Blackerby, CCR No. 877
22
23
24
25

Page 305

77 (Pages 302 - 305)

**Exhibit 1**

**[& - 50]**

| & |
|---|
| **&**  2:3,10,19 228:2 228:8 |

| 0 |
|---|
| **04**  15:4 119:16 151:19,19 |
| **05**  15:5 119:16 151:19 |
| **08**  14:16 80:9 113:14 |
| **09**  80:9 |

| 1 |
|---|
| **1**  174:8 |
| **10**  4:8 5:19,23 7:8 7:16 17:18 87:14 87:18,21 106:5 148:12,19 149:2 149:14,21,23,24 150:4 152:8 172:8 185:9 186:4 191:1 197:25 |
| **100**  4:9,11 |
| **1099**  118:18,24 206:21 |
| **10:20**  104:6 |
| **11**  4:9 17:17,18 100:2,5 255:21 261:22 |
| **12**  4:10 11:6 101:1 101:4 107:24 152:8 288:4 |
| **12th**  1:17 263:7,17 263:19 265:3,24 267:7 270:10 271:6 280:18 288:5 |
| **13**  4:12 234:2,5 |
| **1307**  2:19 |
| **136**  2:14 |

| **1369**  1:16 |
| **13a**  4:13 236:7,11 238:6 |
| **14**  4:14 255:5,8 259:8 278:7 |
| **15**  4:15 42:22 54:8 72:6,7 84:14 256:16,19,22,25 259:8 267:20 |
| **1500**  11:6 |
| **15th**  179:19 |
| **16**  4:16 42:22,23 258:4,7 259:8 279:8 |
| **16th**  276:6 279:23 280:19 281:12 |
| **17**  4:17 261:15,21 |
| **18**  4:18,21 38:10 84:17 85:8,16 132:20 135:22 152:8 266:20 267:1 268:25 295:18 301:9 |
| **1818**  3:8 |
| **18th**  296:22 |
| **19**  4:19 234:15 263:5 278:1,4 |
| **194**  10:13,13 |
| **1950**  15:25 |
| **1950gmail.com.**  15:24 |
| **1990**  117:13,14 |
| **1990s**  115:10 |
| **1993**  117:25 118:1 119:14 121:15,16 |
| **1995**  40:14 |
| **19th**  4:12 234:6 |
| **1a**  255:9 258:13 |
| **1b**  256:22 |
| **1c**  258:8,14 |

| **1e**  267:2 |
| **1f**  295:13 |
| **1st**  179:19 |

| 2 |
|---|
| **20**  4:20 27:13 47:5 47:7 98:23 172:8 279:3,7 280:2 |
| **20,000**  51:5 84:14 |
| **2001**  255:22 |
| **2004**  119:17,17 |
| **2005**  119:17,17 |
| **2009**  101:5 |
| **2010**  4:12 234:6,15 |
| **2018**  290:24 |
| **2021**  4:21 45:12 46:21 50:11 56:14 59:6 60:4 61:11 62:19 63:3,8,20 233:2 253:13 261:22 263:7 265:24 279:8 287:2 288:24 290:24 295:19 301:9,20 |
| **2022**  1:18 7:17 305:17 |
| **21**  4:21 45:14 51:24 295:9,13 297:13 |
| **2144**  1:18 3:4 |
| **234**  4:12 |
| **236**  4:13 |
| **24**  19:3 |
| **24957**  305:20 |
| **25**  87:14,17 149:22 239:9 240:19 241:13 242:8 243:9 |
| **25/10**  87:15,16 |
| **255**  4:14 |

| **256**  4:15 |
| **258**  4:16 |
| **25th**  305:16 |
| **261**  4:17 |
| **266**  4:18 |
| **277**  4:19 |
| **279**  4:20 |
| **28th**  61:5 62:19 63:3 74:3,14 |
| **29**  62:19 255:22 |
| **295**  4:21 |
| **29th**  61:5,11 63:3 74:3,15 263:14 |
| **2:49**  271:7 |

| 3 |
|---|
| **30**  87:13,19,22 149:19 250:15 |
| **300**  2:10 |
| **301**  3:8 |
| **3585**  2:4 |
| **3:30**  57:3 |
| **3:45**  303:14 |
| **3rd**  2:7 7:17 78:25 |

| 4 |
|---|
| **4-18-50**  10:4 |
| **40**  12:18 85:15 |
| **417**  13:22 15:15 |
| **417.888.1000**  3:5 |
| **45**  84:8,20,25 85:15,17 148:14 148:19 149:2 197:25 |
| **45/10**  149:8 |
| **48**  183:18 |
| **4:21cv941**  1:6 |
| **4th**  261:8,11 283:2 |

| 5 |
|---|
| **5**  4:4,8 101:8 |
| **50**  30:3 103:16 125:14 148:11 |

Page 1

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

**[50 - allows]**

149:14,16,16
150:4 183:18
197:25
**50/10** 149:9,9
**50/50** 116:2
**501.370.9300** 2:12
**501.372.6555** 2:5
**501.404.4874** 2:8
**55** 149:12
**5:30** 249:7

**6**

**6** 17:17 249:7
257:24 282:23
**60** 30:3 149:25
150:2
**65804** 3:5
**68** 111:5

**7**

**7,000** 165:16
**711** 2:7
**72015** 2:15
**72201** 2:8,11,20
**72203** 2:4
**72207** 3:9
**75** 35:12
**79** 12:19

**8**

**8** 73:17,18 185:11
186:4
**80** 12:19 35:12
84:18
**800** 2:11
**861** 15:15
**861-0611** 13:22
15:17
**877** 1:16 305:21
**8:30** 5:1

**9**

**9** 7:9,12 9:17
188:10 250:5
**90** 10:22 84:18,21
85:2 112:11 186:3
**93** 112:13 121:19
**95** 10:15
**99** 20:6,7

**a**

**a.m.** 5:1
**abc** 140:7 164:14
164:16
**ability** 48:16 105:3
171:25 174:18
180:21 216:3
**able** 104:25
142:12,13 152:19
297:22
**absorption** 124:6
124:8,9
**account** 16:6
24:25 123:3
**accountant** 294:13
**accounts** 179:17
**accurate** 174:14
201:18 239:20
**accurately** 243:15
**accusation** 281:18
**acquired** 175:2
**acre** 11:6
**act** 81:7,10 82:8
**action** 296:2
305:15
**active** 8:9 211:3
234:20,25
**add** 37:14
**added** 184:23
**adding** 168:19
**addition** 296:4

**additional** 169:8
299:12 303:16
**address** 10:12
20:1 49:22 256:7
**addresses** 15:22
**advantage** 153:10
153:12 302:22,25
303:1
**advantages** 153:13
**advertising** 64:21
64:23,23,24
167:25 168:2,5,6,8
**advice** 94:13
**advise** 218:17
**affect** 37:21,24
38:2 42:10,13
142:19,21 143:1
174:17 178:6,12
**affidavit** 258:12
**affiliate** 299:20
**affiliated** 121:10
121:23 283:16
**afternoon** 105:10
**age** 12:9 174:20
**ago** 9:18 15:9
23:18,20 27:14
31:3 32:12,13
33:2,22,24 37:19
37:19,19 42:20,21
42:23 54:8 72:5,6
72:8 80:4 135:20
145:24 159:4
214:9 267:4
**agree** 65:10 76:13
87:11 102:16
103:17 106:9
107:5 150:17
180:22 189:22
222:22 234:23
243:7 245:5
274:12 281:22

282:2 303:9
**agreed** 4:9 100:6
104:2 148:2 274:9
295:23
**agreement** 39:16
39:24 66:6,7,9,18
69:6,12,16,24 132:7
180:25 181:3,5
**agreements** 162:3
162:4 215:18
216:22,25
**ahead** 72:16
144:17,23 158:5
177:24 178:9,23
189:17 192:21
212:23 216:16
221:20 231:25
232:5 245:25
252:13 264:5,7,9
273:8 279:17
290:3
**ain't** 31:17 41:23
142:11
**airplane** 207:2
**alcohol** 73:6
**alert** 299:10
**alexander** 55:6,13
58:1,3 91:7,8,17
92:2,6 98:10,11
155:8 252:9
**alexandria** 229:23
**allocating** 219:18
**allow** 70:13 86:13
86:16 226:25
265:10
**allowed** 29:3,4
98:20,21 139:24
202:22 209:22
251:6 298:21
**allows** 141:8

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

[almond - asked]

almond  97:23,25
  98:1
alpha  109:2
alternative  104:17
alternatively
  104:12
amanda  56:2
amen  99:10
american  79:20,21
americans  79:21
amount  133:17
  221:8
andrew  198:4,18
angela  3:12 77:15
  87:20 88:5 89:6,6
  90:12 147:2,9,18
  148:4 181:16
  191:23 194:21,23
  194:23 195:10,10
  195:16 196:8,22
  219:3 233:11,13
  233:19 243:22,25
  244:2 251:25
  252:2,5 254:12,16
  285:25
angela's  148:11
angry  282:17
anita  33:8
answer  7:5 12:16
  33:13 34:6 35:19
  35:20 70:15 81:13
  81:14,21,22,22,23
  101:23 110:20
  121:17 125:22
  127:3 132:10
  141:24 143:8
  152:5 178:18
  197:16 200:19
  202:11 219:9,15
  227:2 229:10
  237:8 254:11

260:22 274:15
  286:2,3,6 297:15
  298:7,15,16
answered  16:21
  144:7,8,16,17,23
  145:3,11 291:25
answering  298:17
answers  174:10
anticipate  105:11
anybody  9:9 24:24
  39:17,20 49:4
  52:16 60:19 63:4
  63:8,10 71:20
  93:11 107:21
  109:18 118:20
  135:7 136:23
  137:3 150:6 157:4
  162:13 214:22
  233:3 236:4
  237:11 249:3,24
  258:24 266:22
  267:10,13 275:10
  278:11 281:12
  284:23 285:3
  299:25 301:19
anymore  19:9,15
  24:10 140:25
  175:15 182:19
  195:23 237:22
anytime  105:2
  250:16
anyway  299:25
apart  136:6
apartments  25:8
  160:1
apologize  94:12
app  58:24 59:1
  61:13 75:22 83:22
  87:9 162:22
  257:17 259:4,7,10
  268:4

appalachia  228:25
apparently  278:24
  287:23
appear  297:13
appears  261:21
  269:14
application  4:14
  4:15,16 75:18
  162:16,21 166:8
  252:11 256:1
  274:7 277:11
appreciate  273:14
approach  147:19
approached  214:8
  214:17 215:5,9
approval  166:6,9
  218:7,13,14
approve  76:13
approved  100:15
  172:3,6 206:16
approximately
  100:11 127:10
apps  257:18
april  1:17 202:3
  305:17
architectural
  203:20
area  10:19 22:18
  66:10 86:2 88:20
  91:3 92:12,21
  93:5,8 96:20
  114:15 135:6
  136:21 139:25
  141:17,25 142:3
  143:8 145:19,19
  153:19 154:1
  155:3,7 158:13
  161:2 164:13
  170:12,22 176:6
  176:20 177:13
  181:13,14,17,19

187:22 189:8,12
  192:6,20 193:3,4
  193:11 202:1
  204:14 211:2,13
  213:16 226:8,18
  232:6 234:19,21
  237:13,16 246:5
  278:17
areas  66:2 143:9
  152:10 169:24
  235:9
arguing  286:11
arkansas  1:1 2:4,8
  2:11,15,20 3:9
  4:10 21:17 25:16
  25:18,22 46:20,22
  58:10,20 67:13,15
  92:5,13,14 101:6
  106:21 111:3
  145:18 154:21
  155:1,2,3,4 164:4
  164:7,23 167:15
  187:7,18 198:7
  203:10 211:20,21
  212:3,13 219:6,7
  219:22 229:8
  231:4 235:24
  237:24 252:9,22
  252:24 264:2
  299:18
arrangements
  126:17 131:11
arrested  120:1
arrow  22:18
article  4:11 106:22
artifacts  41:25
aruba  32:22,23
asked  7:7 8:25
  44:2 46:15 52:4
  56:24,25 83:3
  94:11 113:5 144:7

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

Exhibit 1

[asked - believe]

144:16,22 145:3
145:11 147:23
162:11 168:22
194:15 204:8
220:18 233:19
244:3 266:8
**asking**   120:8
125:22 162:13
209:20 220:15,17
**assignment**   55:9
55:10
**assist**   9:9 156:4
**assisted**   156:3
**associate**   218:22
**association**   120:17
**assume**   138:25
**assumes**   294:20
**assuming**   106:13
**at&t**   13:24
**atlanta**   70:21
129:22 130:5
131:15,15,22
134:10,12 135:16
137:4
**attach**   234:17
**attack**   99:9 251:22
**attempt**   229:7
**attempting**   171:5
**attended**   36:13
111:20
**attention**   101:7
**attorney**   94:17,18
94:19 99:9 100:16
110:13 185:6
251:7 298:12,15
298:21 305:13,14
**attorney's**   38:20
**attorneys**   9:8
38:23 39:1,2,18,21
100:13

**august**   4:21 90:8
253:20 261:22
263:7,17,19 265:3
265:24 267:7
270:10 271:6
276:6 278:7 279:8
279:22 280:18,19
281:12 287:2
288:4,5 295:18
296:22 301:9
**austin**   215:12,14
**authority**   161:24
173:4 298:23
**authorize**   100:16
**authorized**   61:1,4
61:13 167:9
263:24
**ava**   11:9,11,22
**available**   78:13
280:21
**avenue**   10:18
**average**   18:18
19:1,12,14 21:8
**avoid**   170:17
222:2
**aware**   43:11,12
49:3,13 54:23
58:2 72:21 82:7
91:7 93:19,23
111:22 121:11
122:10 123:8
128:9,14 137:25
141:16,20 151:4
157:10,15 158:25
162:13 167:21
173:3 174:12
176:3 193:12,15
198:2,24 199:2
202:20,21,24
207:12,15 208:2
211:23 212:14

216:25 217:18,20
217:24,25 221:11
221:15 224:20
230:19 233:2,4,23
253:6 263:2
265:21 275:5,8
278:14 283:15
284:12,19
**awful**   237:1
**awhile**   19:20 80:4
112:4
**aztec**   229:2

**b**

**b**   4:6 20:4 108:19
229:14
**b300**   1:19 3:4
**back**   15:12 17:22
23:12,14,16,18,21
23:24 25:23 27:13
27:23 34:21 37:16
37:20 44:8,25
47:19 50:5,6,6
51:24 52:10 53:9
66:22 76:6 78:7
84:10 100:14
101:9 104:8 106:4
106:6 107:20
145:22 148:11
149:10 158:18
190:25 214:13,24
242:2 243:20
245:10 250:12,13
259:12 264:16,18
264:25 266:7
267:16 273:18,25
287:24 290:16,20
291:2,4 293:21,25
294:7 296:20
**backyard**   25:13
25:14 47:14,14,24
49:18 52:1 254:2

264:15,24 288:1
302:8
**bad**   8:18 18:10,11
49:5,6 68:12
86:10 90:13 106:1
130:17 176:4,14
176:17
**ball**   27:25 28:1
121:25 122:16
**ball's**   122:17
**bar**   30:14,16,18
**barely**   152:12
**bart**   32:23
**bartender**   30:20
**bartenders**   30:9
**base**   139:17
155:20
**based**   9:1,4 29:22
142:17 179:20
244:5
**basis**   203:9 298:9
298:10
**basketball**   247:7
**bass**   262:18
**baths**   12:1 29:6
**baton**   110:14
**bear**   220:17 301:1
**beat**   143:5
**becker**   22:6,8,9
**bed**   13:5 108:11
**bedrooms**   11:24
28:24 29:1
**befriend**   218:20
**beginning**   102:15
163:11 187:6,17
**behalf**   1:15 64:25
156:17 158:24
176:9,15 177:2
**belief**   77:18 299:6
**believe**   20:6 23:7
28:25 63:13

Bushman Reporting
A Veritext Company
800-556-8974
www.veritext.com

**Exhibit 1**

**[believe - builder's]**

100:25 232:12,14
232:20 235:17
237:15 244:8
248:6 267:1 276:2
302:21,21
**bell** 226:1
**bellgard** 108:19
**bells** 229:19
**belonging** 260:19
**benca** 2:19
**bend** 31:3,4
**benefit** 175:18,22
177:22 178:16,19
**benefits** 190:16
**benton** 2:15 46:20
46:22 49:25 50:5
53:17 60:6,16
67:21 74:2,13
93:7 254:2 264:24
278:17
**bentonville** 114:14
114:15
**best** 6:11,15,21
73:19,21,21,22
80:18 102:11
125:15 157:19,21
163:17 165:20
218:18 270:17
289:13
**bet** 185:5
**betcha** 232:16
**better** 137:8 148:1
159:12 297:25
**beyond** 177:13
243:5
**biagio** 20:2,3,7
113:10,11
**bidding** 195:19,20
216:5
**big** 11:5 25:11
28:20 30:16 51:10

121:7 151:6,9
175:18,21 189:18
257:13
**biggest** 127:14,17
**bills** 138:3
**billy** 148:17,21,22
204:5,7,11,13,23
205:6,9,10,13,17
205:23 206:18,25
208:20 209:7,13
209:22 210:2,19
213:2 227:16,23
230:21,22 243:23
244:1,2,3,4,12
**birth** 10:3 110:23
**bit** 34:21 84:9
201:6,22 235:10
235:11,21 282:7
282:18
**bitty** 203:21
**black** 70:24
**blacked** 295:17
304:5
**blackerby** 1:16
305:3,21
**blake** 97:23,25
98:1,3,4
**blend** 126:19,21
126:23
**block** 164:14,16
164:17
**blood** 71:13,14
**blue** 62:5 269:12
**board** 38:11 120:6
**boards** 120:3,5,10
262:24
**boat** 70:23 79:19
79:22,24
**bolder** 18:5
**bonus** 212:15

**books** 64:21
**boral** 124:19
**border** 2:14
**bored** 19:21
**born** 12:18
**borscht** 207:19,22
**borstaff** 124:10
**bother** 283:20,22
**bottom** 149:15
185:11
**bought** 13:15 86:2
112:6 131:16
172:5 179:23
201:11,15 238:15
246:23
**boulder** 124:14
**bounces** 122:20
**bound** 208:19
**box** 2:4 304:5
**boy** 71:25 72:4
**bragged** 243:22
**brain** 23:3
**brand** 67:18
**brandon** 22:6,9
**break** 8:25 107:22
108:17 110:15,15
110:20 289:18
298:5,19 301:15
**breakfast** 13:5
249:18
**brenda** 22:8
**brick** 50:23 109:3
109:3,4,6,13
164:16,17 229:7,9
229:10
**bridge** 70:8
**brief** 99:20
**bring** 30:13 56:25
96:1,2,10 178:21
**bringing** 79:19

**brings** 30:4
**britton** 229:4,13
**broad** 261:4
**broadly** 120:9
**broadway** 204:2
**broke** 54:10,16,19
109:16
**broken** 22:18
**broker** 184:6,11
**brothers** 193:25
194:2,16,24
195:10,22,23
196:3,9,17,23
197:4,10,12,19
199:4 207:24
209:5,6 227:10,13
254:13,21
**brought** 72:1 89:7
225:25 266:16
**brown** 203:4
**bryant** 278:17
**bud** 3:7,7,9 22:17
22:23 39:10,10
100:14 105:17,25
250:10 251:2,2,9
251:10,11,13
289:2 290:10
**bud's** 39:14
**budcumminslaw...**
3:9
**buddies** 90:1
**buddy** 126:12
**build** 38:19 137:11
163:10
**builder** 78:18
92:21,22,23 93:2
160:7 164:2 222:5
**builder's** 21:21,22
21:23 22:4,7,10
80:3

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

[builders - case]

**builders** 44:23,24
120:16 137:12
142:11,12,14,15
168:3 193:7 212:6
**building** 70:3
82:19 132:1
136:10 143:2,2
187:12 188:1,7,8
199:7,12,15,19
200:2
**buildings** 134:21
**built** 27:13 55:6
175:4
**bullshit** 75:13
**bump** 211:18
**bunch** 11:17 15:7
74:24 75:13
**bunches** 105:14
**burden** 252:21,23
**buren** 235:13
236:14
**burn** 104:5 106:2
**burton** 187:12
188:1,7,8 199:7,12
199:15,19 200:2
**business** 4:10 13:7
14:8,19,23,25
16:18 22:22 28:5
34:14,16 36:24
38:19 45:22 51:18
51:23 55:12 57:9
57:10,24 67:18
69:11 73:13,16
74:20 81:1 82:9
82:17 101:6
106:21 113:16
114:4,12 115:2,16
121:5 137:7,16,18
147:9 154:14
159:12,15,16
164:12 166:13

172:15 182:25
188:25 193:18
195:3 196:18
199:12 205:23
212:5 227:4,4
233:6,7 234:19
252:20 254:4
282:9 283:23
**businesses** 115:17
115:18 117:1,5,16
120:25 189:3
**busy** 53:23
**button** 235:14
**buy** 24:13,15,20
24:24 27:7,9 28:1
44:10 45:18,21
46:15 48:7 52:5
57:16 64:11 83:12
83:23,23 84:1
85:20,22 86:6
133:6 134:5 137:3
140:25 143:15
145:5 165:17,23
173:15 191:8,10
195:15 204:19
210:20,20 222:20
222:21 246:18
**buying** 44:14 53:3
57:14 148:5 194:8
194:14 195:23
199:15 265:8
**buys** 128:22 208:9

c

**c** 2:1 3:1,3 23:7,8
305:1,1
**c.j.** 147:4,5,14
**cabot** 92:11 238:4
**calculated** 180:10
**calhoun** 2:7
**california** 127:21

**call** 18:15 53:14
56:23 63:16,21
65:18,19 68:9,19
68:24 69:6,8 76:1
76:2 78:16,23
79:3,4,7 90:12,20
92:17,18 103:21
119:8 126:14
131:9,14,15,24
153:4 183:19,23
184:10 200:9
230:13 248:15
249:1,24 250:9,16
250:20 251:2
252:2 256:10,11
256:14 265:18
267:7,16,17,21
269:24 271:7
272:2,4,9,13
279:24 282:10,12
285:8 289:2 290:6
290:8 293:23
294:2
**called** 10:17 40:5,6
41:2 48:16 52:21
56:24,25 57:2
59:2 62:14 63:6
63:22 67:5 69:4
73:15 74:17,18,24
75:4 78:17,19
92:19 118:11
123:4,7 131:4,5,18
139:5 148:4 188:9
200:10,23 222:18
230:12 246:25
247:23 248:1,10
250:22 251:9,10
251:11 263:12
267:6 269:22
270:1 273:20
275:6 278:16

279:22 282:14
286:7 287:4,16
290:9 293:9
298:19
**calling** 74:19 75:1
**calls** 60:8,10 64:25
78:4 81:12 90:10
90:11 137:2 152:4
216:7 247:25
252:12 260:21
286:1,22 300:9
302:2
**canada** 127:5
**cancelling** 303:1
**cape** 71:25 72:18
**captioned** 100:6
**car** 250:11 287:19
**care** 67:6 107:9,11
149:14 166:23
249:15 264:22
**career** 48:23
102:14
**cargo** 79:25
**carolina** 129:23
130:6 131:23
**carpenter** 112:4
112:10
**carried** 189:19
**carrier** 13:23
**carries** 51:16
**carry** 15:19 66:9
84:3 189:19
208:11 264:9
265:10
**carrying** 152:10
204:24 230:23
**carter** 100:14
**case** 7:18 25:1
89:22 261:3
273:11 301:11

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

[cases - chose]

| | | | |
|---|---|---|---|
| **cases** 167:11 | 119:2 120:6 121:3 | 194:5,12 195:6,8 | **certify** 305:5 |
| **cassinelli** 2:9,10 | 121:5,18,24 122:3 | 196:3 197:11,18 | **chain** 260:25 |
| 6:3 8:16 56:8 | 122:14,15 123:5,7 | 198:8,11,22,25 | **chair** 116:8,9 |
| **catch** 37:12,20 | 123:9,17 124:1,22 | 199:13 200:21 | **chairs** 20:19 |
| **cause** 65:4 | 125:1,11,24 126:5 | 201:11,20 202:10 | **chance** 45:1 |
| **caused** 44:9 | 126:9,16 127:1,13 | 204:8,18 206:19 | 261:18 288:18 |
| 121:16 | 128:11 129:8,11 | 208:20 209:21 | **change** 64:7 |
| **ccr** 1:16 305:21 | 129:19 130:14,15 | 210:21 212:16 | 133:11 145:23 |
| **cell** 13:21 15:14 | 130:21,23 131:4 | 213:9,17 214:8,9 | 146:18,19 155:11 |
| 95:20 96:10,13 | 132:5,8,12 133:25 | 214:17 215:5,13 | 174:10 181:13 |
| 116:19 266:19 | 135:5 136:2,20 | 218:9 219:5 | 188:16 244:18 |
| **cement** 51:17,20 | 138:11,17 139:11 | 220:21 221:16,17 | 279:1 |
| 87:2 | 139:20 140:6,8,11 | 225:21 226:2,6,9 | **changed** 145:24 |
| **central** 1:2 58:9,20 | 140:19,22,25 | 226:14,16,20,25 | 171:1 195:6 205:3 |
| 67:13,15 92:5,13 | 141:2,4,7,14,23 | 227:6,14,17 | 244:19 254:7 |
| 92:14 154:21,25 | 143:10,15,23,24 | 228:14,17,25 | **changes** 9:15 87:1 |
| 155:2,4 164:4,7,22 | 144:6,15,21,24 | 230:18,23 231:22 | 97:21 |
| 187:7,18 203:10 | 145:5,9 148:8 | 234:16,22 241:1 | **characterize** |
| 219:6,7,21 229:7 | 151:3,12,24 | 242:24 244:16 | 243:14 |
| 231:4 252:9,21,24 | 153:14,16,17,21 | 245:16,21 246:4,6 | **charge** 130:19 |
| 264:1 299:18 | 153:22 156:11,17 | 246:18 248:5,6 | 133:20,21 134:1 |
| **cents** 38:10 84:17 | 156:18,19,22 | 252:8,10,18 253:7 | **charlotte** 129:22 |
| 132:20 | 158:13,24 159:1,7 | 254:23 255:1 | 130:6 |
| **centurion** 24:20 | 160:5,13 161:21 | 259:6,10 262:23 | **chasing** 15:10 |
| 27:7,16,19 29:11 | 161:24 162:6 | 263:8 266:6 274:3 | **chattanooga** |
| 34:25 35:23 48:8 | 165:7,18 167:14 | 274:13,15 275:10 | 226:10 227:7 |
| 58:21 63:10 64:9 | 167:20,25 169:11 | 278:13,19 281:4 | 230:20 |
| 64:13,15,18,24,24 | 171:6,12,22 172:2 | 292:1 293:14,17 | **cheap** 143:2 |
| 64:25 65:6,16,23 | 172:18,19 173:4 | 293:18 296:2 | **cheaper** 184:2 |
| 66:3,5,8,13,16,18 | 173:12,13 175:3 | 299:5,11,19 300:2 | **check** 179:14,17 |
| 66:20 68:12 69:13 | 176:4,10,16 177:2 | 302:14,22 303:2 | 179:18 180:5,12 |
| 70:5,13,19 71:8,12 | 177:5,15,17,22,22 | **centurion's** 65:23 | **checks** 179:23 |
| 71:15 77:24 78:2 | 177:25 178:3,21 | 82:6 85:9,10 | 232:19 |
| 80:1 82:22,24 | 179:2,12,16 | 167:10 177:7 | **chevy** 86:16 |
| 83:8,13 86:1,2,5 | 180:11,14,23,24 | 191:16 245:5 | **children** 13:9 |
| 93:22 94:2 97:4 | 181:6,20,24 182:8 | 248:12 249:21 | **china** 79:19 127:5 |
| 97:12 102:13 | 182:14 183:6 | 263:6 291:7,9 | 127:5 |
| 106:13 108:8,10 | 184:9,14 185:13 | 293:13 299:5 | **choose** 208:3 |
| 109:13 111:25 | 188:11,13 189:1 | 303:8 | **chose** 129:4 |
| 112:3,9 117:19,20 | 190:1,3 191:1,13 | **certified** 305:3 | 303:18 |
| 117:22 118:3,9,16 | 192:3,9 193:2 | | |

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

**[chosen - complaints]**

| | | | |
|---|---|---|---|
| **chosen** 103:8 | 95:13,21 201:17 | **comes** 35:22 | **company** 21:23 |
| **christie** 228:15,19 | 208:15 217:3 | 128:22 185:2 | 32:18,19 80:2 |
| **circle** 2:14 | 229:1 254:18 | 229:9 233:12 | 129:5 200:23 |
| **circumstances** | 297:16 | 277:6 | 201:2 207:20 |
| 146:10 170:25 | **coaches** 81:20 | **coming** 48:2 62:6 | 278:15 |
| **clarified** 9:17 | **coaching** 144:9 | 73:12 175:13 | **compare** 124:1 |
| **clarify** 174:11 | 232:1 292:14 | 203:13 219:19 | 125:4 219:6 |
| **clark** 237:24 | 294:22 295:5,8 | 248:19 249:25 | **compensated** |
| **clarksville** 226:6 | 298:22 | 257:23 275:24 | 66:15 |
| **classify** 217:14 | **coat** 99:18,22 | **commenced** 5:1 | **compensation** |
| **cleaned** 18:13 | **cod** 137:24 138:4 | **commercial** 4:14 | 37:21 38:3 70:1 |
| **clear** 6:17 18:5 | 274:16 288:8 | 4:15,16 | 220:10 227:7 |
| 58:22 65:12 | 290:14,18,23 | **commercially** | **compete** 142:3,6,9 |
| 104:20 274:2 | 292:25 293:20 | 81:10 | 170:19 212:3,4 |
| 286:13,21 287:11 | 294:18 299:9 | **commission** | 216:14 |
| 288:18 290:1 | **cold** 26:2,2 | 148:25 149:4 | **competed** 157:6 |
| 292:7,10 303:12 | **collect** 165:20 | 157:2 219:13 | **competing** 159:8 |
| **cleveland** 236:19 | **collection** 37:14 | **commissions** | 170:21 222:2 |
| **click** 268:20 | **collections** 179:20 | 148:7,18 206:7,8 | 245:7 |
| **client** 298:12,21 | 179:21 | 206:14 300:21 | **competition** 142:5 |
| **clinton** 235:13,13 | **color** 87:3 97:21 | **commit** 67:12 | 170:17 178:7,13 |
| 236:15,16 | 126:20 146:12,18 | **committee** 120:6 | 178:17,20 187:22 |
| **close** 78:18 212:19 | **colors** 86:18,20,22 | **committees** 120:3 | 187:24 246:9,9 |
| 218:23 236:5 | 146:21 256:10 | 120:11,12 | **competitive** 108:9 |
| 237:1,12,25 238:3 | **columbia** 211:17 | **common** 215:20 | 248:7 |
| 238:8 239:22 | **come** 13:14 18:5 | 220:18 221:3 | **competitor** 108:14 |
| 244:13 254:13 | 24:6 25:13 32:14 | **communicate** 53:1 | 124:18,19,25 |
| 261:8 293:12 | 40:17 44:3 47:13 | 176:9,15 177:1 | 207:25 227:3 |
| **closed** 277:8 | 50:6 61:13 62:5 | 191:21 220:19 | **competitor's** |
| 288:10 | 67:1 68:1 134:9 | 221:4 285:23 | 135:2 299:7 |
| **closer** 6:6 178:10 | 137:12,14 139:3 | **communicated** | **competitors** |
| **closest** 211:1 | 141:14 142:13 | 53:6,11 191:18 | 108:22 123:9 |
| 232:6 | 143:4 157:25 | **communication** | 124:2 141:22 |
| **clown** 285:14 | 158:10 159:5 | 16:17 301:5 | 177:16 178:17 |
| **clowns** 285:10,11 | 163:16 173:22 | **communications** | 179:1,4 191:6 |
| **club** 26:21 28:14 | 176:21 214:20 | 223:23 238:25 | 209:22 216:1 |
| 29:13 31:14,15,16 | 232:18 247:18 | 286:24 301:11 | 245:22 |
| 31:17,21,22,24 | 261:5 277:14 | **community** | **complained** |
| **clubs** 34:11 | 284:16 294:7 | 103:16 | 163:19 199:21 |
| **clue** 28:4 43:2,9 | 297:21 | **companies** 21:19 | **complaints** 77:4,8 |
| 58:5 92:24 94:4 | | 130:3 170:21 | 77:11 89:8,10,18 |

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

[complaints - correct]

159:7,10
**complete** 9:24
51:18 162:20
174:14 238:11
303:20
**completely** 27:21
**complexes** 25:8
**compliance**
100:19
**computer** 8:13,15
16:21 17:2,4
**concentrating**
257:5
**concepts** 1:8 2:16
21:25 48:6 54:25
55:13,17,18 57:16
57:17 58:2 91:8
96:18 98:7 129:2
135:25 158:3
170:4 198:22
204:19 210:22
217:2,8 220:8,11
224:12 229:6,22
230:11,18,25
231:2,4,23 233:22
262:13 264:1,3
274:4 278:16
283:17 299:17
301:19
**concern** 105:7,7
**concerned** 82:10
91:4 221:21 228:4
229:10
**concerning** 36:7
53:3 95:10
**concerns** 88:25
**conclusion** 81:13
81:23 152:5
260:22
**concrete** 109:3
121:4,8 123:21

**conditions** 109:6
244:17
**condominiums**
159:25
**conducting** 82:8
**conferences** 33:20
**confidential** 216:4
258:17 268:9
**confidentiality**
216:22
**confirmation**
183:8,11 215:1
257:7
**confirmed** 68:25
69:2
**conflict** 140:21,23
141:5 222:20
**conflicts** 157:13
**confused** 153:2
280:1 288:18,20
**confusion** 233:22
**connected** 204:13
**connection** 179:7
231:21
**consequence**
170:15
**consider** 16:22
40:21 108:21
124:24,25 139:18
218:21,24 268:10
**considered** 59:15
281:9
**considering** 69:3
**constitute** 235:9
**construction**
197:15 207:4,7,14
207:16
**consult** 218:17
**cont** 3:1
**contact** 44:24 53:4
156:16 161:22

216:5 239:15
243:13,17 252:1
259:15 266:3
**contacting** 224:25
278:11
**contacts** 38:19
**contained** 7:23
132:4
**contend** 77:6
202:4 276:10
**continue** 46:3
150:7 218:9
234:23
**continued** 94:6
**continuing** 161:15
161:17 175:5
**contract** 30:7
181:21
**contracted** 94:8
184:7
**contracting**
194:12,16
**contractor** 118:13
119:2 133:1,4,6,8
141:7,12,15
159:14,17 160:7
165:16 169:10
170:6 186:21,23
186:24 187:1
190:15 194:10,11
195:2 200:13,14
208:17 210:12
240:10,12 241:1,2
242:20,23 243:2
**contractors** 141:9
169:18 190:8,19
212:8,11 239:24
240:2
**control** 109:9
186:15 254:10

**conversation** 36:8
44:6 59:7 60:3
63:20 95:9 248:14
250:8 265:24
268:6,15,23 270:6
271:12 272:12
274:1 275:17,22
276:10,23 283:4
283:12 284:18
287:21 288:11,16
288:23 292:5,23
293:5 295:25
296:9,10,13
**conversations**
36:6 246:25 247:3
252:15 301:18
302:4
**conveying** 274:24
**convince** 148:6
**conway** 92:6,11
201:25 210:7,14
**cook** 30:10,11
**copied** 235:2
**copies** 95:11 103:9
**copy** 101:21
106:10 107:5
235:3
**core** 234:19
**corners** 86:4
**corona** 32:14
**coronado** 121:12
123:12 207:25
208:1
**corporate** 120:5
215:15
**correct** 5:12,13,17
6:10,14,18,20 7:15
7:18 10:2 17:6
22:13,15 28:2
34:12,13 36:20
45:13,16,17 48:6

[correct - customers]

| | | | |
|---|---|---|---|
| 54:25 56:17 57:13 | 244:23 245:3,22 | **country** 129:17 | **csr** 1:16 |
| 60:7,17 61:16 | 246:21,22 248:7 | 203:19 | **culture** 123:12,13 |
| 62:24 63:16 65:14 | 248:12,13 251:12 | **county** 93:5 | 127:18,21 |
| 65:16 66:17,17,21 | 254:21 255:19,22 | 235:12,18,21,24 | **cummings** 250:10 |
| 68:4,5 76:9 77:1,3 | 255:23,24 258:21 | 236:14,19,24,25 | 251:2,9 |
| 77:20 79:17 81:6 | 259:8,14,21,22 | 237:10,15 | **cummins** 3:7,7 |
| 82:2 84:23 85:18 | 260:5,16,17,20 | **couple** 19:4 88:19 | 39:10 105:17,17 |
| 86:21 91:12 94:9 | 263:9,15,17,18 | 116:11,11 182:23 | 106:7 289:2 |
| 97:5 100:24 | 265:1 269:13,20 | 236:1 239:7 | 290:10 |
| 108:25 109:12,14 | 269:21 270:12,13 | **course** 52:3 216:1 | **cunningham** |
| 109:15,22,25 | 271:22 272:2 | **courses** 111:20 | 122:13 234:7 |
| 110:4,12 112:17 | 274:17 276:2,3 | **court** 1:1 99:23 | 244:12 |
| 115:8 117:6 | 280:3,19,23,24 | 103:22 110:5 | **current** 78:1 |
| 118:14 119:19 | 283:25 284:1 | 236:7 238:10 | **currently** 237:4,4 |
| 120:24 122:2,11 | 286:25 287:1 | 245:10 284:16,17 | **cussing** 267:24,25 |
| 123:24 125:1,7 | 291:17 294:15,16 | 305:3 | **custom** 126:19,21 |
| 127:24 128:16 | 294:19 295:21,22 | **coveted** 164:9 | 221:23 |
| 130:10 132:3 | 297:14,18 300:4,5 | **covid** 34:3,14 37:6 | **customer** 79:8 |
| 133:14,16 136:5 | 301:24,25 302:2,6 | 37:8,21 | 86:15 128:10 |
| 138:21 141:19 | 302:14 | **covin** 39:10 | 139:17,19,20 |
| 143:16,21 146:2 | **corrected** 278:24 | **craig** 70:24 | 143:14 146:14,17 |
| 147:7 155:6 | **correctly** 292:25 | **creatures** 251:16 | 146:22 155:19,20 |
| 156:15,20 157:3 | 293:2 | 251:17 | 165:17,20 173:9 |
| 158:3 172:7 | **correspond** 20:22 | **credit** 4:14,15,16 | 189:10 190:20 |
| 173:13 174:1,2,3 | **cost** 84:12 125:4 | 58:24 59:1 61:13 | 198:14 201:19 |
| 174:24,25 180:11 | 125:10 142:25 | 75:18,22 83:22 | 203:4 242:25 |
| 180:12 184:4,8,16 | 180:3 183:25 | 87:9 162:22 166:8 | **customers** 30:4,5 |
| 184:17 188:14,15 | **counsel** 89:22 | 257:17,18 259:4,7 | 137:21,23 139:14 |
| 188:20 189:4 | 94:13,15,15,16 | 268:4 274:7 | 139:15 141:10 |
| 190:16,17 191:6 | 98:17 107:22 | 277:11 | 146:4,7,8,11,23 |
| 194:13,17,20 | 109:19 235:5 | **creek** 124:15 | 157:9 165:11,14 |
| 195:4,5,8 204:4 | 248:12 249:22 | **crew** 193:8,14 | 189:3,5,14,21,25 |
| 205:3 206:9,13,17 | 266:23 275:12 | **crews** 25:12 192:8 | 192:4 198:20,23 |
| 210:25 212:10 | 289:2,20 293:15 | 192:10,13 193:10 | 233:15,16,17 |
| 213:13,14 218:10 | 303:8 305:13,14 | **criticisms** 77:4,8 | 238:24 239:11,18 |
| 219:14 220:6 | **count** 191:22 | 89:8,18 | 239:18,23 240:2 |
| 221:18 222:3 | **counter** 196:13 | **cross** 214:4 | 240:22,23,23 |
| 224:21,22 234:25 | **counties** 168:20 | **crucial** 137:10,15 | 241:6,14,16 |
| 235:1 237:24 | 234:18 235:7,19 | 137:16 | 242:11,15,19,19 |
| 238:2 242:20,21 | 235:20,23 237:23 | **cruise** 32:25 | 243:3,5,12,13,15 |
| 243:1,6,10 244:6 | 238:5 | | 243:17 245:7,14 |

Bushman Reporting          800-556-8974
A Veritext Company       www.veritext.com

**Exhibit 1**

[customers - decision]

245:15 246:15
275:2 278:12
**cut** 72:3 84:9
145:22 148:11
151:14 179:18
182:2 228:14,15
228:19 244:15
246:18 247:1
269:20 275:3

**d**

**d** 4:1 97:25 108:9
108:19 113:2,2
160:20 210:16
**dabbling** 188:2
**daddy** 147:5
**dan** 8:4 100:14
229:4,13
**dana** 200:25
222:16,18 236:20
236:22 237:21
**danny** 201:4
**darn** 268:4
**darrell** 226:24
230:17,19
**data** 260:18
**date** 10:3 97:11
110:23 171:11
182:24 183:1,1,7
247:12 288:1
297:4
**dated** 4:21 261:22
278:7 279:8
**dates** 59:5 135:23
292:11,13
**daughter** 44:2,4
47:16,17 74:7
**daughters** 12:21
**day** 1:17 18:15
19:1,2,13,14 31:6
31:8 46:9,10
53:25 61:6 87:1

87:13 91:14 105:1
116:14 122:25
137:14 166:11
249:14 267:19
273:7 280:17
289:15 302:9
305:16
**days** 11:19 21:7
30:3 31:13,14
87:14,17,19,22
95:16,17 111:21
149:19,20,22
175:11 209:17
251:4 270:8
280:15
**dead** 35:4
**deal** 39:14 41:12
44:19 52:7 55:11
146:8,10,21,23
148:4,5 179:4,6
197:11 227:6
229:13 233:9,11
269:18 270:14
271:2 272:10,14
**dealer** 15:4 24:10
24:11 38:11 44:12
48:7,9,12,21 49:1
54:2,3,4,11 61:1,4
61:13 64:11,18
65:1,5,8 66:12
71:21 72:8,19,23
73:5 77:12 83:9
86:2 87:7 90:7
91:3 93:21 94:2
126:3,4 128:7,8,23
128:23 131:12,25
132:8,19 133:5,13
133:15 134:14
137:2,3,4 139:18
140:3,3,4,4,7,9,13
140:17,20 141:1,1

141:3,6,11 144:1
148:23 152:2,15
152:17 153:3,10
154:3,5,8,11,15
155:5,6,8,11,23
157:20,23,24
158:23 159:13
160:9 161:6,8
162:8,19 164:22
165:2,18 166:7,17
168:24 171:3,4,7
172:23 173:24
176:5,21 177:10
181:23 182:14
184:7 185:24,25
186:1 187:21
189:9,13,25 190:1
190:21,23 191:9
191:15 194:5,7
195:7 203:22
204:15 207:11
208:3 211:1,17
221:9,16 223:4
226:25 231:1
240:12,12 241:1,2
242:20,22 244:16
246:17,19,23
248:5 252:3 263:8
275:4 292:2 299:5
302:14
**dealer's** 128:25
166:18
**dealers** 16:17
20:22 21:1,12,13
24:2,5,17 33:25
38:8,13,14 48:15
55:14 65:23 66:19
70:13 73:1 74:20
86:20 87:24 97:17
119:7,7,8 128:20
128:21 132:24

133:18 134:7,8
137:24 139:17,21
139:22 143:6,11
143:12,15 145:1,2
145:4 146:3,5,6
148:14,18 151:11
151:24 152:20,23
153:1 154:1,20,22
156:4,5 157:7,14
157:17 158:22,23
159:2,8,11 160:11
160:12,15 161:15
161:22 162:5
163:18,19 165:10
167:1,9,19 168:7
170:11,18 171:25
177:3,6,15 179:5
185:12 186:9,19
189:11 190:4,7
191:1 205:20
206:5,10,11,12
210:5 213:9
220:20,21 221:4
222:2 238:21,23
245:13,21 246:15
**dealership** 82:24
126:3 160:22
171:11,12 192:19
208:12
**dealerships**
257:19
**dealing** 140:15
257:8 303:4,4
**dealings** 81:2
**deals** 214:24
**dealt** 62:13 244:11
**death** 110:14
**debate** 102:2,24
**decided** 290:14
**decision** 66:3,23
67:1,3 76:7,8,12

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

[decision - distributor]

76:16 90:15 91:9
92:7 244:15 247:1
247:5,9 260:4
263:22 278:12
292:24
**decisions** 68:7
76:22 274:22,25
**declaration** 4:8
5:23 6:8 7:17,24
9:1,2,22 99:2
106:20 185:5,8
188:10 239:10
242:9 255:12,13
255:21 263:4
267:2 295:14
**declare** 6:13
**deer** 11:15
**defendant** 1:15
2:16 3:2 99:18,19
**defendants** 1:10
2:13 104:9,12,14
301:12
**defense** 39:23
**definitely** 144:12
191:24
**delete** 18:10,11,23
62:2
**deleted** 277:11
**deliver** 126:6
129:19 184:8
**delivered** 128:11
129:4
**delivery** 244:23
**demands** 35:14,15
35:16 152:20
**department** 138:5
**depends** 19:2
84:13,13 87:20
116:12 131:14
137:11 158:16,16
158:18 163:15

280:20
**deposition** 1:14
5:1,22 36:1,10
98:14 100:5 101:4
103:2 104:1,16
109:18,19 110:9
110:11 174:9,15
234:5 255:8
256:19 258:7
261:20 267:1
278:4 279:6
292:17 295:1,12
298:20 303:18,20
305:8
**describe** 121:5
140:1 181:4
**described** 13:18
**description** 4:7
**design** 203:20
**designed** 245:19
**desk** 116:7 294:6
**desktop** 16:25
**despite** 258:23
**detail** 284:8
**determination**
218:7
**determine** 60:23
213:25
**determined**
179:13
**detrimental**
137:17
**develop** 139:21
151:24 195:3
233:17
**developed** 151:11
194:19
**development**
102:16
**devices** 56:9

**devil** 77:15
**difference** 41:9,10
50:14 85:3,13
143:3 152:2,16
154:15 186:9
197:22,24 259:5
**different** 25:9
26:10 41:23 60:1
63:23 84:18 86:25
97:22 99:6 124:4
125:2 129:20
152:9 153:19,21
154:1,10 195:24
197:23 203:12
208:7,9,21 209:5,8
209:9 268:3
275:16
**difficult** 126:23
**difficulty** 195:11
195:12,14,18
196:23,24 254:13
**dime** 170:24
**direct** 57:14
128:11,20 143:17
191:10 192:3,4
194:14 195:15
198:25 206:10
208:6,16,18
246:15 269:23
**direction** 60:2
63:23 244:14
263:6 305:11
**directly** 116:24
120:19 133:9
141:11 151:1
156:9 180:7,7
189:2 191:19
197:11 201:11,13
202:22 220:11,19
221:4

**disadvantage**
177:25
**disappointed**
75:25
**discount** 87:15
197:23 208:7
**discover** 213:7
**discretion** 166:19
167:6
**discuss** 97:17
272:3
**discussed** 271:13
275:14
**discussion** 200:1
290:17,20 291:15
**discussions** 100:18
**display** 160:16
161:2
**displays** 160:25
**dispute** 239:3
**distributing**
186:12
**distributor** 97:4
108:1 152:3,6,9,11
152:17 153:3,11
153:14,18,25
154:2,6,7,15,17,18
155:12,22,24
158:24 161:6
162:8,19 165:25
166:17 172:15,16
172:17,23 173:24
175:2,4,5 176:5,9
176:14 177:17
184:7 185:22,24
191:13 192:21,23
193:1,1 194:4
195:7,25 197:20
201:14,20 204:18
207:10 216:13
218:8,9 221:16

Bushman Reporting                                    800-556-8974
A Veritext Company                                   www.veritext.com

**Exhibit 1**

**[distributor - employee]**

222:7 223:4
225:23,24 226:16
227:1 278:13
**distributors**
152:23 154:25
156:17 157:7,14
158:23 159:2
160:12,16 161:15
162:5 163:19,20
167:1,9 168:7
170:18 171:25
172:20 177:6,15
179:5 180:14
183:13 186:9
190:6 205:19
213:4,16,19 214:1
214:2 216:24
218:16 220:20,20
221:5 256:14
284:4
**distributorship**
77:18 171:12
193:21 261:3
**district**  1:1,1
**disturbance**  96:3
**diving**  264:18
**division**  1:2
**dmcdaniel**  2:21
**document**  5:22,25
9:7 99:21,22
100:5,7,8,24 101:4
101:16,21 102:6
102:21 105:2,2
234:5 255:8
256:19 258:7
261:20 266:25
278:4,8 279:6
295:12,21 297:17
**documents**  98:25
99:4 103:6,7,25
104:11,13,22

105:9,11,14
109:17 281:16
**doing**  14:18,20
15:4 43:6 44:2,4
46:10 49:3,5 50:2
53:23 57:11,12
58:5,8,13 59:15
92:18,20 103:21
172:15 186:11
188:3,5 196:15,17
196:17 203:13,19
214:25 217:21,22
226:24 244:3
259:17 283:7,18
291:9
**dollars**  182:5
**doors**  277:8
288:10
**double**  252:25
253:1,4
**downing**  2:3
**drafts**  9:11
**draw**  111:12
**dreading**  90:19
**drink**  289:16
**drive**  105:19,21
106:3,5,11 107:7
248:23 249:14
**driveway**  47:17
86:24,25
**driving**  50:5,6
53:9 67:16 264:16
282:25 283:1
**dropped**  235:24
**drove**  46:18,22
47:6 51:25 53:16
57:18 59:9 248:15
248:17 249:5,8,20
254:2 264:23,25
287:17,20 289:3

**drug**  89:3,6
**drugs**  42:7,8,9,14
43:6
**duck**  25:19,23,25
26:8 39:10 82:14
82:15,19 217:16
218:2 251:14
**dufferin**  108:8
**duly**  5:3 305:7
**dustin**  2:18
**dutch**  124:17
**duties**  179:8

**e**

**e**  1:19 2:1,1 3:1,1,4
3:7 4:1,6,12,21
15:22 16:2,4,12
17:21 18:17,20,22
60:25 61:3,20
62:19,23 94:23,24
102:5 103:1,23
104:25 105:21
108:9,19 113:2
116:21 160:20
224:7 234:6,11,15
286:16,17,18
287:12,12 295:19
296:14,22 304:7
305:1,1
**earlier**  122:1
152:22 185:9
254:12 279:9
290:2
**early**  250:5
**ease**  34:22
**easily**  52:20
**east**  10:13
**eastern**  155:3
237:1
**easy**  175:10
**eat**  50:1

**economic**  215:23
**ed**  4:20 73:25
102:12,19 103:15
104:22 114:21,22
114:24 115:6
117:1 118:7
120:20 150:25
151:22 211:3
212:2 222:18
242:2 270:11
273:6 296:1
**edfraley**  15:24
**education**  110:24
**edward**  1:8,14 3:2
4:3,8 5:2,9,23
**ef**  23:17,21
**effect**  54:15 221:8
238:14,18
**effort**  234:20
**eight**  50:25 51:15
82:12 123:15
243:19
**either**  6:4 53:17
62:20 104:10
**el**  23:17,22
**elaborated**  58:12
**eldorado**  142:2
**electronic**  260:18
304:10
**electronically**
259:21 260:16
**else's**  238:16
**emergencies**
136:24
**emergency**  136:24
**employ**  150:7,12
150:17
**employee**  88:21
113:12 117:22
118:15 216:12,19
230:5,11 305:12

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

**[employee - factory]**

305:14
**employees** 45:15
138:14,15,16,19
216:3 220:19,24
221:4 230:1,3
254:24 256:13
259:16 268:8
274:10
**employer's** 283:25
**employment** 38:17
111:24 112:2
**empty** 184:19
**encouraged** 190:7
190:11,18
**ended** 115:7
**ends** 86:4
**enjoy** 261:10
**enjoying** 261:10
**enkema** 94:20,25
95:9 182:6 248:11
275:12 276:11,24
286:13,25 287:12
288:9,23 291:16
292:3,24 293:14
293:19,20 296:9
296:10,20,22
299:15
**enkema's** 293:12
**entail** 83:7,10
**entailed** 83:8
**enter** 181:20
**entirely** 129:6
**entities** 115:9
120:19 134:15,23
**entity** 121:10
123:4,7 139:5
145:14 172:1
205:25
**entry** 124:3
**erin** 2:9 56:4

**especially** 78:20
215:21
**establish** 264:1
**estates** 229:17
**evening** 74:7
90:12
**event** 287:25
**events** 247:13
260:25
**eventually** 300:18
**everybody** 8:6,8
34:18 63:24 69:15
69:17,25 138:23
154:8 159:5
166:10,12,15
168:12 169:11,22
177:5 190:16
221:2 246:9 252:6
261:9 300:3
**everybody's** 76:17
78:3 143:5 149:10
169:12
**evidence** 294:21
**exact** 290:5
**exactly** 61:6
**examination** 4:4
5:5 105:8
**examine** 102:6
**examined** 305:6
**example** 64:20
120:5 126:11
168:20,22 170:4
177:16 178:2
185:22 191:16
220:24 234:21
**exception** 78:22
159:21
**exceptions** 66:1
**excess** 111:21
**exchange** 269:1
280:2

**exclusive** 169:17
169:23 173:10
176:7 187:18
246:14
**exclusively** 169:21
181:12 191:2
**exclusivity** 177:21
178:6,12,20 179:2
222:1 245:6
**excuse** 46:25 57:5
60:8 77:22 137:23
197:4 211:6
213:18 214:12
270:11 275:9
293:13 300:13
**excuses** 262:14
**exhibit** 4:8,9,10,12
4:13,14,15,16,17
4:18,19,20,21 5:19
5:22 7:8,16 100:2
100:5 101:1,4
107:24 185:9
234:2,5 235:6
236:7,11 238:6
255:5,8,9 256:16
256:19,22,22,25
258:4,7,8 261:15
261:21 266:20
267:1,2 268:25
278:1,4 279:3,7
280:1 295:9,13,13
297:13
**exhibits** 4:24
258:13
**existing** 222:7
266:6
**exocranial** 168:22
168:23
**expect** 78:10,25
165:6 182:11
216:12

**expectation** 39:20
**expected** 63:15
272:9
**expensive** 125:6
215:4
**explain** 41:20
115:15 118:21
125:23 130:14
135:1 143:13
149:5 150:13
162:18 164:2
176:17 206:4
252:6 254:16
**explained** 95:12
110:13 147:25
152:18 284:5
**express** 88:24
**extend** 181:18
**exteriors** 225:21
226:3
**extra** 106:10

**f**

**f** 108:9,9 160:20
305:1
**face** 251:18
**facebook** 4:17
261:21 262:1
278:5,25
**facility** 129:13
192:16,17 278:19
**facsimile** 257:6
258:8
**fact** 75:1 194:23
200:8 221:15
**factor** 105:24
**factored** 131:1
**factory** 37:4 57:14
93:22 122:11
129:3 131:6
180:11 183:3,4,14
191:9,10 192:3,5

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

**[factory - follow]**

195:15 198:25
208:5 253:7
262:24 265:18
273:7,12
**facts** 294:20
296:18
**fade** 87:4,5
**fair** 28:22 148:16
180:3 181:4
189:24 206:15
216:8 218:6 248:4
299:4,8
**fairly** 238:8
**faith** 81:8
**familiar** 5:24 6:7
93:6 199:7 200:23
202:14 210:6
215:17 216:21
235:20
**family** 24:17,18,21
24:24 25:7,12,14
159:21,22,23,24
159:25 160:5
169:9,18 170:5
176:6,20,24 194:3
194:11 195:19
**family's** 25:13
**fane** 1:18 3:3
**far** 10:24 20:11
23:25 24:5 28:22
38:18 41:4 82:10
116:3 117:21
119:6 120:25
122:5,6 124:6,7
153:20 158:17,18
175:1,16 181:15
195:18 198:15
203:8 204:12
215:24 217:1
221:21 226:17
228:4 235:19

246:8 248:2
254:22 257:4
**farley** 255:5
256:16 258:4
**farm** 10:13
**farris** 22:23
**fayetteville** 80:23
169:15
**feature** 101:5
**fee** 160:12,13
168:8
**feeding** 154:19
**feel** 52:15 57:19
59:22 71:8,9,11
102:18 175:12
223:11 246:1
282:3,5 289:20
291:13
**feeling** 46:7
116:12 223:21
273:1
**fees** 38:21 39:18
39:21
**feet** 51:4,5 84:7,18
84:25 85:6 173:15
175:9 227:24
**fellow** 72:18
**felt** 81:9
**fence** 76:3,5
114:12
**fifteen** 42:23 98:23
**fifty** 13:14 28:3,3
**fight** 165:14
**figure** 52:24 84:18
179:18 182:6
216:17 220:22
224:1 282:21
**figured** 53:19
285:6
**filed** 4:24 7:17
40:2

**filing** 301:9
**fill** 58:20 87:9
158:10,15 183:21
183:22
**filled** 78:25 94:3
137:18
**final** 76:15
**finally** 75:1
**financial** 116:18
157:16
**financially** 302:13
305:15
**find** 12:12 49:21
67:6 159:11
**finding** 15:4
213:15
**fine** 44:5 56:6
106:18 107:1,3,17
172:10 202:15,16
202:18,22 203:3,6
203:11,16 210:6
210:14 285:17
286:10 289:22
292:21
**finish** 7:4 45:8
70:12 72:13,14
78:20 86:3 90:25
212:21 230:8
274:14 280:14
**fired** 209:1
**fireplace** 22:19,19
22:20,23,24
262:18
**firm** 39:12,13
**first** 5:3,12 58:18
58:19 59:7 63:21
82:13 88:15 91:24
100:21,23 101:10
107:25 108:2,3,5
110:11 133:5
151:18 170:22

175:7,12 185:12
199:20 231:3
239:6 240:19,19
241:12,18 242:9
243:8 248:10
251:7 262:5
263:11 273:20
287:2,3,7 290:4,7
291:13 295:20
**firsthand** 7:22,25
9:1
**fish** 30:25 31:1
32:4 42:1
**fished** 31:2,15
**fishing** 19:16
31:11,18,24 37:2
97:2
**five** 25:5 27:21
31:14,14 37:18,18
95:16,17 102:21
145:24 148:17
233:24 251:4
277:19 285:8
298:1
**fix** 8:21
**fixed** 8:23 160:17
160:19,19
**fixing** 78:18
**flat** 41:3
**flaw** 82:1
**flip** 273:10
**floor** 109:3
**florida** 23:18
70:24
**focus** 101:7 242:10
**folks** 77:5 81:7
88:25 203:23
**follow** 53:17,18,19
93:2 176:11,18
178:10 180:14
212:8,12

**[followed - give]**

followed   92:22
169:18 170:6
following   160:6
169:9 213:21
follows   5:4
foot   8:14 11:7 38:4
38:7,9,10 84:17
271:5
footage   179:18,21
ford   86:17
foregoing   6:14
form   237:9
formed   135:21
forward   101:24
104:15 117:13,14
258:23 259:20
289:21
forwarded   259:3
found   15:6,7 58:15
58:23 213:11
253:24
foundation   62:21
158:4 208:23
221:19 231:24
286:1
four   11:25 12:2
23:13,20 24:4
25:21 28:25,25
30:22 65:3 100:11
148:17 152:9
280:15,17
fourth   2:19
fraley   1:9,14 3:2
4:3,8,20 5:2,9,10
5:19,24 12:5
13:12 14:6,7
19:23 21:3,8
56:13 80:4,11,21
99:17,24 100:2
101:1 102:12,13
104:22 112:12,18

113:7 114:20,21
114:22,24 115:2,6
115:7,21 116:16
117:1,2 118:7
120:8,20 130:1,5,8
130:18 133:5
134:9,11,12,18
136:3,18 138:11
138:14,18,24
142:12 150:25
151:1,22 202:21
203:10 210:9
211:3,10 212:2,2
214:21 215:6
229:6 234:2
236:11 261:15
266:20 270:11
278:1 279:3
285:20 295:9
296:1 303:17,19
304:8
fraley's   99:19
131:17 138:19
frankly   289:8
free   151:14
freeze   23:3
freight   133:23
134:3,3 184:6,11
friday   232:19
friend   39:5 40:21
40:22 41:11 59:17
59:19,21 77:16
90:3 198:16 201:5
218:24 219:1,3
friends   27:5 28:13
31:18 41:8,9
59:17 68:17,20
122:22 200:13
201:4,7 217:12,14
218:21,22,22
221:1 251:13,14

259:16
front   49:14 69:18
175:22 196:12
234:15 244:22
268:25 296:3
298:25
fuel   125:10
fulfill   152:20
266:6
fulfilled   181:15
full   9:24 84:10
108:11,16,17
112:14 174:14
184:3 303:20
fully   35:20 68:7
fulton   235:12
fungible   303:3
furniture   202:15
202:16,18,22
203:3,7,11,16
210:7,11,14
further   100:1
235:11

**g**

g   20:4 108:19
210:16
g.f.   92:19
game   302:16
games   18:4
gap   158:11
garage   185:4
generally   163:6
176:13
george   79:6 123:2
279:13,14,22,24
294:15 295:19
georgia   70:22
130:6 135:16
getting   14:23
35:23 37:16 38:5
41:19 50:8,13

55:12 78:4 91:6
132:15 137:6
148:5,25 149:3
157:23 175:11
178:24 179:14
184:23 190:15
195:16 206:5
235:10,13,21
237:1,12 238:3
261:8 269:20
273:15 275:3
282:8 283:1
289:10 298:6
299:25 300:4
giattina   2:6,7 5:14
105:25 107:14,18
207:22 234:8,11
255:11 261:25
287:10 291:18,24
gift   13:15
girardeau   71:25
72:18
girls   166:15
give   27:11,12 28:8
38:14 46:9 49:10
49:15,22 53:14
58:18 82:25 83:1
83:5 99:9 105:8
105:10 126:12
137:12,14 147:25
164:11 168:21
181:18 182:17
183:11 184:9
185:21 238:10
246:14 263:16,20
264:5 271:5
272:15 273:4
274:14 286:8
288:17 289:2
298:23 303:20

**[given - greg]**

| | | | |
|---|---|---|---|
| **given**  110:9 | 183:7 189:16 | 76:7,24 77:19 | **golf**  217:19 |
| 158:22 174:10 | 190:25 192:21 | 81:24 82:3 86:24 | **golfer**  218:4 |
| **gives**  137:13 | 193:10 205:10,13 | 88:12,19 96:11 | **good**  13:15 15:21 |
| **giving**  174:14 | 205:17 209:21,25 | 97:12 99:25 100:4 | 28:13 30:17 34:25 |
| 272:22 | 211:23 212:6,23 | 101:3,6,22,24 | 42:4 52:15 54:12 |
| **glad**  277:21,22,23 | 213:15 216:15 | 102:2,24 103:7,12 | 54:13,14 57:8,19 |
| **gmail.com**  2:15 | 221:19 225:6,8,11 | 103:20,21,25 | 67:9 69:11 70:2 |
| **go**  6:12,22 8:20 | 228:15 230:25 | 106:23 125:5 | 73:11 74:10 75:8 |
| 19:4,8,9 21:8,19 | 231:25 232:5 | 128:4,17,20 | 77:12,13,14 81:7 |
| 23:25,25 24:6,18 | 233:19 234:20,24 | 142:11,13 144:10 | 86:14 118:12 |
| 26:8 30:5 32:10 | 235:19 236:13 | 144:13 153:22 | 137:19 147:23 |
| 33:3,5 35:14 37:9 | 245:25 250:12,13 | 158:7 167:13 | 163:13 164:3,4,5,7 |
| 37:10,11 38:18 | 251:3 252:5,13 | 168:14 170:23 | 164:13 180:2 |
| 43:7 44:12 45:22 | 256:24 264:5,7,9 | 173:17 174:19,23 | 188:6 207:2 |
| 46:10 47:19,21,22 | 273:8 277:7 | 176:7,21,22 | 214:14 215:2,3 |
| 48:7,9 49:24 | 279:17 289:21 | 183:25 187:21 | 251:14 267:24 |
| 51:24 55:24 56:10 | 290:3 292:16,16 | 189:12 190:2 | 269:18 270:14 |
| 56:15 57:8 60:13 | 297:2,3,5 301:24 | 191:5 219:20 | 271:5,8,19,21,23 |
| 64:6 65:4 66:10 | **goal**  119:12,13 | 224:12 225:11 | 272:10,14,22 |
| 72:16 85:16 86:6 | 147:10 | 232:14 233:5 | 282:5 286:20 |
| 86:24 88:8,19 | **god**  72:6 80:9 | 234:4 235:4,6,15 | 289:16 |
| 91:3 92:5,8 93:2 | **god's**  251:16,17 | 235:16 236:6,7 | **goodness**  272:25 |
| 98:16 99:15 | **goes**  103:14 | 239:14 240:18 | **gooseneck**  278:20 |
| 102:20 104:4,6,15 | 120:25 126:3 | 244:19 245:9 | **gosh**  25:23 |
| 104:17 105:18 | 128:23,23 140:24 | 246:8 250:19 | **gotta**  63:24,25 |
| 107:15 111:6,8,13 | 166:10 242:23 | 251:2 252:6 255:7 | 76:18 |
| 116:10,13 133:3,4 | 246:8 278:21 | 256:24 258:6 | **gps**  49:23 |
| 133:7,8 134:14 | 298:22 | 264:9,11 265:14 | **grade**  110:25 |
| 135:11 140:16,19 | **going**  5:22 6:24 | 265:15,16,17 | **grades**  124:4 |
| 141:2 142:10,16 | 8:17 12:12 15:3 | 266:9,11,25 | **graduate**  111:2 |
| 143:12 144:1,17 | 16:20 20:23 25:13 | 270:17 271:3,4,17 | **grandbabies**  18:3 |
| 144:23 158:4 | 27:6 35:8 38:1 | 271:18,21,23 | 18:3 47:16 261:12 |
| 159:19,20 163:3 | 44:15,17,18,19 | 272:3 273:3,4,8,13 | **granddaughter** |
| 164:18 165:13,17 | 45:25 46:3 47:23 | 273:19,19 276:8 | 44:4 |
| 165:19 166:11,14 | 48:5,12,19 56:11 | 278:3 279:5,15 | **grant**  161:24 |
| 166:17,22 167:12 | 56:25 58:9 60:1 | 280:8,10 284:3 | **granted**  181:6,8 |
| 167:16,22 168:18 | 63:23 65:2 66:10 | 287:8 294:25 | **graves**  232:8 |
| 168:24 169:1,8 | 66:11 67:12,15 | 295:12 296:2,6 | **great**  273:2 |
| 171:14 172:2 | 68:4,5 70:8,9,10 | 297:22 298:16 | **green**  175:10 |
| 174:4 175:13 | 70:23,25 71:6 | 303:6,6,9,11 | **greg**  196:8,10 |
| 177:23 178:8,22 | 72:14 74:11 76:6 | | |

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

[griffin - high]

**griffin** 198:4,18
  199:1
**griffin's** 198:23
**group** 31:17
  105:10
**grow** 168:13,15,19
  171:3 234:23
**growing** 81:4
  168:18
**grown** 139:11,13
**guarantee** 173:14
**guess** 17:20 24:12
  42:4 68:17 88:20
  107:1 111:16
  112:23 113:5
  115:4 136:10
  250:2 254:8 281:8
  303:22
**guessing** 12:18
  51:6 80:16 186:6
  186:7
**guy** 273:2 284:7
  284:11 294:14
**guys** 11:17 106:12
  107:16 287:10

**h**

**h** 4:6 23:7,8 113:2
  210:16
**half** 11:6 46:10,10
  90:18 214:9
**hall** 294:5
**hallway** 277:9
  291:6
**hand** 5:21 100:4
  101:3 234:4
  235:15 255:7
  258:6 261:20
  266:25 278:3
  295:12 305:16
**handed** 248:16

**handling** 130:19
  153:20
**hands** 133:11
  271:19
**hang** 40:23,25
  41:13 42:11
**hanging** 41:4
  279:18
**hank** 203:4
**hank's** 202:14,16
  202:18,22 203:2,2
  203:6,11,16 210:6
  210:11,14
**hanna** 232:8
**happen** 86:9
  128:17 135:14,17
  156:9 170:1
  176:25 182:11,13
  196:22 204:21
  245:20 260:3
  265:7
**happened** 80:15
  80:19 118:1
  128:13,15 194:9
  195:9,21 213:12
  259:24 260:24
  281:11
**happening** 36:10
  36:12 301:10
**happenstance**
  213:12
**happy** 61:25 93:25
  119:11,12,13
  144:19 155:19
**hard** 45:9 142:7
  142:16 169:20
  214:4 238:11
  240:21 273:11
**harder** 54:17,20
**harm** 82:6

**harold** 226:11,12
**harrison** 211:21
  211:24
**harry** 3:7
**hate** 77:15 265:6
**hattiesburg** 210:5
**he'll** 221:17
**head** 61:2 69:20
  69:21 96:9,15
  123:16 171:19,20
**headquarters** 65:1
  227:25
**heads** 211:18
**health** 14:10 26:7
**hear** 6:3 8:5,7,18
  55:4 68:20 213:1
  228:12 233:5
  234:9 252:10
  272:10 292:25
  293:1,4
**heard** 55:1 123:4
  139:5 173:18
  193:25 198:3
  207:6,8 212:24
  213:2 221:7
  225:21 226:5,9,22
  227:14 228:19,21
  229:16 232:10
  251:20 253:12,14
  262:15 281:18,20
  281:21 288:19,22
  292:22 293:24
**hearing** 253:21,22
  255:10 304:3
**heart** 99:9 272:25
  285:22
**heber** 236:20
**hedrick** 73:19,24
**hell** 125:13
**help** 6:6 8:14
  40:19 41:3 82:23

88:19 126:16
  134:20 159:12
  163:17 173:23
  175:8,18 227:23
  233:16,19 237:14
  270:18
**helped** 86:19
  206:1 239:6
**helping** 19:19
  39:11 40:18 206:2
**helps** 49:7,8
**hereinbefore**
  305:10
**hesch** 1:8 2:17
  3:12 21:18,24
  24:16 45:5,7,12
  46:12,21 48:6
  51:25 53:7 56:16
  57:6,7 58:2 59:9
  60:5,8 82:11,13
  89:19 98:2 152:7
  154:24 158:6
  210:21 217:22
  223:23,24 225:8
  225:12,16 252:8
  252:19 254:1,3
  265:9 267:8
  269:16,23,24
  270:2 271:7,11,21
  272:9,13,21 284:4
  284:10,18 285:21
  299:11,20,23
  301:6 302:9
**hesch's** 219:16
  269:5 270:11
**hey** 68:20 78:15
  78:23 131:5
  259:16 273:6
  294:8
**high** 111:3,18,23
  111:24 112:2

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

**[high - industry]**

124:3,6
**higher** 246:20
**highest** 110:24
**highlighted** 4:13
235:4,7,8
**hill** 215:12,14
**hire** 55:8 113:21
**hired** 55:3,7
117:19,20,21
225:16
**hires** 240:10
**hiring** 224:18
**history** 89:4,6
**hit** 177:24
**hobbies** 41:25
**hodge** 2:7
**hold** 51:15 88:7
245:24 265:20
280:25 292:9
**holding** 178:3
**home** 23:2 57:4
73:6 95:25 96:9
106:6 120:16
142:22 239:7
250:13 251:4,9
266:15 290:16
**homes** 142:23
143:5
**honest** 232:13,21
**honestly** 39:15
82:8 125:14 133:3
254:17 297:5
**honor** 170:11
265:14,14,16
**honorable** 169:21
**honorably** 214:2,7
**honored** 169:6,22
**honoring** 97:17
159:9
**hood** 86:16

**hook** 48:5
**hop** 250:11
**hope** 13:15 59:20
**hopefully** 278:17
**hoping** 98:15
**horner** 146:25
147:4,4,8,14 148:2
148:7,25 149:3
187:13 188:4
**hot** 92:7,11 93:8
147:11,12 187:13
188:4 207:7
235:14
**hour** 232:18
285:16
**hours** 19:1,4
248:25 249:20
287:18
**house** 2:3 10:21
11:7 13:17 15:12
26:23 33:17,18
46:18,19 47:3,20
47:21,22 49:19
78:19 125:5
158:15
**houses** 47:23
**housing** 25:7
159:21 160:6
169:9,19 170:5
176:6,20
**how's** 44:4
**huge** 102:14
278:19
**huh** 16:1 20:4,17
22:21 23:9 30:12
33:12,14 69:1,8
76:21 84:22 93:9
123:14 185:10
186:22 187:2
279:15 283:21

**humidity** 87:1
**hundred** 46:9
66:22,25 67:1
70:22 85:1,2,6
165:5 182:5 201:7
204:23 205:1
222:22 244:9
262:7 276:3
**hung** 268:6
**hunt** 11:14 26:2
30:5,21 32:4
40:24 41:1,13
217:15,16 218:2
**hunted** 26:18
251:15
**hunting** 11:13
26:9 27:6 29:25
31:22 34:11 37:1
37:2 42:1 82:14
82:15 90:1,13
97:2 218:1
**hunts** 39:11 41:25
**hurry** 131:8
**hurt** 302:13

**i**

**idea** 42:15 53:13
68:14,14 70:7
106:1 126:18
157:4 158:8 207:5
215:2,4 224:22
225:18 231:11
239:7 254:9 264:3
264:4 267:9
272:17 275:24
300:23
**ideas** 37:12
**identification** 5:20
100:3 101:2 234:3
236:12 255:6
256:17 258:5
261:16 266:21

278:2 279:4
295:10
**identified** 24:3
**illiterate** 17:20
88:16
**impact** 102:14
**important** 86:22
137:7
**impossible** 8:5
**impression** 219:12
**improve** 142:16
**inaccurate** 240:20
**incentive** 97:8,10
**incentives** 158:22
**incident** 72:7
**include** 125:17,20
197:14 224:7
240:2 242:19
**included** 235:17
**including** 216:4
252:9
**income** 118:18,20
118:22 206:21
**incorporated**
99:20
**incorrect** 243:9
**increase** 119:6
**indefinite** 181:5
**independent**
118:13 119:1
129:7
**indication** 106:23
**indirectly** 116:24
120:20 151:2
156:10 220:11
**individual** 134:14
163:15
**individuals** 130:3
145:1
**industry** 125:15
152:17 154:14

[industry - japan]

173:19 215:20
**inform** 204:17
  208:20
**information** 9:20
  68:8 78:13 81:4
  216:4,11,18 244:5
  258:17 259:5,11
  260:19 268:9
**informed** 94:1
  209:4
**infrastructure**
  83:19
**inhouse** 293:15
**injunction** 36:14
  36:19 95:18
**inn** 13:5,6
**inquire** 164:14
  266:5
**ins** 175:17
**inside** 28:5 208:10
**install** 57:11,12
  185:18 188:19
  192:8,14 208:16
**installation** 7:10
  125:19 185:14,20
  185:23 186:3,10
  186:12
**installed** 126:1
  186:5 200:11
**installer** 7:14 57:8
  194:13,17 203:4
**installers** 44:21
  186:20 187:4
  188:14
**installing** 189:1
  240:14 242:25,25
**installs** 240:13
  241:2 242:23
**instance** 72:18
  77:5

**instruct** 101:23
**instructed** 298:15
**instructs** 298:17
**insurance** 14:11
**intact** 14:9,10
**intent** 170:17
**intention** 172:24
**intentionally**
  213:10 261:4
**intentions** 52:5
**interchange** 154:8
  154:9
**interest** 116:15,18
  117:3 157:17
  172:1 215:23
  222:21
**interested** 46:16
  224:17 272:11
  305:15
**internationally**
  127:7
**internet** 257:19
**interrupt** 6:2 8:5
**introduce** 56:19
  57:1 104:10
  107:11 196:8,11
**introduced** 44:13
  45:6,11 105:3
  147:1,2 194:24
  198:13
**introduction**
  196:14,16
**inventory** 50:21
  50:22,24 84:3,5
  137:15 155:14,15
  155:17 180:18
  208:11 231:17
  280:25 281:3,9,10
**investigate** 213:8
**investigation**
  60:22

**invited** 47:20
**invoice** 87:18
**invoices** 181:1
  296:5
**involved** 46:1
  53:24 80:16
  115:20 130:24
  132:11 138:8
  146:7,14 147:22
  148:15 172:11
  187:11 188:25
  215:8 231:7
  273:25 288:15
  290:10
**involving** 261:2
**ipad** 56:9
**iphone** 17:15
**iron** 92:10
**islands** 32:20,24
**issue** 42:19 94:10
  109:14 266:9
  293:19
**issues** 26:7 79:23
  80:2,2 92:15
  93:14 163:18
**it'd** 65:4
**items** 7:23 51:17

**j**

**j** 113:2
**j.b.** 27:25 121:25
  122:16,17,20
**j.b.'s** 122:15
**j.j.** 203:3
**james** 2:3,3 4:4
  5:6,10,21 6:5,7
  8:13,20,23 12:20
  39:12,13 56:10,13
  62:24 63:2 72:17
  81:16,19 82:3,5
  88:8,11 99:12,20
  100:4 101:3,13,18

101:22 102:2,7,23
  103:5,12,14,24
  104:4,8 105:7,18
  105:24 106:9
  107:4,13,20 144:9
  144:12,14,19,25
  145:6,13 158:9
  174:6,8 178:1,11
  178:16,25 186:1
  207:24 208:22,25
  214:13,18 216:8
  216:21 219:11
  221:22 223:25
  224:3 232:1,4,5
  234:4,14 236:13
  237:7,10 242:5
  245:9,15 246:3
  251:23,25 252:16
  255:7,13 256:18
  258:6 260:24
  261:17 262:2,4
  266:22 278:3
  279:5 285:17,20
  286:1,5,12 287:13
  289:20,24 290:6
  291:19,23 292:8
  292:14,16,20,22
  294:22,25 295:4,8
  295:11 298:1,4,9
  298:14,18,24
  301:14,17 303:5
  303:13,17,21
  304:8
**jamesandhouse....**
  2:5
**jane** 1:16 305:3,21
**january** 4:12
  25:25 26:3 234:6
  234:15
**japan** 127:5

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

**[jason - know]**

**jason**  3:3 12:15
39:8 95:5,6,8
99:14 102:21
104:21 105:16
106:10 107:4
**jay**  203:18 210:10
210:10
**jcsmith**  3:6
**jeff**  21:14 22:1,2
78:17 80:12,13,21
163:25 164:1,3
169:15
**jm**  1:6
**job**  24:17 43:6
78:21 86:10 112:8
118:9 119:5 126:4
126:6 128:11
129:4 163:25
188:6 200:15
202:14 203:6,13
**jobber**  191:14
208:4,6,8
**jobbers**  240:3
**jobs**  151:6,9
208:10,19 300:23
**jody**  79:6,7 123:2
279:13,14,22,24
294:11,12,14
295:19
**jody's**  138:5
**john**  94:20 112:25
113:1 116:1,6
136:11,11,17
138:24 182:6
215:6 248:11
250:21 251:3,10
275:12,17,24
276:11,24 286:13
286:24 288:9,23
290:15,19,25
291:1,3,11,16

292:2 293:8,12,14
293:18 294:1
296:10
**john's**  250:22
**johnson**  226:11,12
226:13 230:17,19
**join**  81:17
**joined**  55:25 56:1
111:25 112:3
114:3
**joining**  112:9
113:24
**joint**  39:23
**joking**  277:22
**jones**  70:22 299:3
**jonesboro**  21:18
44:25 46:13,22
47:19 49:25 50:10
52:1 53:17,25
56:15 60:6,16
67:20,21 74:2,13
82:14 83:4 98:10
98:12 155:7
204:14 219:20
229:24 237:13
252:19 254:2
264:17,19,24
278:18,20
**judge**  110:2
**judgment**  85:25
**july**  261:9,11
283:2
**jump**  70:8 101:12
123:15
**jumped**  76:3,5
**june**  44:8,9 45:12
46:21 50:11 51:24
56:14 59:5,6 60:4
61:5,6,11 62:19
63:3,7,20 68:2
74:3,14 78:25

247:18 255:22
263:13
**jury**  110:3,5
**justin**  21:14 80:12
80:13,21 222:10

**k**

**k**  286:16 287:12
**k1**  118:20
**kansas**  22:6
145:19
**kaput**  56:9
**keep**  14:10 15:21
17:25 18:9,13,20
54:16,17,19 89:25
90:2 97:11 103:21
119:11,12,13
155:19 158:20
174:13 281:3,6
**keeping**  77:25
78:3 87:3 119:8
137:15
**keeps**  184:23
**kennedy**  56:2
**kept**  14:9 43:5
277:21,22,23
**kid**  40:18
**kill**  251:16
**kind**  6:2 11:12,21
17:13 32:14,19
41:17,18 55:9
71:15 84:13 105:6
127:20 128:2
169:12 174:20
181:16 182:16
195:11 202:1,6
211:16,18 216:6
227:24 252:5
271:2 272:23
**kindness**  285:22
**kingdom**  297:21

**klaman**  203:3,18
210:10,10
**knew**  48:1 56:1
58:6,8,9,25 68:5,7
73:12,14 79:1
88:17 91:24
191:23,23,23,24
231:6 257:21,25
258:2,16,20 259:2
259:13 260:12,15
260:18,23 263:13
275:3,14 277:16
277:18 280:7
283:18 284:2,3
297:2 302:12
**know**  5:17,18 8:6
17:17,18 18:24
25:4 27:4 28:3,4,6
28:11 29:9 34:6
35:9,10,17,24
36:11,12 39:15,23
39:25 40:7 41:20
41:22 42:8,17,18
42:18 43:10,13,20
43:21 44:17,18,20
44:23 49:13,15
51:11 53:7,15,20
53:21 55:1,2,3,11
55:22 56:2,6 58:7
58:11,13 62:6,11
62:15 64:21 65:1
68:3,6,11 69:4,7,9
70:9,10 71:2,6,8,9
71:18 72:13,13
73:9,25 75:10,12
77:13 78:5,7 79:2
80:15,17,24,24
81:13 89:5,16
91:13 92:25 94:9
95:19 96:7,13,16
96:19 98:3,11,21

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

**[know - left]**

99:21 100:15
101:15 107:1
116:3 122:5,6,8,19
125:13,19 127:4,4
127:6,6,9,12,18
128:15 129:19
130:24 131:24
132:22 133:2
134:2 135:1,6,16
135:23 136:12,14
136:15 137:5
138:7,12,23 139:9
142:23 151:5
154:13 157:4,11
157:12 158:7,17
159:10 166:13
167:18 168:5
169:2,3,13 170:22
171:2 174:16
175:1,19 176:1
177:9,9,12 178:18
179:3 181:20,22
182:13,21 183:10
186:6 189:8 191:4
192:6 193:15,16
193:17 194:9
195:10,13,17,18
195:20 196:22,24
197:1,7,17 198:2
198:18,20 199:3
200:7,15 201:16
201:16 202:12
203:2,8,18 204:6
204:12,25 205:5
207:8,16,17
209:20,24 210:8
210:13,18 212:20
214:19,20,21,23
214:23,25 215:5,9
215:10,10,14,16
216:3 217:1,3,4,6

217:13,21 218:16
219:9,10,12,14,18
219:20,21,24
220:2 222:22
225:9,15 226:4,11
226:13,17,17,21
226:23 227:2,3,5
227:10,12,19
228:5,11,21 229:3
229:5,15 230:14
230:15 231:8,10
231:11 232:8,16
232:22,23,24
233:1 237:7
239:10,16 240:2
244:7,11,14 248:2
248:19 250:18
253:17 254:7,8,10
254:17,20,22
255:1 256:6
257:23 259:18
262:11,20,25
265:7,10 267:10
269:9 270:20
271:20 272:21
273:13 274:5
275:20 278:10,21
281:14 283:19,24
284:1,6,8 285:5
286:4,19 290:5
291:1,3 293:6
295:4,17 296:5,16
297:6,10 298:22
300:17,19,22,25
302:4 303:8
**knowledge**  6:11
6:15 7:22,23,25
9:2,5 96:20
141:25 162:2
177:13 198:10
221:23 229:11,12

231:3 241:16
243:12 255:4
281:17 293:10
297:20 300:20
**known**  29:22
40:13 82:11
103:15 182:8
184:17 198:3
221:12 232:17
**knows**  24:18,22
36:5,18 69:15,17
69:25 135:13,18
169:12,14 185:3

**l**

**l**  97:25 108:19,19
234:7 286:16
**label**  5:22 236:7
**labeled**  5:23 100:5
101:4 234:5 255:8
256:19,21 258:7
261:20 267:1
278:4 279:6
295:12
**labeling**  256:22
**labels**  127:23,25
**labor**  35:4,4,18
79:23
**lacks**  62:21 158:4
208:22 221:19
231:24 286:1
**laid**  26:5
**lake**  10:25 11:1
26:20 31:2 211:15
211:19 236:23
261:14
**lakeside**  200:24
201:1,8,12,19
202:2,10 222:11
222:24
**landscaping**
108:20

**laptop**  16:25 17:7
105:20
**large**  159:14
**largest**  141:22
**lassiter**  2:10
**lasted**  203:22
**lathe**  51:21
**law**  3:7 39:12,13
**lawsuit**  36:4,7
40:11 43:14 95:1
95:10 119:24
248:9 268:5,11
273:21,23,23
274:7,11 276:1
277:4 287:9,19
290:9,21,22
291:11 292:6
301:9
**lawsuit's**  40:2
**lawyer**  292:19
**lay**  60:11 251:4
**lead**  137:6
**leading**  90:9
**lean**  163:13
**learned**  147:17
**learning**  175:17
**lease**  138:10
**leasing**  50:18
**leave**  14:15,17
279:17
**leaving**  47:18
96:17
**lee**  11:4 12:5 78:17
80:12,21 92:19
136:11,17 163:25
169:15 214:21
215:5
**lee's**  12:9 164:1
**leek**  21:14 22:2
**left**  14:8 47:19
52:11 168:25

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

**[left - lumberyard]**

169:3,5 225:5
260:11 281:16
**legal**  81:13,23
152:5 177:5
260:21 277:25
296:2
**legally**  277:14
**legit**  90:24 92:18
**leslie**  111:3,3
**lesser**  246:14
**lester**  200:7,12,18
200:20,21 201:5
301:2
**letter**  24:12
294:18
**letting**  259:18
**level**  110:24 124:3
**lie**  232:15
**liked**  118:10
**limit**  117:12
**limited**  190:12
239:11,19 241:7
241:14 242:11,17
243:4
**limiting**  224:6
**line**  126:14
**lisa**  79:9,10
**list**  24:8 74:9
123:14 152:22
178:19
**listed**  177:6 259:7
295:24
**listen**  71:17,18
**lists**  216:4
**literally**  184:22
**literate**  16:22
**little**  2:4,8,11,20
3:9 6:5 10:17 11:9
11:13,23 17:14
18:5 31:14 34:21
40:18 42:19,24

43:1 65:2 75:25
84:9 89:25 92:21
95:2 112:7 145:19
145:19 146:9,19
163:12,21 170:3,5
170:14 175:17
178:10 185:3
196:4 197:9,9
200:16 201:6,22
202:19,23 203:7
203:21 204:3
211:16 235:10,11
235:21 253:15,18
254:10 264:10,11
264:22 273:4
282:7,18 289:8
**live**  10:6,16,21
13:2 33:9 114:14
164:12 175:8
**lived**  10:14,17
114:16
**living**  71:16 77:14
112:7
**llc**  1:4,8 2:16
115:14 134:25
139:6,9 295:25
**llp**  1:18 3:3
**load**  51:2,4 183:20
183:23 184:18
**loads**  51:1,15
148:9,10 152:8
220:7
**located**  19:24
204:1 227:11
228:22
**location**  122:10
160:17,19 190:22
**locations**  122:3
132:1 193:11
**locator**  177:10
191:16

**lodge**  11:9,10,12
11:13,21,23 13:18
26:25 27:8,13
28:17,17 29:18,19
29:25 31:21 49:9
49:11 82:19 90:13
**lodges**  34:11
**logan**  10:17
**logged**  183:12
**lone**  238:4
**long**  10:14,21
13:13 16:10 18:25
23:22 25:1 27:19
32:12 34:2 35:7
40:13 42:12,21
46:6 47:4,8 57:4
58:14 72:5 82:11
90:14 98:21,22
107:2 113:11
135:20 141:3
158:14 159:3
170:10 172:10
182:21 193:23,24
209:15 223:7
225:5 239:2
243:16 248:23
250:14 268:19,20
280:13 281:13
282:12,15
**longer**  80:10
150:11,17 204:18
209:19 222:15
223:4 228:16
263:7
**look**  44:22 61:7
86:14,24 98:24
106:15 163:3
185:11 209:25
235:8 239:9
247:11 255:20
257:1 258:10

262:21 268:7,11
276:8 277:20
291:12 297:14
301:24
**looked**  44:21
106:14 185:9
256:4 285:7
**looking**  86:10
107:24 190:24
235:5 260:10
263:4 269:24
280:1
**looks**  86:23 126:22
262:6
**lord**  12:10
**losing**  59:16,19,21
77:15
**lost**  65:4 178:4
287:14
**lot**  18:4,15 19:4,9
19:15 29:9 32:11
36:8 38:25 64:22
74:17 75:14 143:3
166:21 180:3
183:25 188:4
277:1
**lots**  78:4 283:7
**lottery**  111:10
**louisiana**  31:5,10
31:18 206:6
**loved**  88:20
**low**  251:4
**loyal**  48:14 165:3
165:6,7
**loyalty**  165:3
166:3
**lucky**  111:17,19
**lumber**  147:14
**lumberyard**
147:16

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

**[lump - materials]**

**lump** 153:5,7
**lunch** 105:13
  106:12 159:5
  175:14 266:23

**m**

**m** 97:25 210:16
  287:12
**ma'am** 269:8
**mack's** 26:13,16
  27:2 49:15
**madder** 137:22,22
**magazine** 4:10
  101:6 168:4
**mail** 4:12,21 15:22
  16:2,4,12 17:21
  60:25 61:3,20
  62:19,23 102:5
  103:1,23 104:25
  116:21 234:6,15
  295:19 296:14,22
**mailing** 234:11
**mails** 18:17,20,22
  105:21 224:7
**main** 32:11 141:9
  172:11 233:12
  252:1,4
**maintained**
  260:15
**maintenance**
  119:9
**majority** 172:12
  233:13
**making** 9:21 38:5
  68:7 90:19 186:12
  186:14 220:4,5
**man** 46:9 67:9
  68:16,17,18,18
  73:19,21,21,22
  98:2 114:1,6
  257:8 274:23
  277:7 283:24

**manager** 113:19
  123:3
**mandatory** 167:7
  192:1
**manmade** 65:17
  65:17,18 86:23
**manner** 81:11
  277:25
**manual** 182:16
**manuals** 182:15
**manufacture**
  35:22
**manufactured**
  123:18
**manufacturer**
  119:3 125:25
  128:24
**manufacturer's**
  119:5
**manufacturers**
  70:3
**manufacturing**
  121:7
**map** 4:13 213:22
  213:24 214:5,6,6
  234:17 235:6
**march** 7:17
  110:14
**marion** 26:10,12
  26:13
**marion's** 28:19
**mark** 235:16
**marked** 4:7 5:19
  100:2 101:1 234:2
  236:11 255:5
  256:16 258:4
  261:15 266:20
  278:1 279:3 295:9
**market** 128:16,17
  128:18 142:3
  164:13 178:7

  246:5,7 299:18
**marketing** 178:11
**marketplace**
  127:14 178:13
**markings** 236:9
**married** 13:11,13
  71:15
**martin** 207:19,19
**marty** 1:8 2:16
  3:12 21:18,24
  24:16 44:13,13,17
  44:25 45:3,5,7,12
  46:12,14,17,21,23
  47:8,12,19 48:5
  49:22,24 50:23
  52:6,7,8,10 53:7,9
  53:19,20 55:5
  56:16 57:1,5,6,7
  57:19 58:2 59:8
  60:5,8,14 67:7,8
  67:10,14 82:11,13
  89:19 98:1 152:7
  154:24 158:6
  210:21 217:21
  219:15,16 223:23
  223:24 224:17,18
  224:24 225:6,8,12
  252:8,19,20 254:1
  254:3,11 262:6
  264:10,16 265:9
  265:15 266:3
  267:7,9 269:5,15
  269:16,17,23,24
  270:2,10,16,16,16
  270:18,21 271:3,7
  271:11,21 272:3,9
  272:13,15,20,23
  284:4,5,10,18
  285:20 299:10,20
  299:23 301:6
  302:9

**marty's** 50:7
  55:12 57:24 155:2
  231:13
**mary** 57:1
**mason** 112:5
  186:22,24,25
  198:7 210:12
**masonry** 14:6,7
  19:23 21:3,8
  40:17 51:18,23
  80:4,11 102:13
  103:16 108:2
  112:12,19 113:7
  114:20,21,23,24
  115:6,7,21 116:16
  117:2,2 118:7
  120:8,20 130:1,5,8
  130:18 133:5
  134:10,18 136:3
  136:18 138:11,14
  138:24 142:12
  145:16 146:2
  150:25 151:1,22
  156:7,10 188:12
  202:21 203:10
  210:9,13,17 211:3
  211:11 212:2
  229:2,6 239:12,20
  240:5,8,13,24
  241:3,15 242:13
  243:2,4
**masons** 192:22
**match** 86:8,17
**material** 38:1 86:5
  152:19 153:20
  188:17 265:22
**materials** 7:11
  23:17,21 24:13,15
  37:14 38:5 91:6
  182:3

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

[mathematician - mistaken]

**mathematician** 150:3
**matter** 74:25 200:8
**maxwell** 33:17,18
**mccollum** 26:11 26:13 28:9 29:16 49:9
**mccollum's** 29:19 49:11
**mcdaniel** 2:18,19 8:4
**meals** 30:8
**mean** 10:6 14:21 15:2 18:12,13 24:13,23 25:18 33:24 40:16 43:19 49:6,8 50:20 55:12,16 57:3 58:23 59:12,15,25 62:13,13 64:3,4,12 64:20,22 67:17 70:4 71:14,16,18 73:4 75:9 76:20 76:21 77:13 80:1 80:16 81:1 83:2 84:8 86:23 87:23 91:5 92:17 93:16 95:4 106:1 112:20 115:15 120:25 122:7,8 123:11,14 124:2,9 127:5 128:4 129:10 134:9,24 137:4 138:14 139:16 140:23,24 142:4,7 142:11 143:11 144:5 148:17 149:5 150:14 158:16,17 163:12 163:15,16,24

168:19 169:14 170:2,15 173:20 174:19 175:16 177:4 179:21 182:24 185:16,21 186:2 190:2 192:1 192:4 201:23 202:6 208:16 213:21 216:18 220:22,23 224:1,3 231:6 232:25 233:11 235:20 236:3 241:4 246:13 249:13,14 254:8 258:10 260:9,10 273:3 280:11 289:18 292:15
**means** 64:5 87:16 87:17 173:18 183:1,16,17 185:17 191:7 236:4 269:10
**measured** 51:13
**medications** 174:17
**medium** 127:15
**meet** 46:12,22 47:2,4 52:1 56:16 82:13 98:22 117:24 166:14,15 250:14
**meeting** 44:15 49:18 51:25 52:3 56:14 96:12 253:15,18,20,25 254:3 264:13,23 277:7 286:13 288:1 289:3,11,25 293:18 302:8

**meetings** 33:25 97:16 159:1,4,6 224:4,6 289:6 290:3,15
**meets** 163:4 166:12
**megan** 1:7 2:13,14 40:2,4 43:23 44:3 44:7 47:12,15 53:2,5 54:24 74:4 74:6 89:11,13 96:17,23 223:9,12 223:14 225:15 232:12,15,18 253:7 262:19,22 281:15
**megansims71** 2:15
**member** 31:21 120:14,16
**memberships** 34:10
**memphis** 148:23 204:12 205:11,14 210:3 227:15,18 228:2,8,14,15,20
**mention** 224:13,14
**mentor** 102:8
**mentored** 102:15
**mercy** 246:23
**mess** 45:8
**message** 4:18,19 4:20 62:22 267:3
**messages** 18:8,14 274:24
**met** 5:11,15 47:6 98:22 118:11 195:15 198:19 243:15 250:8
**meth** 150:16,20
**method** 16:16

**michelle** 12:24
**microphone** 8:9 8:24
**mid** 90:8 124:3
**middle** 101:8
**midrange** 127:16
**midst** 298:20
**miles** 20:12
**mind** 12:12 39:1 59:1 173:5 186:8
**mine** 38:14 39:6 76:7 88:22 192:7 221:10 232:11 241:9
**minimal** 163:8
**minimum** 168:10
**minute** 47:18 75:17 130:4 272:7
**minutes** 47:5,7 98:23 100:12 102:21 148:6 233:25 250:15 267:20 285:9 298:2
**mischaracterizat...** 291:20
**mississippi** 137:1 148:18 205:15 206:5 210:5 214:11
**missouri** 1:20 3:5 10:8,9 11:9,11,22 19:25 21:16 129:24,25 145:18 211:12,15,18 248:22 305:4
**misspelled** 269:7
**misstated** 278:25
**misstates** 231:25
**mistaken** 188:9

Page 25
Bushman Reporting
A Veritext Company
800-556-8974
www.veritext.com
Exhibit 1

**[molds - new]**

**molds** 280:20
**mom** 203:21
**moment** 7:7 29:15
183:11 261:5
270:5 277:16
**moments** 9:18
267:3
**monday** 13:14
**money** 48:13
55:19 85:7 143:18
165:18,21 179:25
180:2,3 184:1
186:13,14 196:2
198:1 205:22
206:2 207:13
220:4,5,8 221:8
225:16 246:6,6
253:1,3 279:20,21
**month** 21:9,10
116:12
**monthly** 181:1
**months** 37:10,11
37:18,19 179:22
203:22 206:1
209:17
**morning** 5:11 57:4
98:15 105:10,12
116:13 188:16,22
249:7 257:24
282:23
**morrison** 143:4
**motel** 33:18
**motion** 99:19
**mountain** 23:2
73:6 229:17
**move** 25:15 74:12
94:12 237:9 238:9
252:21,23 264:6
297:25
**moved** 50:8,13
51:14 112:11

133:12
**moving** 50:12
264:4
**mow** 256:18
**mud** 256:23
**muffled** 6:2
**multi** 24:17,18,21
24:24 25:7,8,12,13
25:14 31:6,8
159:21,22,23,24
159:25 160:5
169:9,18 170:5
176:6,19,24 194:3
194:11 195:19
**multiple** 191:19
280:16
**murdaugh** 210:16
**mute** 251:23
**muted** 304:6
**mutual** 27:5
**mwbfirm.com**
2:20,21

**n**

**n** 2:1 3:1,8 4:1
23:7,8 94:23,23,24
97:25 108:9 113:2
229:14 286:16,18
287:12
**nail** 289:24
**nam** 111:6,8
**name** 5:7,10 11:3
12:23,25 22:12,22
23:1,19 26:15,21
29:13,16 33:7
72:1 73:16,23
79:5,8,10 82:6
94:21 98:3 113:9
114:8 128:1,3,25
147:12 167:10,20
173:12 192:23
193:17 198:4

203:5 225:25
262:14 286:14
**named** 87:8 98:2
**names** 21:20 24:7
38:15 92:25
100:13 232:10
**nap** 289:19
**narrowed** 171:1
**nashville** 15:13
33:11 37:4 122:11
133:24 166:11
192:20 193:3,4,11
225:22 227:25
248:17,24 249:21
253:8 281:1,4
287:18 293:5
**natural** 65:7,12
108:1 112:5
124:22,25 125:6
**nature** 174:18
**near** 7:10
**necessarily** 158:1
231:2
**necessary** 116:14
**need** 39:1 52:24
55:24 65:1 69:8
69:23 74:8 92:1
106:16 107:10
110:15 116:13
131:5 134:10
143:13 154:11
166:13 174:10
175:14 176:11
178:10 183:19
188:16 245:2
250:9 251:23
252:18 255:2
265:8 266:3
289:14,16 299:11
302:5,18

**needed** 54:16
76:14 86:3 131:8
159:11 200:11
223:11,14 233:15
271:9,18 300:24
**needing** 79:1
152:21 297:6
300:10
**needs** 136:23
154:7 277:13
294:23
**negative** 233:3
**neither** 170:23
**nephew** 122:16,17
**nervous** 34:18
**never** 15:18 40:12
41:1 47:14,20
48:23 49:20 51:13
54:21 66:25 67:12
67:17 73:2 74:6
78:4 89:12,15
90:11 91:19 92:10
98:12 118:15
119:22 128:10,13
141:5 156:22,23
156:24 162:15
164:11 166:22
167:22 170:15
181:15 182:12,12
187:9 196:1
200:20 207:6
215:24 224:13
228:23 229:23
230:6,15 232:10
232:15 257:5
279:2,21 297:17
**nevertheless**
303:11,21
**new** 37:12,12
44:24 50:8,9,9,12
50:14 67:18 175:8

Page 26

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

**[new - okay]**

188:8 206:11,12
252:20 302:16
**news**  176:5,14,17
**nice**  38:25 75:11
272:24
**nick**  232:8
**night**  57:4 106:5
249:8,15 264:8
**nine**  51:1,15
**ninety**  85:6
**noncompete**
215:17 216:25
**noncompetes**
254:23
**nope**  250:4 266:24
290:8
**normally**  158:14
158:20
**north**  129:23
130:6 131:23
204:3 235:11
**northern**  131:18
131:19 133:7,9
136:6,9,22 139:1,6
139:7 180:5,9
214:9
**northwest**  212:3
**note**  4:24
**notes**  99:24 301:1
301:23
**notice**  1:17 137:13
172:23 257:24
269:19 303:18
**noticed**  303:18
**notification**
263:16
**notified**  90:16
225:10 263:6
**notify**  90:5 225:6
225:7

**notifying**  93:20
**november**  25:24
**number**  13:21
15:14 17:17 20:5
81:20,23 95:20
96:14 111:18
118:11 256:8
266:4 269:4,5,15
269:16 270:11
272:5,8
**numbers**  216:5
294:14

**o**

**o**  20:4 97:25 113:2
229:14
**o'clock**  106:5
174:8 249:7 250:6
257:24 282:23
**oak**  238:4 254:13
**oaks**  193:25 194:2
194:16,24 195:10
195:21,23 196:3,8
196:9,10,16,22
197:4,9,12,18
199:4 207:24
209:5,6 227:10,13
254:21
**oath**  5:3 109:21
**object**  173:1 237:9
303:16
**objection**  81:12,18
108:24 152:4
177:23 178:8,14
178:22 208:22
216:15 219:8
223:25 245:24,25
286:6,7 298:11
**objections**  109:11
**obligation**  109:24
**obviously**  48:1

**ocala**  23:18
**occasions**  191:19
**occur**  126:8 141:8
141:19
**occurred**  247:13
275:11 281:19
296:13
**octavian**  203:14
203:20
**offer**  173:8
**offered**  104:9
**office**  2:4 19:15,18
19:22 20:13,14
21:1 24:19 50:7,8
50:9,9,12,15,15,17
54:5 56:6 64:14
83:16 102:25
104:21 113:4,5
116:4,5 160:25
161:1 180:20,21
182:22 230:2
249:5,18 250:2,22
268:3 291:6,7
293:12 297:1,2
**offices**  1:18 3:7
20:19 34:17
229:22 291:10
**officially**  277:24
**offshore**  79:24
**oh**  10:15 12:10
23:13 25:6,23
30:22 32:8 34:24
35:12 37:18,25
47:5 50:22 51:5
72:6 80:9 93:16
116:11 117:14
122:17 123:11
193:22 249:9
271:13 277:20
286:9 288:7 293:4
297:10

**okay**  9:15 13:7
15:1 16:24 17:19
18:17,23 20:13,25
21:14 22:5,17,25
28:20 39:9 45:3
55:23 57:12,18
58:17 59:6 62:1,2
62:3,10,24 63:17
66:12 67:24 74:1
75:21 81:5 84:4
84:20 85:6,13
86:6,11 87:22
93:1 95:8,20 99:8
107:13 110:16,17
115:6 117:12,16
118:5,8 122:19
130:2 133:25
135:15 136:25
138:6 139:18
141:6,12 147:3,6
150:6 153:2,5
154:2 158:14
160:4 161:10
171:10 172:22
173:24 175:7
177:13 186:1,8
187:3 190:5
212:22 213:22
215:9 235:19
236:6,10 238:9
239:24 240:16
243:8 247:4
251:10 253:23
255:13 257:3
258:3,16 262:21
263:13,21 264:18
265:11 266:4,12
269:12 277:5,18
287:17 288:17
289:18 290:17
292:14 293:3,7,17

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

**[okay - pardue]**

293:24 296:17
297:12 298:9
299:2
**oklahoma** 22:18
145:20
**olathe** 22:6
**old** 12:14 30:16
33:19 50:15
**once** 19:10,20 44:1
75:4 149:9 166:11
168:15 171:17
175:2,3 189:11
198:19 230:12
244:15
**one's** 129:22,23
225:19
**ones** 38:12 111:19
152:25 230:2
235:16,17 239:4
293:9
**open** 24:25 58:4,9
75:19 92:1 136:25
137:2 158:23
168:25 169:3
171:8,10 176:7
202:7,9 211:16,24
212:1 214:9 227:1
231:11 235:25
236:2,18,18
237:23 257:13
**opened** 203:24
**opening** 57:25
58:2 82:23 231:4
278:17
**operate** 138:19
145:13
**operates** 138:13
**operation** 26:6
132:8 147:13
**opportunity** 48:13
58:18,19 82:25

83:1,5,7 148:1
158:8 162:9
168:23 173:1
190:9
**oral** 180:25 181:5
**order** 4:9 78:24
99:19 100:7,19
105:8 106:19
140:7 156:23,24
158:15 183:5,6,17
184:15,18,20
281:5 296:4
**ordered** 129:2
**ordering** 137:6
**orders** 38:8 77:25
78:3,7 94:3
137:18 156:21
157:5 158:17
266:6 273:8,14
295:24 296:3
297:13 299:10
**organizations**
120:14
**orientation** 182:17
**original** 4:24
117:18 235:4
236:8
**outs** 175:17
**outside** 92:16
96:20 141:25
151:12,25 159:16
171:5 184:13
185:19 186:5
192:7 230:3
234:20,21,24
289:19 294:4
**outsource** 126:10
**outstanding** 296:5
297:14
**owe** 143:17

**owed** 165:18 182:4
**owes** 165:16
**owned** 27:19,23
117:5 136:10,20
**owner** 27:16,23
102:13 112:16,18
113:12 172:11,12
**owners** 27:17 28:6
121:22
**ownership** 115:10
116:15 117:3
**ownerships** 34:10
**owns** 27:2 50:18
116:2 121:18
130:2,5,6,7,11,20
132:1 133:15
134:17 136:9,15
136:18 139:9
**ozark** 19:25 20:9
113:9 129:23,25
130:9
**ozarks** 211:16,19

**p**

**p** 2:1,1 3:1,1
**p.a.** 2:3
**p.m.** 271:7
**pace** 173:16
**package** 270:18
271:2
**page** 4:2 6:12
101:8,9,10 108:2
185:12 262:5,13
262:17,21 273:10
**pages** 256:3
**paid** 38:4,6,7,9,13
87:14,19 116:23
133:25 179:11,12
179:13,15,16
182:2 195:16
220:13 225:16
296:3,5

**paige** 44:2 47:18
**pallet** 84:15,20,25
85:1,3
**pallets** 85:15
**paragraph** 7:12
9:17 101:8 107:25
108:3,5 185:11
188:10 234:17
239:9 240:19,19
241:12 242:8
243:9 255:15,21
263:5
**paralegal** 105:12
105:18
**pardon** 111:7
**pardue** 27:11,12
27:15,19,22 28:8
28:10,14,20 29:21
30:21 32:4 34:8
35:20,21,25 36:7
36:25 49:3 63:12
63:20 64:2 67:2
71:17 72:9,19,23
76:10 89:22 94:15
117:24 121:21
122:22 126:11
166:9 167:12,16
172:6 192:13,25
198:17 204:17
206:16 209:1,9,11
217:22 221:7
228:8,10 244:11
244:25,25 245:2
250:16,20,25
255:2 258:25
259:1,3,21 261:17
263:20 267:11
275:10 277:7
279:25 282:19
285:1,5 286:25
288:24 293:20,22

Bushman Reporting
A Veritext Company
800-556-8974
www.veritext.com

**Exhibit 1**

**[pardue - pieces]**

294:8 296:11,21
299:15
**pardue's** 33:5
  95:20 96:13
  192:17 217:7
  218:7,13,14
  225:24
**paris** 22:17
**parking** 19:4
  184:21 185:4
**part** 39:13,14
  55:16 80:4,10,21
  80:22 114:2
  121:12 166:3
  205:18 211:24
  237:1,18 256:20
**partial** 27:23
**partially** 50:13
**participate** 223:22
**participating**
  304:4
**particular** 246:5
**parties** 305:13
**partner** 112:23,24
**partnership**
  115:14 118:22
**party** 186:20
  187:4 188:13
  194:13,17 292:19
**paso** 23:17,22
**passing** 303:22
**pat** 5:10 6:2
  101:11 103:10
**pat's** 105:6
**patrick** 2:3
**pay** 39:1,17,17,21
  87:11,13,17 134:4
  149:16,22 160:11
  160:12 168:8
  181:1,23,25 182:4
  244:22

**paying** 38:20
**payment** 149:5,7
**payments** 138:2
  149:10
**payroll** 55:9,10
**pays** 16:5 130:22
  134:2
**peel** 105:21
**pegg** 148:17,21,22
  204:5,6,7,11,13,17
  204:23 205:6,17
  205:23 206:18,25
  208:20 209:7,13
  209:22 210:19
  213:2 227:16,23
  230:21,22 243:23
  244:1,2,12
**pegg's** 205:10,13
  210:2
**pen** 235:15
**penalty** 6:13
**pending** 110:19
**people** 15:19
  16:17 34:17,21
  38:25 41:12,17,18
  49:7,8 78:10
  81:21 131:15
  153:19 154:19
  164:10,14 166:13
  170:3 184:10
  185:19 189:20
  234:16 249:15
  300:10
**people's** 47:23
**percent** 35:12 46:9
  66:22,25 67:1
  70:23 87:14,18,21
  149:13,16,24
  150:2,4 165:5
  172:8,9 186:3,4
  201:7 204:23

205:1 222:22
  244:9 262:7 276:3
**perfectly** 90:23
**performance**
  179:8
**performed** 240:6
  240:8
**performing** 241:3
**performs** 239:12
  239:19 241:7,15
  242:12 243:4
**peril** 295:3,7
**period** 77:21,24
  87:13 90:14
  117:12 121:23
  161:20 181:5,8
  250:17 276:20,21
  301:3,8
**periodically** 62:14
**perjury** 6:13
**permission** 92:1,3
  92:4 158:9 169:8
**person** 9:21 36:22
  36:23 105:1 128:4
  172:1 198:3
  248:10 252:4
  262:5 268:2
  272:23 276:12,13
  304:1
**personal** 7:23 9:4
  39:5 41:19 90:2
  140:4 152:13
  157:16 217:6,11
**personally** 14:2
  30:19 44:11
  145:10,12 179:6
**phase** 302:18,19
**phases** 102:15
**philosophy** 48:10
**phone** 14:9 15:14
  15:17,18 16:8,19

17:5,11,13,14 18:1
  18:4,13 36:22,24
  40:1 52:21 63:21
  64:21 68:9 95:22
  95:23,24 96:1,8,12
  96:14 102:24
  116:22 247:25
  255:17,18 256:8
  257:9,12 260:11
  260:16,20 266:10
  266:14 267:17
  268:20 270:1,3
  276:9,11 277:14
  277:25 282:8
  283:9 284:21
  285:23 286:22
  290:6,8 291:4
  293:23,23 294:2
  294:10 300:9
  302:1,1,6
**phones** 15:19
  251:24 266:19
**photographs**
  104:13 258:13
**phrase** 212:24
  213:1 216:17
**physical** 132:1
**physically** 98:8
  238:10
**pick** 33:13 262:24
  270:3 297:7
**picked** 52:20
  232:19 270:1
**picture** 55:7 91:15
  91:23,25 105:23
**pictures** 91:21
**piece** 132:13,19
  193:20 227:20
  228:6,23
**pieces** 86:6

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

[pilot - process]

**pilot** 207:3
**pissy** 170:3
**pjames** 2:5
**place** 10:24 11:5
26:15 28:20 54:7
83:20 129:14
157:25 230:7
232:11 305:9
**placed** 156:21,22
167:1 299:9
**places** 26:10
154:10 215:21
**plaintiff** 1:5,15 2:2
188:11 191:19
239:12 240:13
241:5,7,15 242:12
263:6
**plaintiff's** 99:18
188:25 239:11,18
240:7,22,23 241:6
241:14 242:10,18
243:3
**plaintiffs** 303:17
**plan** 204:9
**planhub** 251:20
251:21
**plant** 15:12,13
33:19,19 35:1
37:16 72:1 78:10
78:23 121:7 126:2
138:8 166:12,14
166:15,17,23
292:21 297:9
**play** 18:3 19:15
**pleadings** 106:15
106:24
**please** 41:21 62:1
93:24 146:16
162:18 232:2
242:4 292:18

**plenty** 168:12,21
181:19 300:1
**pllc** 2:7,19 115:14
**plus** 142:25
**plymouth** 188:9
199:11
**pocket** 99:8,18
**point** 54:23 68:3
95:4 115:4 196:20
201:12 224:11
242:16 258:16
304:4
**points** 111:23
**poles** 19:16
**policy** 245:6
**pool** 26:20
**poorly** 194:15
**pop** 203:21
**portion** 214:15
245:11
**position** 104:20
112:8 117:18
119:18 122:19
298:19 299:1
**possible** 157:18
225:2
**post** 2:4 4:17
278:5
**posting** 262:22
**potential** 77:14
157:21 257:19
**potentially** 304:1
**potted** 292:20
**poured** 87:1
**practice** 221:13,23
221:23
**prairie** 26:13,16
27:2 238:1
**precast** 65:8,15
121:4 123:18

**prefer** 191:4
**preference** 126:22
222:1
**preferences** 216:5
216:6
**preferred** 16:16
183:25 191:25
**prefers** 191:1
**preliminary** 36:13
36:18
**prepare** 30:8
98:13
**prepared** 9:7
303:20
**prepurchase**
85:11
**presence** 264:1
**present** 3:10 47:10
**preserve** 266:11
**pretty** 7:10,15
8:18 30:17 88:16
189:18 214:14
236:4 237:12
267:24 292:7
**prevent** 245:6
**previous** 9:11
56:25 219:6
**price** 131:1 133:17
143:5 148:11
149:15 150:5
166:25 167:3,4,5,7
246:14,20 271:5,5
271:8 272:16,22
**pricing** 142:19,21
143:7 153:8,9
170:23 271:12,22
271:24 272:1
**principal** 222:9
**principals** 217:8
**prior** 93:20,25
94:5 231:25 280:7

292:1,3 305:6
**private** 27:1
**privilege** 110:19
298:10,13,21
**privileged** 99:25
**pro** 2:14 262:18
**probably** 12:18
14:16 16:11 17:18
20:12 21:9 25:23
27:21 30:3 36:23
37:1,2,5 42:22
48:18 50:25 51:5
52:22 72:6 74:10
74:19 79:4 85:8
89:17 90:18 99:9
113:14 123:14
125:9,9 127:16
135:22 145:25
158:19 177:25
182:7 186:3,4,5
188:7 209:19
220:1 223:8
232:17 235:22,23
248:1,8 250:15
252:14 256:23
269:8 270:8
274:18 288:3
302:7
**problem** 8:8,10,12
8:24 79:18 106:8
150:16 170:7
171:9 172:21
173:22,23 175:16
222:25 223:6
256:9 285:18
**problems** 93:11,14
109:11
**procedure** 245:6
**process** 110:14
166:6 167:13,23
171:15 179:13

**[process - questions]**

280:17
**produce** 99:25
123:24 273:8
**produces** 121:8
**producing** 274:6
**product** 68:13
78:11 79:19 82:21
86:24 108:10,25
109:4 124:1
125:24 127:22
132:4,5 135:3,5
137:7 143:13,20
143:23,25 144:2
144:15,21 147:11
153:16,17,23
155:13 166:24
176:22 180:9
181:7,10,24
184:15,23 188:8
189:1 190:15
192:9 198:8,11
199:13 209:23
210:9 213:9
226:19,20 228:9
230:24 233:21
238:15,16 241:1,2
242:22,24 245:16
248:7 280:19
281:10 299:7,12
300:17,24 302:17
302:22
**production** 35:10
37:17 78:9 79:14
79:16 93:22
184:16
**products** 48:8
65:17 70:14 108:1
109:7 118:10
119:9 123:17,19
127:1 135:19
143:10,25 144:6

145:9,16 146:2
148:8 153:18
156:8,10,14
160:16 161:25
173:5 185:13
187:12 188:1,8,11
188:13 189:2
191:2,6 199:8,12
199:15,19,24
200:2 213:5 222:2
245:7 246:17
300:12,15
**professional**
120:14
**prohibition** 171:4
**prohibitions**
172:15 177:19
**project** 86:3,4
92:20 176:20
186:4
**projects** 185:14
186:10
**promise** 173:14
**pronounce** 207:23
**proof** 150:19
**properly** 87:3
**property** 115:16
197:15 260:12
**prosperous** 157:22
218:19
**protect** 165:7,10
189:5
**protected** 189:7
189:21
**protective** 99:19
106:19
**proud** 90:4 102:18
**provia** 58:24
59:12 60:12 62:8
63:24 64:6,8,12,20
64:25 65:4 66:21

68:21 75:18 77:6
77:19 81:5 86:6
123:11 142:2
177:17 222:15,19
222:20 245:17,21
247:21 252:11
259:5,7 268:2
276:8 303:2
**provia's** 61:15
**provide** 104:11
168:11 177:22
271:21,23
**provided** 104:23
172:23 244:6
**provisions** 178:6
178:12,20 179:2
**psi** 124:8,13
**public** 75:20
**publishing** 258:21
**pull** 76:6 106:11
106:14 107:15
130:17 137:4
140:5 228:8
**pumice** 124:12
**purchase** 133:13
134:12 166:25
167:3 185:13
198:8,10 201:8,13
216:6 230:17
246:20
**purchased** 87:12
198:12 201:10
**purchaser** 172:9
**purchases** 244:17
**purchasing** 128:21
175:16 188:25
**purpose** 97:7
**pursuant** 1:17
**pushing** 153:18
**put** 49:22 55:9
85:24 104:24

105:19,19 107:7
113:12 138:4
163:13 183:23
184:1,16,20
190:24 252:21,23
252:25 254:5
257:19 271:3
288:8 289:12
292:24
**puts** 130:15
**putting** 86:16
293:19

**q**

**quads** 160:2
**qualified** 54:11
162:23,25
**qualify** 54:3,4
72:2 152:11
**quality** 124:17
**quantity** 152:18
**question** 7:4 16:20
59:8 70:12,15
72:15 74:8,12
82:1 88:23 90:25
105:15 110:18,18
110:20 134:22
144:8,17,22
151:23 153:5
168:14 187:16
197:16 214:14
237:8 239:17
242:2,3,6,8 254:11
259:12 291:24
298:7
**questioning**
303:16
**questions** 35:19
57:23 81:3 101:19
125:22 217:6
303:23 304:1,6

Bushman Reporting
A Veritext Company

**Exhibit 1**

**[quick - recollection]**

quick  107:16
  148:5 301:15
quicker  137:8
quickly  6:22
  124:11 168:17
  264:4 280:9 285:7
quit  34:5 43:3 75:1
  90:10 282:8
  292:14 295:4,8
quite  150:14
  176:12 254:5
quota  111:16
quote  212:18,19
  254:13,14 285:22

**r**

r  2:1,3 3:1 108:9
  108:19 113:2,2
  210:16 229:14
  305:1
r.j.  146:25 147:3,3
  147:6,8,22 148:7
  148:16,24 149:3,9
  187:13 188:4,5,6
rains  179:22
randy  1:7 2:13
  4:19 40:2,5,6,13
  40:20,23 41:4
  43:20 44:10,19
  45:6,11,22,25 46:7
  46:14,24,25 47:12
  52:1,4,6 53:1
  54:24 55:7 56:19
  56:23,24,24 57:6,7
  59:1,7,12 60:4,10
  62:5,7,20 63:6,21
  67:17 74:2,4,15
  88:12,18 89:9
  96:16,22 150:8,10
  150:12,16 175:17
  175:20 191:24
  220:25 223:7,12

224:8,11,13 225:7
  225:11,13,15
  230:4,10,15 231:9
  232:12,14,17
  246:24 247:6,23
  248:1,2 253:6
  254:1,1,4 256:11
  264:8,12,14,21
  267:25 278:5,10
  281:14 285:24
  288:2 301:18
  302:8
randy's  46:18,19
  47:3 49:18
range  124:3,16
  151:14
rank  127:14
  169:14
rate  197:23
ray  3:11 5:17
  59:18 147:18
  218:24 222:8
  234:7,16 238:13
  267:16 268:17
  274:17 285:25
  288:14,15
reaching  273:12
read  8:7 100:12
  214:13,16 239:14
  242:1,2 245:10,12
  257:10,11,12
  304:7
reading  108:4
  258:12
ready  107:10
  183:20 283:2
  289:21 299:17
real  6:22 26:2
  65:13 90:2 107:15
  130:16 155:18
  218:23 251:14

257:13 271:16
realize  47:9
  109:21 302:15
really  17:20 28:7
  32:5 36:8 43:16
  43:17 51:21 59:1
  59:17 61:1 75:9
  80:15 89:5,7,12,15
  92:10,24 106:1
  117:20 119:13
  122:20 125:20
  127:8 130:16
  134:2 135:23
  142:1,22 143:25
  145:4 146:6,6
  148:16 153:12
  156:6 160:8
  161:13 164:11
  168:5 169:20
  178:18 181:15
  182:22 187:9
  191:25 194:9
  195:9,17,19
  196:22 199:6
  200:3,20 201:21
  205:8 214:2,19
  215:3,10,14
  216:18,23 218:3
  218:23 227:19
  228:5 237:20
  239:16 242:7
  251:1 252:21
  254:19 263:25
  277:6 281:13
  284:6 290:15
  294:11
reason  42:2 69:8
  77:17 205:2 253:4
  293:6 303:9
reasonable  81:11
  104:17

reasons  42:5
  245:20
rebar  51:22
recall  48:24 49:2
  63:19 93:14 97:20
  100:10,17,23
  182:10 200:6
  225:3 230:16
  238:17,18,20
  239:4,5,8 247:3,6
  247:7 251:1
  260:25 261:5
  265:23 268:22,24
  273:15 276:22
  277:2 283:4,14
  289:6,7,11 290:12
  292:5 294:11
  299:24 300:11,14
  300:16 301:7,10
  301:13,17,22
receive  78:4 148:7
  212:15 227:7
  256:24 300:20
received  67:22,24
  206:21 220:10
  256:20,21 258:9
  258:13 287:19
  288:6
receiving  63:2
  282:12
reception  294:5
recess  56:12 104:7
  174:7 234:1
  285:19 298:3
  301:16
recipient  128:3
recognize  89:17
  262:4
recollection  74:22
  150:22 239:1

**[recommend - results]**

**recommend** 176:1
**recommended**
  71:20 72:8,19,22
**record** 5:8 8:20,22
  45:9 56:10 65:12
  69:23 81:16,19
  88:8,10 99:15,16
  99:21 101:19
  104:4,9,20 107:15
  107:19,21 214:16
  245:12 287:11
  303:12,16
**records** 98:24
  103:9 281:15,25
  283:25 285:23
  300:2,6 301:24
  302:6 303:8
**red** 26:20 235:15
**reduced** 305:10
**refer** 146:4
**referring** 139:19
  146:5 253:19
  285:13
**reflect** 302:1
**regard** 132:8
  186:10 300:12,15
  301:10
**regarding** 89:1
  100:18 200:2
  216:12 276:14
  288:24 290:18
**regardless** 202:8
**regional** 103:16
**regular** 37:17
  149:10
**regularly** 234:19
**rehab** 43:7
**reinstallation**
  125:18
**related** 50:2 261:3

**relating** 110:19
**relationship**
  140:12,17,20
  141:15 147:23
  156:16 159:15
  161:14,16,20
  181:4 217:7,9,11
  218:15
**relationships**
  142:17,18
**relative** 305:12,14
**relook** 256:4
**rely** 7:20 9:20 10:1
  74:11 110:5,6
  174:23
**remaining** 238:5
  299:10
**remember** 23:19
  25:6,24 40:9
  53:15 63:5,11
  71:25 72:3 74:21
  79:10 174:18
  193:24 200:1
  203:5 208:24
  209:20 225:1
  230:14 241:25
  247:25 248:3
  276:19 277:1,3
  284:20,22 290:4
  291:16 292:11,12
  297:5,7 298:8
  302:9,11
**remembering**
  289:14
**removing** 281:15
**renewal** 171:11,15
**rental** 115:16
**rep** 119:3,5 215:15
  228:16
**repeatedly** 285:24

**rephrase** 68:19
  93:24 142:24
  144:18 156:12
  176:11 242:5
  245:8
**replaced** 157:23
**replacement**
  125:17
**replicate** 126:24
**reporter** 5:20
  100:3 101:2
  214:16 234:3
  236:8,12 238:10
  245:10,12 255:6
  256:17 258:5
  261:16 266:21
  278:2 279:4
  295:10 305:4
**reporter's** 4:24
**repping** 14:22
  15:1 119:15
  151:20
**represent** 5:11
  95:3
**representation**
  234:22,25
**representative**
  173:19,21,25
  206:19 213:17
**representing**
  99:23 104:22
  251:8
**represents** 95:4
  234:18
**reps** 70:5,13,16,19
  148:15
**republic** 1:19 3:4
**request** 169:6
**requested** 214:15
  245:11

**require** 163:11
**required** 132:23
  160:11,12 162:17
  168:7 230:17
  244:22
**requirement** 85:9
  85:10,19 155:16
  155:18 172:22
**requirements**
  83:11 87:6 97:14
  160:15 161:10,12
  162:9 163:4,6
  177:21 180:13,15
**rescued** 266:16,18
**reserve** 303:7
**reside** 10:5
**residence** 13:18
**residences** 10:23
  11:8 13:19
**respect** 142:14,15
  189:20
**respected** 103:15
  160:5,9
**respects** 141:7
**respond** 280:9
**response** 99:18
**responsibilities**
  179:8
**rest** 7:14 15:8
  78:21 303:7,14
**restraining** 4:9
  100:6
**restrict** 160:10
**restrictions** 109:5
  167:1 171:24
  172:14 177:19
  187:3
**result** 60:15 296:8
**resulted** 296:14
**results** 262:14

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

**[resuming - rusty]**

| | | | |
|---|---|---|---|
| **resuming** 174:9 | 68:1,10,16 70:4,21 | 276:5 279:5 | 185:3 |
| **retail** 149:17 | 74:9,11 75:6,23 | 281:11 283:3 | **rows** 184:3 281:8 |
| 272:18 | 79:12 82:3 85:19 | 284:2 286:12,21 | **rt** 269:9,10 |
| **retaliated** 274:13 | 88:18 93:10 95:7 | 287:4,12,13 | **rudder** 112:25 |
| 274:16 | 96:4,6,16 99:11 | 294:17 295:11 | 113:1,11 114:14 |
| **review** 7:7 9:2 | 102:12 107:14,18 | 296:12 298:14,18 | 116:1,2 136:11,17 |
| **reviewed** 7:16 | 107:24 108:7 | 298:25 299:3 | 138:24 214:22 |
| 109:17 | 110:21,22 111:23 | 300:8 301:14 | 215:6 |
| **rhodes** 3:12 59:18 | 113:21 114:16 | 304:6 | **rule** 69:19,22 |
| 83:12 219:1,3 | 115:9,20 116:7 | **rights** 181:9 | **rules** 6:25 171:23 |
| 243:23,25 251:25 | 119:14 120:13 | **rime** 237:6 | 180:13,15 |
| 252:2 254:12 | 121:9,20 123:2 | **ring** 229:19 | **ruling** 218:12 |
| 265:4 266:5 267:7 | 124:15 125:16,21 | **road** 1:19 3:4 | **run** 23:22 78:20 |
| 269:1,2,11 270:12 | 125:23 129:23 | 10:13 19:6,8 24:1 | 90:18 139:1 |
| 272:13,21 279:8 | 135:17,18,25 | 28:18 180:4 | 279:11,16 280:8 |
| 280:3 285:24,25 | 136:19 137:17 | 187:12 249:16 | 280:10,16 281:8 |
| 288:12 | 139:8 145:6 146:1 | 277:20 | 295:24 |
| **rich** 148:5 | 147:15 148:24 | **rock** 2:4,8,11,20 | **rung** 225:25 |
| **richardson** 2:18 | 150:25 154:20 | 3:9 11:2 13:17 | **running** 14:23 |
| 6:1 56:3 81:17 | 155:10 158:18 | 31:2 65:2 92:21 | 102:23 180:4 |
| 101:11,14,15,20 | 163:14 164:20 | 170:5 202:19,23 | 193:23 278:18,20 |
| 101:25 102:4,20 | 169:7 170:25 | 203:7 204:3 | **runs** 25:25 193:8 |
| 103:3,10,20 104:2 | 174:13 176:4 | 261:14 264:10,11 | **russ** 143:3 |
| 105:5 106:18 | 177:1 178:19,25 | 264:22 | **rusty** 3:11 5:17,18 |
| 107:17 234:10,13 | 179:11 181:6 | **rockin** 73:17,18 | 11:7 24:17,22 |
| 237:3 303:23 | 183:11 184:25 | **roger** 122:13 | 29:1 54:6 59:18 |
| 304:10 | 187:12 188:2 | 244:12 | 76:21 83:12 84:9 |
| **rid** 223:12,14 | 189:9 191:11 | **rogersville** 10:8,10 | 85:24 88:21 |
| **ride** 73:11 | 209:15 211:18 | 10:11,18 | 128:25 130:16 |
| **right** 5:14,21 7:5,6 | 220:1,6 221:24 | **role** 119:2 175:4,6 | 147:9,18,18,21 |
| 7:16 11:21 13:9 | 222:11 223:1,3 | **room** 50:16,19 | 154:9 163:16,24 |
| 13:21 15:7,22 | 234:12,12,13,14 | 89:16 168:13,21 | 163:25 164:19 |
| 18:25 20:8,20 | 235:22,25 238:1,3 | 290:20 291:2,4 | 166:1 168:25 |
| 22:1 23:23 24:8 | 238:13 243:11,22 | 293:21,25 296:21 | 169:14 175:22 |
| 24:18 26:8 28:14 | 244:10 245:4,23 | **rougher** 170:14 | 178:3 181:16 |
| 28:18 29:15,21 | 246:3 249:17 | **roughly** 51:6 84:8 | 186:2 191:23 |
| 30:13 32:3,13 | 256:15 259:25 | 84:14 85:1,8 | 198:12 200:9,10 |
| 33:23 34:5,7 | 261:7 262:8,12 | 145:25 223:8 | 200:17 203:12 |
| 38:20 45:6 49:17 | 263:4 266:14 | **routine** 83:25 | 213:2 218:24 |
| 51:24 55:14 59:16 | 269:7 270:4 | **row** 183:13,21 | 222:7 233:12 |
| 60:18 61:24 63:6 | 272:17 273:18 | 184:15,19,20,22 | 234:6,16 238:13 |

**[rusty - seminars]**

249:17 263:11
267:16,24 268:2
268:17 270:7
273:20,21,24
285:25 287:8
288:11,14,15
295:25
**rusty's** 20:23
164:2 169:6

**s**

**s** 2:1,10 3:1 4:6
**sale** 208:19
**sales** 37:15 53:24
55:19 98:9 119:6
127:15 136:25
167:4 169:3 178:4
185:19 186:5
192:21 196:2
215:15 219:5,7,16
234:20
**salesman** 62:12
226:15
**saline** 93:4,6
**salter** 207:4,6,13
207:16
**sample** 262:24
**sat** 43:21 100:11
**saw** 100:14 109:18
146:15 224:8
257:4 279:2
**sawmill** 112:6
117:10
**saying** 58:4 65:20
80:25 106:16
150:20,22 199:19
220:1 233:3 251:1
262:15 275:21
294:18
**says** 6:13 65:1
102:12,19 103:14
185:12 234:17

239:11 240:7
241:5,6 242:9
258:12 262:8,12
262:17,23 263:5
269:9 273:6
278:15,21 280:5
295:23
**scan** 102:4,21
103:1,23 104:24
105:12,13,18
107:5
**scanned** 104:11
**scattered** 129:17
**scenario** 270:25
**school** 111:3,24
112:3
**scott** 2:18,20 70:22
101:14 234:8,8
261:25 303:22
**screen** 253:16
304:2
**screwed** 183:9
**se** 2:14
**seal** 305:16
**search** 213:7
**searcy** 164:20
235:21 237:2,14
237:15,16
**season** 11:19
25:19,23,25
**second** 15:19 88:7
88:9 101:7,9,12
174:5 234:12,17
262:12 289:7
**see** 7:9 8:3,21
48:10 57:1 61:3,7
67:16 74:2 86:25
91:23 94:10 99:12
99:14 100:12
101:9,20 102:5
107:10 108:2

131:9 156:23,24
157:1 158:12
175:13 205:16,17
223:5 243:14
257:1,15,16
258:11 262:9
289:13 300:3
304:2
**seeing** 100:24
**seek** 94:13 296:2
**seen** 29:22 44:3
91:21 100:7,8
158:21 227:13
253:15 261:22
278:6,7 295:14,20
297:17 300:6
**select** 119:7
**sell** 7:11,13 44:11
44:18 48:4,11,18
52:8,11 53:7 65:6
65:7,23 66:19,21
69:13 70:13 115:3
123:17,19 124:22
127:11 132:21,23
132:25 133:1
134:13 135:19
140:3,8 143:10,11
143:12,23,24,25
144:1,6,24 145:2,4
145:9,16 146:2
147:11 154:5
156:9,13 160:16
161:25 164:17,20
165:7 167:5,8
168:23 169:4,6
171:5 173:4
176:22 177:16,16
180:9,22 181:9,10
185:18 186:4,20
188:13,17 189:10
189:13 190:25

191:2 192:3,19
193:6 198:22
199:13 200:21
201:2 202:10,22
204:11,14 207:25
208:17,18 209:22
210:9 214:10
226:19 236:3
238:15 245:16,21
254:6
**selling** 44:16 45:1
55:21 64:8 65:3
66:10,13 68:21
69:3 77:6 92:16
93:11,16 108:7,25
109:6 119:7 141:3
151:19 153:25
155:4,5,6 156:7
157:17 170:12
171:5 187:3
190:14,19,22
191:5 195:3
199:22,23,24
200:16 204:10
206:10 208:5,21
209:2 213:4,9
219:24 221:16
222:19 228:9
229:7 248:6 252:8
252:17 254:9
269:17 299:6
302:22
**sells** 50:23 65:16
127:7 132:14
141:6 143:20
154:3 188:8 217:9
221:9 240:11
241:1 242:22
**semi** 200:14
**seminars** 33:21
111:21,22

**[send - sir]**

**send**  17:21,22
61:10,20 62:7
102:22 105:12,13
105:20 126:15
183:8 184:4
257:21 258:1
259:18 268:3
279:19 282:7
284:23 285:3,10
**sending**  74:3
105:23 259:17
268:8 274:6 282:4
283:8
**sense**  256:23
296:17
**sent**  55:6 58:4
60:25 61:8,17
62:6,8,10,18 63:7
74:14 75:3 91:14
91:24,25 104:11
193:14 247:20
255:16,25 259:4
271:6 272:5,8
279:21 282:19
284:13 285:2,5,12
296:6,13,14
**sentence**  8:19
240:19 241:12,18
242:9 243:8
**sentina**  15:3
**separate**  22:14
134:15,21,22
136:6
**separately**  147:20
147:21
**series**  81:3
**serve**  99:23 102:7
111:14 120:3,13
**served**  248:9,21
292:6

**service**  79:9 90:13
155:20
**serving**  213:17
**set**  54:1 104:1
105:13 140:9
141:2 142:10
145:5 148:19
152:9 157:24
158:7,10 184:12
190:7 206:11
252:4 253:10
285:15
**setting**  9:13
206:12
**seven**  82:12
123:15 248:25
249:20 287:17
**sexist**  68:18
**shades**  86:25
**shakes**  69:20
171:19
**shaking**  69:21
171:20
**shaped**  30:16
**share**  246:11,13
**shared**  106:25
**sharing**  101:17
**sheet**  167:7
**ship**  32:25 141:11
182:24 183:1,7,20
183:23,24 198:25
**shipped**  127:22
132:12 183:2
296:4 300:18
**shipper**  185:3
**shipping**  130:22
185:2
**ships**  156:25
**shit**  297:10
**shock**  242:7

**shockley**  21:15,16
80:12 222:10
**shoot**  251:18
**shop**  22:19,20,23
262:18 278:17
**short**  227:21
**shorthand**  305:9
**shots**  34:23 253:16
**show**  238:14
256:18 279:6
**showing**  235:7
**showroom**  162:24
163:1,2,7 166:7
182:18 205:10,13
231:14
**shows**  56:1 168:3
168:4 239:7
**shut**  32:14 35:5,7
211:5,7 238:16,22
244:2,4 260:1
**shutting**  238:20
243:23 244:1
**side**  125:5 200:16
284:6
**siding**  200:24
201:1,2,8,12,19
202:2,10 222:12
222:20,21,24
236:23
**sign**  304:7
**signature**  305:20
**sim**  44:13 46:23
**similar**  190:22
**similarly**  70:20
**sims**  1:7,7 2:13,13
2:14 4:19 40:2,3,4
40:6,13,20 43:23
44:7 45:3,7,11
46:24,25 47:11,12
49:18 52:1 53:2,2
53:5,11 54:24,24

56:19,23 57:5,6,8
59:2,7,12 60:4,10
62:6,7,20 63:6,21
68:9,11 74:2,4,5
74:15 88:12,18
89:1,9,11,13 96:17
96:17,22,23 150:8
150:12,16 175:18
175:20 191:24
220:25 223:7,9,12
223:18,21,23
224:8,11,13 225:6
225:7,13,15,16
230:4,10,15 231:9
232:12 246:24
247:6,23 248:1
253:6,7 254:1,1,4
262:19,22 264:8
264:12 278:6,10
281:14,15 285:24
288:2 297:8
301:18 302:8
304:2,2
**sir**  5:7,25 6:7 8:1
8:24 9:23 10:3,7
15:16 30:2 39:4
39:19,22 51:3
54:18 56:20 77:10
82:2 84:24 93:18
96:5 97:19 100:4
102:7,10 103:14
103:19 107:21
109:8,20,23 110:1
112:21 113:23
114:1 116:17
118:4,17 121:1
123:6 124:23
126:7 135:4
136:13,16 139:3
139:12 140:18
144:25 145:22

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

[sir - southern]

150:1 151:17
152:1 153:9
154:23 155:25
157:10 159:18
160:14,18,23
161:18 162:7
165:19 167:24
174:8 179:7
180:16 192:11,12
192:15 193:22,24
194:6 197:3
201:21 213:6
214:18 217:24
218:5 223:13
225:14 228:7
234:4,14 239:10
239:21 241:8,23
245:4 251:21
255:7,20 266:8,25
269:8 277:13
278:3,8,9,23
283:11,11 289:8
295:11,15 299:13
301:4,17,22
302:24 303:5
sit  9:13 20:16,18
20:21 116:8,9
297:21
site  126:4 128:11
129:4
sites  126:6
sits  131:2
sitting  8:14 104:15
135:18 178:5
184:19 294:4
situated  70:20
situation  58:16
71:1,7 73:3,4
138:1 146:24
160:6 166:1
175:15 179:24

182:13 254:21
six  15:8 21:12 24:3
26:6 37:10,11,18
37:18 78:19 103:9
145:24 153:1
206:1
size  28:22,23
30:17 32:5 89:23
158:16 161:10
168:10 197:8
256:4 266:2
skid  84:16,19,21
85:2,4,8,11,14,16
129:1 280:15,16
280:17
skids  78:19 84:17
134:10 183:18,18
184:1 280:16
sleep  19:3
slid  84:9
slow  79:19,22 84:9
178:24 220:7
slowed  37:25
174:20
small  50:17
203:21
smart  17:14
smarter  235:3
smith  3:3 8:11
12:16 55:24 56:5
62:21 63:1 72:12
81:12,25 88:7
95:8 99:10,15,17
102:25 104:19,21
107:9 144:7,11,16
144:22 145:3,11
152:4 158:4 174:4
177:23 178:8,14
178:22 185:24
216:7,15 219:8
221:19 231:24

232:3 233:24
242:1 245:24
252:12 255:12
260:21 285:15
286:10 289:22
290:1 291:14,21
292:4,9,15,18
294:20,24 295:2,6
298:6,12,23 299:2
303:11,15,25
smoke  212:18
213:3
smooth  98:16
sneak  251:21
social  40:22 41:8
41:10 96:25
socially  30:23 32:3
34:8 42:3 217:22
sold  48:21 49:16
80:13 112:21
115:2 118:2,9
120:21 127:1
128:25 131:12
132:18 133:4,5
144:15,20 148:8
151:1,2 154:16
170:4 190:16
197:13,18 199:18
201:17 210:10
222:24 246:17
281:10
sole  77:17
solely  199:23
solicit  189:25
solutions  108:2
solve  173:23
somebody  46:11
67:7 105:15 134:3
134:5 150:20
171:18 172:6
173:21 196:12

203:7
somebody's  93:17
son  10:24 12:4
19:14,17 20:14
24:16 80:22
112:22,23 115:2
115:25 118:2
120:21 135:18
136:11 147:6
son's  11:3 14:8
21:1 112:24
135:13 214:24
sons  12:7
sorry  6:1 8:4
12:11 33:15 45:10
69:22 70:11 75:7
75:8 91:1 97:9
101:11,15 105:7
105:16 108:12
171:21 209:7
229:16 230:9
237:4 283:11,11
287:14 299:22
sound  273:23
274:10 296:1
sounded  215:3
274:7
sounds  65:12
251:21 255:24
268:5 287:4
source  9:21
154:19 184:13
195:24
south  11:16
140:24 202:1
234:22
southeastern
155:3
southern  131:20
131:21

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

Exhibit 1

[speak - stone]

| | | | |
|---|---|---|---|
| **speak** 98:17 | **springs** 92:7,11 | 239:20 246:2 | 80:2,3 81:2,7 82:5 |
| 171:21 291:25 | 93:8 147:11,12 | 248:8 274:17 | 82:17 83:8,13,24 |
| **speaking** 304:3 | 187:14 188:4 | 299:8 | 84:1,14 86:2 87:3 |
| **spec** 142:22 143:2 | 202:3 207:7 | **states** 1:1 127:1,10 | 87:12 88:1,12,15 |
| 143:4 | 236:21 | 145:17 146:1 | 88:17,25 90:6,15 |
| **special** 25:12 | **square** 11:7 17:14 | 156:8,10 | 91:8,9 92:9,20 |
| 126:20,23 272:16 | 38:4,7,9,10 51:4,5 | **stay** 75:23 81:1 | 93:4,16,20,20 94:1 |
| **specifically** 56:18 | 84:7,17,25 85:1,6 | 101:18 | 94:14 96:17 98:6 |
| 142:8 | 173:15 179:21 | **stayed** 47:14 88:21 | 98:6,7 102:8,13 |
| **speculating** | 271:5 | 164:25 227:4 | 107:25 108:1,8,9 |
| 284:22 296:15 | **st** 32:23 | **steals** 283:24 | 108:11,13,25 |
| **speculation** 216:7 | **stabbed** 73:6 | **step** 299:18 | 109:6 112:5 114:4 |
| 252:12 286:2 | **stack** 106:24 | **stick** 189:18,19 | 118:10 121:3,4,4,6 |
| **speech** 303:6,10 | **stacy** 114:7 115:20 | **stock** 83:24 84:2 | 121:8,12,18,24 |
| **spell** 23:6 94:21,24 | **standby** 105:1,15 | 135:2,5 137:15 | 122:3 123:5,7,10 |
| 113:1 286:14,19 | **standing** 241:12 | 280:22 | 123:12,13,18,23 |
| **spelling** 287:11 | 241:19 | **stole** 262:2 284:1 | 123:25 124:10,12 |
| **spencer** 1:18 3:3 | **start** 44:15 77:22 | **stone** 1:4,7 2:16 | 124:22,22,25 |
| **spencerfane.com** | 84:6 85:22,23 | 5:11 15:3 21:21 | 125:6,12,24 |
| 3:6 | 91:5 101:21 | 21:22,23,25 22:4,7 | 126:12 127:13,18 |
| **spend** 19:12 221:8 | 112:12 222:19 | 22:10 24:8,10 | 127:20,21 128:1,2 |
| 261:11 | 224:10,11 227:22 | 27:7,16,20 28:8 | 128:21,22,25 |
| **spent** 116:6 197:9 | 229:7 280:13 | 29:11 37:12,13 | 129:1,2,2,3,9,12 |
| 232:17 | **started** 14:18,20 | 44:10,11,14,20 | 130:15,17,18,18 |
| **split** 105:5,9 | 15:1,4 40:14,15,18 | 45:15,18,21 46:4,6 | 130:20,22 131:4,6 |
| 148:18 206:14 | 67:18 88:15,16 | 46:15 48:4,6,11,19 | 131:9,13,16 |
| **splitting** 206:6,8 | 118:6,7 119:15 | 48:21,25 49:10 | 132:12 133:12,19 |
| **spot** 184:21 | 151:19,20 163:9 | 50:22 52:6,9,11,16 | 133:22 135:24 |
| **spring** 2:10 101:5 | 163:17 175:9,11 | 52:19 53:3,8 | 136:20,21,23,24 |
| **springdale** 19:10 | 175:19 187:10,14 | 54:25 55:13,16,18 | 137:4 139:14 |
| 21:17 78:17 80:13 | 204:10 206:2,5 | 57:14,16,17 58:2 | 140:8,9 141:4 |
| 92:19 154:9 164:1 | 239:6 252:20 | 58:21,23 59:18 | 146:13,15 147:1 |
| 169:16 202:17 | **starting** 34:20,21 | 60:12,12,19 62:12 | 148:5,8,25 149:4 |
| 203:13 222:6 | 37:16,20 | 62:16 63:23 64:15 | 150:7,9 151:2,7,10 |
| **springfield** 1:19 | **state** 5:7 188:11 | 64:15,16,17 65:6,7 | 152:10,21 153:2 |
| 3:5 13:3 102:14 | 298:9,10 305:4 | 65:9,12,13,15 66:9 | 154:7,10,10,11 |
| 104:15 114:10 | **stated** 213:23 | 66:18,20,24 68:4 | 157:5 158:2,3 |
| 204:7 211:12,15 | 305:10 | 68:12,20,21 69:14 | 161:24 164:12,18 |
| 248:22,23 249:19 | **statement** 102:17 | 73:1,17 74:19 | 164:19 165:1,2,15 |
| 249:21 287:18 | 103:17 150:18 | 76:1 77:5,6,9,21 | 165:17 166:22 |
| | 216:9,10 239:17 | 77:25 78:5,24 | 167:2,14 170:4,21 |

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

**[stone - sure]**

172:5 175:11,21
176:2 177:17
178:12 179:23
181:6 183:6
184:22 187:7,11
187:17,21 188:3
189:6 190:6,24
191:2 194:7,8,16
195:7 196:15,17
196:18 197:1,12
197:13,19 198:1
198:13,14,22
199:14,16,16,21
199:23 200:2,11
200:16,18,21
201:3,8,13,15,16
201:17,19 202:4,9
202:25 203:23
204:8,19,24
206:19 207:25
208:1,14,21 209:2
209:5,8 210:21,21
210:24 214:10
217:2,8,9 218:9
219:6 220:8,11,21
221:9,16 222:5,19
222:22,24 223:11
223:18 224:12
225:17 226:6,9,14
228:2,8,15,20,25
229:6,21 230:11
230:18,18,25
231:2,3,20,21,23
231:23 232:7
233:3,9,14,22,22
234:18 235:9
238:2,6,24 239:18
239:19 240:6,9,11
240:25 241:3
242:11,12,19,24
244:16,20 246:19

247:1,10 248:5,6
252:1,3,9,10,18
258:17 259:15
260:1,13,19 261:2
262:13 263:25
264:3 265:2,9,14
269:17,19 271:9
271:15,18 273:5
274:3,13,16 275:2
275:3,11 276:8,14
276:17 278:11,13
278:16,19 279:10
279:16 280:5,9,10
281:16,25 283:16
285:10,12,21
288:24 290:23
292:1,25 293:13
293:19 294:18
295:19,24 296:1
299:4,6,9,11,17,19
299:25 300:4,4,10
300:12,15 301:19
302:12
**stones** 64:13 65:3
66:11 124:11
208:10 209:10
265:10
**stood** 47:24
**stop** 24:11 49:24
50:2 189:15
196:15,17 265:8
289:14 294:23
**stopped** 33:1 94:3
204:7
**stops** 50:3
**store** 49:14 55:14
58:1,3,9 91:8,17
92:2 114:18 129:8
129:11,14 155:8,9
155:11,12,13
231:4,7,12

**storefront** 140:6
**stores** 113:20
**story** 11:23 45:2
**straight** 44:22
68:16,19 115:1
131:25 192:25
264:25
**street** 2:7,10,19
3:8 10:11,17 20:1
69:5 113:9 188:2
**strength** 124:8,13
**strictly** 138:8
**strike** 60:9 77:22
100:22 129:11
194:15 196:15
197:5 203:14
216:2 240:10
286:23
**stucco** 228:3,9
**stuff** 80:23 106:13
106:17 182:18
183:10 253:15
259:17 288:9
**stupid** 112:6
**stuttgart** 25:21
26:9 27:6 29:25
82:20 126:12
193:13,15 198:7
**subcontractor**
101:5
**subject** 218:6,13
**subsequently**
283:15
**substance** 251:6
**sue** 182:9 274:3
**sued** 119:20,22
275:19 289:1
**suggested** 167:6
**suggesting** 255:3
**suggestive** 81:24
82:4 232:4 286:7

**suggests** 286:6
**suing** 268:7
**suite** 1:19 2:11 3:4
**sulfur** 197:14
**summer** 45:14
233:2 253:13
288:24 290:24
301:20
**sunset** 29:18,19
**sunshine** 87:5
**supply** 35:18
222:5
**supposed** 78:24
160:24 161:9
169:23 201:25
219:12 251:3
259:2 279:19
286:8,9
**sure** 6:23 7:4
19:22 25:20 52:8
55:25 61:6 65:11
66:13 67:18 70:23
72:12 90:21,23
91:2 93:13,25
94:24 104:20
110:13 122:23,24
131:3 144:3,19
157:17 174:6
185:21 192:24
201:7 202:11,20
204:23 207:21
209:15,24 225:9
225:10 231:18
235:5 236:25
237:19,20 246:10
247:11 257:2
262:7 264:20
265:22 271:16,17
276:3,19 282:3
285:6 291:23

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

**[surmise - terminate]**

**surmise** 57:22
**surrounding** 211:12
**swann** 2:3
**swanson** 200:25 201:4 222:16,18 236:20,22 237:21
**switch** 56:9 96:4,6
**switching** 59:2 60:12 63:12
**swoop** 104:24
**sworn** 5:3 305:7

**t**

**t** 4:6 229:14,14 305:1,1
**table** 11:2 13:17 31:2 261:14
**tablet** 17:9
**take** 14:24 31:6 37:13 45:1 46:12 47:8 48:13 56:18 64:1,2 67:6 74:8 76:20 96:12 101:25 103:3,22 104:12 106:2,11 107:8 115:2 124:10 140:16,19 141:15 142:14 150:3,4 158:14 176:21 193:20 217:17 221:9 233:24 235:7 249:15 255:19 264:21 274:19 280:13 289:18,19 298:1 301:15 304:7
**taken** 1:15 32:17 155:23 305:8
**takes** 25:11 51:22 54:4

**talk** 7:1,1 28:10 35:8,25 36:11,23 40:8,11 44:7,9 46:17 49:17 52:7 60:3 62:19 63:3,8 63:10 67:14 73:7 74:4,15 76:10 90:1 94:17 101:16 109:18 161:23 166:8 170:10 177:3 189:16 224:18 228:10 230:1,4,10,15 233:5 244:25 245:2 249:3,21 251:7 254:25 263:10 265:2 266:22 267:13 270:24 275:10 281:12 282:6 294:3,9,10 298:4 299:14
**talked** 29:22 36:3 36:21 40:4,10 43:14,21,23 44:1 44:13 47:15,18 48:1 52:18 57:25 60:14 67:7 70:16 71:3 74:6 80:3 88:20 89:21,24 94:25 95:5 98:21 106:19 107:21,25 108:7 147:22 148:3,15 156:7 188:16 194:21 200:5,8 204:5,10 225:19 227:13 243:25 247:17 248:2 250:24 263:11 264:7 268:1 269:25

270:4 271:11,14 271:20,25,25 272:1,1 273:7 282:14,16 283:13 284:21 293:21 294:8 302:5
**talking** 18:21 25:18 46:14 52:25 58:14 61:15 68:12 68:15 79:20 102:9 109:16 117:7 132:15 139:8 160:21 182:6,7 190:3 209:17 219:15 224:11 237:3,4 238:23 245:13 247:7 267:3 279:9 290:22,23 293:8 296:21,24 301:2
**talks** 101:8,10 109:2
**tan** 269:13
**taylor** 3:8
**team** 270:24
**teamed** 270:21
**technical** 87:2
**telephone** 216:5 276:23 288:22
**tell** 6:24 19:12 21:19 24:6 28:22 32:20 33:1 36:6 50:25 51:21 52:2 52:13,16 54:6,21 57:5,19 59:4,6 61:19 67:3 69:16 69:18 74:18 78:9 79:15 81:25 85:24 87:16 88:14 89:3 95:14 109:24 110:15 111:23

143:3 150:6,9 163:16 173:18 179:12 183:16 188:23 195:21 199:22 203:15,23 206:24 223:17,18 224:24 228:16 233:14,15 238:13 240:18 246:24 248:14 249:17 250:7 255:14 265:6,18 267:8,21 268:3 275:16 276:22 277:2 283:3 284:10,13 284:15,17 286:13 287:3,14,25,25 292:23 297:22
**telling** 36:9 88:18 199:11 206:18 237:18 238:20 240:9,11,25 268:1 272:13
**temporary** 4:9 100:6
**ten** 11:19 20:12 112:5 134:10 223:8 243:19,20 292:5
**tennessee** 33:10 193:3,4 225:22 227:24 228:1 230:20
**term** 171:11,13 173:17
**terminate** 66:24 73:8 76:8 77:2 90:15 91:9 113:25 172:24 175:24 176:2 191:5,7 221:17 247:9

Bushman Reporting
A Veritext Company
800-556-8974
www.veritext.com

**Exhibit 1**

**[terminate - thought]**

278:13 295:1
**terminated** 72:25
77:17 90:17 93:21
94:2,14 171:18
191:12 209:14
210:19 222:17
231:20 276:18
299:4,19 302:13
**terminating** 90:6
252:3 271:14
275:11
**termination** 72:22
171:22 173:2
231:21 272:1
276:14 292:1,3
299:21
**terminology** 65:10
**terms** 149:1,2,4,5
197:19 244:17
**territories** 97:17
97:18 160:4
163:20 169:17,21
213:25 235:25
**territory** 92:9,16
93:12,17 145:21
151:12,13,14,15
151:16,18,25
152:23,24 159:8,9
159:14,16 160:8
164:1,4,5,7,9
165:8 168:10,15
168:16,19 169:5,8
169:12 170:19
171:1,6,7,8,10
173:10 175:3
176:8,23 181:12
181:14 187:8,15
187:18 189:14
199:14,22 201:22
201:24 202:5,7,9
202:25 204:11

207:11 211:10,17
211:20,24,25
212:12,13 213:16
213:18,19,20
214:1,4 226:2
227:1,17 234:24
235:9,18 236:1,17
236:18 237:19,21
238:2,6 253:5
**terry** 200:7,9,9,10
200:12,20 201:5
301:2
**testified** 5:3
119:24 122:1
254:12 301:21
**testify** 29:3
**testimony** 58:17
64:19 65:5,22
91:12 110:6,7
174:23 211:5,7
212:9 213:12
231:25 238:7
243:14 259:6
260:6 262:25
279:1 291:14,20
292:7,10
**texarkana** 178:3
**texas** 23:17
**text** 4:18,19,20
17:23 18:7,14
58:4 61:21,22
62:22 63:3,7
67:22,25 74:3,14
75:3,9,17,17,19,24
91:14 104:13
107:2 255:21
256:6,20,21 266:3
267:3 269:1,3,15
269:16 271:6
273:15,17 276:6
278:25 279:7,9

280:2 285:2
**texted** 266:7 269:3
270:10 273:18
276:7
**texts** 17:25 224:7
284:23
**thank** 255:14
304:8
**theirs** 130:7
**them's** 58:15
**thick** 108:13
**thing** 32:11 85:23
87:2 90:3 170:22
174:19 186:11
192:18 195:18
210:24 216:6
224:9 247:16
259:23 264:8
300:11,14
**things** 42:3 53:23
86:19 97:22 99:6
106:24 181:13
220:7,17 233:3
289:14
**think** 8:23 9:14
20:8 23:1,11
29:14,14 34:9
41:21 42:6 43:18
45:3 52:9,11
53:16 62:22 63:22
71:24 72:2 79:5,8
88:17 95:18 99:1
99:5,7 100:9
103:11 104:16
109:16 113:2
114:7,8 124:21
136:17 138:24
146:25 156:6
174:21,22 201:6
202:16,17 203:9
204:22 207:22

217:1 228:4
230:22 231:5
232:22,24 236:4
240:18 241:4
245:4 253:14
254:6,15 255:23
261:9 266:8
270:22 273:3,18
276:7 282:15
286:17 289:6
290:2 291:14,19
292:6,8 296:12
297:2 303:25
**thinking** 46:15
58:6 61:12 67:8
67:10 84:8 98:5
230:12 256:2
287:15 290:13
**third** 186:20 187:4
188:13 194:13,17
262:17
**thirds** 262:22
**thirty** 149:20
**thomas** 1:7 4:17
45:5,7,12,24 47:12
52:2 53:2,12
54:24 60:18 61:8
61:10,18 62:4,9,10
62:11,15,18 67:22
67:25 74:3,4,14,16
75:16 89:14 96:17
232:20 233:1
247:15,16 255:16
256:6 258:1,20
262:1,8 278:11
281:15 282:4
283:5,16 284:19
285:13 301:19
**thoroughly** 268:10
**thought** 76:14
134:17 147:24

Bushman Reporting
A Veritext Company

**Exhibit 1**

**[thought - train]**

| | | | |
|---|---|---|---|
| 206:15 213:4 | 225:24 228:8,10 | 225:10 227:21 | 148:16 156:3,5 |
| 222:14 225:12 | 244:11,25,25 | 233:18 237:5,21 | 164:18 178:2 |
| 239:25 263:22 | 247:17 250:16,18 | 241:11 243:16 | 188:21 197:2 |
| 288:19,21 292:22 | 250:20 258:25 | 245:8 249:6 261:8 | 199:5 203:17 |
| 293:24 | 259:1,3,21 263:20 | 271:16 273:11 | 204:9 205:7 |
| **thousand**  182:5 | 267:10 273:22,22 | 275:18 276:20,21 | 206:25 209:3,9,11 |
| **threaten**  274:3 | 274:19,21 275:1 | 278:18 281:13 | 210:20,24 221:1 |
| **threatened**  273:23 | 275:14 277:7 | 284:14 285:14 | 224:4 231:22 |
| **three**  15:9 16:11 | 279:25 282:19 | 290:5 295:20 | 244:3 246:25 |
| 23:13,20 24:3 | 284:25 285:2,7 | 296:7 300:1 301:3 | 254:20 263:22 |
| 30:22 32:13 38:23 | 286:25 288:9,24 | 301:8 302:19 | 264:8 265:17 |
| 39:2 59:17 65:3 | 290:9,19,25 291:1 | 303:7,13 305:9 | 266:2 267:25 |
| 66:10 111:21 | 291:4 293:9,20,22 | **timely**  137:18 | 268:23 269:22,24 |
| 129:16 141:22 | 294:3,8,10 295:23 | **times**  25:21 26:4 | 272:15 273:22 |
| 148:9,10 152:9 | 296:11,21 | 29:8 30:22 40:5 | 275:6 276:7 |
| 153:25 154:18 | **time**  5:12 29:2 | 48:20 72:25 85:17 | 279:10,12 280:8 |
| 158:19,19 171:14 | 34:2 37:3 42:22 | 87:23 88:4 91:16 | 282:9 283:6 |
| 203:22 229:24 | 44:17 45:14 46:5 | 116:11,12 179:22 | 284:12,18 287:8 |
| 256:3 270:8 | 48:25 53:5 55:5 | 229:21,25 255:25 | 287:20 289:4 |
| **throw**  173:17 | 58:11 66:11 71:25 | 292:5 | 290:11,12 292:4 |
| **thumb**  105:19,21 | 77:21,24 78:2 | **timothy**  2:6 | 297:23 |
| 106:11 107:7 | 88:22 90:11,14 | **tire**  41:3 | **toledo**  31:3,4 |
| **thunder**  262:3 | 91:5 92:17 95:15 | **tired**  15:9 24:1 | **tonight**  106:4 |
| **tied**  22:10 280:15 | 100:21,23 102:1 | 114:3 289:9,10 | **top**  7:1,2 96:15 |
| **tim**  5:14 27:11,12 | 102:23 103:4,8,13 | **today**  5:15 9:16 | 124:14,15 262:9 |
| 27:15 28:8,10 | 103:23 104:5 | 48:11 54:7 98:14 | 302:16 |
| 31:12 35:20 49:3 | 105:23,24 106:3 | 100:21,23 109:21 | **tough**  72:13 |
| 63:12,16,20 64:2 | 106:11 112:14 | 110:6 112:20 | **tour**  166:12 |
| 67:2 71:17 72:8 | 114:13 116:6 | 174:15 188:23 | **touring**  297:9 |
| 72:19,23 73:19,21 | 117:12 121:13,23 | 248:4,4 252:7,19 | **tournament**  31:3 |
| 73:24,25 76:10 | 127:4 137:6 | 292:10 303:19 | 31:19 |
| 89:22 94:15 95:20 | 147:10,22 150:13 | **told**  34:12 36:15 | **town**  114:16 142:4 |
| 96:13 107:1,6 | 151:13 159:3 | 36:16 44:11,16 | **tracy**  13:1 |
| 117:24 121:21 | 163:24 166:21 | 46:5,6,14 52:8,10 | **trade**  80:20 |
| 122:22 126:11 | 168:22 182:21 | 53:9,20 54:6,10 | 160:10 168:3 |
| 166:9 167:12,16 | 185:2 187:11 | 55:8 57:2,7 59:2 | **traded**  80:22 |
| 172:6 198:16 | 194:8,18,22 197:9 | 63:12,12 67:5,16 | **trades**  80:23 |
| 204:17 206:16 | 198:15 200:20 | 72:2 73:24 75:1 | **trailer**  26:24 |
| 209:1,9,11 214:24 | 201:12 204:8 | 75:10,13,15 76:12 | **train**  200:18 |
| 217:7,22 218:7,13 | 205:21 206:20 | 76:14 95:15,19 | 215:22 |
| 218:14 221:7 | 215:3 218:2 224:8 | 96:1 146:25 | |

Bushman Reporting          800-556-8974
A Veritext Company        www.veritext.com

**Exhibit 1**

**[trained - understand]**

trained  40:19
tran  304:7
transcript  4:24
  8:7
transfer  106:10
  171:25
travel  25:12 34:19
traveled  203:18
treat  153:22
treated  25:9
tri  236:23
trial  10:1 110:7
tricia  13:12
tried  90:12 164:11
trinidad  127:6
trip  31:6,8,11
  60:15 67:20,21,24
  74:1,13 97:8
trips  25:16 32:7,11
  32:16,18,19,25
  71:10 96:22 97:5
  97:7,10 263:21
tro  255:9 262:1
trouble  42:24 43:1
  75:14 77:25 78:3
  78:6 88:9 91:6
  119:10 146:12,13
  266:19 283:8
  286:20 289:13
  299:25 300:3
troy  58:15 59:18
  147:2,8,18,24
  148:3 181:16
  191:23 219:1
  233:12 252:2,4
  263:11 265:4,6,15
  265:25 266:5
  267:7 269:1,2,4,11
  269:25 270:12,17
  270:19 271:17,23
  272:2,4,8,12,21,22

273:6 275:6 279:8
  280:3 285:21,24
  287:5 288:8
  295:19,23
troy's  269:3
truck  19:3 84:11
  86:17 126:2
  183:19 184:1,4
  190:25
trucker  129:6
truckers  129:7
trucking  126:14
  129:5
truckload  83:24
  84:1,4,7 85:12,14
  85:20 131:5
  152:10 185:1
trucks  126:9,10
  219:19
true  6:10,14,17,20
  7:18 60:20,23
  239:13 244:8
  246:1 248:8
  291:18
truth  109:25
truthful  232:13,21
try  6:25 7:1 18:9
  41:3 48:5,14
  72:14 89:25
  146:16 158:20
  168:12,21 176:11
  181:18 189:16
  212:18 213:3,7
  218:20,22 251:19
  264:11 265:14,16
  289:23,24
trying  23:1 71:24
  79:7 81:25 99:5,6
  99:7 114:7 119:7
  142:23 147:11
  154:12 195:3

216:17 220:22
  224:1 231:5
  240:17 241:5,20
  241:25 254:16
  261:9 272:20
  273:9 282:21,24
  287:24 289:1,5,5,7
  290:4
tulsa  22:18,23
tuned  87:3
turkey  11:19
turkeys  11:15,16
turn  15:11 23:12
  23:14,16,23
  183:17 188:10
  223:18,19 250:11
  285:8 297:12
  301:14
turned  15:8 23:18
  23:21 61:1 151:6
  151:9
turnkey  7:10,14
twelfth  110:25
twice  9:14 21:9,10
  100:12 125:8
  198:19 230:12
  262:9
two  16:11 18:19
  23:15,16 25:17
  29:7 31:2 37:5
  59:17 60:13 64:13
  69:5 70:3 71:1
  81:20,23 90:19
  105:14 117:16
  137:13 148:14,15
  153:25 154:18
  159:23 165:4
  170:20 179:22
  214:8 218:3
  229:24 256:2
  262:22 265:10

270:8 286:22,24
  289:6 290:2
type  51:7 60:22
  108:25 125:11
  136:24 160:11,13
  162:16,20 168:8
  171:11 182:14
  194:3 216:11
typed  280:6
typically  37:9
  81:22 128:7
  166:20

**u**

u  23:7,8 30:16
  108:9 113:2
  210:16,16
ugly  267:22,23
uh  16:1 20:4 22:21
  23:9 30:12 33:12
  33:14 84:22 93:9
  123:14 185:10
  186:22 187:2
  279:15
ultimately  66:23
undercut  59:22
undercutting
  59:24 60:1
underline  235:16
  235:18
understand  42:14
  45:20 46:1 60:4
  64:3 65:11,20
  80:25 105:6 106:7
  121:6 144:3
  150:14,21 154:16
  156:12,13 166:25
  174:22 176:12
  178:15 204:22
  207:3 216:10
  240:21 241:20
  243:15 255:9

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

**[understand - waste]**

271:3 272:20
278:5 286:22
287:17 295:14
296:18 303:21
**understanding**
28:12 39:17 42:16
56:14 77:19 80:18
132:6 154:12
187:9,20 205:2
210:23
**understood** 127:7
187:6,16 204:20
208:25 244:24
254:15 279:20
**unich** 23:3,5,9
**united** 1:1
**units** 25:8
**unloaded** 79:25
**unreal** 270:22
**untruth** 143:22
144:5,14,20
**unusual** 256:11,13
**url** 107:2
**use** 15:23 44:21
105:20 106:16
125:6 126:21
152:13 167:10,19
185:20 216:13
245:16 264:21
**user** 125:25 146:5
186:17
**users** 189:2 192:4

**v**

**v** 1:6
**vacant** 178:5
**vacations** 217:17
**vague** 177:23
178:8,22 200:3
216:15 219:8
223:25 245:25

**valley** 229:17
**value** 173:5,6
**van** 235:12 236:14
**vb** 235:21
**vegas** 32:10,12
**vehicle** 14:13
**vendor** 233:21
**veneer** 65:15,18
65:19,24 125:24
127:13 151:2
178:11
**verify** 273:9
**verizon** 13:25 14:1
**version** 304:11
**vertically** 186:15
**vietnam** 111:8
**violation** 100:19
**virus** 32:14 183:10
**volume** 139:14
154:16

**w**

**w** 2:7,19
**wait** 75:17 78:21
130:4 158:19
250:5,7 263:19
272:7
**waited** 263:20
**waiter** 30:20
**waiting** 137:21
184:19 249:18
263:25
**waits** 30:18
**waives** 298:20
**wake** 19:4 282:24
**walk** 289:19
**walked** 89:16
198:19 250:2
**wall** 109:3
**walmart** 19:3
113:19,19,22
114:3,11,17,18

139:4
**want** 6:17 24:13
34:17 41:15,16,22
42:2,10 45:1
47:21,22 48:11,13
53:7,10 54:1
56:13 60:11 64:5
64:12,13 65:11
66:13,21 75:10,12
90:21,23 91:2
96:2,3 101:16,18
101:20 104:5,19
106:2,4 139:23
141:2 154:13
157:19,20,21,22
157:24 163:9
164:5,10,22
166:22,23 168:24
170:18,20 171:2
173:18 213:8
218:19 222:19
223:2 235:7 237:8
238:9 242:1,2,10
246:7 254:4
266:18 274:15
277:13 286:12,21
288:17 289:12
**wanted** 43:19
45:18,20,22 47:9
48:17,18 52:5,8,11
55:25 57:2 83:3
104:23 114:2
126:11 130:16
139:3 147:17
154:4 158:10,12
158:12 167:5,14
172:5 181:17
189:9,13 190:10
195:15 225:6,7
230:18,23 246:4
246:11,12,13

250:18 265:21
270:19 277:24
285:21
**wanting** 44:10
46:15 57:8 104:15
105:8 147:8
164:20
**wants** 140:4 141:1
141:11 272:24
**war** 170:23
**warehouse** 51:7
51:10 54:5 83:17
130:8,11,13,17,18
130:20,23,25
131:9,17,17,18,19
131:20,21 132:2,9
132:11,13,16,18
132:21 133:2,7,9
133:13,15,19,22
133:24 134:6,13
135:11,25 136:1,2
136:4,7,9,18,22
137:3 138:10,13
138:14,16,20,22
139:2,6,7 140:5
152:7,19 161:3,4
161:11 162:23,25
166:7 180:6,10,18
184:21 190:23
209:10 210:3
214:10 231:16
**warehouses**
129:16,20,21
130:2 132:5
134:15 135:2,20
281:6
**warn** 284:7,11
**warranty** 125:11
**warrior** 249:16
**waste** 66:11

Bushman Reporting
A Veritext Company
800-556-8974
www.veritext.com

**Exhibit 1**

**[water - workers]**

**water** 124:6,8,9,11
289:17
**way** 34:4 35:12
37:22 38:16 39:13
47:6 49:25 52:10
69:5 74:25 113:13
145:22 149:12
157:9 158:6,21
179:1 180:10
205:15 210:4
217:4 220:7
235:24 243:20
249:1,3 251:9
262:23 279:1
289:12
**ways** 125:3 156:3
156:4 165:4
**we've** 79:18 156:7
200:4
**website** 61:15
75:18,19,23
106:13 107:1
177:7,11 191:16
228:9 247:21
**wedding** 73:20,22
**week** 18:16 19:10
19:11 21:7,9
60:13 90:18
116:11 158:19,19
247:18 261:10
302:9
**weeks** 26:6 31:2
37:19,19 88:19
90:9,19 137:13
209:17
**wellstone** 26:20
**went** 15:12 25:21
31:10 32:10,23
35:11,15,16,18
44:25 47:15 54:8
54:24 56:9 60:14

83:24 87:23 88:24
114:4 115:6 116:5
118:2,11 145:6
152:22 154:9,10
163:25 188:6
189:17 194:21
195:24 197:17
204:9 205:16
210:2,4 222:15
227:4 253:7,12
262:23 275:23
287:15 288:7,9
290:16 291:1,3
293:21,25 294:10
**wes** 23:3,4,8 143:4
**west** 136:25
214:10
**westlaw** 298:24
**whatsoever** 53:5
**white** 236:24,25
237:10,15
**wide** 176:7
**wife** 33:5 73:14
89:24
**wife's** 33:7
**william** 1:7 4:17
44:14,15,22,23
45:5,7,11,24 47:11
47:11 52:2 53:2
54:24 55:8,9
60:18 61:8,10,17
62:4,9,10,11,18
67:22,25 74:2,4,14
74:15 75:1,10,16
89:14,15 96:17
232:20 233:1
247:14,14,16
255:16 256:11
257:25 262:1,8
278:11 281:15
282:4 283:4

284:19 285:13
301:18
**williams** 62:15
**willing** 103:1
104:14 299:18
**wing** 27:2
**wings** 26:14,16
**wiped** 277:19
285:7
**wipes** 285:7
**wire** 51:21 123:21
**wise** 287:25
**wish** 24:14 66:22
**witness** 4:2 12:14
69:20 99:14
101:19 104:18
171:19 216:4
242:4 291:17
292:12 303:22
305:6,16
**wives** 32:6 33:3
**wolff** 2:19
**wonderful** 7:3
**word** 8:18 107:8
297:24
**worded** 241:25
**words** 20:21 26:5
36:11 41:12,14
54:11,15 58:12
59:16 64:5,22
68:6 73:5 78:17
79:13 80:14,20,22
83:3 167:18
173:16 179:15
181:18 186:2
188:24 190:23
213:8 221:7
238:14,18 241:8
241:22
**work** 13:7 14:3,4,5
15:8 16:2 18:7,25

19:14,17 20:25
23:25 29:10 30:8
40:19 43:8 45:25
46:3 50:2,4 54:19
54:25 57:11,12
66:10,12 88:12
95:16,17 98:4,8,10
112:2,8 113:3,4,6
113:15,18 114:11
114:20 118:2
126:13 138:17,18
140:1 142:7,16
147:9,19 150:10
154:11 163:9
164:6 167:17
169:12 173:16
177:3 180:21
181:16,17 187:10
188:12 196:17
203:10 210:13
211:21 214:2
216:13 223:7,9
224:12 225:7,8,11
226:14,18 233:13
234:18 239:13,19
239:20 240:5,8,24
241:4,6,7,15
242:13,15 243:5
251:4 257:9
270:17,19 284:3
285:21
**worked** 46:8 87:21
116:4 122:14,25
151:22 200:14,15
200:17 205:8
249:14 288:10
293:10
**worker** 54:12,13
54:14 122:14
**workers** 30:7

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

**[working - zoom]**

**working**   40:14,15
40:17 43:3 46:6,8
50:7 54:17 66:14
79:22 88:23
112:10 114:3,17
114:18 176:19
187:10,14 196:13
216:19 256:9
278:16 284:6
**workload**   252:25
253:1,4
**works**   1:4 5:11
13:5 24:9,10
44:20 45:15 46:4
46:6 52:16,19
58:23 59:18 60:12
60:19 62:12,16
63:23 64:15,16,16
64:17 66:24 68:4
68:12,20 73:1
74:20 76:1 77:5,9
77:22,25 78:5,24
81:2,7 82:5 88:1
88:12,16,25 90:6
90:15 91:9 92:9
92:20 93:4,16,20
93:21 94:1,14
98:2,6,6,6 102:8
103:11 107:25
108:25 109:6
123:5,7 129:1,2
131:4,16 147:1
148:8 149:1,4
150:7,9 153:2
158:3 161:25
164:19 165:1,2,15
167:2,14 172:5
175:11,21 176:2
177:9 181:6 183:6
184:23 187:7,11
187:17 189:6

190:7 194:7,9,16
195:7 196:15,17
196:18 197:2,12
197:20 198:1,13
198:14 199:14,16
199:21 200:2,18
201:9,13,16,17,19
202:5,10,25
203:23 210:25
215:13 219:6
222:24 223:11,18
225:17 231:20,21
233:3,10,14,22
235:9 238:2,6,24
239:18 240:6,9,11
240:25 241:3
242:11,12,19,24
244:16 247:2,10
248:5,6 252:1,3,10
258:17 259:15
260:1,13,19 261:2
265:2 269:19
271:15 274:14,16
275:2,3,11 276:15
276:17 278:12,13
281:16,25 285:10
285:12,21 288:25
290:23 292:1,25
293:13,20 294:18
295:20,25 296:1
299:4,6,9,11,19
300:4,12,15
302:12
**world**   147:24
**worry**   264:10,22
**worse**   8:17 273:19
**worth**   253:3
**wound**   80:14
**wrightsville**   10:9
**write**   236:2

**writing**   162:10,14
305:11
**written**   162:3,4
172:23 181:3,21
**wrong**   64:8 92:19
156:1 167:4
257:21,25 258:2
259:17 281:23,24
293:1
**wrote**   118:10
294:17

| x |
| --- |

**x**   4:1,6 17:17
160:20

| y |
| --- |

**yard**   19:20
**yards**   51:2
**yeah**   6:3 16:9
17:16 25:6 26:25
29:17,20 30:15
32:23 35:12 37:7
40:22 49:5 50:1
50:23 52:22 56:22
57:11 59:14 73:9
73:14,19 74:25
83:23 85:2 87:13
93:2 97:13 99:7
107:17 111:12
114:18,25 116:6
116:22 117:15
124:20 136:17
138:12 142:1
143:1 149:2 151:6
156:2 160:24
161:3,22 164:24
171:14 180:18
182:1 186:18,22
186:25 189:23
190:5 193:9
199:18 203:2

204:15 215:24
220:6 223:5 232:6
234:10 236:23
237:25,25 243:10
262:10 264:16
274:8 277:18
286:3 289:10,22
292:18 296:19
**year**   11:17 30:22
32:10 111:4
125:14 168:4
173:15 175:8,12
209:19,21
**year's**   137:12
**years**   13:14 15:6,9
16:11 23:13,18,20
24:4 25:2,3,17
27:5,14,21 32:13
33:2,22,24 37:5
42:19,22,23 54:8
62:14 72:6,7
82:12 103:16
112:5 135:22
139:11 145:24
146:18 159:4
171:14 178:4
182:23 209:18
214:9 223:8
227:13 232:16
243:20 277:19
**yep**   76:19 281:7
**ys**   31:9

| z |
| --- |

**zero**   16:23 91:18
269:19
**zoom**   2:9,14,18,18
3:7,12,12 56:1
88:9 104:3 253:20

Bushman Reporting
A Veritext Company

800-556-8974
www.veritext.com

**Exhibit 1**

```
                  Federal Rules of Civil Procedure

                              Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the

deponent or a party before the deposition is

completed, the deponent must be allowed 30 days

after being notified by the officer that the

transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to

sign a statement listing the changes and the

reasons for making them.

(2) Changes Indicated in the Officer's Certificate.

The officer must note in the certificate prescribed

by Rule 30(f)(1) whether a review was requested

and, if so, must attach any changes the deponent

makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.
```

**Exhibit 1**

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

**Exhibit 1**